**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| IN RE INDIVIOR PLC SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No.  3:24-cv-554 (HEH)<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ......................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 5

III.    PARTIES ...................................................................................................... 5

IV.     SUBSTANTIVE ALLEGATIONS ................................................................ 7

        A.      Background ....................................................................................... 7

        B.      Federal Legislation Relevant to Claims ................................................. 9

        C.      Statements Concerning SUBLOCADE and PERSERIS During the Class Period 11

        D.      The Truth Emerges ............................................................................ 15

        E.      Confidential Witnesses Confirm that Defendants Mislead the Public During the
                Class Period Concerning the Performance and Prospects of PERSERIS ............. 17

V.      FALSE AND MISLEADING STATEMENTS ................................................ 24

VI.     LOSS CAUSATION ................................................................................... 37

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................... 37

        A.      Crossley ......................................................................................... 37

        B.      Simkin ........................................................................................... 39

VIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS ......................................... 41

COUNT I
        Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
        Thereunder Against All Defendants ...................................................... 44

COUNT II
        Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ..... 47

IX.     PRAYER FOR RELIEF .............................................................................. 48

X.      DEMAND FOR TRIAL BY JURY .............................................................. 49

Lead Plaintiff David Hanshew ("Plaintiff"), by and through undersigned counsel, brings this federal securities class action individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Indivior PLC ("Indivior" or the "Company"), analysts' reports and advisories about the Company, an investigation conducted by Plaintiffs' attorneys, including interviews with numerous confidential witnesses ("CWs") who are former Indivior employees, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Indivior securities on NASDAQ or other exchange based in the United States between February 22, 2024 and July 8, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officers.

---

[1] Any emphasis in any quoted language below is added, unless otherwise indicated.

2.     Indivior is a global pharmaceutical company that develops, manufactures, and markets drugs to treat opioid use disorders ("OUD") and serious mental illnesses.  Indivior's flagship drug is SUBLOCADE, a monthly injection used to treat moderate to severe OUD.  In 2023, sales of SUBLOCADE generated net revenue of $630 million, which accounted for 58% of Indivior's net revenue in 2023.

3.     Until July 2024, Indivior also sold PERSERIS, which is an injection to treat schizophrenia in U.S. adults.  In 2023, PERSERIS sales generated net revenues of $42 million.  Indivior intended that growing PERSERIS sales would diversify its revenues.

4.     In October 2023, Indivior launched OPVEE, a nasal spray to reverse opioid overdoses on an emergency basis.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the financial prospects of Indivior's top two drugs—SUBLOCADE and PERSERIS—and thus overstated Indivior's anticipated revenue and other financial metrics.

6.     With respect to SUBLOCADE, Defendants knew or recklessly disregarded that forecasting when the negative impact of legislatively-driven Medicaid disenrollments on sales of SUBLOCADE would subside was (as Defendants themselves eventually admitted) "incredibly, incredibly difficult," "very complicated," and "very tough."  Thus, Defendants knowingly or recklessly misled investors when they stated with certainty during the Class Period that such negative impact "will" resolve and "go away" after the first half Indivior's 2024 fiscal year when in fact they had no clear basis to know when that impact would resolve.  Likewise, Defendants knowingly or recklessly misled investors when they stated during the Class Period that they remained confident in their net revenue guidance for SUBLOCADE in fiscal year 2024 when they had no basis for that confidence.  In short, while Defendants identified Medicaid disenrollment as

a risk to SUBLOCADE sales, they falsely stated during the Class Period that they were able to forecast the impact of that risk, and that they knew with certainty when that risk would subside when, in fact, as Defendants finally conceded on July 9, 2024, forecasting the impact of the Medicaid disenrollment risk was "incredibly, incredibly difficult," "very complicated," and "very tough" because of the chaotic process of Medicaid re-enrollment.

7.      With respect to PERSERIS, Defendants knew or recklessly disregarded that, during the Class Period, PERSERIS had never met its annual sales goals, Indivior sales representatives were finding that PERSERIS was challenging and tough to sell, and clinicians prescribing PERSERIS were providing *negative* feedback to multiple Indivior sales representatives concerning PERSERIS's product features as compared to the product features of UZEDY (a directly competing drug).  Multiple confidential witnesses confirmed these facts; that PERSERIS never hit its annual sales goals, that PERSERIS was a challenge to sell, and that clinicians were providing negative feedback to sales representatives concerning its product features, including as compared to the product features of UZEDY.  Thus, Defendants knowingly or recklessly misled investors during the Class Period when they stated that PERSERIS continued to receive positive prescriber feedback concerning its product features, and likewise when they repeatedly stated during the Class Period that they remained confident in their guidance for PERSERIS for net revenue in 2024 and peak net revenue.

8.      During the Class Period, Defendants Crossley and Simkin sold a substantial number of INDV shares on the London Stock Exchange, thus demonstrating a motive for making materially false and misleading statements during the Class Period.

9.      The Class Period begins on February 22, 2024, when Indivior announced its fourth quarter ("Q4") and full year ("FY") 2023 results and provided the following net revenue guidance

3

for FY 2024: (i) SUBLOCADE net revenue guidance in a range of $820-$880 million; and (ii) PERSERIS net revenue guidance in a range of $55-$65 million.  Indivior reaffirmed the foregoing net revenue guidance, in whole or in part, multiple times in April, May, and June 2024, accompanied by multiple optimistic and positive statements about the competitive positioning and sales potential of SUBLOCADE and PERSERIS, as detailed below.

10.    On July 9, 2024, before markets opened, Indivior issued a press release "announc[ing] a business update encompassing [its] outlook for [second quarter ('Q2')] and FY 2024 financial performance" ("July 9 Update").  The July 9 Update reduced SUBLOCADE net revenue guidance for 2024 to $765-$805 million from the previous range of $820-$880 million. The July 9 Update also shocked investors by announcing that Indivior would immediately cease all sales and marketing of PERSERIS on the ground that "there is no longer a path forward for PERSERIS that is financially viable."  The July 9 Update was issued just over one month after the Jefferies Global Healthcare Conference on June 5, 2024, at which Defendant Crossley reiterated the midpoint of $850 million for Indivior's net revenue guidance for SUBLOCADE in 2024, and forecast peak net revenue for PERSERIS of $200 million to $300 million.

11.    Following the July 9 Update, and further commentary by Defendants on a conference call that same morning before markets opened, Indivior's stock price fell $5.15 per share, or 33.57%, to close at $10.19 per share on July 9, 2024.

12.    As a result of Defendants' materially false and misleading statements during the Class Period, and the precipitous decline in the market value of the Company's securities upon the disclosure of the truth on July 9, 2024, Plaintiff and other Class members suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Indivior is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' misconduct took place within this Judicial District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

17.    Plaintiff, as per his financial interest chart, certification, and declaration attached as Exhibits A, C and D, respectively, to the Declaration in Support of Motion of David Hanshew for Appointment as Lead Plaintiff and Approval of Selection of Counsel (ECF Nos. 20-1; 20-3; 20-4), acquired Indivior securities at artificially inflated prices during the Class Period, and was damaged upon the revelation of the alleged corrective disclosures.

18.    Defendant Indivior is organized under the laws of England and Wales with principal executive offices located at 10710 Midlothian Turnpike, Suite 125, North Chesterfield, Virginia 23235.  Since June 12, 2023, the Company's ordinary shares have traded in an efficient

market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "INDV."  The Company's ordinary shares also trade in an efficient market on the London Stock Exchange ("LSE") under the same ticker symbol.

19.     Defendant Mark Crossley ("Crossley") has served as Indivior's Chief Executive Officer at all relevant times.

20.     Defendant Ryan Preblick ("Preblick") has served as Indivior's Chief Financial Officer at all relevant times.

21.     Defendant Richard Simkin ("Simkin") has served as Indivior's Chief Commercial Officer at all relevant times.

22.     Defendants Crossley, Preblick and Simkin are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Indivior's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Indivior's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Indivior, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Indivior and the Individual Defendants are collectively referred to herein as "Defendants."

6

### IV.    SUBSTANTIVE ALLEGATIONS

#### A.    Background

25.    Indivior is a global pharmaceutical company that develops, manufactures, and markets drugs to treat OUD and serious mental illnesses.

