**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

---------------------------------------------------------
                                )

IN RE INDIVIOR PLC SECURITIES     )   Case No. 3:24-cv-554 (HEH)
LITIGATION                           )
                                )
                                )
--------------------------------------------------------

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

| | |
|---|---|
| Robert J. Giuffra, Jr.* | Brian E. Pumphrey (VSB No. 47312) |
| David M.J. Rein* | Garrett H. Hooe (VSB No. 83983) |
| Julia A. Malkina* | Frank Talbott V (VSB No. 86396) |
| SULLIVAN & CROMWELL LLP | MCGUIREWOODS LLP |
| 125 Broad Street | Gateway Plaza |
| New York, New York 10004 | 800 East Canal Street |
| Telephone: (212) 558-4000 | Richmond, Virginia 23219 |
| Facsimile: (212) 558-3588 | Telephone: (804) 775-1000 |
| giuffrar@sullcrom.com | Facsimile: (804) 775-1061 |
| reind@sullcrom.com | bpumphrey@mcguirewoods.com |
| malkinaj@sullcrom.com | ghooe@mcguirewoods.com |
| | ftalbott@mcguirewoods.com |

\* Admitted *pro hac vice*

*Counsel for Defendants*

January 10, 2025

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................5

    A.    The Parties ...................................................................................................................5

    B.    Indivior's Warnings to Investors that Its SUBLOCADE Sales Are Highly
         Dependent on Medicaid Reimbursement..........................................................................5

    C.    Indivior's July 9, 2024 Announcement of Reduced Net Revenue Guidance and
         PERSERIS' Discontinuance ........................................................................................9

    D.    Plaintiff's Claims .....................................................................................................10

ARGUMENT ............................................................................................................................11

I.     PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS
      AS A MATTER OF LAW .........................................................................................11

    A.    Defendants' Projections and Forecasts Are Not Actionable .........................................12

    B.    Indivior Disclosed the Risk that Its Net Revenue Forecasts for SUBLOCADE
         Could Be Reduced ....................................................................................................15

    C.    Indivior Disclosed the Competitive Pressures PERSERIS Faced ................................17

II.    PLAINTIFF DOES NOT PLEAD FRAUDULENT INTENT AS A MATTER
      OF LAW ...................................................................................................................19

    A.    Plaintiff Does Not Allege a Motive or Opportunity for Securities Fraud .....................20

    B.    Plaintiff Does Not Allege Intentional Misconduct or Severe Recklessness..................22

III.   PLAINTIFF'S CONTROL-PERSON CLAIM ALSO MUST BE
      DISMISSED...............................................................................................................28

IV.   CONCLUSION .........................................................................................................28

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)............................................................................................................5

*Barry* v. *Novartis Pharmaceuticals Corp.*,
No. 22-cv-196, 2022 WL 2373452 (E.D. Va. June 30, 2022)....................................................9

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007)............................................................................................................5

*Boykin* v. *K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) .............................................................. 3, 14, 16, 22-23

*City of Roseville Employees' Retirement System* v. *Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010).......................................................................................22

*Cozzarelli* v. *Inspire Pharmaceuticals Inc.*,
549 F.3d 618 (4th Cir. 2008) .........................................................................................11, 20, 23

*Credit Suisse Securities (USA) LLC* v. *Billing*,
551 U.S. 264 (2007)..........................................................................................................11

*Elam* v. *Neidorff*,
544 F.3d 921 (8th Cir. 2008) ............................................................................................27

*Employees' Retirement System of the City of Baton Rouge & Parish of East Baton*
*Rouge* v. *MacroGenics*,
61 F.4th 369 (4th Cir. 2023) .............................................................. 12-13, 14, 18

*Fanucchi* v. *Enviva Inc.*,
No. 22-cv-2844, 2024 WL 3302564 (D. Md. July 3, 2024) ....................................................24

*Greenhouse* v. *MCG Capital Corp.*,
392 F.3d 650 (4th Cir. 2004) .........................................................................................4, 21

*Gross* v. *AT&T Inc.*,
No. 19-cv-2892, 2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021) ...........................................25

*Hayes* v. *Crown Central Petroleum Corp.*,
78 F. App'x 857 (4th Cir. 2003) .............................................................. 11-12

*In re Advanta Corp. Securities Litigation*,
180 F.3d 525 (3d Cir. 1999)..............................................................................................22

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997)...................................................................................................21

*In re Cable & Wireless, PLC Securities Litigation*,
  321 F. Supp. 2d 749 (E.D. Va. 2004) ......................................................................................18

*In re E.Spire Communications, Inc. Securities Litigation*,
  127 F. Supp. 2d 734 (D. Md. 2011)........................................................................................22

*In re Marriott International, Inc., Customer Data Security Breach Litigation*,
  543 F. Supp. 3d 96 (D. Md. 2021) ............................................................................................4

*In re PEC Solutions Securities Litigation*,
  No. 03-cv-331, 2004 WL 1854202 (E.D. Va. May 24, 2004)...........................................22, 24

*Iron Workers Local 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ........................................................................ 23-24, 26

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001)....................................................................................................22

*KBC Asset Management NV* v. *DXC Technology Co.*,
  19 F.4th 601 (4th Cir. 2021) .............................................................................................24, 27

*Knurr* v. *Orbital ATK Inc.*,
  220 F. Supp. 3d 653 (E.D. Va. 2016) ........................................................................................5

*Knurr* v. *Orbital ATK Inc.*,
  272 F. Supp. 3d 784 (E.D. Va. 2017) ......................................................................................25

*Lerner* v. *Northwest Biotherapeutics*,
  273 F. Supp. 3d 573 (D. Md. 2017)........................................................................................24

*Longman* v. *Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ..................................................................................................17

*Maguire Financial, LP* v. *PowerSecure International, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ........................................................................................3, 11, 19

*Marsh Group.* v. *Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) ....................................................................................2, 12, 13

*Matrix Capital Management Fund, LP* v. *BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ..................................................................................................22

*Morrison* v. *National Bank of Australia, Ltd.*,
  561 U.S. 247 (2010).................................................................................................................11

*NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes Inc.*,
No. 09-cv-01740, 2013 WL 1188050 (D. Conn. Mar. 23, 2013) ..................................... 24-25

*Oklahoma Firefighters Pension & Retirement System* v. *K12, Inc.*,
66 F. Supp. 3d 711 (E.D. Va. 2014) ...............................................................................3, 25

*Oklahoma Firefighters Pension & Retirement System* v. *Xerox Corp.*,
300 F. Supp. 3d 551 (E.D. Va. 2018) ...................................................................................18

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)................................................................................................16, 19

*Ottmann* v. *Hanger Orthopedic Group., Inc.*,
353 F.3d 338 (4th Cir. 2003) ...............................................................................3, 20, 22

*Phillips* v. *LCI International, Inc.*,
190 F.3d 609 (4th Cir. 1999) ...............................................................................................19

*Raab* v. *General Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ............................................................................... *passim*

*San Antonio Fire & Police Pension Fund* v. *Syneos Health Inc.*,
75 F.4th 232 (4th Cir. 2023) ...............................................................................................20

*Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta*,
552 U.S. 148 (2008)................................................................................................................11

*Svezzese* v. *Duratek, Inc.*,
67 F. App'x 169 (4th Cir. 2003) ...........................................................................................28

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)...................................................................................................20

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................4, 11, 20, 22