##### i.    SUBLOCADE

26.    Indivior's flagship drug is SUBLOCADE, a monthly injection containing a medicine called buprenorphine that is used to treat moderate to severe OUD.  In 2023, sales of SUBLOCADE generated net revenue of $630 million, which accounted for 58% of Indivior's net revenue in 2023.

27.    During the Class Period, SUBLOCADE's primary direct competitor was a long-acting injectable buprenorphine product marketed as BRIXADI in the United States and as BUVIDAL outside the United States.

28.    Because most individuals suffering from OUD are not employed or do not have employer-based health coverage, Defendants advised that approximately 70% of the patients that use SUBLOCADE are reimbursed through Medicaid (the federal program providing healthcare coverage to low-income individuals).

##### ii.    PERSERIS

29.    During the Class Period, Indivior also sold PERSERIS, which is an injection used to treat schizophrenia in U.S. adults. In 2023, PERSERIS sales generated net revenue of $42 million for Indivior.  Indivior launched PERSERIS in order to diversify its revenue.

30.    PERSERIS was sold through Indivior's Behavioral Health Division, which had a sales organization that was separate from the sales organization of the division that sold SUBLOCADE.

7

31.    PERSERIS uses an ingredient called risperidone that is administered monthly by subcutaneous injection in the abdomen or the back of the upper arm by a healthcare provider using an *18-gauge* needle.[2]

32.    To prepare an injection of PERSERIS, a healthcare provider must mix a prefilled liquid syringe and a prefilled powder syringe, as per instructions in the prescribing information for PERSERIS.[3]

33.    The direct competitor for PERSERIS during the Class Period was a drug called UZEDY, manufactured by Teva Pharmaceuticals, Inc. ("Teva").  UZEDY also uses risperidone as its ingredient, and is administered every 1 or 2 months by subcutaneous injection in the abdomen or back of the upper arm by a healthcare provider using a *21-gauge* needle. UZEDY is prepared as a single-dose prefilled glass syringe, and thus does not require any mixing prior to administration.[4]

34.    The 21-gauge needle used to inject UZEDY is thinner than the 18-gauge needle used to inject PERSERIS, and thus a UZEDY injection would be meaningfully less likely than a PERSERIS injection to be reported by patients as painful.  For example, a study published in November 2015 entitled "*The importance of needle gauge for pain during injection of lidocaine*" found that, after receiving three injections of 3 ml 1% lidocaine subcutaneously on the abdomen using needles of different gauges, respondents verbally reported the thinnest (*i.e.*, highest gauge)

---

[2] Subcutaneous injections are injected into the fatty tissue just below the skin.  In contrast, intramuscular injections are injected into muscle, which is deeper than skin.

[3] *See* PERSERIS Prescribing Information at 4-7 (https://www.perseris.com/Downloads/USPI.pdf).

[4] *See* UZEDY Prescribing Information at 2-3 (https://www.UZEDY.com/globalassets/UZEDY/prescribing-information.pdf).

needle as least painful as compared to the thicker (*i.e.*, lower gauge) needles.[5] The results of this study matched the findings in an earlier article published in September 2007 entitled "*Does Needle Size Matter?*" reporting that "[n]eedle gauge has been shown to significantly affect the frequency of pain during needle insertion into the skin of human subjects," with "insertion of a 27- or 28-gauge needle . . . [having] an approximately 50% chance of being reported as painful, which was significantly greater than insertion of a 31-gauge needle . . . which had a 39% chance of causing pain."[6]   As further discussed below, multiple CWs corroborated that healthcare providers complained about the thicker 18-gauge needle used to inject PERSERIS and that it was more painful for patients.

### B.      Federal Legislation Relevant to Claims

35.      There are several federal statutes relevant to the claims in this action. *First*, at the start of the COVID-19 pandemic, Congress enacted the Families First Coronavirus Response Act ("FFCRA"), which required Medicaid programs to keep people continuously enrolled through the end of the COVID-19 public health emergency ("PHE") in exchange for enhanced federal funding. However, as part of the Consolidated Appropriations Act ("CAA"), signed into law in December 2022, Congress de-linked the continuous enrollment provision from the PHE, thus ending continuous enrollment on March 31, 2023, which led states to begin disenrolling people from Medicaid. States began disenrolling people from Medicaid in different months, with some states beginning disenrollments in April 2023, others in May or June 2023, and yet other states in July 2023 or later.  During the unwinding of the continuous enrollment provision, millions of people

---

[5] *See* https://pubmed.ncbi.nlm.nih.gov/26595751/.

[6] *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC2769648/.

were expected to lose Medicaid.  But not everyone who lost Medicaid became uninsured—some individuals were eligible for re-enrollment.

36.    *Second*, the Inflation Reduction Act of 2022 ("IRA") requires the Secretary of the U.S. Department of Health and Human Services ("HHS") to, among other things, negotiate the price of a set number of high-spend Medicare drugs and biologicals per year starting in 2026. The IRA also requires manufacturers of certain drugs covered by Medicare Part B (administered by physicians) or Part D (retail prescription drugs) to pay rebates to Medicare if they increase prices faster than inflation.

37.    Under the IRA, the negotiation-eligible drugs are drugs without generic or biosimilar equivalents, which are covered under Medicare Part D or Part B, and are among the highest-spend Medicare-covered drugs. Excluded from negotiation are low-spend Medicare drugs for which total spending under Medicare Parts B and D is less than $200 million in 2026 (increased by inflation in subsequent years).

38.    On August 29, 2023, the Centers for Medicare & Medicaid Services ("CMS"), the division of HHS responsible for administering the Medicare and Medicaid programs, published a list of the first 10 drugs covered under Medicare Part D selected for price negotiation based on total gross covered prescription drug costs under Medicare Part D and other criteria as required by the law.  CMS advised that, for the time period between June 1, 2022 and May 31, 2023, about 8,247,000 people with Medicare Part D coverage used those 10 drugs to treat a variety of conditions, such as cardiovascular disease, diabetes, autoimmune diseases, and cancer. The selected drugs accounted for $50.5 billion in total Part D gross covered prescription drug costs (an average of $5 billion per drug), or about 20% of total Part D gross covered prescription drug costs during that time period.

39.     As early as February 2024, consultants were opining that aside from the direct impact that the IRA would have on the prices of drugs that become subject to negotiation, the IRA would also have indirect impact and spillover effect on the pricing of other drugs not subject to direct price negotiation.[7]

**C.     Statements Concerning SUBLOCADE and PERSERIS During the Class Period**

**i.     Q4 and FY 2023 Results**

40.     The Class Period begins on February 22, 2024, when Indivior issued a press release during pre-market hours announcing its Q4 and FY 2023 results.  The press release provided net revenue guidance in fiscal year ("FY") 2024 for (i) SUBLOCADE in a range of $820-$880 million, and (ii) PERSERIS in a range of $55-$65 million.

41.     That same day, Indivior held an earnings call ("Q4 2023 Call") concerning Q4 2023 and FY 2023 results. During the Q4 2023 Call, Defendant Crossley stated in relevant part:

> Looking ahead to 2024, *we expect another year of strong net revenue growth led by SUBLOCADE*. Taking the midpoint of our guidance, $850 million of SUBLOCADE net revenue implies 35% year-over-year growth, marking another major step towards our target of greater than $1.5 million in peak net revenue.

42.     Concerning PERSERIS, Defendant Crossley stated:

> Moving now to PERSERIS, it's fair to say that we did face some significant challenges in the last couple of quarters of 2023 as a result of competitive pressures from a well-funded new market entrant. *We nevertheless continue to believe in the potential of th[is] important medicine for schizophrenia based on its differentiated clinical profile and strong feedback we get from clinicians*. Furthermore, since we expanded the field force nationally in 2022, we've seen increases in market coverage and penetration.

---

[7] *See "The Inflation Reduction Act's Ripple Effects on the U.S. Health Care Ecosystem*, February 5, 2024 (https://www.bcg.com/publications/2024/inflation-reduction-acts-effects-on-us-health-care-ecosystem).