*United States* v. *Garcia*,
855 F.3d 615 (4th Cir. 2017) .................................................................................................7

*Xerox Financial Services, LLC* v. *JP1 Enterprises, Inc.*,
No. 23-cv-03493, 2024 WL 4025842 (D. Md. Sept. 2, 2024)................................................7

*Yates* v. *Municipal Mortgage & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ................................................................................4, 21, 23

**Statutes and Rules**

15 U.S.C. § 78j(b) .............................................................................................................. 10-11, 28

15 U.S.C. § 78t(a) .............................................................................................................. 10-11, 28

15 U.S.C. § 78u-4 ...............................................................................................................11, 12, 20

15 U.S.C. § 78u-5 ...............................................................................................................2, 3, 14

17 C.F.R. § 240.10b-5 ....................................................................................................... 10-11

Fed. R. Civ. P. 9(b) ...........................................................................................................1, 11

## PRELIMINARY STATEMENT

This lawsuit is a textbook example of the sort of baseless shareholder litigation that Congress sought to end by enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendant Indivior PLC ("Indivior") develops pharmaceutical products for the treatment of opioid use disorder ("OUD") and mental illnesses. In July 2024, Indivior announced the reduction of its estimated forecast of future revenues for its OUD treatment drug SUBLOCADE, and the discontinuance of its schizophrenia treatment product PERSERIS. Following this announcement, Indivior's share price declined.

Applying 20/20 hindsight, Plaintiff David Hanshew, who claims to have lost a total of $596 from his investment in Indivior common stock, filed this putative class action alleging securities fraud against Indivior and its most senior executives—Chief Executive Officer Mark Crossley, Chief Financial Officer Ryan Preblick, and Chief Commercial Officer Richard Simkin (collectively, "Individual Defendants"). The Fourth Circuit has held that such hindsight-based claims are barred: "The market has risks; the securities laws do not serve as investment insurance. Every prediction of success that fails to materialize cannot create on that account an action for securities fraud." *Raab* v. *Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993). Applying the PSLRA and settled law, this Court should dismiss the Amended Complaint ("Complaint" or "AC") on two grounds, either of which separately and independently supports dismissal:

*First*, Plaintiff falls far short of the exacting requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) to plead with particularity that Defendants made actionable, material misstatements to investors. Impermissibly seeking to capitalize on Indivior's July 9, 2024 announcement lowering its 2024 net revenue forecasts for SUBLOCADE and PERSERIS and announcing the discontinuance of PERSERIS, Plaintiff claims that the company's projections of future net revenues for both products, issued during the first half of 2024, were misleading. But,

as the Fourth Circuit has recognized, "predictions of future growth" are not actionable, "because they will almost always prove to be wrong in hindsight." *Raab*, 4 F.3d at 290. In the Fourth Circuit, securities fraud claims based on projections are not actionable unless they contain "specific statements of fact" or "guarantees," neither of which Plaintiff alleges or could allege here. *Marsh Grp.* v. *Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002). The PSLRA's safe harbor for "forward-looking statements" also protects Indivior's challenged projections, which specifically included "statement[s] containing a projection of revenue" and were accompanied by "meaningful cautionary" language. *Id.* § 78u-5(c)(1), (i)(1).

As to SUBLOCADE, Plaintiff claims that Indivior's projections should have accounted for the risk that increased Medicaid disenrollments would adversely impact SUBLOCADE's revenues because OUD patients are frequently uninsured. But Defendants warned investors of exactly this risk, including how recently passed federal legislation could increase Medicaid disenrollments and "adversely affect" SUBLOCADE sales. (Ex. 3 at 27.) Defendants also disclosed the assumptions underlying Indivior's projections for SUBLOCADE, and investors, who also could review government information on Medicaid disenrollments, could independently assess potential future impacts. *See Raab*, 4 F.3d at 291 (companies have "no duty to advise investors of what was already commonly known").

Plaintiff also has no basis to challenge Indivior's PERSERIS projections. Indivior's revenue projections for this schizophrenia drug took into account increased competitive pressures, including from Teva Pharmaceuticals' competing product UZEDY. Defendants explicitly warned investors that "PERSERIS faces competition . . . including . . . from competitors *such as . . . Teva*" (Ex. 3 at 80) (emphasis added), and that "competition has intensified" in PERSERIS' product category (Ex. 4 at 4).

Moreover, as shown below, many of Indivior's forecasts about SUBLOCADE's and PERSERIS' prospects were vague or generic, general statements of optimism, or opinions, none of which was specific enough to be actionable. *See Raab*, 4 F.3d at 289, 290 ("the market price of a share is not inflated by vague statements predicting growth"; "mere expressions of optimism" not actionable); *Okla. Firefighters Pension & Ret. Sys.* v. *K12, Inc.*, 66 F. Supp. 3d 711, 718 (E.D. Va. 2014) (dismissing claims where "the statements are, in substance, only non-actionable opinions").

*Second*, the Complaint does not satisfy the PSLRA's exacting requirements for pleading fraudulent intent.  Plaintiff does not allege "with particularity facts giving rise to the strong inference" that Defendants acted with "intent to deceive, manipulate, or defraud" investors. *Maguire Fin., LP* v. *PowerSecure Int'l, Inc.*, 876 F.3d 541, 546-47 (4th Cir. 2017) (citations omitted).  The Complaint does not allege either "intentional misconduct" or "severe recklessness," which is "such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Ottmann* v. *Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003) (citation and internal quotation marks omitted).  And for any forward-looking statement covered by the PSLRA safe harbor—such as all of Indivior's challenged revenue projections here—Plaintiff does not plead "actual knowledge" of its falsity. 15 U.S.C. § 78u-5(c)(1); *see Boykin* v. *K12, Inc.*, 54 F.4th 175, 184 (4th Cir. 2022).

To try to end-run the PSLRA, Plaintiff tries to allege scienter based on sales of Indivior common stock by Messrs. Crossley and Simkin in March 2024, approximately four months before Indivior issued revised revenue projections for SUBLOCADE and PERSERIS in July 2024.  But Indivior's public securities filings reflect that both Individual Defendants sold their stock within

-3-

days of the end of pre-determined vesting periods, which had been established years earlier when they were granted their restricted stock awards as part of their compensation packages.[1] Courts routinely reject scienter claims based on such compensation-based trading. (*See infra* at pp. 21-22.)

Plaintiff also cannot plead scienter based on the Individual Defendants' high-level corporate positions. The Fourth Circuit has rejected scienter theories that "a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." *Yates* v. *Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014).

*Finally*, Plaintiff tries to plead scienter based on the allegations of eight unidentified "confidential witnesses" ("CWs"). The Complaint does not allege that any of the CWs reported to the Individual Defendants, much less that any of the CWs raised concerns *to the Individual Defendants*. None of the CWs makes allegations about SUBLOCADE, Indivior's largest grossing product. Rather, these CWs speculate only that the Individual Defendants had access to information about PERSERIS sales data and negative healthcare provider feedback about PERSERIS versus a competitor product. Thus, as a matter of law, the "Confidential Witness allegations fail to support a strong inference of scienter," because "none of the Confidential Witness allegations are regarding what any of the Individual Defendants actually knew about . . . the falsity of any statements." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 145 (D. Md. 2021), *aff'd sub nom. In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022).

---

[1]   On a motion to dismiss, the Court should consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely," *Greenhouse* v. *MCG Cap. Corp.*, 392 F.3d 650, 657 (4th Cir. 2004).