43.     Concerning SUBLOCADE, Defendant Preblick stated that our "full-year 2024 net revenue expectations for SUBLOCADE are $820 million to $880 million." He added:

Our SUBLOCADE guidance range contemplates a ***modest impact*** from the Medicaid re-enrollment similar to full-year 2023 and we will continue to monitor this dynamic during the year. Overall, we remain confident in meeting our net revenue target of $1 billion run rate exiting 2025 and our longer-term net revenue target of greater than $1.5 billion.

44.     Concerning PERSERIS, Defendant Preblick stated:

For PERSERIS, our full-year 2024 net revenue expectations are $55 million to $65 million, which represents 43% growth at the midpoint. As Mark mentioned, we remain confident that PERSERIS' ***differentiated profile*** supports our peak net revenue expectations of $200 million to $300 million.

### ii.     Q1 2024 Results

45.     On April 25, 2024, Indivior issued a press release announcing its first quarter ("Q1") 2024 results.  The press release downplayed headwinds impacting SUBLOCADE's growth while reaffirming the Company's FY 2024 guidance, stating, in relevant part:

Our [Q1] results reflect continued double-digit top-line momentum led by SUBLOCADE (buprenorphine extended-release). The underlying demand for this transformative treatment for moderate-to-severe [OUD] remains strong and our strategy to expand prescribing in the justice system is delivering excellent results. SUBLOCADE's reported growth was, however, ***adversely impacted by transitory items, including accelerating Medicaid patient disenrollments***, a cyberattack on the largest U.S. medical claims processor and abnormal trade destocking. ***We fully expect these items to resolve as the year progresses and, combined with the benefits of recent commercial investments behind SUBLOCADE, we anticipate an acceleration in our top-and bottom-line growth over the remainder of 2024, particularly in the second half. We therefore reconfirm our 2024 guidance, including SUBLOCADE net revenue of $820m to $880m.***

46.     That same day, Indivior held an earnings call ("Q1 2024 Call") concerning Q1 2024 results.  During the Q1 2024 Call, Defendant Crossley stated in relevant part:

[L]ed by SUBLOCADE, we delivered another quarter of solid double-digit top-line growth in the first quarter. Total net revenue grew 12% versus year-ago quarter to $284 million . . . . ***Turning to SUBLOCADE, we delivered year-over-year net revenue growth of 36% in the first quarter, which is in line with our [FY] growth***

12

*expectations*. SUBLOCADE's sequential net revenue growth of 2% was lower than we planned. We believe growth in dispenses were negatively impacted by two external forces, including a higher-than-expected rate of Medicaid patient disenrollments and the cyberattack at Change Healthcare.

*Let me provide more color on how each of these impacted SUBLOCADE's growth in the quarter and why we remain confident in our [FY] 2024 net revenue guidance*. First, the most recent data on Medicaid renewals indicates a higher-than-expected number of patient disenrollments of over 20 million. Recall at the peak during COVID, over 90 million patients were enrolled in Medicaid. This is particularly relevant in opioid use disorder treatment as the nature of the disease means that approximately 70% of our patients are covered by Medicaid. *The impact of this disenrollment process will annualize at the end of June and therefore this headwind should begin to subside as we move through the second half of the year. Although the impact on SUBLOCADE's growth in the quarter was larger than expected, Medicaid disenrollment was a known dynamic*.

47.     Defendant Crossley later added:

With . . . *Medicaid renewal annualizing at the end of June, we look forward to subsiding impacts from these transitory items, which we believe are masking the strong underlying demand for SUBLOCADE. In fact, early dispense trends in April are tracking back to the growth levels we had expected in [Q1]*.

48.     Concerning PERSERIS, Defendant Crossley stated:

Turning to PERSERIS, while competition has intensified in the risperidone LAI [long-acting injections] category, once-monthly risperidone products are gaining share rapidly, and the overall category is still growing. *Against this backdrop, we continue to highlight PERSERIS' unique product profile, which continues to result in positive anecdotal prescriber feedback on product performance*. Sequential dispense growth was 10%, *not only underscoring the good underlying momentum we're seeing, but also representing an acceleration from previous quarters*. We expect to augment our efforts with PERSERIS at the publication of real world evidence studies in the second half of 2024. *Taken together, we remain confident in our [FY] net revenue guidance for PERSERIS and expect accelerating net revenue moving forward*.

49.     Subsequently, concerning SUBLOCADE, Defendant Preblick stated:

Medicaid disenrollment dynamics had a disproportionate impact on our company as more than two-thirds of SUBLOCADE patients are covered by Medicaid. This impact accelerated in Q1, beyond the low single-digit headwind we had seen in prior quarters. *Looking ahead, we expect this trend to begin subsiding in the second half of 2024, as [Defendant Crossley] noted*.

13

50.    Concerning PERSERIS, Defendant Preblick stated:

Moving to PERSERIS, reported net revenue of $11 million was up 38% versus the prior year and down 8% sequentially, due to low single-digit million destocking in the quarter. Encouragingly, dispenses are up 10% sequentially. *We remain confident in meeting our [FY] net revenue guidance of $55 million to $65 million.*

51.    Defendant Preblick concluded his prepared remarks stating:

We have discussed a number of the external dynamics which impacted SUBLOCADE results in the quarter. *Based on our expectations for a resolution of these transitory headwinds* and continued strong business execution, we remain comfortable with our guidance elements for [FY] 2024, *including SUBLOCADE net revenue of $820 million to $880 million*.

52.    Later during the Q1 2024 Call, after an analyst asked Defendant Crossley to elaborate further concerning "growth headwinds from change in Medicaid," Crossley responded that "we have a continuing headwind of . . . the Medicaid renewal continuing, through to the half year where then we'll annualize that, *and that headwind will go away in the back half*."

### iii.    The May 2024 Presentation

53.    On May 23, 2024, Indivior management gave a presentation ("May 2024 Presentation") in New York City to analysts entitled "Transforming Lives and Driving Value Creation."   Defendants Crossley, Preblick and Simkin all participated in the May 2024 presentation.

54.    In a slide presented by Defendant Crossley, the May 2024 Presentation indicated that PERSERIS sales would "diversify" Indivior's revenue.

55.    In slides presented by Defendant Simkin, the May 2024 Presentation (i) touted that PERSERIS was capturing a disproportionate share of "NBRx" or "New-to-Brand Prescription" (*i.e.*, a patient's first prescription for a particular drug) for long-acting injectables ("LAI") drugs to treat schizophrenia; and (ii) projected peak net revenue for PERSERIS in 2024 of $200 million to $300 million.

14

56.     In a slide presented by Defendant Preblick, the May 2024 Presentation reaffirmed prior FY 2024 net revenue guidance for SUBLOCADE of $820 million to $880 million, and for PERSERIS of $55 million to $65 million.

### iv.    June 2024 Presentation

57.     On June 5, 2024, Defendant Crossley gave a presentation ("June 2024 Presentation") entitled "Transforming Lives and Driving Value Creation" as part of the 2024 Jeffries Global Healthcare Conference.  In a slide presented by Defendant Crossley, the June 2024 Presentation reaffirmed prior FY 2024 net revenue guidance for SUBLOCADE of $820 million to $880 million, and for PERSERIS of $55 million to $65 million.

### D.    The Truth Emerges

58.     On July 9, 2024, during pre-market hours, Indivior issued a press release "announc[ing] a business update encompassing [its] outlook for Q2 and FY 2024 financial performance[.]"  The July 9 Update reduced FY 2024 net revenue guidance for SUBLOCADE to $765-$805 million from the previous range of $820-$880 million. The July 9 Update also advised that the Company would immediately cease all sales and marketing of PERSERIS.

59.     The July 9 Update explained that the reduction in guidance of SUBLOCADE net revenue for FY 2024 resulted in major part from accelerated Medicaid disenrollments at the end of Q2 2024 that disproportionately impacted SUBLOCADE. The July 9 Update further explained that Indivior was ceasing the marketing and sale of PERSERIS due "to the highly competitive market and impending changes that are expected to intensify payor management in the treatment category in which PERSERIS participates," which led Indivior to conclude that "there is no longer a path forward for PERSERIS that is financially viable."