## BACKGROUND[2]

### A.    The Parties

Indivior develops, manufactures, and markets pharmaceutical products to treat OUD and mental illnesses. (AC ¶ 2.) Its products are sold in 37 countries. (Ex. 3 at 64.)[3] Indivior's shares trade on the London Stock Exchange and the NASDAQ in the United States. (AC ¶ 18.)

Lead Plaintiff David Hanshew allegedly purchased 100 Indivior shares on NASDAQ. (AC ¶ 17; ECF Nos. 20-1; 20-3; 20-4.) He claims to have lost only $596. (ECF No. 20-1.)[4]

### B.    Indivior's Warnings to Investors that Its SUBLOCADE Sales Are Highly Dependent on Medicaid Reimbursement

In 2023, SUBLOCADE, a long-acting injectable product used to treat OUD, generated net revenues of $630 million, accounting for 58% of Indivior's net revenues. (AC ¶ 26.) More than six million people in the United States suffer from OUD, and opioid overdose deaths have been rising for years because of the increased prevalence of fentanyl and similar highly potent opioids. (Ex. 5 at 2, 5.) Because many individuals who suffer from OUD are not employed or do not have employer-provided insurance, approximately 70% of patients who use SUBLOCADE are covered by Medicaid. (AC ¶ 28; Ex. 4 at 3.)

---

[2]    For purposes of this motion, the Court should accept as true only Plaintiff's "well-pleaded facts." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). The Court should not credit "unadorned conclusory allegations" or "naked assertions of wrongdoing." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007).

[3]    Exhibit numbers refer to exhibits appended to the Declaration of David M.J. Rein, dated January 10, 2025.

[4]    Mr. Hanshew is not an institutional investor with a significant stake in Indivior. Of relevance here, the PSLRA was enacted to "combat abuse of the class action machinery in securities fraud cases by ensuring that these class actions are [not] controlled . . . by law firms or professional plaintiffs with only nominal interests at stake. Instead, Congress sought to ensure that reasonably sophisticated plaintiffs with large or at least, relatively large financial stakes in the case would act as lead plaintiffs." *Knurr* v. *Orbital ATK Inc.*, 220 F. Supp. 3d 653, 657 (E.D. Va. 2016) (internal quotation marks omitted).

On February 22, 2024, Indivior announced its Q4 2023 and fiscal year ("FY") 2023 results, which disclosed FY 2023 net revenues of $630 million for SUBLOCADE and projected FY 2024 net revenues of $820-880 million for SUBLOCADE.  (AC ¶ 40; Ex. 6 at 2.)  The company's press release cautioned investors that it contained "forward-looking statements," which "involve risks and uncertainties as they relate to events or circumstances that may or may not occur in the future." (Ex. 6 at 7.)  The release warned that there could be "differences between Indivior's expectations and actual results" because of (i) "our dependence on third-party payors for the reimbursement of our products," (ii) "the increasing focus on pricing and competition in our industry," and (iii) "market acceptance of our products as well as our ability to . . . compete with other market participants."  (Ex. 6 at 7.)

In an earnings call that day ("Q4 2023 Call"), Indivior described the assumptions underlying its net revenue projections for its products, including SUBLOCADE.  At the start of the call, Indivior warned investors that "actual results may differ materially," and referred investors to a slide containing a "list [of] factors that may cause [Indivior's] results to be materially different."  (Ex. 7 at 2; Ex. 8 at 2.)  CEO Crossley explained that the "midpoint" of Indivior's guidance for SUBLOCADE—$850 million—"implies 35% year-over-year growth."  (Ex. 7 at 3.) CFO Preblick explained that the "SUBLOCADE guidance range contemplates a modest impact from the Medicaid reenrollment similar to [FY] 2023," and that Indivior would "continue to monitor this dynamic during the year."  (AC ¶ 43; Ex. 7 at 9.)

Both before and after the Q4 2023 Call, Indivior warned investors about how Medicaid reimbursement affects product sales.  For example, in its 2023 Annual Report, Indivior explained that sales of its products "depend, in part, on the availability of reimbursement from third-party payors such as state and federal governments, including Medicare and Medicaid," and that

"[d]eterioration in the timeliness, certainty and amount of reimbursement . . . could reduce the use of, and revenues generated from, [Indivior's] products and could have a material adverse effect on [its] business [and] financial condition." (Ex. 3 at 26-27.) Indivior also cautioned investors that recent federal legislation could cause Medicaid disenrollments, which could in turn "adversely affect" Indivior's product sales. (Ex. 3 at 27.) At the start of the COVID-19 pandemic, Congress passed the Families First Coronavirus Response Act, which required that Medicaid keep people continuously enrolled through the end of the public health emergency. (AC ¶ 35; Ex. 3 at 27.) But, on March 31, 2023, the Consolidated Appropriations Act ended continuous enrollment, and states began disenrolling people from Medicaid. (AC ¶ 35; Ex. 3 at 27.)

The market was well aware of the risk of Medicaid disenrollment. In August 2022, the U.S. Department of Health and Human Services ("HHS") published guidance projecting that "approximately 15 million individuals" would lose Medicaid coverage when continuous enrollment ended. (Ex. 9 at 1.)[5] Of those individuals, HHS projected that 8.2 million would lose Medicaid eligibility, and that 6.8 million would lose Medicaid coverage for procedural reasons despite still being eligible—known as "administrative churning." (Ex. 9 at 1.) HHS forecasted that in a "no churning" scenario, 8.2 million people would lose Medicaid coverage, while in a "high churning scenario," 18.4 million people would be disenrolled. (Ex. 9 at 5.) A high churning scenario could occur "if there is substantial beneficiary confusion, high rates of moving or changes in residence, and/or overloaded state Medicaid eligibility systems." (Ex. 9 at 5.) In the middle of this developing and volatile situation, CEO Crossley reported in an April 25, 2024 earnings call

---

[5]     The Court may "take judicial notice of information contained on state and federal government websites." *United States* v. *Garcia¸* 855 F.3d 615, 621 (4th Cir. 2017). *See Xerox Fin. Servs., LLC* v. *JP1 Enters., Inc.*, 2024 WL 4025842, at *2 (D. Md. Sept. 2, 2024) ("the court may take judicial notice of publicly available information on state and federal government websites without converting the [12(b)(6)] motion to one for summary judgment").

("Q1 2024 Call") that the "impact of this disenrollment process will annualize at the end of June"—*i.e.*, that the anticipated annual effect of Medicaid disenrollment could affect Indivior's post-June projections (Ex. 4 at 3), as turned out to be the case when the company announced lower revenue projections on July 9, 2024 (Ex. 10 at 1).

Indivior also sold PERSERIS, a once-monthly long-acting injectable ("LAI") of risperidone indicated to treat schizophrenia. (AC ¶ 29.) PERSERIS generated net revenues of $42 million in 2023. (AC ¶ 29.) Indivior's February 22, 2024 earnings release announced FY 2023 net revenues of $42 million for PERSERIS and projected FY 2024 net revenues of $55-65 million for PERSERIS. (AC ¶¶ 29, 40; Ex. 6 at 2.) Indivior explained that PERSERIS has a "unique product profile, which continues to result in positive anecdotal prescriber feedback on product performance," and that "once-monthly risperidone products are gaining share rapidly and the overall category is still growing." (Ex. 4 at 4; AC ¶ 48.)