15

60.     After issuing the July 9 Update, Indivior held a conference call ("July 9 Call") to discuss the July 9 Update.  During the July 9 Call, an analyst questioned Defendants on their visibility into the impact of Medicaid disenrollment on SUBLOCADE sales:

> Thank you very much for taking my questions. My first one was on the Medicaid disenrollment dynamic. ***Just wanted to understand what visibility you have on the timing.*** If you could help us how -- the complexity around the procedures to reenroll patients basically, what do they have to go through? How long does it take? I guess, in a nutshell, how complicated it is for patients who dropped to get back on coverage on Medicaid.

61.     Defendant Crossley responded by conceding for the first time that the impact of Medicaid disenrollment on SUBLOCADE sales is "***incredibly, incredibly difficult to forecast***":

> I think what we see with regards to Medicaid reenrollment visibility on timing. ***I think the first part of this is, it is <u>incredibly, incredibly difficult</u> to forecast with what we're seeing.*** What we're seeing is states finalize their renewals, you see patients holding out to the last date, almost in anticipation of losing it. When people are f[alling] out of coverage, there's an estimate that 69% of those falling out of coverage are due to procedural reasons. ***And so the time and pace at which they're re-enrolling, it's just <u>very complicated</u> to forecast that***.
>
> And then we've seen the extension of the renewal process, which is pushed into Q3 for eight of the 11 remaining states with Alaska and D.C. in 2025 in New York not scheduled. ***So a lot of lack of precision and inability to forecast what is really a one-off item that is kind of unprecedented with no analog***. ***So very tough to forecast this***.
>
> When it comes to SUBLOCADE and the churn of patients, I think you're right. If I think about churn when it comes to disruption and re-enrollment, ***in this very unique patient base, that's a bit more chaotic than an average Medicaid patients [*sic*], the process of managing paperwork to reenroll is not as normal of a process as it would be for you or me***. And so that process can be extended and take longer than we expect.

62.     Thereafter, another analyst inquired into "the changes in the [IRA]," and asked Defendants to "provide a little bit more detail on why that is specifically affecting" PERSERIS. Defendant Crossley responded that the IRA is "resulting in increased management of the category, which is impacting both price as well as volume as the category is managed with PERSERIS's

16

*lack of scale in the market*," and therefore, with respect to PERSERIS, "what we see is not getting to profitability for a long period of time that we believe makes the product not financially viable."

63.   Following the July 9 Update and the July 9 Call, Indivior's stock price fell $5.15 per share, or 33.57%, to close at $10.19 per share on July 9, 2024.

64.   As a result of Defendants' materially false and misleading statements during the Class Period, and the precipitous decline in the market value of the Company's securities upon the disclosure of the truth on July 9, 2024, Plaintiff and other Class members suffered significant losses and damages.

**E.   Confidential Witnesses Confirm that Defendants Mislead the Public During the Class Period Concerning the Performance and Prospects of PERSERIS**

65.   Multiple confidential witnesses confirmed that, contrary to Defendants' statements, PERSERIS was failing to compete successfully with its direct competitor, UZEDY, because prescribers preferred UZEDY to PERSERIS because, among other reasons, PERSERIS required a thicker needle for injection (*i.e.*, 18-gauge) than UZEDY (21-gauge), PERSERIS did not come pre-mixed like UZEDY did, and PERSERIS had fewer dosing options than UZEDY.[8]

**i.   Confidential Witness-1**

66.   CW-1 worked for Indivior out of California as an Area Sales Director from August 2020 to July 2024 managing a team of Institutional and Clinical Specialists that sold PERSERIS. She reported to Machado.

67.   CW-1 explained that Indivior's internal sales goals for PERSERIS were presented in annual incentive plans distributed to Indivior's sales force. The incentive plan outlined the sales goals that sales representatives must meet in order to receive their bonus.

---

[8] To protect their anonymity, all Confidential Witnesses are given she/her pronouns.

68.     CW-1 further explained that Tyson and Defendant Simkin, negotiated the sales goals for PERSERIS, and that the incentive plans with the sales goals were finalized by Defendants Simkin and Preblick.  The incentive plans were then passed down by Tyson to Machado and his other reports. As an Area Sales Director, CW-1 typically received an email with the incentive plan attached as a PowerPoint presentation that she was responsible for presenting to her team.

69.     CW-1 stated that the sales goals in the incentive plans were discussed both in one-on-one meetings with field sales representatives, and in broader meetings with other Sales Directors and Tyson.  Meetings with PERSERIS leadership to discuss sales goals were held 3-4 times per year, which were typically attended by Tyson, and occasionally by Simkin.

70.     CW-1 stated that she never hit her individual annual sales quotas for PERSERIS, and that PERSERIS sales never hit its annual national sales goals during her time working for Indivior.  The failure of PERSERIS to meet annual sales goals was discussed at the meetings attended by Tyson, and occasionally by Simkin.

71.     CW-1 further stated that PERSERIS sales in 2024 were nowhere near the approximately $60 million midpoint for revenue projected for 2024.

72.     CW-1 explained that she regularly used a web-based sales performance management platform called Javelin to set and manage sales goals as well as analyze territory design and optimization.  The software tracked individual sales representatives' performance and the sales team's overall performance against the established goals.  Javelin's data was accurate, but it lagged by about two months, and to fill this gap, Indivior also deployed an internally-developed performance tracker that generated weekly and monthly "*ad hoc*" reports circulated as Excel files attached to an email.

18

73.     CW-1 states that the Individual Defendants would have received weekly and monthly updates from the finance team regarding PERSERIS sales.

74.     CW-1 explained that PERSERIS sales were adversely affected by sales of UZEDY. CW-1 explained that Uzedy's 21-gauge needle is thinner than Perseris' 18-gauge needle, and a thinner needle would tend to cause less pain to patients.  Additionally, CW-1 stated that UZEDY offered far more dosing options than PERSERIS (*i.e.*, 8 for UZEDY versus 2 for PERSERIS).[9]

75.     CW-1 stated that sales representatives would enter healthcare provider feedback concerning PERSERIS into a CRM application called Veeva.  Such feedback was then passed along from sales representatives to managers to senior leaders and marketers.  CW-1 stated that the marketing team was aware of provider complaints and was responsible for developing material to handle objections.

### ii.     Confidential Witness-2

76.     CW-2 worked for Indivior as an Area Sales Director in the Behavioral Health division from January 2019 to July 2024, overseeing a team of nine sales representatives including clinical and institutional specialists targeting the North Carolina area, reporting to Shawn Sprung, Indivior's Commercial Head of Sales for its Behavioral Health division in the East.

77.     CW-2 said the CFOs from hospitals began complaining about reduced reimbursements for PERSERIS in January 2024, and that these complaints were tied to the Inflation Reduction Act, because previously, the health organization administering the drug would bill a maximum amount to Medicaid and Medicare.  These programs then reimbursed providers

---

[9] *Compare* PERSERIS Prescribing Information at 3 (https://www.perseris.com/Downloads/USPI.pdf) (2 dosing options: 90 mg and 120 mg) *with* UZEDY Prescribing Information at 1 (https://www.UZEDY.com/globalassets/UZEDY/prescribing-information.pdf) (8 dosing options).

based on the drug's average selling price plus a 6% add-on payment.  But under the IRA, the reimbursement for such drugs is based on their new maximum fair price plus 6%.[10]  CW-2 began raising this issue with her manager, Shawn Sprung, in February 2024, because customers were threatening to stop using PERSERIS and switch to generics, communicating to Spring "on numerous occasions" in one-on-one phone calls "that you should be aware we may be at risk of losing business."  By March 2024, CW-2 stated that this issue became a topic in leadership meetings, including during weekly calls in which the Behavioral Health division held leadership phone calls with area sales directors, where the issue of reimbursements came up at least four to five times.  CW-2 stated that Tyson was usually on these calls, and Preblick occasionally joined these calls.  Additionally, CW-2 noted that CEO Crossley sometimes accompanied sales representatives on their meetings with customers to hear directly from providers, noting that he would ask the doctors in these meetings what was holding them back from using PERSERIS and what was stopping them from selling more.