Indivior's public disclosures cautioned that the Inflation Reduction Act of 2022 ("IRA") could negatively affect PERSERIS sales. Indivior explained that the IRA "requires the HHS Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain high-spend drugs and biologicals per year starting in 2026." (Ex. 3 at 27.) And Indivior noted that the IRA increasingly managed its interactions with Medicare—by "penaliz[ing] manufacturers of certain Medicare Parts B and D drugs for price increases above inflation." (Ex. 3 at 27.)

In addition to the challenges posed by the IRA, Indivior disclosed the competitive risks for its products. For example, Indivior's 2023 Annual Report warned investors that its "existing products face increasing competition," and that its products could "be rendered obsolete or uneconomic through the development of new products with unique advantages." (Ex. 3 at 22-23.)

Indivior cautioned that "PERSERIS faces competition from other long-acting injectables, including existing products from competitors such as . . . Teva," the manufacturer of UZEDY, another risperidone LAI.  (Ex. 3 at 80; AC ¶ 33.)  And in the Q1 2024 Call, Mr. Crossley warned that "competition has intensified in the risperidone LAI category."  (Ex. 4 at 4.)

The market also was aware of differences between Indivior's PERSERIS and Teva's UZEDY.  For example, the Complaint cites December 2022 prescribing information for PERSERIS stating that it uses an 18-gauge needle, and that a healthcare provider must mix a prefilled liquid syringe with a prefilled powder syringe.  (AC ¶ 32 n.3.)  The FDA-approved publicly available prescribing information for UZEDY states that it uses a single prefilled syringe and a 21-gauge needle—thinner than PERSERIS' 18-gauge needle.[6]  (AC ¶ 33 n.4.)  A 2007 study referenced in the Complaint reported that "[n]eedle gauge has been shown to significantly affect the frequency of pain during needle insertion," and a 2015 study referenced in the Complaint indicated that patients reported that thicker needles were more painful than thinner needles.  (AC ¶ 34 ns. 5, 6.)

### C.   Indivior's July 9, 2024 Announcement of Reduced Net Revenue Guidance and PERSERIS' Discontinuance

On July 9, 2024, Indivior issued a press release ("July 9 Update") lowering its FY 2024 net revenue guidance for SUBLOCADE from $820 to $880 million to $765 to $805 million.

---

[6]   Since PERSERIS' and UZEDY's respective launches, the market has known of the differences between the two products.  In July 2018, FDA-approved publicly available prescribing information for PERSERIS stated that this product required use of an 18-gauge needle, and that a healthcare provider must mix a prefilled liquid syringe with a prefilled powder syringe.  (Ex. 12 at 4.)  And April 2023 FDA-approved publicly available prescribing information for UZEDY stated that this product required use of a smaller 21-gauge needle and a single prefilled syringe.  (Ex. 13 at 10.)  The Court "may take judicial notice of and consider the public records of the FDA . . . without transforming [a motion to dismiss] into a motion for summary judgment."  *Barry* v. *Novartis Pharm. Corp.*, 2022 WL 2373452, at *5 (E.D. Va. June 30, 2022) (citations omitted) (taking judicial notice of FDA-approved prescribing information).

(AC ¶ 58; Ex. 10 at 2.)  The July 9 Update identified several contributing factors, including (i) "[o]ngoing Medicaid disenrollments in the second quarter," (ii) a cyberattack, (iii) "one-off inventory adjustments" by specialty pharmacies, and (iv) "longer lead times to open new criminal justice system accounts."  (Ex. 10 at 2.)  Later that day, Mr. Crossley expanded on those factors in an analyst call ("July 9 Call").  (AC ¶ 60.)  For example, Mr. Crossley explained that Medicaid reenrollment was "incredibly, incredibly difficult to forecast."  (AC ¶ 61; Ex. 11 at 7.)

Indivior's July 9 Update also announced that the company would discontinue PERSERIS "due to the highly competitive market and impending changes that are expected to intensify payor management," referring to the IRA's drug pricing changes.  (Ex. 10 at 1.)  The July 9 Update explained that Indivior "will no longer deploy a dedicated sales force" for PERSERIS and "expect[s] to reduce headcount by approximately 130 employees" as a result.  (Ex. 10 at 1.)  In the July 9 Update, Indivior also announced that it would pay $85 million to resolve an antitrust lawsuit. (Ex. 10 at 3.)  Indivior's stock price closed at $10.19 per share on July 9, 2024, $5.15 lower than the previous day's closing price.  (AC ¶ 63.)

### D. Plaintiff's Claims

Seeking to capitalize on these developments, the Complaint alleges that Indivior's July 9 Update revealed the supposed falsity of 16 statements made by Defendants from February 22 to June 5, 2024, regarding Indivior's net revenue projections for SUBLOCADE and PERSERIS.  To try to buttress his claims, Plaintiff cites alleged statements of eight purported CWs, seven of whom were allegedly part of the sales force for PERSERIS that was disbanded when Indivior discontinued that product.

Plaintiff asserts (AC ¶ 1) two Exchange Act claims on behalf of a putative class of all persons who acquired Indivior shares on NASDAQ between February 22 and July 8, 2024:  (i) a securities fraud claim against Defendants under Section 10(b) and Rule 10b-5; and (ii) a "control

person" claim against the Individual Defendants under Section 20(a).   15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a).[7]

## ARGUMENT

### I.   PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENTS AS A MATTER OF LAW.

To state a claim for securities fraud, Plaintiff must allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  Under Rule 9(b), Plaintiff must plead "with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The PSLRA, in turn, "was enacted by Congress '[a]s a check against abusive litigation by private parties,' lest every rosy corporate prognostication generate potential liability."  *Maguire*, 876 F.3d at 546 (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  "[I]n an effort to weed out unmeritorious securities lawsuits," Congress "tightened the procedural requirements that plaintiffs must satisfy" to bring a securities fraud action.  *Credit Suisse Sec. (USA) LLC* v. *Billing*, 551 U.S. 264, 284 (2007).  As a result, Plaintiff must plead "each statement alleged to have been misleading" and the "reasons why."  15 U.S.C. § 78u-4(b).

Congress made these heightened pleading standards "demanding," because it recognized the "danger that some Exchange Act suits seek only valuable settlements and fees rather than success on the merits."  *Cozzarelli* v. *Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008).  "If

---

[7]    Plaintiff does not (*see* AC ¶ 1)—and cannot—assert any claims on behalf of investors who purchased shares on the London Stock Exchange.  *See Morrison* v. *Nat'l Bank of Australia, Ltd.*, 561 U.S. 247, 265 (2010).

the complaint does not meet these pleading requirements, the district court 'shall, on the motion of any defendant, dismiss the complaint.'" *Hayes* v. *Crown Centr. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (quoting 15 U.S.C. § 78u-4(b)(3)(A)).  Because the Complaint does not satisfy the PSLRA's demanding pleading requirements, the Court should dismiss it with prejudice.

### A.    Defendants' Projections and Forecasts Are Not Actionable.

Almost all of the statements that Plaintiff challenges were projections of future net revenues for SUBLOCADE and PERSERIS.[8]  The Fourth Circuit has made clear that "statements regarding projections of future performance" are not actionable unless containing "specific statements of fact or . . . worded as guarantees." *Marsh*, 46 F. App'x at 146.  This is because to permit claims based on projections "would put companies in a whipsaw, with a lawsuit almost a certainty . . . .  Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer." *Id.*  In short, projections are not actionable because "[a]n inability to foresee the future does not constitute fraud." *Hillson Partners Ltd. P'ship* v. *Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994) (citations omitted).