78.    CW-2 further stated that during the first quarter of 2024, her understanding is that not a single team achieved its sales goal for PERSERIS.  CW-2 said that some teams missed their goal by a bigger margin than others, but everyone missed the goals.

79.    CW-2 also stated that a common provider complaint about PERSERIS was the large needle size (18-gauge) when most other injectables were 21 or 23-gauge.  CW-2 explained that patients complained about the pain from the needle.  The pain could be worse for thinner patients with less adipose tissue.

---

[10] https://www.bcg.com/publications/2024/inflation-reduction-acts-effects-on-us-health-care-ecosystem.

### iii.  Confidential Witness-3

80.    CW-3 worked for Indivior as a senior medical affairs executive for several years, including while the Individual Defendants were in their current roles as Chief Executive Officer, Chief Financial Officer, and Chief Commercial Officer.

81.    CW-3 stated that the needle size used to administer PERSERIS was the biggest challenge for providers; "it was always a common complaint."  CW-3 stated that patients were scared of the needle and that it often left bruises at the injection site.  CW-3 spoke with providers about pain management such as using ice for swelling or lidocaine to numb the area.  But "the fact is that it's a big needle," CW-3 said.

82.    CW-3 confirmed that Indivior had an internal system to document provider feedback, known as X-Fly.[11]  CW-3 says she is "sure" that the information regarding provider feedback in X-Fly would be escalated to executives.  CW-3 also noted that the medical team had regular meetings where they would talk about a number of insights into provider feedback.  CW-3 noted that these meetings were often attended by Chief Executive Officer Mark Crossley.  CW-3 further clarified that there were company-wide meetings as well as medical division meetings once or twice a year, and that the medical division would also meet for division-wide presentations where provider feedback was discussed, and that Chief Executive Officer Crossley often listened into the meetings as a silent observer.

---

[11] In Indivior's Annual Report and Accounts for 2002, dated March 7, 2023, Peter Bains, the Chair of the Science and Policy Committee of the Indivior Board of Directors, wrote that his Committee reviewed the introduction of X-Fly Insights Management for use by the Medical Affairs team.

### iv.   Confidential Witness-4

83.    CW-4 worked for Indivior as a Senior Clinical Specialist from April 2024 to July 2024 selling PERSERIS to psychiatrists in eastern North Carolina.  CW-4 reported to a manager who reported to Shawn Sprung, who since January 2022, has served as the Commercial Head of Sales for the Eastern U.S. unit of the Behavioral Health Division of Indivior that sold PERSERIS. Sprung reported to Glenn Tyson ("Tyson"), who served from March 2023 to September 2024, as the President of the Behavioral Health Division.[12]

84.    CW-4 indicated that selling PERSERIS was a challenge because of competition from UZEDY.  CW-4 explained that a lot of doctors told her that they preferred UZEDY because PERSERIS required a thicker needle for injection.  CW-4 recalled being told that patients complained about the size of the needle.

85.    CW-4 stated that she used a CRM application called Veeva to manage her communications with providers.

86.    CW-4 advised that UZEDY was outselling PERSERIS by about a nine to one margin in her territory.

### v.   Confidential Witness-5

87.    CW-5 worked for Indivior as an Executive Clinical Specialist from November 2021 to July 2024 selling PERSERIS to psychiatrists and community health centers across western Oklahoma and south central Kansas.

88.    CW-5 described PERSERIS as "a tough drug to sell."  CW-5 further indicated that PERSERIS was not gaining a disproportionate share of the LAI market.

---

[12] Indivior referred to its sales representatives as Clinical Specialists and Institutional Specialists, with the latter tending to focus more on sales to institutions like hospitals.

89.    CW-5 participated in calls with Tyson.  During these calls, Tyson discussed the business, marketing and numbers of the Behavioral Health Division.  CW-5 advised that PERSERIS never met its annual sales target, but that Tyson advised call participants not to be concerned because the board of directors and executives of Indivior believed in and supported PERSERIS.

### vi.    Confidential Witness-6

90.    CW-6 worked for Indivior as a Senior Area Sales Director from January 2022 to August 2024 leading a team of Institutional and Clinical Specialists across the Western United States selling PERSERIS to psychiatrists and hospitals.  CW-6 reported to Lisa Machado ("Machado") who served as Commercial Head of Sales of the Western U.S. unit of the Behavioral Health Division, from September 2021 to August 2024.  Machado reported to Tyson.

91.    CW-6 indicated that UZEDY had the advantage of (i) being pre-mixed (as opposed to PERSERIS, which requires a healthcare provider to mix a prefilled liquid syringe and a prefilled powder syringe), and (ii) using a thinner needle for the injection (*i.e.,* 21-guage needle versus a thicker 18-guage needle for PERSERIS).

### vii.    Confidential Witness-7

92.    CW-7 worked for Indivior as an Executive Clinical Specialist from December 2021 to July 2024 selling PERSERIS to healthcare professionals in the psychiatric space.  CW-7 stated that UZEDY took market share from PERSERIS by touting the thinner needle used for the injection.

### viii.    Confidential Witness-8

93.    CW-8 worked for Indivior as an Executive Clinical Specialist from April 2023 to September 2024 selling PERSERIS to community mental health centers and psychiatric hospitals

23

in Kansas City, Missouri. CW-8 stated she knew of territories that were routinely missing sales goals and people who didn't come close to achieving their targets. CW-8 further noted that Tyson attended every Plan of Action meeting where the entire division gathered to discuss sales goals, quotas, and losses in market share and she was aware that Crossley and Preblick discussed PERSERIS' performance during "Townhall" calls.

## V.    FALSE AND MISLEADING STATEMENTS

### i.    February 22, 2024

*Statement #1*

94.    On February 22, 2024, during the Q4 2023 Call, Defendant Crossley stated in relevant part concerning PERSERIS:

> Moving now to PERSERIS, it's fair to say that we did face some significant challenges in the last couple of quarters of 2023 as a result of competitive pressures from a well-funded new market entrant. ***We nevertheless continue to believe in the potential of th[is] important medicine for schizophrenia based on its differentiated clinical profile and strong feedback we get from clinicians***.

95.    The above statement was materially false and misleading because: (1) clinicians prescribing PERSERIS were providing overwhelmingly *negative* feedback to Indivior representatives concerning PERSERIS's features as compared to UZEDY, not "strong feedback" that would have bolstered Indivior management's belief in the potential of PERSERIS; (2) PERSERIS's "differentiated clinical profile" was differentiated from its primary competitor, UZEDY, by being inferior by having a larger needle that was more painful for patients, requiring mixing two syringes to prepare the injection, and having far fewer dosing options (*i.e.*, 2 options versus 8 options for UZEDY), according to provider feedback; and (3) Crossley knew or recklessly disregarded that Indivior sales representatives were finding that PERSERIS was "tough to sell" and a "challenge to sell" because clinicians prescribing PERSERIS were providing *negative*

24

feedback to Indivior representatives concerning PERSERIS's features as compared to UZEDY's features, in particular, that UZEDY was injected using a thinner higher 21-gauge needle than the 18-gauge needle used to inject PERSERIS (which meant patients would generally experience less pain when injected with UZEDY than when injected with PERSERIS), UZEDY was delivered as a pre-filled syringe (whereas preparing a PERSERIS injection requires a healthcare provider to mix a prefilled liquid syringe and a prefilled powder syringe), and PERSERIS had fewer dosing options.

***Statement #2***

96.    During the Q4 2023 Call, Defendant Preblick stated concerning PERSERIS:

For PERSERIS, our full-year 2024 net revenue expectations are $55 million to $65 million, which represents 43% growth at the midpoint. As Mark mentioned, we remain confident that ***PERSERIS' differentiated profile*** supports our peak net revenue expectations of $200 million to $300 million.