In the face of the PSLRA's rigorous pleading requirements, Plaintiff cannot plead that Defendants' projections for Indivior's net revenue guidance for SUBLOCADE and PERSERIS were materially false.  Specifically, Plaintiff challenges forward-looking statements like "[w]e [] reconfirm our 2024 guidance, including SUBLOCADE net revenue of $820 million to $880 million" (Statement 3), and "we remain confident in our full-year 2024 net revenue guidance" (Statement 4; *see* Statements 1, 2, 5-10, 12-16 in Ex. 1).  As the Fourth Circuit has

---

[8]    *See* Statements 1-10 and 12-16.  For the Court's convenience, the statements challenged in the Complaint are listed in Exhibit 1 to the Rein Declaration.

recognized, such "[f]uture performance projections . . . not phrased as guarantees" are not actionable. *Emps.' Ret. Sys. of Baton Rouge & Par. of E. Baton Rouge* v. *MacroGenics*, 61 F.4th 369, 389 (4th Cir. 2023).

Courts in this Circuit consistently reject hindsight-based claims based on such projections. For example, in *MacroGenics*, after a pharmaceutical company issued a forecast "anticipat[ing] the preliminary positive trend . . . in favor of [its product] Margetuximab to continue" that was wrong in hindsight, the Fourth Circuit affirmed the dismissal of securities fraud claims because the statement was "covered by the projection-of-future-performance bucket." 61 F.4th at 389. Similarly, in *Raab*, after General Physics Corp. forecast "an expected annual growth rate of 10% to 30% over the next several years" that would last "well into the future," which turned out not to be the case, the Fourth Circuit affirmed dismissal because the projections were "anything but definite," and "hardly constitute[d] a guarantee" that could be actionable. 4 F.3d at 288-90; *see also Hillson*, 42 F.3d at 213-15 (statement that company "'on track' for a record-breaking year" not actionable even though projection not met); *Marsh*, 46 F. App'x at 146-47 ("expression[s] of 'commitment' to paying the quarterly dividend" "not guarantees and lack the factual specificity necessary to make them actionable in this circuit" when such dividends are not paid).

Far from guaranteeing its projections, Indivior repeatedly warned investors that its performance might not meet its projections. For example, in its February 22, 2024 earnings release, Indivior cautioned that "[a]ctual results may differ materially . . . because they relate to future events." (Ex. 6 at 7.) In its 2023 Annual Report, Indivior warned investors that "actual results, performance or achievements or industry results could be affected by, among other things:" "[c]ompetition," "[o]ur dependence on third-party payors for the reimbursement of our products and the increasing focus on pricing and competition in our industry." (Ex. 3 at 6.)

-13-

To protect public companies from the substantial expense of defending securities fraud claims when projections do not come to pass, Congress enacted a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u-5. The PSLRA defines forward-looking statements to include "statement[s] containing a projection of revenues" and "statement[s] of future economic performance." *Id.* § 78u-5(i). Under the PSLRA, a company or officer "shall not be liable" for forward-looking statements if (i) they are accompanied by "meaningful cautionary" language *or* (ii) the plaintiff does not plead that the statements were made with "actual knowledge" of their falsity. *Id.* § 78u-5(c)(1). Here, both safe harbor protections apply.

*First*, Indivior accompanied each of the challenged forward-looking statements with meaningful cautionary language. For example, Indivior included the following warning at the outset of its April 25, 2024 earnings call:

> Before we begin, I need to remind everyone that on today's call, we may make forward-looking statements that are subject to risks and uncertainties and that actual results may differ materially. We list the factors that may cause our results to be materially different on Slide 2 of this presentation.

(*See* Ex. 4 at 2, Ex. 2.) "Slide 2" then warned investors that "[v]arious factors may cause differences between Indivior's expectations and actual results, including" (i) "healthcare laws and regulations," (ii) "payment and reporting obligations under government pricing programs," (iii) "competition," and (iv) "our dependence on third-party payors for the reimbursement of our products and the increasing focus on pricing and competition in our industry." (Ex. 14 at 2.)

*Second*, as explained in Section II below, the Complaint fails to allege the required particularized facts that any Defendant made any statement with actual knowledge of its falsity (or even that any statement was false). *See, e.g.*, *MacroGenics*, 61 F.4th at 387 (affirming dismissal under PSLRA safe harbor); *Boykin*, 54 F.4th at 184 (same).

For these reasons alone, all of Plaintiff's claims based on forward-looking statements (Statements 1-10 and 12-16 in Ex. 1) should be dismissed with prejudice.

### B. Indivior Disclosed the Risk that Its Net Revenue Forecasts for SUBLOCADE Could Be Reduced.

Trying to plead fraud based on 20/20 hindsight, Plaintiff asserts that Indivior's statements forecasting SUBLOCADE net revenues and how Medicaid disenrollment would impact those revenues were misleading because Indivior later lowered its forecast and the impact of Medicaid disenrollment was greater than predicted.[9] (AC ¶ 6.) Plaintiff's hindsight-based claims fail for multiple independent reasons.

As a threshold matter, Indivior never guaranteed—not once—that SUBLOCADE's actual net revenues would meet its projections, or that Indivior could accurately forecast when the impact of Medicaid disenrollment would subside. Instead, in its February 22, 2024 earnings release, Indivior cautioned that "actual results" might differ from its projections, including because of "healthcare laws and regulations," and "our dependence on third-party payors for the reimbursement of our products." (Ex. 6 at 7.) And, in its March 6, 2024 Annual Report, Indivior warned that revenues "depend, in part, on the availability of reimbursement from third-party payors such as state and federal governments, including Medicare and Medicaid," and that "[d]eterioration in the timeliness, certainty and amount of reimbursement . . . could reduce the use of, and revenues generated from [Indivior's] products." (Ex. 3 at 26-27.) Far from providing comfort about the risks of Medicaid disenrollment, Indivior explicitly cautioned investors it might "be adversely affected by disenrollments from government benefit programs such as Medicaid," warning that "[d]uring the unwinding of the continuous enrollment provision, millions of people

---

[9] This section applies to Statements 3-5, 7, 9, 10, 13, and 15. (*See* Ex. 1.)

are expected to lose Medicaid which could reverse recent gains in coverage." (Ex. 3 at 27.)

Plaintiff's focus on Medicaid enrollment levels also ignores Defendants' stated reasons for the reduced revenue projection for SUBLOCADE. Defendants did not say that Indivior's revised revenue projection for SUBLOCADE resulted *solely* from Medicaid enrollment levels, but rather said its revised projection was also the result of a "cyber-attack," "one-off inventory adjustments" by specialty pharmacy and specialty distributors, and "longer lead times to open new criminal justice accounts." (Ex. 10 at 2; *see* Ex. 11 at 4-5.)