97.    The above statement that, based on "PERSERIS's differentiated profile," PERSERIS sales were expected to hit $55 million to $65 million in 2024, and $200 million to $300 million at peak, was materially false and misleading because (1) PERSERIS's "differentiated clinical profile" was differentiated from its primary competitor, UZEDY, by being inferior by having a larger needle that was more painful for patients, requiring mixing two syringes to prepare the injection, and having far fewer dosing options (*i.e.,* 2 versus 8 for UZEDY), according to provider feedback; and (2) Preblick knew or recklessly disregarded that given the negative feedback from prescribers regarding PERSERIS (as described above), the consistent failure of PERSERIS to meet its annual sales goals, and the reports of drops in reimbursements for PERSERIS that began emerging in early 2024 (as per CW-2), there was no basis to "remain confident" that sales of PERSERIS would reach $200 million to $300 million at peak, and that

25

instead, to the contrary, Indivior was likely to have to cease all sales and marketing activities related to PERSERIS.

### ii.    April 25, 2024

*Statement #3*

98.    On April 25, 2024, Indivior issued a press release announcing its Q1 2024 results. The press release downplayed headwinds impacting SUBLOCADE's growth while reaffirming the Company's FY 2024 guidance, stating, in relevant part:

> Our [Q1] results reflect continued double-digit top-line momentum led by SUBLOCADE (buprenorphine extended-release). The underlying demand for this transformative treatment for moderate-to-severe [OUD] remains strong and our strategy to expand prescribing in the justice system is delivering excellent results. SUBLOCADE's reported growth was, however, ***adversely impacted by transitory items, including accelerating Medicaid patient disenrollments***, a cyberattack on the largest U.S. medical claims processor and abnormal trade destocking. ***We fully expect these items to resolve as the year progresses and, combined with the benefits of recent commercial investments behind SUBLOCADE, we anticipate an acceleration in our top-and bottom-line growth over the remainder of 2024, particularly in the second half. We therefore reconfirm our 2024 guidance, including SUBLOCADE net revenue of $820m to $880m.***

99.    The above statement reconfirming 2024 guidance for SUBLOCADE net revenue of $820 million to $880 million because "we fully expect" accelerating Medicaid patient disenrollments" to resolve "as the year progresses," was materially false and misleading because Defendants knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis to reassure investors that "we fully expect" the impact of disenrollment "to resolve as the year progresses," and therefore no basis to reconfirm guidance of SUBLOCADE net revenue of $820 million to $880 million in 2024.

*Statement #4*

100.    That same day, during the Q1 2024 Call, Defendant Crossley stated in relevant part:

Turning to SUBLOCADE, we delivered year-over-year net revenue growth of 36% in the first quarter, which is in line with our [FY] growth expectations. SUBLOCADE's sequential net revenue growth of 2% was lower than we planned. We believe growth in dispenses were negatively impacted by two external forces, including a higher-than-expected rate of Medicaid patient disenrollments and the cyberattack at Change Healthcare.

***Let me provide more color on how each of these impacted SUBLOCADE's growth in the quarter and why we remain confident in our [FY] 2024 net revenue guidance.*** First, the most recent data on Medicaid renewals indicates a higher-than-expected number of patient disenrollments of over 20 million. Recall at the peak during COVID, over 90 million patients were enrolled in Medicaid. This is particularly relevant in opioid use disorder treatment as the nature of the disease means that approximately 70% of our patients are covered by Medicaid. ***The impact of this disenrollment process will annualize at the end of June and therefore this headwind should begin to subside as we move through the second half of the year. Although the impact on SUBLOCADE's growth in the quarter was larger than expected, Medicaid disenrollment was a known dynamic***.

101.    The above statement that "we remain confident in our 2024 net revenue guidance" for SUBLOCADE because the "headwind" from Medicaid disenrollment "should begin to subside as we move through the second half" of 2024, was materially false and misleading because Crossley knew or recklessly disregarded that the negative impact of Medicaid disenrollments on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis to state that the "headwind" from Medicaid disenrollment "should begin to subside as we move through the second half of the year," and thus no basis to "remain confident" in Indivior's net revenue guidance for SUBLOCADE for 2024.

*Statement #5*

102.    Defendant Crossley later added during the Q1 2024 Call:

27

With . . . *Medicaid renewal annualizing at the end of June, we look forward to subsiding impacts from these transitory items, which we believe are masking the strong underlying demand for SUBLOCADE*.

103. The above statement that "we look forward to subsiding impact" from Medicaid disenrollment because of "Medicaid renewal annualizing at the end of June," was materially false and misleading because Defendants knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis to state that Defendants were looking "forward to subsiding impacts" from Medicaid disenrollment after June 2024.

*Statement #6*

104. During the Q1 2024 Call, Defendant Crossley stated concerning PERSERIS:

Turning to PERSERIS, while competition has intensified in the risperidone LAI [long-acting injections] category, once-monthly risperidone products are gaining share rapidly, and the overall category is still growing. *Against this backdrop, we continue to highlight PERSERIS' unique product profile, which continues to result in positive anecdotal prescriber feedback on product performance*. Sequential dispense growth was 10%, *not only underscoring the good underlying momentum we're seeing, but also representing an acceleration from previous quarters*. We expect to augment our efforts with PERSERIS at the publication of real world evidence studies in the second half of 2024. *Taken together, we remain confident in our [FY] net revenue guidance for PERSERIS and expect accelerating net revenue moving forward*.

105. The above statements were materially false and misleading because: (1) clinicians prescribing PERSERIS were providing overwhelmingly *negative* feedback to Indivior representatives concerning PERSERIS's features compared to UZEDY, not "positive" feedback; (2) PERSERIS's "unique product profile" was differentiated from its primary competitor, UZEDY, by being inferior by having a larger needle that was more painful for patients, requiring mixing two syringes to prepare the injection, and having far fewer dosing options (*i.e.,* 2 versus 8

28

for UZEDY), according to provider feedback; (3) Crossley knew or recklessly disregarded that Indivior sales representatives were finding that PERSERIS was "tough to sell" and a "challenge to sell" because clinicians prescribing PERSERIS were providing negative feedback to Indivior representatives concerning PERSERIS's features as compared to UZEDY's features, in particular, that UZEDY was injected using a thinner higher 21-gauge needle than the 18-gauge needle used to inject PERSERIS (which meant patients would generally experience less pain when injected with UZEDY than when injected with PERSERIS), UZEDY was delivered as a pre-filled syringe (whereas preparing a PERSERIS injection requires a healthcare provider to mix a prefilled liquid syringe and a prefilled powder syringe), and PERSERIS had fewer dosing options; thus there was no basis for Crossley to state that, based on PERSERIS's product profile, "we remain confident in our net revenue guidance for PERSERIS" and that they expected "accelerating net revenue" for PERSERIS "going forward."

### Statement #7

106.   Subsequently, concerning SUBLOCADE, Defendant Preblick stated:

Medicaid disenrollment dynamics had a disproportionate impact on our company as more than two-thirds of SUBLOCADE patients are covered by Medicaid. This impact accelerated in Q1, beyond the low single-digit headwind we had seen in prior quarters. ***Looking ahead, we expect this trend to begin subsiding in the second half of 2024, as [Defendant Crossley] noted***.

107.   The above statement that "we expect" the trend of Medicaid disenrollments to "begin subsiding in the second half of 2024," was materially false and misleading because Preblick knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis to state that "we expect" the Medicaid disenrollment trend "to begin subsiding in the second half of 2024."

29

*Statement #8*

108.    Concerning PERSERIS, Defendant Preblick stated:

Moving to PERSERIS, reported net revenue of $11 million was up 38% versus the prior year and down 8% sequentially, due to low single-digit million destocking in the quarter. Encouragingly, dispenses are up 10% sequentially. ***We remain confident in meeting our [FY] net revenue guidance of $55 million to $65 million.***

109.    The above statement that "we remain confident in meeting our net revenue guidance of $55 million to $65 million" for PERSERIS, was materially false and misleading because Preblick knew or recklessly disregarded that given the negative feedback from prescribers regarding PERSERIS (as detailed above), the consistent failure of PERSERIS to meet its annual sales goals, and the reports of drops in reimbursements for PERSERIS that began emerging in early 2024 (as per CW-2), sales of PERSERIS in 2024 could not possibly reach $55 million to $65 million, and that instead, to the contrary, Indivior was likely to cease all sales and marketing activities related to PERSERIS.