Moreover, Plaintiff challenges several statements about SUBLOCADE that are textbook examples of opinions, not facts. (*See* Statements 3, 4, 5, 7, 9, and 10 in Ex. 1.) Plaintiff, for example, challenges Mr. Crossley's statement (Statement 5) that "with . . . Medicaid renewal annualizing at the end of June, we look forward to subsiding impacts from these transitory items, which *we believe* are masking the strong underlying demand for SUBLOCADE." (Emphasis added.) Such opinion statements "may often be recognized by their wording"—"the prefatory 'I believe' or 'I think,' for example, conveys that a speaker is sharing a personal belief, not warranting facts." *Boykin*, 54 F.4th at 183. Because opinion statements are "inherently subjective and uncertain assessments," they are actionable only if the "opinion expressed was not sincerely held" or contains "embedded statements of untrue facts." *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015). Plaintiff makes no particularized allegation that any opinion was not "honestly held." *Id.* at 186. Nor does he allege that any opinion contained embedded statements of untrue facts.

Plaintiff's allegations also fail because public information available to investors made clear that Defendants' projections might turn out to be wrong. Defendants disclosed how their SUBLOCADE projections assumed a "modest impact" from Medicaid reenrollment. (AC ¶ 43;

Ex. 7 at 9.)  But HHS stated publicly in 2022 that Medicaid disenrollment would be hard to predict and published widely varying scenarios.  (Ex. 9 at 4-6.)  HHS projected that of the "approximately 15 million individuals" who would lose Medicaid coverage when continuous enrollment ended, 6.8 million could be disenrolled as a result of administrative churn with the possibility of later reenrollment.  (Ex. 9 at 1.)  HHS also mapped out a "no churning scenario," in which 8.2 million people would lose Medicaid coverage, and a "high churning scenario," in which 18.4 million people would lose coverage.   (Ex. 9 at 5.)   Notably, Defendants disclosed the enrollment assumptions underlying their projections, but if investors disagreed, they were free to apply their own assessment based on publicly available HHS information.  *See Longman* v. *Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (affirming dismissal where alleged corrective information was "already publicly available, and therefore, [was] not material either to [the company's] earnings or the price of its stock").

### C.      Indivior Disclosed the Competitive Pressures PERSERIS Faced.

Plaintiff challenges Defendants' optimistic projections about PERSERIS, such as "we remain confident in our [FY] net revenue guidance for PERSERIS and expect accelerating net revenue moving forward."[10] (Statement 6.)  Plaintiff asserts that Defendants should have disclosed PERSERIS' competitive pressures, including how some providers preferred the features of Teva's UZEDY.  Plaintiff's theory fails as a matter of settled law.

To begin, Indivior never guaranteed that PERSERIS would be successful, or that its projections about this drug would be borne out.  Instead, Indivior repeatedly warned of competitive risks to PERSERIS.  For example, Indivior's 2023 Annual Report cautioned that "PERSERIS faces competition from other long-acting injectables, including existing products from competitors such

---

[10]      This section applies to Statements 1, 2, 6, 8, 11, 12, 14, and 16.  (*See* Ex. 1.)

as . . . Teva," UZEDY's manufacturer. (Ex. 3 at 80; AC ¶ 33.) Indivior also cautioned that its "existing products face increasing competition" and could "be rendered obsolete or uneconomic through the development of new products with unique advantages." (Ex. 3 at 22-23.) And during the April 25, 2024 earnings call, Mr. Crossley warned that "competition has intensified in the risperidone LAI category" (Ex. 4 at 4), PERSERIS and UZEDY's prescription category (Ex. 15 at 45). *See MacroGenics*, 61 F.4th at 390 (no misstatement where "warnings were 'extensive, specific and tailored' to the 'very complaints' [Plaintiff] raise[s]").

Indivior's projections about PERSERIS were "loosely optimistic statements that [were] so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Cable & Wireless, PLC Sec. Litig.*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004). For example, Plaintiff alleges that the statement "[w]e remain confident in meeting our [FY] net revenue guidance of $55 million to $65 million" was misleading. (Statement 8.) But this statement is "loosely optimistic" and "clearly constitute[s] the opinions of the speaker." *In re Cable & Wireless*, 321 F. Supp. 2d at 766-68 (dismissing securities fraud claim based on "statements concerning the future growth of the company" that were "not actionable as false statements under the securities laws").

And some challenged statements are too vague to be actionable. For example, a fraud claim cannot rest on statements like: "[W]e continue to highlight PERSERIS' unique product profile, which continues to result in positive anecdotal prescriber feedback on product performance."[11] (Statement 6.) *See Okla. Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*, 300 F.

---

[11]    Statement 11 ("PERSERIS capturing disproportionate share of NBRx") also is too vague to be actionable, especially where Plaintiff does not allege the accompanying data is false.

Supp. 3d 551, 569 (E.D. Va. 2018) (statements that "vaguely and enthusiastically described" company's "performance" and "expectations of business success" inactionable because "[s]tatements of this nature do not give a reasonable investor meaningful information on which to rely").

Many of Defendants' statements about PERSERIS constitute inactionable opinions as a matter of law. (*E.g.*, Statement 1 ("[w]e nevertheless *continue to believe* in the potential of th[is] important medicine") (emphasis added).)     As with SUBLOCADE, Plaintiff makes no particularized allegations that Defendants' opinion statements about PERSERIS were "not sincerely held" or contain "embedded statements of untrue facts." *Omnicare*, 575 U.S. at 176. To the contrary, Plaintiff relies on CW 5 who alleges that "the board of directors and executives of Indivior believed in and supported PERSERIS." (AC ¶ 89.) Finally, Plaintiff's allegations that "clinicians were providing negative feedback to sales representatives concerning PERSERIS' product features, including as compared to the product features of UZEDY," does not render any challenged statement false. (AC ¶ 7.) Defendants did not represent that all clinician feedback was positive. And the "product features," including that the larger needle might be more painful to patients, and the mixing requirement, were all well-known to investors through publicly available information. (*See* p. 9, *supra*.) *See, e.g.*, *Phillips* v. *LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999) (no material misstatement based on "information that was publicly available to reasonable investors").

## II.     PLAINTIFF DOES NOT PLEAD FRAUDULENT INTENT AS A MATTER OF LAW.

Beyond Plaintiff's failure to plead any actionable misstatements, the Court should dismiss the Complaint for the separate and independent reason that he fails to allege scienter—an "intent to deceive, manipulate, or defraud." *Maguire*, 876 F.3d at 546-47. Under the PSLRA, Plaintiff

bears the burden to plead "with particularity facts giving rise to a strong inference" that each statement's maker acted with the requisite state of mind of "intentional misconduct" or "severe recklessness." *Cozzarelli*, 549 F.3d at 623; *see* 15 U.S.C. § 78u-4(b). Plaintiff must allege facts that support a strong inference of scienter as to each Individual Defendant, and, as to Indivior, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). For an inference to be "strong," the Supreme Court has held that it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling . . . and at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 323-24. Thus, in reviewing Plaintiff's allegations, this Court "must consider plausible, nonculpable explanations for [the Individual Defendants'] conduct." *Id.* at 324. The Fourth Circuit has made clear that "an inference of scienter can only be strong—and compelling, and powerful—when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli*, 549 F.3d at 624.

### A. Plaintiff Does Not Allege a Motive or Opportunity for Securities Fraud.

The Fourth Circuit has directed that "courts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter." *Ottmann*, 353 F.3d at 345. In evaluating whether the required inference of scienter is strong, the absence of a sufficient allegation of motive "weighs heavily" against a plaintiff in the scienter analysis. *San Antonio Fire & Police Pension Fund* v. *Syneos Health Inc.*, 75 F.4th 232, 242 (4th Cir. 2023).