*Statement #9*

110.    Defendant Preblick concluded his prepared remarks stating:

We have discussed a number of the external dynamics which impacted SUBLOCADE results in the quarter. ***Based on our expectations for a resolution of these transitory headwinds*** and continued strong business execution, we remain comfortable with our guidance elements for [FY] 2024, ***including SUBLOCADE net revenue of $820 million to $880 million***.

111.    The above statement that based on "expectations for a resolution" of the Medicaid disenrollment dynamic (which Indivior had stated with certainty earlier in the call would occur in the second half of fiscal year 2024), Defendants remained "comfortable" with "net revenue" guidance for SUBLOCADE of "$820 million to $880 million" in 2024, was materially false and misleading because Preblick knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to

30

forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis for sharing an expectation for a resolution of the headwind from Medicaid disenrollment, and therefore no basis to "remain comfortable" with "net revenue" guidance for SUBLOCADE of "$820 million to $880 million" in 2024.

***Statement #10***

112. Later during the Q1 2024 Call, after an analyst asked Defendant Crossley to elaborate further concerning "growth headwinds from change in Medicaid," Crossley responded that "we have a continuing headwind of . . . the Medicaid renewal continuing, through to the half year where then we'll annualize that, ***and that headwind <u>will go away in the back half</u>***." Defendant Crossley thereafter stressed that "we've got a few additional tailwinds."

113. The above statement that the impact of the "headwind" from Medicaid disenrollment on SUBLOCADE sales "***will*** go away in the back half," was materially false and misleading because Crossley knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis for Crossley to state with certainty (*i.e.*, using the word "will") that the "headwind" of Medicaid disenrollment "***will*** go away in the back half."

### iii. May 23, 2024

114. On May 23, 2024, Defendants Crossley, Simkin and Preblick participated in the May 2024 Presentation.

31

***Statement #11***

115.    In a slide presented by Defendant Simkin, the May 2024 Presentation stated that PERSERIS was capturing a disproportionate share of "NBRx" or "New-to-Brand Prescriptions" (*i.e.*, a patient's first prescription for a particular drug) for LAI drugs to treat schizophrenia:



### PERSERIS is Gaining Stronger Advocacy and Driving Depth in Prescription Volume

TRANSFORMING LIVES & DRIVING VALUE CREATION | MAY 23, 2024





116.    The statement in the slide above that PERSERIS was capturing a disproportionate share of new LAI prescriptions was materially false and misleading because, as CW-5 stated, PERSERIS was not gaining a disproportionate share of the LAI market because PERSERIS was a "tough drug to sell" because of competition from UZEDY, and Simkin would have known this fact because, as CW-1 stated, Simkin finalized the sales goals for PERSERIS, and kept abreast of PERSERIS sales via weekly and monthly updates from Indivior's finance team.

32

*Statement #12*

117.    In a slide presented by Defendant Simkin, the May 2024 Presentation reaffirmed peak net revenue for PERSERIS of $200 million to $300 million.



118.    The statement in the slide above projecting peak net revenue for PERSERIS of $200 million to $300 million was materially false and misleading because Simkin knew or recklessly disregarded that, given the consistent failure of PERSERIS to meet its annual sales goals, and the reports of drops in reimbursements for PERSERIS that began emerging in early 2024 (as per CW-2), peak net revenue of PERSERIS could not possibly reach $200 million to $300 million, and that instead, to the contrary, Indivior was likely to cease all sales and marketing activities related to PERSERIS. Simkin would have known or recklessly disregarded that PERSERIS was not meeting its annual sales goals because, as CW-1 stated, Simkin finalized the sales goals for PERSERIS,  and kept abreast of PERSERIS sales via weekly and monthly updates from Indivior's finance team.

33

*Statements #13 and #14*

119.   In a slide presented by Defendant Preblick, the May 2024 Presentation reaffirmed prior FY 2024 net revenue guidance for (i) SUBLOCADE of $820 million to $880 million, and (ii) PERSERIS of $55 million to $65 million:

# FY 2024 Guidance[1]

| Total Net Revenue | $1,240m to $1,330m (up 18% at mid-point) |
|---|---|
| **Key Products:** | |
| • SUBLOCADE NR (Total) | • $820m to $880m (up 35% at mid-point) |
| • OPVEE NR | • $15m to $25m |
| • PERSERIS NR | • $55m to $65m (up 43% at mid-point) |
| Adj. Gross Margin % | Low to mid 80% range |
| Adj. OPEX (SG&A + R&D): | $695m to $720m |
| • SG&A | • $575m to $590m |
| • R&D | • $120m to $130m |
| Adj. Op. Profit | $330m to $380m (up 32% YOY with adj. operating margin[2] up ~300bps at the mid-point) |

[1] As of May 23, 2024, before exceptional items and assuming no material change in key FX rates vs FY 2023 average rates; mid-point %'s are versus FY 2023 on same basis
[2] Adjusted Operating Margin = Adjusted Operating Profit divided by Net Revenue

120.   The above statement concerning FY 2024 net revenue guidance for SUBLOCADE of $820 million to $880 million in 2024, was materially false and misleading because Preblick knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated

34

to forecast," and "very tough to forecast," and thus there was no basis to provide "net revenue" guidance for SUBLOCADE of "$820 million to $880 million" in 2024.

121.   The above statement concerning FY 2024 net revenue guidance for PERSERIS of $55 million to $65 million in 2024, was materially false and misleading because Preblick knew or recklessly disregarded that given the negative feedback from prescribers regarding PERSERIS (as detailed above), the consistent failure of PERSERIS to meet its annual sales goals, and the reports of drops in reimbursements for PERSERIS that began emerging in early 2024 (as per CW-2), sales of PERSERIS in 2024 could not possibly reach $55 million to $65 million, and that instead, to the contrary, Indivior was likely to cease all sales and marketing activities related to PERSERIS.

### iv.  June 5, 2024

**Statements #15 and #16**

122.   On June 5, 2024, Defendant Crossley gave the June 2024 Presentation, which reiterated Indivior's FY 2024 net revenue guidance for SUBLOCADE and PERSERIS, as depicted in the following graphic:

35




123.    The above statement concerning FY 2024 net revenue guidance for SUBLOCADE in 2024 with a mid-point of $850 million, was materially false and misleading because Crossley knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis to provide "net revenue" guidance for SUBLOCADE in 2024 with a midpoint of $850 million.

124.    The above statement concerning FY 2024 net revenue guidance for PERSERIS in 2024 with a midpoint of $60 million, was materially false and misleading because Crossley knew or recklessly disregarded that given the negative feedback from prescribers regarding PERSERIS (as detailed above), the consistent failure of PERSERIS to meet its annual sales goals, and the reports of drops in reimbursements for PERSERIS that began emerging in early 2024 (as per CW-2), sales of PERSERIS in 2024 could not possibly reach $60 million (as corroborated by CW-1),

and that instead, to the contrary, Indivior was likely to cease all sales and marketing activities related to PERSERIS within a few short weeks.

## VI.   LOSS CAUSATION

125.   As detailed above, in the July 9 Update and during the July 9 Call, Defendants shocked investors by (i) reducing SUBLOCADE net revenue guidance to $765-$805 million from the previous range of $820-$880 million, and (ii) disclosing that Indivior would immediately cease all sales and marketing activities related to PERSERIS on the ground that "there is no longer a path forward for PERSERIS that is financially viable."

126.   Following the July 9 Update and the July 9 Call, Indivior's stock price fell $5.15 per share, or 33.57%, to close at $10.19 per share on July 9, 2024 on unusually high trading volume.

127.   As a result of Defendants' materially false and misleading statements during the Class Period, and the precipitous decline in the market value of the Company's securities upon the disclosure of the truth on July 9, 2024, Plaintiff and other Class members have suffered significant losses and damages.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

128.   During the Class Period, Defendants Crossley and Simkin sold a substantial number of INDV shares on the London Stock Exchange, thus demonstrating a motive for making materially false and misleading statements during the Class Period.