Here, Plaintiff's motive theory is that Mr. Crossley and Mr. Simkin sold Indivior shares in March 2024, approximately four months before the alleged "corrective disclosure" on July 9, 2024.

-20-

(AC ¶¶ 128-36.)  But the mere allegation "that some officers sold stock" is not sufficient to "infer fraudulent intent." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997). The Fourth Circuit has held that allegations of stock sales "will only support an inference of scienter 'if the timing and amount of a defendant's trading were *unusual or suspicious.*'" *Yates*, 744 F.3d at 890 (emphasis added).

Here, the Complaint alleges nothing unusual or suspicious about these stock sales.  As part of their total compensation, Mr. Crossley and Mr. Simkin were awarded restricted shares that could not be sold until the end of a predetermined multi-year vesting period.  (Exs. 16, 17, 18.)  The terms of those awards, including the restrictions and vesting dates, were publicly disclosed to shareholders in Indivior's SEC filings.[12]  (Exs. 16, 17, 18.)  For both Mr. Crossley and Mr. Simkin, the vesting periods ended, and the shares could be sold, starting in March 2024, which they then did.  (*See* Ex. 16 (awards "granted on March 1, 2021," and "[i]n accordance with the Rules of the Indivior Long-Term Incentive Plan ('LTIP'), conditional awards held by" Mr. Simkin vested on March 1, 2024); Ex. 17 ("[f]ollowing the end of the holding period, 91,204 Shares were released on March 5, 2024" to Mr. Crossley from "awards granted on March 5, 2019 and August 8, 2019"); Ex. 18 (award "granted on March 15, 2022," and, "following the end of the two-year deferral period," "vested in favour of Mark [Crossley] under the Indivior Deferred Bonus Plan 2018" on March 15, 2024).)

Notably, Mr. Crossley's sales on March 14, 15, and 18, 2024, and Mr. Simkin's sales on March 4, 5, 6, and 14, 2024, all took place within days of the shares vesting.  Because those sales

---

[12]    The Court may take judicial notice of these SEC filings on a motion to dismiss.  *See Greenhouse*, 392 F.3d at 657 ("[A] court ruling on a 12(b)(6) motion may look to documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely.").

followed vesting dates established long before the alleged misstatements, there is nothing suspicious about their timing. Instead, the shares were "an intended part of [Mr. Crossley and Mr. Simkin's] overall compensation package," *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999), and the sales "can hardly form the basis for a strong inference of scienter," *City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010) (no scienter because granting executives "stock options" and "compensat[ing] [them] according to the performance of their company" is "ubiquitous").

Finally, Plaintiff alleges no motive allegations at all for Mr. Preblick. Thus, it is undisputed that, for Mr. Preblick, Plaintiff faces "a more stringent standard for establishing fraudulent intent," *In re E.Spire Comms., Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 744 (D. Md. 2011), and "the strength of the circumstantial allegations must be correspondingly greater," *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

### B. Plaintiff Does Not Allege Intentional Misconduct or Severe Recklessness.

The Complaint also falls far short of meeting the PSLRA's "exacting" burden to allege strong circumstantial evidence of intentional misconduct or severe recklessness. *Tellabs*, 551 U.S. at 313. "Intentional misconduct encompasses deliberate illegal behavior." *In re PEC Sols. Sec. Litig.*, 2004 WL 1854202, at \*4 (E.D. Va. May 24, 2004). Severe recklessness is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Cap. Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (citations omitted). Such "severe recklessness" is, in essence, "a slightly lesser species of intentional misconduct." *Ottmann*, 353 F.3d at 344. For forward-looking statements that fall within the PSLRA safe harbor, which applies to the revenue projections challenged here (*see* § I.A, *supra*), Plaintiff must plead "actual

knowledge" of falsity. *Boykin*, 54 F.4th at 184. Plaintiff faces an especially "difficult task" to plead scienter because the Complaint does not "allege[] the existence of any internal documents . . . or other direct statements contradicting the inference that defendants acted with a lawful intent." *Cozzarelli*, 549 F.3d at 626. Plaintiff's hodgepodge of speculative circumstantial scienter theories does not come close.

***Defendants' Corporate Positions.*** Plaintiff speculates that "[a]s the senior managers and/or directors of Indivior, the Individual Defendants had knowledge of the details of Indivior's internal affairs," "knew the adverse non-public information," and had "actual knowledge" or "acted in reckless disregard" of the challenged statements' falsity. (AC ¶¶ 154, 155, 161.) If scienter could be pled by such boilerplate allegations reciting the defendants' positions and access to information, every case naming a senior executive would survive a motion to dismiss. But the Fourth Circuit has squarely held that a "pleading of scienter . . . may not rest on a bare inference that a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." *Yates*, 744 F.3d at 890; *see, e.g.*, *Iron Workers Loc. 16 Pension Fund* v. *Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 592 (E.D. Va. 2006) (assertions defendant "must have known" statement was misleading "because of his or her position" are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate").

Plaintiff's allegation that the Individual Defendants had "access to data concerning PERSERIS sales" and "access to prescriber feedback concerning PERSERIS" (AC ¶¶ 138-39) also does not meet the PSLRA's heightened pleading burden. He does not allege, as he must to survive this motion, "specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to

know that the statement was false." *Iron Workers*, 432 F. Supp. 2d at 592; *see, e.g.*, *Lerner* v. *Nw Biotherapeutics*, 273 F. Supp. 3d 573, 593 (D. Md. 2017) ("Courts have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA"); *In re PEC Sols.*, 2004 WL 1854202, at *14 (plaintiff cannot raise a "strong inference of scienter" without specifying "knowledge of the specific fact of materiality").

***Confidential Witnesses***. Plaintiff's reliance on eight purported CWs does not satisfy his pleading burden.

*First*, each CW makes allegations solely about PERSERIS, not SUBLOCADE, and their allegations have no bearing on scienter for any statement Defendants made about SUBLOCADE, Indivior's largest grossing product.[13] The CWs' focus on PERSERIS is telling. PERSERIS' 2023 net revenues were only $42 million, less than 4% of Indivior's overall net revenues, while SUBLOCADE's net revenues were $630 million, fifteen times more. (Ex. 6 at 2.)

*Second*, each of the CWs was admittedly "several levels removed from the company's executive team," and, fatally for his Complaint, Plaintiff does not allege that any of the CWs ever "passed their concerns on to" the Individual Defendants. *KBC Asset Mgmt. NV* v. *DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021). As a matter of law, this pleading failure renders Plaintiff's boilerplate CW allegations irrelevant for scienter. *See, e.g.*, *Fanucchi* v. *Enviva Inc.*, 2024 WL 3302564, at *14 (D. Md. July 3, 2024) (no scienter where CW was "five levels removed" from defendant and "entirely outside of [defendant's] chain of command"). And, in any event, Plaintiff cannot rely on a reporting arrangement alone to allege scienter. *NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes Inc.*, 2013 WL 1188050, at *36 (D. Conn. Mar. 23, 2013) (reporting line

---

13    The challenged statements Defendants made about SUBLOCADE include Statements 3-5, 7, 9, 10, 13, and 15. (*See* Ex. 1.)

alone insufficient to allege scienter).

*Third*, because the CW allegations do not address the Individual Defendants' knowledge about the challenged statements, the number of CWs cannot salvage Plaintiff's legally deficient Complaint. *See, e.g.*, *K12*, 66 F. Supp. 3d at 728 (no scienter despite nine CWs); *Gross* v. *AT&T Inc.*, 2021 WL 9803956, at *6 (S.D.N.Y. Sept. 27, 2021) (no scienter despite "a whopping total of 70 CWs").