### A.   Crossley

129.   Crossly admitted that he knew the impact of Medicaid disenrollment was difficult when he stated as much on July 9, 2024, conceding that forecasting the impact of Medicaid disenrollment risk was "incredibly, incredibly difficult," "very complicated," and "very tough" because of the chaotic process of Medicaid re-enrollment.  Additionally, according to the Center

37

for Medicare & Medicaid Services' Scheduled State Timelines for Completing Unwinding-Related Renewals Preliminary Analysis as of May 2024,[13] by the beginning of the Class Period, unwinding related renewals were already in process, and completed for many states:  by February 2024, five states (ID, MT, NH, OK, SD) were completed; by March 2024, twelve further states (AR, AZ, CT, FL, IA, IN, NE, OH, PA, UT, WV, WY) were completed; and by April 2024, 15 further states (CO, DE, GA, KS, MA, MD, ME, ND, NM, NV, RI, TN, VA, VT, WA) were completed.

130.   On March 18, 2024, Indivior filed a Form 6-K with the SEC with an exhibit announcing that on March 14, 2024, March 15, 2024 and March 18, 2024, Crossley disposed of a total of 117,197 Shares.  Specifically, 91,204 Shares were sold on March 14, 2024 at an average price of £16.30 per share for proceeds of approximately 1.49 million pounds (or approximately $1.9 million at the exchange rate of 1.28 dollars per pound on that date); 15,444 Shares were sold on March 15, 2024 at an average price of £16.44 per share for proceeds of approximately 253,899 pounds (or approximately $322,452 at the exchange rate of 1.27 dollars per pound on that date); and 10,549 Shares were sold on March 18, 2024 at an average price of £16.17 per share for proceeds of approximately 170,577 pounds (or approximately $216,633 at the exchange rate of 1.27 dollars per pound on that date).

131.   Indivior further announced that following the above transactions, Crossley had a beneficial interest in 90,032 Indivior shares.  This was considerably lower than the 132,155 Indivior shares in which Crossley had a beneficial interest as of June 30, 2023, as reported in Indivior's 2023 annual report filed on Form 20-F on March 6, 2024.

---

[13] *See* https://www.medicaid.gov/resources-for-states/downloads/sst-cmpltng-unwndng-rnwls-prlmnry-anlys-05312024.pdf.

132.   In sum, Crossley's sales of Indivior shares during the Class Period generating proceeds of approximately $2.4 million at prevailing exchange rates reduced his beneficial interest in Indivior shares from 207,229 shares to 90,032 shares, representing a decrease of approximately 57% in Crossley's holdings of Indivior shares (*i.e.*, 117,197/207,229).

**B.**   **Simkin**

133.   On March 6, 2024, Indivior filed a Form 6-K with the SEC with an exhibit announcing that it received notification on March 5, 2024, that Simkin sold a total of 42,449 Indivior shares on March 4, 2024 and March 5, 2024, at an average price of £17.18 per Share for proceeds of 729,273 pounds (or approximately $926,000 at an exchange rate of approximately 1.27 dollars per pound on that date).   Indivior further announced that following this transaction, Simkin had a beneficial interest in 208,875 shares in the Company.

134.   On March 8, 2024, Indivior filed a Form 6-K with the SEC with an exhibit announcing that it received notification on March 7, 2024, that Simkin sold 30,000 Indivior shares on March 6, 2024 at the price of £17.22 per share for proceeds of $516,600 pounds (or approximately $656,082 at an exchange rate of approximately 1.27 dollars per pound on that date). Indivior further announced that following this transaction, Simkin had a beneficial interest in 178,875 shares in the Company.

135.   On March 18, 2024, Indivior filed a Form 6-K with the SEC with an exhibit announcing that it received notification on March 14, 2024, that Simkin sold 61,285 Indivior shares on March 14, 2024 at an average price of £16.30 per share for proceeds of $998,945 pounds (or approximately $1.28 million at an exchange rate of 1.28 dollars per pound on that date). Indivior further announced that following this transaction, Simkin had a beneficial interest in 117,590 shares in the Company.

136. In sum, Simkin's sales of Indivior shares during the Class Period generating proceeds of approximately $2.86 million at prevailing exchange rates reduced his beneficial interest in shares of the Company from 251,324 shares to 117,590 shares, representing a decrease of approximately 53% in Simkin's holdings of Indivior shares (*i.e.*, 133,734/251,324). Indivior's 2023 annual report filed on Form 20-F on March 6, 2024, did not report Simkin's holdings of Indivior shares as of June 30, 2023.

137. Further bolstering the inference of scienter, Defendants made their final materially false and misleading statements during the Class Period in very close proximity to the revelation of the truth on July 9, 2024.  Indeed, the materially false and misleading statements in the June 2024 Presentation reaffirming the net revenue guidance for SUBLOCADE and PERSERIS in 2024, were made on June 5, 2024, just over a month before the truth was revealed on July 9, 2024.

138. Further bolstering the inference of scienter, during the quarterly conference calls described above, and during the May 2024 and June 2024 Presentations, all of the Individual Defendants made statements concerning past and future PERSERIS sales, thus indicating that the Individual Defendants had access to data concerning PERSERIS sales. CW-1 corroborated such access, stating that (i) Defendant Simkin was involved in determining the sales goals for PERSERIS, (ii) Defendants Simkin and Preblick finalized the sales goals for PERSERIS, (iii) the fact that PERSERIS was not meeting annual sales goals was discussed at meetings held 3-4 times a year that were occasionally attended by Simkin, and (iv) the Indivior executives had access to the "ad hoc" Excel reports and Javelin data reporting PERSERIS sales.

139. Further bolstering the inference of scienter, on the Q4 2023 Call, and the Q1 2024 Call, Defendant Crossley advised analysts that prescriber feedback concerning PERSERIS was positive, as detailed above.  Such statements indicate that Crossley had access to prescriber

feedback concerning PERSERIS, and thus would have known or recklessly disregarded that there was widespread prescriber feedback concerning PERSERIS that was negative, as per the statements of the multiple CWs described above. CW-1 corroborated such access, stating that healthcare provider feedback concerning PERSERIS would have been shared with senior executives and members of Indivior's marketing team in order to determine how to address such feedback. Further, CW-2 noted that Defendant Crossley sometimes accompanied sales representatives on their meetings with customers to hear directly from providers, noting that he would ask the doctors in these meetings what was holding them back from using PERSERIS and what was stopping them from selling more. Further, CW-3 noted that that meetings of the medical affairs division to discuss provider feedback were often attended by Defendant Crossley.

140. CW-8 further bolstered the inference of scienter, noting that Tyson attended every Plan of Action meeting where "the entire division gathered to discuss sales goals, quotas, and losses in market share" and she was aware that Crossley and Preblick discussed PERSERIS' performance during "Townhall" calls."

## VIII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

141. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Indivior securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41

142.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Indivior securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Indivior or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

145.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Indivior;

- whether the Individual Defendants caused Indivior to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

42

- whether the prices of Indivior securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

146. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

147. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Indivior securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Indivior securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

148. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43

149.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

150.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

151.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

152.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Indivior securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Indivior securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

44

153. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Indivior securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Indivior's finances and business prospects.

154. By virtue of their positions at Indivior, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

155. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Indivior, the Individual Defendants had knowledge of the details of Indivior's internal affairs.

156. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

45

Indivior. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Indivior's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Indivior securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Indivior's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Indivior securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

157. During the Class Period, Indivior securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Indivior securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Indivior securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Indivior securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

46

158.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

160.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.     During the Class Period, the Individual Defendants participated in the operation and management of Indivior, and conducted and participated, directly and indirectly, in the conduct of Indivior's business affairs.  Because of their senior positions, they knew the adverse non-public information about Indivior's misstatement of income and expenses and false financial statements.

162.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Indivior's financial condition and results of operations, and to correct promptly any public statements issued by Indivior which had become materially false or misleading.

163.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Indivior disseminated in the marketplace during the Class Period concerning

47

Indivior's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Indivior to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Indivior within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Indivior securities.

164.   Each of the Individual Defendants, therefore, acted as a controlling person of Indivior. By reason of their senior management positions and/or being directors of Indivior, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Indivior to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Indivior and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

165.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Indivior.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

48

## X.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 5, 2024

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice*)
Austin P. Van
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
(*pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*