At most, the CWs collectively allege that the Individual Defendants had access to information about healthcare provider feedback and sales data for PERSERIS, but not SUBLOCADE, some of which was negative. But Plaintiff identifies no particular information provided to any Individual Defendant that rendered any challenged statement false, nor any basis for these allegations reflecting intentional misconduct or severe recklessness. In short, none of the CW allegations sufficiently pleads any Individual Defendant's scienter:

- CWs 1 through 5 allege that some healthcare providers gave negative feedback on PERSERIS, including that it required a thicker needle and offered fewer dosing options than UZEDY. (*See, e.g.*, AC ¶¶ 75, 79, 81, 84, 88.) But the fact that PERSERIS competed with UZEDY and had these different features was known to investors. (*See* p. 9, *supra*.) *See Knurr* v. *Orbital ATK Inc.*, 272 F. Supp. 3d 784, 802-03 n.29 (E.D. Va. 2017) (public information "undercut any inference of scienter").

- The few mentions made by the CWs of the Individual Defendants come nowhere near alleging that any Individual Defendant had knowledge that any challenged statement was false:

  o CWs 1, 2, 3, and 8 allege generally that the Individual Defendants had access to provider feedback and sales data for PERSERIS. (*See, e.g.*, AC ¶¶ 73, 77,

-25-

82, 93.)    Merely alleging "access to internal corporate documents and conversations" does not support the required strong inference of scienter.  *Iron Workers*, 432 F. Supp. 3d at 592.

o   CWs 1, 2, 5, and 8 allege that they or others did not meet their sales goals for PERSERIS (AC ¶¶ 70, 78, 89, 93), and CW 1 asserts that Mr. Simkin "occasionally" attended meetings where sales goals for PERSERIS were discussed (AC ¶ 69).  This assertion has no bearing on scienter because no challenged statement represented anything about sales goals, let alone that they were always met.  Tellingly, Plaintiff does not claim that the PERSERIS sales data disclosed to investors was inaccurate, nor that PERSERIS' competition with UZEDY was hidden from investors.

o   CWs 2 and 3 allege that Mr. Crossley sometimes attended meetings where "provider feedback" was shared (*e.g.*, AC ¶¶ 77, 82), but Mr. Crossley and the other Defendants never represented to investors that all feedback was positive, and identifying instances of negative feedback does not suggest they knew any challenged statement was false.

o   CW 2 alleges that the IRA was "tied to" "reduced reimbursements for PERSERIS," and Mr. Preblick "occasionally joined calls" where "the issue of reimbursements" came up.  (AC ¶ 77.)  But the IRA was fully known to investors, and Plaintiff alleges no false statement about PERSERIS reimbursement amounts.

o   CW 8 alleges that Messrs. "Crossley and Preblick discussed PERSERIS' performance during 'Townhall' calls" (AC ¶ 93), but does not allege anything

-26-

they said, let alone that they contradicted any challenged statement.

  o  CW 5 alleges that "the board of directors and executives of Indivior believed in and supported PERSERIS," thereby recognizing, contrary to the Complaint's allegations, that Defendants subjectively believed their statements were accurate. (AC ¶ 89.)  And CW 5's allegation that "PERSERIS was not gaining a disproportionate share of the LAI market" contains no specifics and is not tied to any time period and thus does not support that any Defendant had scienter. (AC ¶ 88.)

**Temporal Proximity**.  Plaintiff speculates that scienter is supported by the fact that "the June 2024 Presentation reaffirming the net revenue guidance for SUBLOCADE and PERSERIS" was made "just over a month before" the July 9, 2024 reduced revenue forecast.  (AC ¶ 137.)  But the Fourth Circuit has "declin[ed] to draw a strong inference of scienter based *solely* on there being a short amount of time between positive announcements and statements announcing negative financial information."  *KBC*, 19 F.4th at 612-13.  In *KBC*, the Fourth Circuit explained that relying on the time gap between the challenged statements and the alleged corrective disclosures is "little more than pleading fraud by hindsight."  *Id.*; *see, e.g.*, *Elam* v. *Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008) (scienter allegation based on defendant "experience[ing] financial difficulties within a month of [making] positive statements" was "nothing more than hindsight").  Inferring scienter based on the time period between forecasts and their modification is especially inappropriate because "[p]redictions of future growth . . . will almost always prove to be wrong in hindsight."  *Raab*, 4 F.3d at 290.

**Defendants' Statements**.  Finally, Plaintiff is wrong that scienter is supported by Mr. Crossley's honest recognition "that forecasting the impact of Medicaid disenrollment risk was

'incredibly, incredibly difficult,' 'very complicated,' and 'very tough.'" (AC ¶ 129.) That it turned out to be difficult to forecast the impact of Medicaid disenrollment does nothing to allege Mr. Crossley's scienter from February 22 to July 9, 2024 when Indivior forecasted the impact of Medicaid disenrollment. Simply put, "hindsight does not establish fraud." *Raab*, 4 F.3d at 291.

## III.   PLAINTIFF'S CONTROL-PERSON CLAIM ALSO MUST BE DISMISSED.

The Complaint's "claim for controlling person liability under section 20(a) must be based upon a primary violation of the securities laws." *Svezzese* v. *Duratek, Inc.*, 67 F. App'x 169, 174 (4th Cir. 2003). Because Plaintiff has failed to plead a claim against Defendants under Section 10(b), Plaintiff's Section 20(a) claim fails as a matter of law. *See Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 478 n.7 (4th Cir. 2011) (dismissing Section 20(a) claim).

## IV.   CONCLUSION

The Complaint should be dismissed in its entirety and with prejudice.

Respectfully submitted,

|  | /s/ *Brian E. Pumphrey* |
|---|---|
|  | Brian E. Pumphrey (VSB No. 47312) |
| Robert J. Giuffra, Jr.* | Garrett H. Hooe (VSB No. 83983) |
| David M.J. Rein* | Frank Talbott V (VSB No. 86396) |
| Julia A. Malkina* | MCGUIREWOODS LLP |
| SULLIVAN & CROMWELL LLP | Gateway Plaza |
| 125 Broad Street | 800 East Canal Street |
| New York, New York 10004 | Richmond, Virginia 23219 |
| Telephone: (212) 558-4000 | Telephone: (804) 775-1000 |
| Facsimile: (212) 558-3588 | Facsimile: (804) 775-1061 |
| giuffrar@sullcrom.com | bpumphrey@mcguirewoods.com |
| reind@sullcrom.com | ghooe@mcguirewoods.com |
| malkinaj@sullcrom.com | ftalbott@mcguirewoods.com |

\* Admitted *pro hac vice*

*Counsel for Defendants*

January 10, 2025

-28-

**CERTIFICATE OF SERVICE**

I certify that on January 10, 2025, I filed (i) Defendants' Motion to Dismiss the Amended Complaint; (ii) Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint; and (iii) Declaration of David M.J. Rein, dated January 10, 2025, on the Court's CM/ECF docket which sent a notice of electronic filing to all counsel of record in this matter.

/s/ *Brian E. Pumphrey*
Brian E. Pumphrey (VSB No. 47312)
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
Facsimile: (804) 775-1061
bpumphrey@mcguirewoods.com