# Exhibit 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

## FORM 20-F

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934
OR
☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2023.
OR
☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
OR
☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
Date of event requiring this shell company report _____
For the transition period from _____ to _____
Commission file number: 001-37835

# Indivior PLC

(Exact name of Registrant as specified in its charter)
Not applicable
(Translation of Registrant's name into English)

England and Wales
(Jurisdiction of incorporation or organization)

10710 Midlothian Turnpike, Suite 125
North Chesterfield, Virginia 23235
(Address of principal executive offices)

**Jeff Burris, Chief Legal Officer**
(**804**) 379-1090 legal@indivior.com
10710 Midlothian Turnpike, Suite 125
North Chesterfield, Virginia 23235
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.50 nominal value per share | INDV | London Stock Exchange<br>The Nasdaq Stock Market LLC |

Securities registered or to be registered pursuant to Section 12(g) of the Act: None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

As of December 31, 2023, the number of outstanding ordinary shares was 136,526,357.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  ☐ Yes   ☒ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.  ☐ Yes   ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  ☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated Filer ☐          Non-accelerated filer ☒
Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards[†] provided pursuant to Section 13(a) of the Exchange Act.  ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.  ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).  ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:   U.S. GAAP ☐

International Financial Reporting Standards as issued by the International Accounting Standards Board ☒ Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.      Item 17 ☐  Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☐   No ☐

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| | Glossary | 2 |
| | About this Annual Report | 5 |
| | Cautionary Note Regarding Forward Looking Statements | 6 |

## PART I

| | | |
|---|---|---|
| Item 1 | Identity of Directors, Senior Management and Advisers | 8 |
| Item 2 | Offer Statistics and Expected Timetable | 8 |
| Item 3 | Key Information | 8 |
| Item 4 | Information on the Company | 63 |
| Item 4A | Unresolved Staff Comments | 108 |
| Item 5 | Operating and Financial Review and Prospects | 108 |
| Item 6 | Directors, Senior Management and Employees | 130 |
| Item 7 | Major Shareholders and Related Party Transactions | 155 |
| Item 8 | Financial Information | 157 |
| Item 9 | The Offer and Listing | 159 |
| Item 10 | Additional Information | 159 |
| Item 11 | Quantitative and Qualitative Disclosures About Market Risk | 171 |
| Item 12 | Description of Securities Other than Equity Securities | 172 |

## PART II

| | | |
|---|---|---|
| Item 13 | Defaults, Dividend Arrearages and Delinquencies | 173 |
| Item 14 | Material Modifications to the Rights of Security Holders and Use of Proceeds | 173 |
| Item 15 | Controls and Procedures | 173 |
| Item 16A | Audit Committee Financial Expert | 173 |
| Item 16B | Code of Ethics | 173 |
| Item 16C | Principal Accountant Fees and Services | 174 |
| Item 16D | Exemptions From the Listing Standards for Audit Committees | 175 |
| Item 16E | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 175 |
| Item 16F | Change in Registrant's Certifying Accountant | 176 |
| Item 16G | Corporate Governance | 176 |
| Item 16H | Mine Safety Disclosure | 177 |
| Item 16I | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 177 |
| Item 16J | Insider Trading Policies | 177 |
| Item 16K | Cybersecurity | 177 |

## PART III

| | | |
|---|---|---|
| Item 17 | Financial Statements | F-1 |
| Item 18 | Financial Statements | F-1 |
| Item 19 | Exhibits | 200 |
| | Signature | 203 |

i

## ABOUT THIS ANNUAL REPORT

As used herein, references to "we," "us," the "Company," "Indivior," "Indivior PLC," "Indivior Group" or the "Group," or similar terms in this Form 20-F mean Indivior PLC and, as the context requires, its consolidated subsidiaries.

Our consolidated financial statements appearing in this annual report on Form 20-F are prepared in U.S. dollars and in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board ("IFRS").

In this annual report, we present certain financial information and measures and certain operational data which are not calculated in accordance with IFRS, such as adjusted gross margin, adjusted selling, general and administrative expenses, adjusted operating profit, adjusted tax expense, adjusted effective tax rate, adjusted net income and adjusted diluted earnings per share. A summary of the non-IFRS measures discussed in this annual report, and of how we use such measures, is presented in "*Item 5. Operating and Financial Review and Prospects*," including cross-references to the sections of this annual report in which these non-IFRS measures are reconciled to the most directly comparable measure calculated in accordance with IFRS.

This annual report includes certain trademarks, service marks and trade names that we own or otherwise have the right to use. SUBLOCADE®, SUBUTEX Prolonged Release®, PERSERIS®, SUBOXONE® Film, SUBOXONE® Tablet, SUBUTEX® Tablet, TEMGESIC®, and INDIVIOR® are registered trademarks of Indivior UK Limited, and OPVEE® is a registered trademark of Indivior Inc. All rights reserved. This annual report also contains additional trademarks, trade names, and service marks belonging to other parties, which are the property of their respective owners. Solely for convenience, our trademarks, service marks and trade names referred to in this annual report may appear without the ® or ™ symbol, but such references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights to these trademarks, service marks and trade names. We do not intend our use or display of other parties' trademarks, trade names, or service marks to imply, and such use or display should not be construed to imply a relationship with, or endorsement or sponsorship of us by, these other parties.

Statements made in this annual report on Form 20-F concerning the contents of any contract, agreement or other document are summaries of such contracts, agreements or documents and are not intended to be complete; such descriptions are qualified in their entirety by reference to the full text of such contract, agreement or other document that may be filed as an exhibit to this annual report, and you may read the document itself for a complete description of its terms. Such exhibits may contain representations and warranties by the parties thereto, which were made only for purposes of that agreement and as of specified dates; are subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosure schedules; may have been made for the purposes of allocating contractual risk between the parties to the agreement instead of establishing these matters as facts; and are subject to standards of materiality applicable to the contracting parties that may differ from those applicable to investors. Investors should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of the Group or any of its subsidiaries or affiliates. Moreover, information concerning the subject matter of the representations, warranties and covenants may have changed after the date of any such agreement, which subsequent information may or may not be fully reflected in the Group's public disclosures.

5

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This annual report contains certain statements that are forward-looking. Forward-looking statements include, among other things, statements regarding the Indivior Group's financial guidance including operating and profit margins for 2024 and its medium- and long-term growth outlook; assumptions regarding expected changes in market share and expectations regarding the extent and impact of competition; assumptions regarding future exchange rates; strategic priorities, strategies for value creation, and operational goals; expected future growth and expectations for sales levels for particular products; expected market growth rates, growing normalization of medically assisted treatment for opioid use disorder, and expanded access to treatment; our product development pipeline and potential future products, expectations regarding regulatory approval of such product candidates, the timing of such approvals, and the timing of commercial launch of such products or product candidates, and eventual annual revenues of such future products; expectations regarding future production and costs at the Group's Raleigh, North Carolina manufacturing facility; and other statements containing the words "believe," "anticipate," "plan," "expect," "intend," "estimate," "forecast," "strategy," "target," "guidance," "outlook," "potential," "project," "priority," "may," "will," "should," "would," "could," "can," "outlook," "guidance," the negatives thereof, and variations thereon and similar expressions. By their nature, such forward-looking statements involve risks and uncertainties as they relate to events or circumstances that may or may not occur in the future. Actual results may differ materially from those expressed or implied in these forward-looking statements.

The forward-looking statements in this annual report are made based upon our current expectations and beliefs concerning future events and involve a number of known and unknown risks and uncertainties. Such forward-looking statements are based on numerous assumptions regarding our present and future business strategy and the environment in which we operate, which may prove to be inaccurate. In particular, our actual results, performance or achievements or industry results could be affected by, among other things:

- The substantial litigation to which we are or may become a party;

- Our reliance on third parties to manufacture commercial supplies of most of our products, conduct our clinical trials and at times to collaborate on products in our pipeline;

- Our ability to comply with legal and regulatory settlements, healthcare laws and regulations, requirements imposed by regulatory agencies and payment and reporting obligations under government pricing programs;

- Risks related to the manufacture and distribution of our products, most of which contain controlled substances;

- Market acceptance of our products as well as our ability to commercialize our products and compete with other market participants;

- The fact that a substantial portion of our revenue derives from a small number of key proprietary products;

- Competition;

- The uncertainties related to the development of new products, including through acquisitions, and the related regulatory approval process;

- Our dependence on third-party payors for the reimbursement of our products and the increasing focus on pricing and competition in our industry;

- Unintended side effects caused by the clinical study or commercial use of our products;

- Our use of hazardous materials in our manufacturing facilities;

6

- Our ability to successfully execute acquisitions, partnerships, joint ventures, dispositions or other strategic acquisitions;

- Our ability to protect our intellectual property rights and the substantial cost of litigation or other proceedings related to intellectual property rights;

- The risks related to product liability claims or product recalls;

- The significant number of laws and regulations that we are subject to, including due to the international nature of our business;

- Macroeconomic trends and other global developments such as the COVID-19 pandemic;

- The terms of our debt instruments, changes in our credit ratings and our ability to service our indebtedness and other obligations as they come due;

- Changes in applicable tax rate or tax rules, regulations or interpretations and our ability to realize our deferred tax assets;

- Volatility in our share price due to factors unrelated to our operating performance; and

- Such other factors as set out in "*Item 3.D.* Risk Factors" and "*Item 5.* *Operating and Financial Review and Prospects*."

Forward-looking statements contained in this annual report apply only at the date of this annual report. We undertake no obligation publicly to update or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

We strongly recommended that you read the risk factors set out in "*Item 3.D.* Risk Factors" of this annual report for a more complete discussion of the factors that could affect our future performance and the industry in which we operate.

7

PART I

**ITEM 1: IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2: OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3. KEY INFORMATION**

**A.      [Reserved]**

**B.      Cash and Cash Equivalents, Capitalization and Indebtedness**

Not applicable.

**C.      Reasons for the Offer and Use of Proceeds**

Not applicable.

8

**D.      Risk Factors**

You should carefully consider the risks described below, together with all of the other information in this annual report on Form 20-F. The risks and uncertainties below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we believe to be immaterial may also adversely affect our business. If any of the following risks occur, our business, financial condition, and results of operations could be seriously harmed, our stock price might decline, and you could lose all or part of your investment. This annual report also contains forward-looking statements that involve risks and uncertainties. Our actual results may differ materially from those in these forward-looking statements as a result of various factors, including the risks described below and elsewhere in this annual report.

**Summary of Risk Factors**

We are subject to a variety of risks and uncertainties which could have a material adverse effect on our business, financial condition, and results of operations. The summary below is not exhaustive and is qualified by reference to the full set of risk factors set forth in this "Risk Factors" section.

Risks Related to our Business
- We are subject to substantial litigation and ongoing investigations and information requests.
- We rely on third parties to manufacture commercial supplies of most of our products.
- Compliance with legal and regulatory settlements requires significant resources and, if we fail to comply, we could be subject to penalties or excluded from government healthcare programs.
- We are subject to additional risks because we import, manufacture, and distribute controlled substances.
- We are subject to risks related to the manufacture of our products.
- We receive substantial revenue from a small number of key proprietary products.
- We depend on our ability to commercialize our products and acceptance of our products by physicians, patients, and healthcare payors.
- Several factors affect the rate at which our revenues may grow.
- We operate in a highly competitive industry.
- We rely on some third parties to develop our pharmaceutical pipeline and conduct clinical trials.
- Clinical trials for the development of products may be unsuccessful.
- We depend on third-party payors for reimbursement for our products.
- The clinical study or commercial use of our products may cause unintended side effects.
- We use hazardous materials in our manufacturing facilities.
- We face additional risks when we manufacture for others.
- We may fail to develop or acquire other new products or compounds.
- Acquisitions, partnerships, joint ventures, dispositions, and other business combinations or strategic transactions involve several inherent risks.
- We may be subject to adverse public opinion.
- Failure to retain key personnel or attract new personnel could have an adverse effect on us.

Risks Related to Intellectual Property
- We may incur substantial costs as a result of intellectual property litigation or other proceedings.
- We may not be able to protect our intellectual property rights throughout the world.
- We may fail to obtain and maintain patents and protect other proprietary rights.

Risks Related to Regulatory or Legal Matters
- The regulatory approval process is expensive, time-consuming, and uncertain.
- Regulatory agencies may impose limitations or post-approval requirements on our products.
- Guidelines published by professional societies, insurance carriers, physician groups, science foundations, and other organizations may affect the use of the Group's products.
- Product liability and product recalls could have a material adverse effect on us.
- We are subject to federal, state, local, and foreign healthcare laws and regulations.

9

- We may fail to comply with payment and reporting obligations under governmental pricing programs.
- We are subject to healthcare fraud and abuse, transparency, and false claims laws.
- We are subject to anti-corruption laws and regulations.
- The pharmaceutical industry faces significant government scrutiny regarding pricing and competition.

Risks Related to our Financial Condition and Tax Matters
- We are subject to macroeconomic trends in the markets where we operate.
- The recent pandemic and governmental and societal responses thereto have adversely affected our business and may continue to do so.
- Our insurance coverage may not be adequate.
- Our $243.8 million term loan contains covenants that could limit our ability to plan for or respond to changes in our business.
- We may not be able to generate sufficient cash to service all of our indebtedness and may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.
- Changes in our credit ratings may reduce access to capital and increase borrowing costs.
- Our effective tax rate may increase, and changes in tax rules and regulations, or interpretations thereof, may adversely affect our financial condition.
- Our deferred tax assets may not be realized.
- If a United States person is treated as owning at least 10% of our ordinary shares, such holder may be subject to adverse U.S. federal income tax consequences.

Risks Related to Our Ordinary Shares
- Our ordinary shares are subject to market price volatility.
- Our ordinary shares are listed to trade on more than one stock exchange, and this may result in price variations.
- We may transition our primary listing to the U.S., which could cause volatility in our share price and shareholder base.
- The rights afforded to our shareholders are governed by English law.
- Our business strategy may involve transactions which may dilute existing shareholders' interests.
- Securities or industry analysts may fail to publish research or may publish inaccurate or unfavorable research about our business.
- We may not pay dividends in the future.

Risks Related to Information Security and Data Privacy
- We are at risk for business interruptions or breaches of data security.
- We are required to maintain the privacy and security of personal information.

Risks Related to Our International Status and Operations
- We are subject to various risks related to the local and international nature of our business.
- We are exposed to risks related to currency exchange rates.

Risks Related to Being a Publicly-Traded Company in the U.S.
- We may fail to maintain effective internal controls over financial reporting.
- We are a foreign private issuer and may lose our foreign private issuer status in the future.
- We expect to eventually change to U.S. generally accepted accounting principles.
- We are subject to risks related to changes in accounting standards, assumptions, and estimates.
- The obligations associated with being a public company in the U.S. are significant.
- Corporate responsibility matters may impose additional costs and expose us to new risks.

10

### Risks Related to our Group and Its Business

*We are currently, in the past have been, and in the future may be, subject to substantial litigation and ongoing litigation that could cause us to incur significant legal expenses, divert management's attention, and result in harm to our business.*

We have been, and may in the future become, involved in various legal proceedings, regulatory proceedings, and government enforcement actions. Such proceedings may include claims for, or the possibility of, damages or fines and penalties involving substantial amounts of money or other relief, including but not limited to civil or criminal fines and penalties. For example:

- In 2019, the U.S. Attorney's Office for the Western District of Virginia brought an indictment, followed by a superseding indictment (the "2019 Indictment"), against the Group in connection with our marketing and promotional practices related to SUBOXONE Film and SUBOXONE and SUBUTEX Tablets. The indictments charged Indivior Inc. and Indivior PLC with health care fraud, mail fraud, wire fraud, and conspiracy to commit the same. They generally alleged that the Company had falsely represented that SUBOXONE film was safer and less susceptible to misuse, abuse, diverse, and inadvertent pediatric exposure than SUBOXONE tablets, purportedly to delay approval of generic versions of SUBOXONE tablets and retain market share. Pursuant to a Resolution Agreement made on July 24, 2020 as part of a global resolution with the U.S. Attorney's Office for the Western District of Virginia, the DOJ's Consumer Protection Branch, the FTC, and several U.S. state attorneys general, an indirect wholly owned subsidiary of Indivior PLC pleaded guilty to a single count of making false statements relating to healthcare matters in 2012 (the "Resolution Agreement"). The DOJ dismissed all charges in the indictment, and the Group agreed to a total of $600 million in fines, and agreed to substantial reporting and compliance obligations related to its U.S. operations, among other things. The Resolution Agreement is filed as Exhibit 4.3 to this annual report.

- In January 2021, the Group announced it had reached an agreement with Reckitt Benckiser Group plc ("RB") to resolve claims that RB issued in the Commercial Court in London in November 2020, seeking indemnity under the Demerger Agreement entered into on November 17, 2014 between RB and Indivior to effect the Demerger and to govern the relationship between RB and the Group following the Demerger. Pursuant to the settlement, RB agreed to withdraw its $1.4 billion claim and to release the Group from any claim for indemnity under the Demerger Agreement relating to the DOJ and FTC settlements that RB entered into in July 2019, as well as other claims for indemnity arising from those matters. The Group agreed to pay RB a total of $50 million and released RB from any claims to seek damages relating to the Group's settlement with the DOJ and the FTC.

- In July 2022, the Group settled antitrust, patent infringement, and wrongful injunction claims with the manufacturer of a generic buprenorphine/naloxone film drug product for approximately $72 million and approximately $15 million for similar claims made by a second manufacturer of such a generic film drug product in October 2023.

- During 2023, Indivior Inc. settled civil antitrust cases filed by a class of direct purchasers, a class of end payors, and 41 states and the District of Columbia that had been consolidated in multi-district litigation pending in the U.S. District Court for the Eastern District of Pennsylvania (the "Antitrust MDL") for $385 million, $30 million, and $103 million, respectively.

We are also subject to several significant unresolved matters. For example,

- Separate cases alleging facts similar to the Antitrust MDL were filed by several insurance companies and remain pending in the Circuit Court for the County of Roanoke, Virginia. A trial is scheduled for July 15, 2024 to August 8, 2024.

11

- Humana, Inc. filed a Complaint in Kentucky on August 20, 2021 with substantially the same claims as were raised in the Antitrust MDL. Centene Corporation and several of its affiliates filed a complaint in the Circuit Court for the County of Roanoke, Virginia alleging similar claims on January 13, 2023.

- The Group has been named as a defendant in more than 400 civil lawsuits alleging that we engaged in a longstanding practice to market opioids as safe and effective for the treatment of long-term chronic pain to increase the market for opioids and our own market share, or alleging individual personal injury claims.

- On September 21, 2022, certain shareholders issued representative and multiparty claims against Indivior PLC in the High Court of Justice for the Business and Property Courts of England and Wales, King's Bench Division. On January 16, 2023, the representative served its Particular of Claims setting forth in more detail the claims against the Group, while the same law firm that represents the representative also sent its draft Particular of Claims for the multiparty action. The claims made in both the representative and multiparty actions generally allege that Indivior PLC violated the U.K. Financial Services and Markets Act 2000 ("FSMA 2000") by making false or misleading statements or material omissions in public disclosures, including the 2014 Demerger Prospectus, regarding an alleged product-hopping scheme regarding the switch from SUBOXONE tablets to SUBOXONE film. Indivior PLC filed an application to strike out the representative action. On December 5, 2023, the court handed down a judgment allowing the Group's application to strike out the representative action. The court subsequently awarded certain costs to the Group. On January 23, 2024, the claimants requested permission to appeal the decision to the court of appeals.

The amount of time that is required to resolve legal or regulatory proceedings is unpredictable and any litigation or claims against us, even those without merit, may cause us to incur substantial costs, divert management's attention from the day-to-day operation of our business, and materially harm our stock price and reputation. In addition, we are obligated to indemnify and advance expenses to certain individuals and entities involved in certain of these and related proceedings. Any adverse judgment in or settlement of any pending or any future litigation could result in significant payments, fines and penalties that could have a material adverse effect on our business, results of operations, financial condition and reputation.

Moreover, the outcome of these legal proceedings may differ from the Group's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Although the Group maintains general liability insurance, the amount of liability that may result from certain of these risks may not always be covered by, or could exceed, the applicable insurance coverage. Various factors or developments can lead the Group to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Group's results of operations or cash flows in any particular period. In addition, negative publicity related to these proceedings may negatively impact the Group's reputation.

For a more detailed discussion involving the Group's legal proceedings and associated accounting estimates, see "*Item 10. Additional Information—C. Material Contracts*" and "*Item 18. Financial Statements—Audited Consolidated Financial Statements—Note 19—Provisions and Other Liabilities, Note 20—Contingent Liabilities and Note 21—Legal Proceedings*", especially at the captions "Antitrust Litigation and Consumer Protection" and "Civil Opioid Litigation" which provide information regarding additional matters that we believe may be significant to the Group as of the date of the filing of this annual report.

*We rely on third parties to manufacture, package, test, and distribute our products and their facilities and processes must meet stringent regulatory requirements.*

The Group relies almost exclusively on third parties, including contract manufacturing organizations, to manufacture, package, test, and distribute our products. The manufacturing of our products, which include oral solid dose tablet products, film products, a nasal spray product, and terminally sterilized and aseptically filled injectables, is subject to stringent global regulatory, quality, and safety standards, including current Good Manufacturing Practice ("cGMP"). Some of our products, including SUBOXONE Film, SUBLOCADE long-acting injectable, and PERSERIS long-acting injectable, and OPVEE nasal spray, are significantly more complicated to manufacture than tablet products. We have limited control over the performance of our third-party manufacturers and are currently dependent on our third-party contract manufacturing partners whom we manage via supply and quality agreements.

Similarly, the Group relies on a third-party logistics vendor and a network of specialty pharmacists and specialty distributors to fulfill orders and distribute our products in the U.S. and logistics and distribution partners to distribute our products worldwide. This process is complicated because most of our products contain controlled substances that require special handling, such as import and export permits, adherence to a risk evaluation and mitigation strategy ("REMS") protocol, and import restrictions on controlled substances. See also, "*We are subject to additional risks because we import, manufacture, and distribute controlled substances.*"

Our Fine Chemical Plant ("FCP") in Hull, UK manufactures the buprenorphine HCl active pharmaceutical ingredient ("API") used in our tablet and film drug products. This site also produces the intermediate Buprenorphine Base, which is purified by a third-party manufacturer and used in the manufacture of the SUBLOCADE (buprenorphine extended-release) injection drug product. All other APIs required for use in the manufacture of our commercial drug products are supplied by third-party manufacturers.

SUBOXONE (buprenorphine/naloxone) Film drug product is manufactured under a license and supply agreement with Aquestive Therapeutics (formerly known as MonoSol Rx). SUBLOCADE is manufactured under a supply agreement with Curia (formerly known as AMRI). We provide the buprenorphine API used in all of our products and procure from third-party suppliers the polymer and syringe assembly used in the manufacture of SUBLOCADE and PERSERIS, and the API used in PERSERIS as well as the other API used in SUBOXONE. PERSERIS is manufactured under a supply agreement with Curia, which manufactures the liquid syringe, and Patheon Pharmaceuticals, LLC, which manufactures the powder syringe containing risperidone API. Curia has manufacturing facilities located in Burlington, MA and Albuquerque, NM which support the Group's products. Patheon has a manufacturing facility located in Greenville, NC. We also utilize a third-party packager. We have contracted for the commercial supply of OPVEE with Summit BioSciences located in Lexington, KY. SpecGx LLC provides the nalmefene, and Neurelis, Inc. provides the dodecyl maltoside (an absorption enhancer) used in the manufacture of OPVEE.

We or our third-party manufacturers may encounter difficulties in production, such as issues with production costs and yields, process controls, quality control, and quality assurance, including testing of stability, impurities and impurity levels, sterility, and other product specifications by validated test methods, compliance with strictly enforced global and regional regulations, and disruptions or delays caused by man-made or natural disasters, pandemics or epidemics, or other business interruptions, including, for example, the COVID-19 pandemic. In 2023, the FDA validated additional equipment and an additional manufacturing line at the existing Curia facility in Albuquerque, NM. In addition, in November 2023 we purchased an approximately 80,000 square foot facility in Raleigh NC to provide additional manufacturing capacity. Once validated and given regulatory approval, these should meet anticipated demand for the next several years. However, it will take multiple years before new equipment will be validated at the Raleigh facility, and there can be no assurance that such efforts will be successful. If we are unable to otherwise obtain adequate manufacturing capacity for SUBLOCADE and PERSERIS, we may suffer

13

supply disruptions which would reduce growth in our net revenues and in turn have a material adverse effect on our business, financial condition, and results of operations.

If we or any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements or pass regulatory inspection, we or our third-party manufacturers will not be able to ensure an adequate supply of products and/or secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no direct control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. If the FDA or any other applicable regulatory authorities do not approve these facilities for the manufacture of our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to supply our primary active ingredients or manufacture our products, we may need to find alternative manufacturing facilities, which may significantly impact our ability to develop, obtain regulatory approval for or market our products. To the extent our manufacturing facility or that of any third-party manufacturers that we engage with respect to our products are different from those currently being used for commercial supply in the U.S., studies will have to be completed, and the FDA will need to approve such facilities prior to our sale of any product manufactured using these facilities. Any delay or interruption in our ability to meet commercial demand for our products will result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for these products. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trials, and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely, which in turn could have a material adverse effect on our business financial condition, and results of operations.

*Compliance with the terms and conditions of our Corporate Integrity Agreement, the Resolution Agreement with the U.S. Attorney's Office for the Western District of Virginia and the U.S. Department of Justice ("DOJ")'s Consumer Protection Branch, and the Stipulated Order for Permanent Injunction and Equitable Monetary Relief with the U.S. Federal Trade Commission ("FTC") requires significant resources and management time and, if we fail to comply, we could be subject to criminal charges, penalties, or, under certain circumstances, excluded from government healthcare programs, which would materially adversely affect our business.*

We operate on a global basis and the pharmaceutical industry is both highly competitive and highly regulated. Complying with all applicable laws and regulations, industry standards, and our Group's Code of Conduct are core to the Group's mission, culture, and practices. The Group has policies and procedures to identify, analyze and investigate any potential or actual violations of law, regulation, or policy and, if necessary, take appropriate remedial or corrective actions. Effective procedures and controls assist in helping to ensure that we provide reliable information and prevent and detect potential fraud or misconduct. Failure to comply with applicable laws and regulations may subject the Group to civil, criminal, and administrative liability, including but not limited to the imposition of substantial monetary penalties, fines, damages and restructuring of the Group's operations through the imposition of compliance or integrity obligations, and have a potentially adverse impact on the Group's prospects, reputation, results of operations and financial condition.

In 2020, Indivior Inc. entered into a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services Office of the Inspector General ("HHS-OIG"). The CIA was part of the Group's resolution of federal criminal and civil charges related to our film and tablet products. In particular, an indictment and superseding indictment issued in the U.S. District Court for the Western District of Virginia in 2019 charged Indivior Inc. and Indivior PLC with health care fraud, mail fraud, wire fraud, and conspiracy to commit the same. The indictments generally alleged that the Company had falsely represented that SUBOXONE Film was safer and less susceptible to misuse, abuse, diversion, and inadvertent pediatric exposure than SUBOXONE and SUBUTEX Tablets, purportedly to delay approval of generic versions of SUBOXONE tablets and retain market share. The indictments were dismissed as part of a resolution agreement with the DOJ in which the Company did not admit to any wrongdoing, except that subsidiary Indivior Solutions, Inc. ("Solutions") pleaded guilty to a one-count felony information

14

charging Solutions with making false statements to MassHealth (the administrator of Medicaid and the Children's Health Insurance Program (CHIP) in Massachusetts) in October 2012. The resolution agreement also settled civil claims alleging that the Company caused false claims to be submitted to government healthcare programs.

The CIA imposes significant compliance obligations on Indivior Inc.'s business and practices and requires Indivior Inc. to engage an Independent Review Organization and a Board Compliance Expert to assess Indivior Inc.'s compliance program and compliance with CIA requirements. The CIA also sets forth monetary penalties that may be imposed on a per-day basis for failure to comply with certain obligations in the CIA. The CIA requires procedures under which Indivior Inc. must notify HHS-OIG of certain reportable events, and must notify HHS-OIG if it fails to meet the requirements under the CIA. The CIA requires Indivior Inc. to file annual reports describing steps it has taken to implement the terms of the CIA, certifications from certain employees that their department or functional area is compliant with certain laws and regulations, and a certification from the Compliance Officer and Chief Executive Officer that Indivior Inc. is in compliance with the CIA, to the best of their knowledge. The CIA also requires an annual resolution from the Nominating Committee of the Group's Board of Directors that it has reviewed the effectiveness of the Group's compliance program. In the event that HHS-OIG determines Indivior Inc. to be in material breach of certain requirements of the CIA, including, without limitation, repeated violations or any flagrant violation of the CIA, a failure by Indivior Inc. to report a reportable event and take corrective action, a failure to engage and use an independent review organization, among others, Indivior Inc. may be subject to exclusion from participation in the U.S. federal healthcare programs, which would have a severe impact on the Group's ability to comply with the financial covenants in the Group's term loan, maintain sufficient liquidity to fund its operations, generate future revenue, and would ultimately impact the Group's viability.

The FTC Stipulated Order contains The FTC Stipulated Order contains specific notice and reporting requirements over a 10-year period related to certain activities, including (i) notice of filing a Citizen Petition along with certain information; (ii) notice of filing of a New Drug Application for new drug formulations related to Indivior approved drugs, (iii) requirement to provide additional information about certain launch activities related to the new drug formulation; (iv) certain restrictions on pricing of the old drug formulations and activities regarding those old drug formulations for a period of time; (v) notice of FDA Approval of a drug or if Indivior Inc. obtains a drug through a license, acquisition or through obtaining control of an entity; (vi) notice of certain corporate activities such as a dissolution, merger, acquisition of Indivior Inc.; (vii) an obligation to provide the States with certain information and interviews necessary to evaluate compliance with the Settlement Order; and (viii) an obligation to provide reports to the States explaining how Indivior has complied with the Settlement Order, if requested. The Group may be punished for contempt of court, including, but not limited to criminal contempt, if it fails to comply with any terms of the FTC Stipulated Order or Resolution Agreement. The obligations in the FTC Stipulated Order expire in November 2030.

Similarly, in June 2023, Indivior Inc. reached agreement with the Attorneys General of 41 States and the District of Columbia (the "States") to resolve allegations that Indivior Inc. violated the Sherman Act and laws of the States by engaging in anticompetitive activities designed to impede competition from generic equivalents of the brand-name drug Suboxone, which Indivior Inc. disputes. As part of the settlement, Indivior Inc. also agreed to certain compliance and reporting obligations under a Stipulated Final Judgment and Dismissal with Prejudice (the "Settlement Order"). These obligations are similar to those in the FTC Order. The obligations in the Settlement Order expire concurrently with those of the FTC Stipulated Order in November 2030.

The Resolution Agreement imposes several significant compliance obligations on the Group, separate from the CIA, including without limitation certain reporting obligations and the requirement that the Group's Chief Executive Officer (a) certifies on an annual basis that, to the best of their knowledge, after a reasonable inquiry, the Group was in compliance with the U.S. Federal Food, Drug and Cosmetic Act (and implementing regulations) and has not committed healthcare fraud, or (b) provides a certified list of all non-compliant activities and steps taken to remedy the activity. The Resolution Agreement also requires

15

an annual resolution from the Group's Board of Directors that it has reviewed the effectiveness of the Group's Compliance Measures set forth in Section I of Addendum A to the Resolution Agreement. A material breach of the Resolution Agreement could reinstate the indictment against the Group.

The Group's policies, procedures and protocols are designed to prevent and detect failures to comply with the terms of the CIA, the Resolution Agreement, the FTC Order, and the Settlement Order; however, there can be no assurance that a relevant failure that bypasses established controls will be prevented or detected. Any failure to comply with such terms may subject the Group to criminal charges and penalties, or, under certain circumstances, could exclude the Group from U.S. government healthcare programs, which could have a material adverse effect on the Group's business, financial condition and results of operation.

For more information, see "*Item 18, Financial Statements—Audited Consolidated Financial Statements—Note 19—Provisions and Other Liabilities*' and "*Item 10. Additional Information—C. Material Contracts.*" We have filed copies of the Resolution Agreement, the CIA, and the FTC Order as Exhibits Nos. 4.3, 4.4, and 4.5, respectively, to this annual report.

### *We are subject to additional risks because we import, manufacture, and distribute controlled substances.*

Our key products in the U.S. for opioid use disorder, SUBLOCADE long-acting injectable extended-release injection, SUBOXONE Film sublingual film, and outside the U.S., SUBLOCADE, SUBOXONE and SUBUTEX sublingual tablets, contain the active ingredient buprenorphine, which is a controlled substance under the Controlled Substance Act (CSA) and similar laws in other countries. Buprenorphine is a partial agonist opioid. Compared to a full opioid agonist, buprenorphine has less maximal euphoric effect than a full agonist, and a ceiling on its ability to cause respiratory depression. While we market these products for the treatment of opioid use disorder, the use of any opioid is highly stigmatized. Many people who are non-prescribers may fail to distinguish between drugs of abuse and drugs intended for treatment. The lack of distinction between the types and mechanisms of opioids, like buprenorphine, which is a partial opioid agonist, is widely misunderstood. These perceptions and misunderstandings may cause a variety of problems for the Group, including adverse publicity and cause some persons or entities to decline to do business with us. See for example, "*We may be subject to adverse public opinion,*" and "*Failure to retain key personnel or attract new personnel could have an adverse effect on us.*

Products designed to treat drug addiction, by their nature, face additional risks. Drug addiction is a difficult environment in which to market our products. Societally, there is a stigma that prevents many persons who suffer from OUD or other types of addiction from coming forward to receive treatment because of potential reputational damage, societal scrutiny, and other factors. Patients with OUD often suffer from other co-morbidities, including poor general health and mental health issues like schizophrenia, which may impact one's understanding of the disease or affect their ability to obtain treatment. Similarly, drug addiction can result in job loss or unemployment, indebtedness, and criminal problems including incarceration which may make it more difficult for someone to obtain treatment. Other challenges include the misuse, diversion, or abuse of our products.

Regulators may impose additional requirements because of the nature of our products. Buprenorphine and products containing buprenorphine are classified as Schedule III controlled substances in the U.S. by the Drug Enforcement Agency (DEA) and similarly restricted by law enforcement authorities in the rest of the world that are signatories to the WHO Single Convention on Narcotic Drugs (1961). Other molecules considered as product candidates may have more stringent classification (i.e. Schedule I or II) or ambiguous classifications. In the U.S., SUBLOCADE and SUBOXONE are subject to a risk evaluation and mitigation strategy (REMS). The SUBLOCADE REMS restricts the distribution of the product so that SUBLOCADE is dispensed directly to certified healthcare settings and pharmacies for administration by a healthcare professional. This closed distribution system should help mitigate the risk related to the potential for misuse and diversion by the patient, since the product is not dispensed directly to the patient.

16

Individual states have also established controlled substance laws and regulations. Though state-controlled substance laws often mirror federal law, they may separately schedule our products or our product candidates as well. We or our partners may also be required to obtain separate state registrations, permits or licenses in order to be able to manufacture, distribute, administer or prescribe controlled substances for clinical trials or commercial sale, and a failure to meet applicable regulatory requirements could lead to enforcement and sanctions by the states in addition to those from the DEA or otherwise arising under federal law.

U.S. facilities conducting research, manufacturing, distributing, importing or exporting, or dispensing controlled substances must be licensed and must comply with the security, control, recordkeeping and reporting obligations under the CSA, DEA regulations, and corresponding state requirements. The ability to do so is considerably more difficult for molecules and product candidates with a Schedule I or II classification, or ambiguous classification. In addition, the DEA and state regulatory bodies conduct periodic inspections of certain registered establishments that handle controlled substances. Obtaining and maintaining the necessary registrations and complying with regulatory obligations may result in the delay of the importation, manufacturing, distribution or clinical research of our commercial products and product candidates. Furthermore, a failure to comply with CSA, DEA or state regulations by us or any of our third-party manufacturers can result in regulatory action, which can lead to criminal or civil penalties, the refusal to renew necessary registrations or proceedings to restrict, suspend or revoke applicable registrations.

A partial or total loss of revenue from one or more such shipments could have a material adverse effect on our business, results of operations and financial condition. Further, individual distributors and pharmacies may have their own legal, regulatory or business policy requirements that could restrictions or limits the distribution of prescription products. A partial or total loss of revenue from one or more such shipments could have a material adverse effect on our business, results of operations and financial condition. Further, individual distributors and pharmacies may have their own legal, regulatory or business policy requirements that could impose restrictions or limit the distribution of prescription products.

Products containing opioids often require a REMS to mitigate potential risks which may be associated with the use of a product and to inform patients and prescribers of those risks. For example, the FDA requires a REMS for SUBLOCADE and SUBOXONE Film, and other products that we sell in the future may become subject to a REMS specific to the product or shared with other products in the same class of drug. The cost to implement the REMS may be high, which may in turn have a material adverse effect on our business, financial condition, and results of operations.

*We are subject to risks related to the manufacture and distribution of our products globally and must meet stringent current Good Manufacturing Practices.*

All facilities and manufacturing techniques used for the manufacture of our products must be operated in conformity with the mandatory manufacturing standards (often referred to as current good manufacturing practice (cGMP)) of the FDA, the UK Medicines and Healthcare products Regulatory Agency ("MHRA"), the Irish Health Products Regulatory Authority (HPRA), and other regulatory authorities. Manufacturing facilities are subject to periodic unannounced inspections by the FDA, MHRA, HPRA, and other regulatory authorities. Failure to comply with applicable legal and regulatory requirements, and with the manufacturing details filed as part of our marketing authorization, subjects our manufacturing facilities or the facilities of our third-party manufacturers to possible legal or regulatory action, such as inspectional observations (e.g., Form FDA 483 notices), warning letters, suspension of manufacturing, product seizure, withdrawal of the product from the market, administrative, civil and criminal penalties, among other enforcement remedies. Therefore, such enforcement actions may adversely affect our ability to manufacture, or our third-party suppliers' ability to supply, finished products.

For example, our Raleigh site was inspected by the FDA in January 2024 regarding cGMP practices related to a particular product we make for a third party. The FDA provided six observations on its Form FDA 483, which is the document used by the FDA to highlight and summarize potential quality or

17

regulatory issues or infractions at the end of an inspection. We have responded to the FDA with a remediation action plan. If the FDA accepts our plan, we expect the results of our remediation efforts will be reviewed during the next inspection.

Also, the manufacturing and distribution of our products globally are highly exacting and complex, due in part to strict regulatory and manufacturing requirements. Problems may arise during manufacturing and distribution for a variety of reasons, including but not limited to equipment malfunction, failure to follow specific protocols and procedures, testing nonconformities (e.g., sterility failure), failure to follow and provide oversight in cGMP, defective raw materials, product theft or diversion within our legal chain of custody, restricted supply of raw materials or components due to geopolitical disruption or pandemic, and environmental factors.

Our manufacturing facilities, and those owned by third-party contract manufacturing organizations ("CMOs"), also maintain high direct and indirect labor costs due to the complexity of manufacturing processes, often requiring specialized personnel. As such labor costs are largely fixed, we are unable to offset such costs if we experience any interruptions or delays in the manufacturing process, product or regulatory approval delays or product suspensions or recalls. In addition, any significant personnel shortages at our manufacturing facilities, whether temporary or prolonged, may cause significant interruptions to our manufacturing facilities and to our supply of products. While some of these costs may be borne directly by third-party CMOs, we may also incur costs for additional safety stock and supplies, repairs, capital expenditures for improvements, even if not required to do so contractually, or indirectly for lost sales. We may also suffer from lost sales as a result of stock outs. This is more pronounced outside the U.S. market where packaging and labeling batches for particular markets tend to be quite small, and require substantial lead time. Please refer to *"Item 4. Information on the Company—B. Business Overview Background—6. Manufacturing"*, for more information.

We have either a single or dual source of supply for the raw materials, product components, and drug products used in most of our marketed products, drug product candidates under development, and their respective APIs (including buprenorphine). Single sourcing puts us at risk of a potential interruption to supply in the event of manufacturing, quality or compliance difficulties.

In the event of any supply chain disruption or product quality issues, our suppliers or third-party manufacturers may not have adequate contingency plans in place that enable them to continue to supply or manufacture our products within contractual deadlines or at all. If any of our suppliers or third-party manufacturers fails or refuses to supply us for any reason, it would take a significant amount of time and expense to implement and execute the necessary technology and design transfer to, and to qualify, a new supplier or manufacturer, as applicable. Often, as a general guide, this transfer time averages 36 months and is based on several factors. The FDA and similar international or national regulatory bodies must approve our filings which identify the manufacturers of the active and inactive pharmaceutical ingredients and certain packaging materials used in our products. If there are delays in qualifying new suppliers or facilities or a new supplier is unable to meet the FDA's or similar international regulatory body's requirements for approval, there could be a shortage of the affected products for the marketplace or for use in clinical studies, or both, which could negatively impact our anticipated revenues and could potentially cause us to breach contractual obligations with customers or to violate local laws requiring us to deliver the product to those in need. Any delay in supplying, or any failure or refusal to supply, products to, or delays in manufacturing by, our suppliers, or any catastrophe or natural or man-made disaster affecting such third-party manufacturing facilities or suppliers, could result in our inability to meet current and future state commercial demands for our products, which in turn could materially adversely affect our business, prospects, results of operations and financial condition. The Group's supply monitoring and contingency planning processes include proactive management of inventories throughout the supply-to-patient delivery process and initiatives to identify and qualify alternative sites and/or suppliers. Despite these mitigating measures, if major delays, interruptions, or quality events occur at those contracted suppliers, contracted manufacturers, or packaging organizations, the delivery of products to our patients could be significantly disrupted, which could materially adversely affect the sales of our products and accompanying revenues. Further, any interruption in supply could result in delays in meeting our

18

contractual obligations and could damage our relationships with our licensees, including the loss of manufacturing and supply rights and/or revenues.

*We receive substantial revenue from our key proprietary products and our success depends on our ability to successfully commercialize new products.*

Historically, our business has been dependent on the sale of products containing buprenorphine. We developed SUBUTEX Tablets, SUBOXONE Tablets, SUBOXONE Film and SUBLOCADE for the treatment of OUD.

Our oral buprenorphine products, including SUBOXONE Film, SUBOXONE Tablets, and SUBUTEX Tablets, are subject to substantial competition. Revenues from film and tablet products are declining. Further, we agreed in the Resolution Agreement to not employ a sales force to promote or sell SUBOXONE Film in the U.S. and we do not sell SUBOXONE or SUBUTEX Tablets in the U.S. As a result, sales of SUBLOCADE have become increasingly important to our revenue growth and financial results.

Our operating plan assumes that SUBLOCADE, SUBOXONE Film, SUBOXONE Tablets, and SUBUTEX Tablets, will remain the treatment of choice for OUD patients who can benefit from MAT. There is no guarantee that we can maintain sales at or near historical levels, or that sales will continue to grow. In this regard, our ability to maintain or increase sales are subject to a number of risks and uncertainties including (i) competition from the introduction of branded competition or generic versions of our products; (ii) pricing pressure from, changes in policies by, or restrictions on reimbursement imposed by, third party payors, including our ability to maintain adequate coverage and reimbursement for our products; (iii) increased rebates required to maintain access to our products; (iv) challenges to our intellectual property around SUBLOCADE; and (v) continued acceptance of SUBLOCADE by physicians and patients. Any significant negative developments relating to these risks could have a material adverse effect on our revenues from these products and, in turn, on our business, financial condition, cash flows and results of operations and the market price of our ordinary shares.

Further, the biotechnology and biopharmaceutical industries are characterized by rapidly advancing technologies. Our future success will depend in part on our ability to maintain a competitive position. If we fail to stay at the forefront of technological change to create and develop product candidates, we may be unable to compete effectively. Our competitors or technological change may limit the commercial value of our products or product candidates by advances in existing technological approaches or the development of new or different approaches, potentially eliminating the advantages of our proprietary products and product candidates.

*Our ability to generate revenues from our products is subject to attaining significant market acceptance among physicians, other qualified HCPs, patients, specialty distributors, and healthcare payors and our ability to successfully develop and execute commercialization strategies for each of our products. Failure to do so would adversely impact our financial condition and prospects.*

A substantial majority of our resources are focused on the commercialization of our current products. Our current products, and other products or product candidates that we may develop or acquire, may not attain market acceptance among physicians and other HCPs to administer our products, patients, specialty distributor, healthcare payors or the medical community. If any of our commercial strategies are unsuccessful or we fail to successfully modify our strategies over time due to changing market conditions, our ability to increase market share for our products, grow revenues and sustain profitability will be harmed.

Our success will also depend in large part on our ability to continue to successfully manufacture and commercialize new products in the complex markets into which they are sold. For example, the FDA approved PERSERIS as the first once-monthly subcutaneous extended-release injectable suspension of risperidone indicated for the treatment of schizophrenia in adults in 2018. We launched commercial sales of PERSERIS in the U.S. in 2019. PERSERIS now faces increased competition 4 years later from a new

19

competitor and a number of well-established competitors and could face additional competition in the future.

Another example is SUBLOCADE, approved in 2017 as the first once-monthly subcutaneous extended-release injectable suspension of buprenorphine. We initiated commercial sales of SUBLOCADE in 2018. In the U.S., a competitor introduced its own subcutaneous extended-release injectable suspension of buprenorphine in 2023.

Similarly, we recently devoted significant resources to acquire Opiant Pharmaceuticals, Inc. As a result, we acquired Opiant's product, OPVEE. In 2023, the FDA approved OPVEE. However, because most of the potential customers for OPVEE are incremental to the customers for our current OUD products, we may face challenges building a sales force and delivery network to serve these new customers. Our ability to realize the benefits from the Opiant Merger is substantially dependent on our ability to successfully commercialize OPVEE. We launched OPVEE in October 2023 and to date have had only limited sales. If we are unsuccessful at convincing State authorities and first responders to increase their rate of adoption of OPVEE, our results of operations could suffer.

We believe the degree of market acceptance and our ability to generate revenues from our products depends on several factors, including:

- the timing of market introduction of our products as well as competitive products;

- our ability to manufacture in sufficient quantities in compliance with requirements of regulatory agencies and at acceptable quality and pricing levels in order to meet commercial demand and where applicable demand for samples;

- our ability to secure formulary approvals for products at a substantial number of targeted hospitals and Organized Health Systems ("OHSs") and criminal justice systems ("CJSs");

- our ability to implement and maintain agreements with wholesalers and distributors on commercially reasonable terms, and their performance, over which we have limited control;

- our ability to receive adequate levels of coverage and reimbursement for products from commercial health plans and government health programs;

- our ability to train, deploy and support qualified customer-facing field teams which include a sales force, a managed care team, account teams that target OHS and CJS, as well as a channel team;

- market demand for our products through our marketing and sales activities and other arrangements established for their promotion;

- the efficacy and safety of our products;

- potential or perceived advantages or disadvantages of our products over alternative treatments, including the cost of treatment and relative convenience and ease of administration;

- the prevalence of the disease or condition for which the product is approved and the projected growth of the markets in which our products compete;

- the effect of current and future healthcare laws and legislation and regulation controlling the conditions of treatment and the distribution of the products for OUD treatments;

- the extent to which physicians diagnose and treat the conditions that our products are approved to treat, physicians' willingness to prescribe the product, and our ability to educate physicians with respect to new products;

- the prevalence and severity of any side effects;

20

- the price of our products, both in absolute terms and relative to alternative treatments;

- impact of past and limitation of future product price increases;

- the extent to which physicians and patients delay visits or writing or filling prescriptions for our products and the extent to which operations of healthcare facilities, including infusion centers, are reduced;

- product labeling or product insert requirements of the FDA or other regulatory authorities;

- the nature of any post-approval risk management plans mandated by regulatory authorities; see "*We are subject to additional risks because we import, manufacture, and distribute controlled substances,*" and

- acceptance by patients, physicians and applicable specialists.

Any factors preventing or limiting the market acceptance or commercialization of our products could have a material adverse effect on their sales and hence our business, results of operations and financial condition.

**_Our revenues may decrease or grow at a slower than expected rate due to many factors._**

We cannot be assured that our products will be, or will continue to be, accepted in the U.S. or markets outside the U.S. or that we will be able to maintain or increase sales of our products. Factors that may cause revenues from our products to grow at a slower than expected rate, decrease or cease altogether, include, among others:

- the perception of physicians and other members of the healthcare community as to our products' safety and efficacy relative to that of competing products and the willingness or ability of physicians and other members of the healthcare community to prescribe, dispense and/or administer, and patients to use, our products;

- unfavorable publicity concerning us, our products, similar classes of drugs or the industry generally;

- the cost-effectiveness of our products, the impact of price changes in the market, and the reimbursement policies of government and third-party payors;

- the cost and availability of raw materials necessary for the manufacture of our products;

- the successful manufacture of our products on a timely and cost-effective basis;

- the size of the markets for our products, and patient and physician satisfaction with our products;

- significant changes in the competitive landscape for our products, including any approval of generic versions of our products or other branded products that may compete with our products;

- adverse event information relating to our products or to similar classes of drugs;

- changes to the labels of our products, or of products within the same drug classes, to add significant warnings or restrictions on use;

- our continued ability to engage third parties to package and/or distribute our products on acceptable terms;

- regulatory developments and actions related to the manufacture, commercialization or continued use of our products, including FDA actions such as the issuance of a REMS or warning letter, or

21

conduct of an audit by the FDA or another regulatory authority in which a manufacturing or quality deficiency is identified;

- the extent and effectiveness of the sales, marketing and distribution support for our products, including our licensees' decisions as to the timing and volume of product orders and shipments, the timing of product launches, and product pricing and discounting;

- disputes with our licensees relating to the use of our technology in, and marketing and sale of, products from which we received, or are currently receiving, manufacturing and/or royalty revenue, and the amounts to be paid with respect to such products;

- exchange rate valuations and fluctuations;

- U.S. and global political changes and/or instability, and any related changes in applicable laws and regulations, that may impact resources and markets for our products; and

- the potential negative impact of current and future healthcare laws and legislation and regulation controlling the conditions of treatment and the distribution of the product including, with respect to OUD treatments, new governmental or regulatory guidelines or policies limiting the prescription of opioids to patients.

*We operate in a highly competitive industry, which includes companies with greater resources, including larger R&D and sales organizations, and more experience working with large and diverse product portfolios, than us. The approval and launch of generic or branded products that compete with SUBLOCADE, SUBOXONE Film, SUBOXONE Tablet, and SUBUTEX Tablet could have a material adverse effect on our business, prospects, results of operations and financial condition.*

The manufacture and sale of pharmaceuticals are highly competitive. Our competitors may have substantially greater financial, operational and human resources than we do. Companies with more extensive resources and larger research and development expenditures have a greater ability to fund clinical trials and other development work necessary for regulatory applications. There is also a risk that our competitors may launch competing products before we are able to complete all of the regulatory milestones required to launch our own product. Competitors may also have a greater ability to offer higher rebates, discounts, chargebacks or other incentives to gain commercial advantage, and may be more successful than us in acquiring or licensing new products for development and commercialization.

Smaller or earlier-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. If any product that competes with one of our products or product candidates is approved, our sales of that product could decrease, the effect of which would be heightened by our product and geographic concentration, which could have an adverse impact on our business, prospects, results of operations and financial condition.

In addition, many pharmaceutical companies are able to deploy more personnel to market and sell their products than us. Each of our sales representatives is responsible for a territory of significant size. The continued growth of our current products and the launch of any future products may require the expansion of our sales force and sales support organization internationally and we may need to commit significant additional funds, management and other resources to the growth of our field organization. We may not be able to achieve any such necessary growth in a timely or cost-effective manner or at all or realize a positive return on our investment. Likewise, if our R&D organization is not appropriately sized to effectively develop our current pipeline and future pipeline projects, the commercial net present value of our current pipeline and any future pipeline projects may be diminished. This in turn could materially and adversely affect our business prospects, results of operations, and financial position. Critically, investment in a novel asset pipeline is required to ensure the sustainability of Indivior through the launch of new medicines as our existing products face increasing competition through generics and alternatives.

The pharmaceutical and biotechnology industries are also characterized by continuous product development and technological change. Our products could, therefore, be rendered obsolete or uneconomic through the development of new products with unique advantages (including, e.g., new chemical entities that may be safer, more effective or more convenient than our products) or by technological advances in manufacturing or production by our competitors. In particular, several of our branded products face competition from generic products in key markets as well as competition from alternative products or treatments. Among other things, competition could continue to require us to increase further the level of rebates and other offsets to gross revenues, particularly in our U.S. operations, and could impact potential volume growth of any particular product, which could reduce our net revenues and therefore our results of operations in future periods.

*Branded Products*

The introduction of branded products that compete with our products may lead to a loss of sales of our products and/or a decrease in the price at which our products can be sold. For example, SUBLOCADE is distributed in the U.S., Australia, Canada, Israel, Finland, Germany, New Zealand, and Sweden. However, Camurus, in partnership with Braeburn Pharmaceuticals, Inc., in 2023 obtained FDA approval of its long-acting injectable buprenorphine product which now competes with SUBLOCADE in the U.S. Additionally, we expect that Braeburn may eventually seek approval in Canada. Camurus' product is already well established in Sweden, Finland, Norway, and Australia, and is available in additional countries. Any of the foregoing competitive developments could have a material adverse effect on our business, prospects, results of operations and financial condition. Among other things, developments of this nature have in the past, and could in the future, require the Group to increase further the level of rebates and other offsets to gross revenues, particularly in its U.S. operations, as well as impact potential volume growth of any affected products, which, in turn, could reduce net revenues and, therefore, its results in future periods.

Similarly, OPVEE (nalmefene) nasal spray competes against branded and generic naloxone nasal sprays, including Narcan® (naloxone HCl) Nasal Spray 4 mg (which is available without a prescription), along with 4 mg naloxone generic equivalents, and Kloxxado® (naloxone HCl) Nasal Spray 8 mg, as well as naloxone or nalmefene administered by syringe.

*Generic Products*

The introduction of generic products typically leads to a loss of sales of the branded product and/or a decrease in the price at which branded products can be sold, particularly when there is more than one generic product available in the market. In addition, legislation enacted in the U.S. allows for the dispensing of generic products and, in some instances, the dispensing of generic products rather than branded products may be required (in the absence of specific instructions from the prescribing physician). If we fail to obtain or maintain adequate patent protection, we may not be able to prevent third parties from launching generic or biosimilar versions of SUBLOCADE and/or PERSERIS.

Our SUBOXONE Film product already faces four generic competitors in the U.S. We are aware of one competitor that has received FDA approval but is unable to enter the market until 2025, and another with an application pending before the FDA. We have seen our market share of film decline from greater than 50% in 2018 to an average share of 19% during 2023 and expect further declines if other competing products become available or if existing participants choose to disrupt the market in line with industry analogs. Additionally, we no longer promote SUBOXONE Film in the U.S. and no longer sell or market our SUBUTEX Tablets and SUBOXONE Tablets in the U.S. We generally face generic competition globally for these products. For a detailed discussion of the competition that we face with respect to our current marketed products, technology platforms and product indications, please see the section entitled "Competition" in "*Item 4. Information on the Company—B. Business Overview*" in this annual report. If we are unable to compete successfully in this highly competitive industry, our business, financial condition, cash flows and results of operations could be materially adversely affected.

23

*Most of our pharmaceutical pipeline relies on collaborations with third parties, which may adversely affect the development and sale of our products.*

We depend on alliances with other companies, including pharmaceutical and biotechnology companies, vendors and service providers, for the development of a portion of the products in our pharmaceutical pipeline and for the commercialization and sales of certain of our commercial products. For example, we have collaborations with third parties under which we share development rights, obligations and costs and/or commercial rights and obligations. See "*Item 4. Information on the Company—B. Business Overview Background—5. Pipeline.*"

Our agreements with development partners typically require substantial up-front investments, potential milestone or option payments, and royalties on net sales to the development partner. For example, through our agreements with multiple collaboration partners, we have aggregate potential financial obligations of up to approximately $344 million upon the completion of all development milestones and additional potential financial obligations of an aggregate of $721 million if all sales milestones are met. Development milestones generally are payable upon the attainment of certain milestones towards and including the approval of a new product and by definition would be triggered if at all prior to the sale of such products. Sales milestones are payable upon the attainment of specified commercial sales levels. See also "*Item 10. Additional Information—C. Material Contracts,*' for additional details regarding these collaboration agreements. Similarly, we have potential obligations of up to $68 million in connection with a Contingent Value Agreement entered into in connection with the acquisition of Opiant Pharmaceuticals, Inc., a Delaware corporation ("Opiant") based upon future sales of OPVEE reaching certain levels. See "*Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources,*" at the caption "*CVR Agreement.*" While these payments, if triggered, would require substantial resources, at the same time they reflect increased value of products or potential products as development or sales milestones are attained.

Also, failures by these parties to meet their contractual, regulatory, or other obligations to us or any disruption in the relationships between us and these third parties, could have a material adverse effect on our pharmaceutical pipeline and business. In addition, our collaborative relationships for R&D and/or commercialization and sales often extend for many years and have given, and may in the future give, rise to disputes regarding the relative rights, obligations and revenues of us and our collaboration partners, including the ownership or prosecution of intellectual property and associated rights and obligations. This could result in the loss of intellectual property rights or protection, delay the development and sale of potential pharmaceutical products, affect the effective sale and delivery of our commercialized products and lead to lengthy and expensive litigation, administrative proceedings or arbitration.

There is also a trend in the specialty pharmaceutical industry of seeking to "outsource" drug development by acquiring companies with promising drug candidates. We face substantial competition from historically innovative companies, as well as companies with greater financial resources than us, for such acquisition targets.

See also "*If we fail to develop or acquire other new products or compounds for development, our business, prospects, results of operations and financial condition could be materially adversely affected.*"

*Clinical trials for the development of products, including our key pipeline products, may be unsuccessful and our product candidates may not receive authorization for manufacture and sale.*

Before obtaining regulatory approvals for the commercial sale of each product under development, we must demonstrate, through pre-clinical, clinical and other studies, that the product is safe and effective for the claimed use or uses, and also demonstrate that the product is of appropriate quality. No assurance can be provided that a clinical study will demonstrate that a particular product candidate safely provided hypothesized benefits.

Our lead development products are: AEF0117(synthetic CB1 specific signaling inhibitor) which is currently undergoing a Phase 2b study; INDV-2000 (selective orexin-1 receptor antagonist) for which two

24

Phase 1 clinical trials (single and multiple ascending dose studies) have been completed and for which we expect to initiate a clinical Phase 2 proof-of-concept study in the second quarter of 2024; and INDV-6001 (buprenorphine based long-acting injectable) for which we plan on commencing a Phase 2 clinical trial later in 2024. Additionally, INDV-1000 (Selective GABAb positive allosteric modulator), INDV-5004 (drinabant injection for acute cannabinoid overdose) and CT-102 (prescription digital therapeutic to treat OUD) are in the pre-clinical stage.

However, the results from early clinical trials may not be indicative of results obtained in later and larger clinical trials, and therefore these product candidates may fail to show the desired safety and efficacy in later clinical trials despite having progressed successfully through initial clinical testing. In that case, the FDA or the equivalent regulatory authority in jurisdictions outside the U.S. may determine that our data are not sufficiently compelling to warrant marketing approval and may require us to engage in additional clinical trials or provide further analysis which may be costly and time-consuming and substantially delay the receipt of such regulatory approval (which may delay the launch of any potential product).

Also, the development process takes many years and can be very expensive. The number and duration of pre-clinical studies and clinical trials that are required vary depending on the product candidate, the indication being evaluated, the trial results and the regulations applicable to the particular product candidate. Such clinical and other studies can be delayed or halted for a variety of reasons, including:

- challenges in identifying clinical development pathways, including appropriate clinical trial protocol design, particularly where there is no regulatory precedent;

- delays or failures in obtaining regulatory authorization to commence a trial because of safety concerns of regulators relating to our product candidates or similar product candidates of our competitors or failure to follow regulatory guidelines;

- delays or failures in obtaining clinical materials and sufficient quantities of the product candidate for use in trials;

- delays or failures in reaching an agreement on acceptable terms with prospective study sites;

- delays or failures in obtaining approval of our clinical trial protocol from an institutional review board or ethics committees to conduct a clinical trial at a prospective study site;

- delays in identifying, recruiting, or enrolling patients to participate in a clinical trial;

- failure of clinical investigators to comply with FDA and other regulatory agencies' good clinical practice ("GCP") requirements;

- unforeseen safety issues, including negative results from ongoing pre-clinical studies and adverse events associated with product candidates;

- inability to monitor patients at multiple study sites adequately during or after treatment;

- disagreements with collaborative partners on the planning and execution of product development; or

- insufficient funds to complete the trials.

For example, regulatory approval to conduct clinical studies of one of our product candidates for one of our non-opioid OUD treatments was delayed due to a clinical hold originating with FDA's concerns related to a third-party's product, rather than our own product.

25

Many companies in the pharmaceutical industry have suffered significant setbacks in drug development and there can be no guarantee that FDA approval will ultimately be obtained for any given product.

Further, the COVID-19 pandemic caused certain delays in the execution of our internal and third-party clinical and/or chemistry, manufacturing and controls (CMC) studies such as patient enrollments in clinical trials and CMC operations. If similar or more severe pandemics were to occur in the future, we could experience more significant disruptions to our clinical development programs.

*We rely on third parties to conduct our clinical trials, and if they do not properly and successfully perform their legal and regulatory obligations, as well as their contractual obligations to us, we may not be able to obtain regulatory approvals for our product candidates within the timeframes currently envisaged, or at all and may be exposed to regulatory sanctions.*

We rely on contract research organizations and other third parties to assist in designing, managing, monitoring and otherwise carrying out our clinical trials, including with respect to site selection, contract negotiation and data management. We do not control these third parties and, as a result, may not be able to prevent delays, interruptions, or other issues with respect to the clinical trials conducted by such third parties. They may fail to perform their contractual duties, comply with regulations or meet expected deadlines. If we, contract research organizations, our clinical investigators, or other third parties assisting us or our study sites fail to comply with applicable GCP requirements, the clinical data generated in the relevant clinical trials may be deemed unreliable and the FDA or its non-U.S. counterparts may require us to perform additional clinical trials before approving our marketing applications.

In addition, clinical trials must be conducted with products manufactured, labeled and supplied under the FDA's and non-U.S. regulatory agencies' current good manufacturing practices ("cGMP") regulations and in strict compliance with local regulatory requirements (e.g., compliance with Investigational New Drug (IND) application in the U.S., Clinical Trial Application (CTA) in Europe, etc.). Our failure, or the failure of third parties conducting clinical trials on our behalf, to comply with these regulations may require us to repeat or redesign clinical trials, which would delay the regulatory approval process or expose us to regulatory sanctions.

If our clinical trials do not meet regulatory requirements, or if the third parties conducting our clinical trials need to be replaced, our clinical trials may be extended, delayed, suspended or terminated. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trials, and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. If any of these events occur, we may not be able to obtain regulatory approval for our product candidates or succeed in our efforts to create approved line extensions for our existing products or generate additional useful clinical data in support of these products, which would adversely affect our business, prospects, results of operations and financial condition.

*Revenues generated by sales of our products depend on the availability from third-party payors for reimbursement for our products and the extent of cost-sharing arrangements for patients (e.g., patient co-payment, co-insurance, deductible obligations) and cost-control measures imposed, and any reductions in payment rate or reimbursement or increases in our or in patients' financial obligation to payors could result in decreased sales of our products and/or decreased revenues.*

In both U.S. and non-U.S. markets, sales of our products depend, in part, on the availability of reimbursement from third-party payors such as state and federal governments, including Medicare and Medicaid in the U.S. and similar programs in other countries, managed care providers and private insurance plans. Deterioration in the timeliness, certainty and amount of reimbursement for our products, the existence of barriers to coverage of our products, increases in our financial obligation to payors, including government payors, limitations by healthcare providers on how much, or under what

26

circumstances, they will prescribe or administer our products or unwillingness by patients to pay any required co-payments, or deductible amounts, could reduce the use of, and revenues generated from, our products and could have a material adverse effect on our business, financial condition, cash flows and results of operations.

For example, in the U.S. market, when generic versions of a product are available, payors may impose access restrictions on the branded product, such as requiring prior authorization, imposing high patient co-pays, or precluding coverage altogether. In some cases, similar restrictions might apply when a therapeutic alternative is available. In addition, when a new product is approved, the availability of government and private reimbursement, any applicable coverage restrictions and the amount of reimbursement are all uncertain. The prices for certain of our products, when commercialized, may be high compared to other pharmaceutical products. As a result, we may encounter difficulty in obtaining satisfactory pricing and reimbursement for our new products. The failure to obtain and maintain pricing and reimbursement at satisfactory levels for our products may adversely affect our results of operations and prospects.

In the U.S., federal and state legislatures, health agencies and third-party payors continue to focus on containing the cost of healthcare, including by comparing the effectiveness, benefits and costs of similar treatments. Any adverse findings for our products may reduce the extent of reimbursement for our products. Economic pressure on state budgets may also result in states increasingly seeking to limit coverage or payment for drugs, including but not limited to price control initiatives, discounts and other pricing-related actions. Over the past several years, several states have enacted drug pricing transparency laws that require companies to report on drug price increases and justify how drug prices were set, and we expect additional state or federal drug pricing initiatives to be proposed and enacted in the future. In addition, state Medicaid programs are increasingly requesting that manufacturers pay supplemental rebates and require prior authorization by the state program for use of any drug. Managed care organizations continue to seek price discounts and, in some cases, impose restrictions on the coverage of particular drugs. Government efforts to reduce Medicaid expenses may lead to increased use of managed care organizations by Medicaid programs, which may in turn result in managed care organizations influencing prescription decisions for a larger segment of the population and a corresponding constraint on prices and reimbursement for our products. Further, the Inflation Reduction Act of 2022, or IRA, which, among other things, requires the HHS Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain high-spend drugs and biologicals per year starting in 2026, penalizes manufacturers of certain Medicare Parts B and D drugs for price increases above inflation, and makes several changes to the Medicare Part D benefit, including a limit on annual out-of-pocket costs, and a change in manufacturer liability under the program that could negatively affect us. Congress and the Biden Administration continue to examine various policy proposals that may result in pressure on the prices of prescription drugs in government health programs.

We may also be adversely affected by disenrollments from government benefit programs such as Medicaid. At the start of the pandemic, Congress enacted the Families First Coronavirus Response Act (FFCRA), which included a requirement that Medicaid programs keep people continuously enrolled through the end of the COVID-19 public health emergency (PHE), in exchange for enhanced federal funding. Primarily due to the continuous enrollment provision, Medicaid enrollment grew substantially compared to before the pandemic and the uninsured rate has dropped. However, as part of the Consolidated Appropriations Act (CAA), signed into law in December 2022, Congress de-linked the continuous enrollment provision from the PHE thus ending continuous enrollment on March 31, 2023. During the unwinding of the continuous enrollment provision, millions of people are expected to lose Medicaid which could reverse recent gains in coverage, though not everyone who loses Medicaid will become uninsured and some persons will be eligible for re-enrollment. States began disenrolling people from Medicaid in different months, with some states began disenrollments in April 2023, others in May or June, and even July or later for some states.

In addition, the outcome or settlement of litigation could impact the practices of healthcare providers and patients, and the policies and practices of third-party payors, including Medicare, Medicaid, managed

https://www.sec.gov/Archives/edgar/data/1625297/000162529724000017/indv-20231231.htm#id39cb0e1a10249e1ab7b8f77d921d68a_1981    33/281

care providers and private insurance plans. For example, the Group has been named as a defendant in a federal multi-district opioid litigation. The litigation and negative media attention may cause wholesalers to refrain from purchasing buprenorphine products from us, and may cause other business partners to decline to do business with us, which in turn could materially and adversely affect our business and financial condition.

In Europe and many other countries, government-sponsored healthcare systems are the primary payors for healthcare expenditures, including payment for drugs. We expect that these countries will continue to act to reduce expenditure on drugs, including mandatory price reductions, patient access restrictions, suspensions of price increases, increased mandatory discounts or rebates, preference for generic products, reduction in the amount of reimbursement and greater importation of drugs from lower-cost countries. Any such cost-control measures would likely reduce our revenues. In addition, certain countries set prices by reference to the prices in other countries where our products are marketed. Thus, the inability to secure adequate prices in a particular country may not only limit the marketing of products within that country, but may also adversely affect the ability to obtain acceptable prices in other markets.

There can be no assurance that our products will obtain favorable reimbursement status in any country. The failure to obtain and maintain reimbursement, or an adequate level of reimbursement, for our products may have a material adverse effect on our business, prospects, results of operations and financial condition.

See also "*The pharmaceutical sector is facing increased government scrutiny from competition and pricing authorities around the world, and any failure to comply, may expose us to significant damages and commercial restrictions that can materially and adversely affect our business.*"

**The clinical study or commercial use of our products may cause unintended side effects or adverse reactions, or incidents of misuse may occur, which could adversely affect our products, business and share price.**

The administration of drugs to humans carries the inherent risk of product liability claims whether or not the drugs are actually the cause of an injury. Our products may cause, or may be perceived to have caused, injury or dangerous drug interactions or may produce undesirable or unintended side effects, and we may not learn about or understand those effects until the products have been administered to study participants or patients for a prolonged period of time. Additionally, incidents of product misuse may occur. We cannot be certain that the clinical or commercial use of our products will not produce undesirable or unintended side effects that have not been evident in the use of, or in clinical trials conducted for, such products to date.

For example, the Group has been named as a defendant in more than 30 lawsuits that have been consolidated into a multi-district litigation in the Northern District of Ohio (see *In Re Suboxone (Buprenorphine/Naloxone) Film Products Liability Litigation*) in which individual plaintiffs claim that Suboxone caused them to suffer dental cavities, tooth loss, or other damage to their teeth. The plaintiffs generally allege that the Group failed to properly warn physicians of the risk of dental injury, and further allege that Suboxone products were defectively designed. The plaintiffs generally seek compensatory damages, as well as punitive damages and attorneys' fees and costs. Product liability cases such as these typically involve issues relating to medical causation, label warnings and reliance on those warnings, scientific evidence and findings, actual, provable injury and other matters. These cases are in their preliminary stages. These cases followed a January 2022 FDA warning about dental problems associated with buprenorphine medicines dissolved in the mouth to treat opioid use disorder. The FDA added a requirement that all manufacturers of these products provide a warning in their prescribing label and their patient Medication Guide. See "*The FDA, the DEA, or other regulatory agencies may impose limitations or post-approval requirements on approvals for our products*" below.

These events, among others, could result in product recalls or additional regulatory controls (including additional regulatory scrutiny, a REMS and requirements for additional labeling) or product liability claims.

28

Our product liability insurance coverage may be inadequate to satisfy liabilities that arise, we may be unable to obtain adequate coverage at an acceptable cost or at all or our insurer may disclaim coverage as to a current or future claim. This could prevent or limit the development or commercialization of our products. In addition, the reporting of adverse safety events involving our products, including instances of product misuse, and public rumors about such events could cause our product sales or share price to decline or experience periods of volatility. These types of events could have a material adverse effect on our business, financial condition, cash flows and results of operations.

*We use hazardous materials in our manufacturing facilities, and any claims relating to the improper handling, storage, release or disposal of these materials could be time-consuming and expensive.*

Our operations are subject to complex and increasingly stringent environmental, health and safety laws and regulations in the countries where we operate and, in particular, in the U.K. and U.S. where we have manufacturing and R&D facilities. The costs of compliance with environmental, health and safety laws and regulations are significant. If an accident or contamination involving pollutants or hazardous substances occurs, an injured party could seek to hold us liable for any damages that result, and any liability could exceed the limits or fall outside the coverage of our insurance. We may not be able to maintain insurance with sufficient coverage on acceptable terms, or at all. Costs, damages and/or fines may result from the presence, investigation and remediation of such contamination at properties currently or formerly owned, leased or operated by us or at off-site locations, including where we have arranged for the disposal of hazardous substances or waste. In addition, we may be subject to third-party claims, including for natural resource damages, personal injury and property damage, in connection with such contamination, or in some cases for contamination or pollutants at properties we own caused by prior owners. We have developed and implemented a proprietary risk mitigation program to preemptively identify and address environmental, health, safety and security risks; however, there can be no assurance that a violation of current or future environmental, health or safety laws or regulations will not occur. Any violations, even if inadvertent or accidental, or the cost of compliance with any resulting order, fine or liability that may be imposed, could materially adversely affect our business, financial condition, cash flows and results of operations.

*We face additional risks as a manufacturer that manufactures pharmaceutical products for others and, in the future, for ourselves.*

With the recent purchase of our Raleigh, North Carolina manufacturing facility, we assumed obligations to manufacture drugs and other products for third parties. We purchased the Raleigh facility with a view towards eventually manufacturing some of our products there in order to ensure supply security. There may also be potential to improve manufacturing costs. However, before doing so, we will need to (i) perform our obligation under existing contracts and meet related regulatory requirements with respect to those products, and (ii) invest in additional capital equipment and testing before we can secure our long-term supply. As a result, we face additional risks, and the risks discussed in this report may apply to both our business as well as our activities as a contract manufacturer of products for others.

a. *Onerous contracts.* In connection with our acquisition of the Raleigh facility, the Group assumed onerous contracts and carries a provision of $28 million (See Note 19). The facility continues to manufacture products for customers based on the terms of contracts that existed pre-acquisition and the expected costs to fulfill these contracts are in excess of the economic benefits expected to be received by the Group. The minimum performance period in the onerous contracts ends on various dates through the end of 2025 and the provision is recorded at its discounted value, using a market rate at the time of the transaction determined to be 7.6%. Our actual losses on these contracts may be greater if our estimates and assumptions prove incorrect.

b. *Expected operating losses.* In addition to the provision of $28 million which we recognized at the time of acquisition, we expect to incur incremental operating costs over the next 2 years for items such as

29

depreciation of excess capacity, incremental compensation expense from additional headcount, and incremental information technology and other expenses to bring the Raleigh facility onto our systems.

c. *Expected investment in capital equipment.* In order to produce Indivior products at the Raleigh facility, we will need to invest in the build-out of an aseptic syringe filling suite with supporting manufacturing process equipment and warehouse expansion that will need to be qualified, followed by the technology transfer of our manufacturing process to be validated for regulatory approval. We expect these activities to cost approximately $50 million and take approximately 3 years before approval by the FDA. Any changes to our cost estimates or delays in obtaining regulatory approval of our manufacturing site may increase our expenses or delay our ability to manufacture our own products at the Raleigh facility and correspondingly delay expected cost savings.

d. *Quality Control and Product Safety.* As a manufacturer of pharmaceutical products for third parties, we are responsible for ensuring the quality, safety, and efficacy of the pharmaceutical products we manufacture. Any deviations from quality standards or safety concerns could result in FDA enforcement actions, product recalls, legal liabilities, damage to our reputation, and financial losses.

e. *Product Liability and Litigation.* The pharmaceutical industry is susceptible to product liability claims and lawsuits. Any adverse events, side effects, or alleged defects in the pharmaceutical products we manufacture could result in litigation, regulatory actions, and financial liabilities.

f. *Data Integrity and Record Keeping.* Accurate and compliant recordkeeping is crucial in the pharmaceutical industry. Any issues related to data integrity or recordkeeping practices may result in regulatory actions, warning letters, or sanctions by the FDA.

g. *Regulatory Changes and Uncertainties.* Our operations are subject to evolving regulatory requirements, policies, and interpretations by the FDA. Changes in regulations or guidelines could require us to modify our manufacturing processes, quality control measures, or documentation practices, which may result in additional costs or delays.

h. *FDA Inspections and Audits.* We are regularly subject to inspections and audits of our manufacturing facilities by the FDA and other regulators to assess compliance with current Good Manufacturing Practices (cGMPs) and other regulatory standards. Any deficiencies or non-compliance identified during these inspections could lead to warning letters, import bans, product recalls, or delays in approvals, which could adversely affect our business and reputation.

i. *Ability to Secure Supply.* Whether we can achieve our goals of enhancing supply securing will depend on whether we can successfully integrate the Raleigh facility and its workforce into our operations, our ability to install, validate, and secure FDA approval of a new manufacturing line, and our ability to operate the facility efficiently.

***If we fail to develop or acquire other new products or compounds for development, our business, prospects, results of operations and financial condition could be materially adversely affected.***

A key element of our long-term strategy is to develop or acquire and commercialize a portfolio of other products or product candidates in addition to our current products, through business or product acquisitions. Because we dedicate only a small portion of our own resources towards proprietary drug discovery, the success of this strategy depends in large part upon the combination of our regulatory, development and commercial capabilities and expertise and our ability to identify, select and acquire approved or clinically enabled product candidates for therapeutic indications that complement or augment our current products, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. For example,

- In June 2021, we acquired an exclusive option for AEF0117, a synthetic CB1-specific signaling inhibitor designed to treat cannabis-related disorders, from the French company Aelis Farma.

30

- We are developing INDV-6001 (buprenorphine-based long-acting injectable) for the treatment of OUD in collaboration with Alar Pharmaceuticals Inc.

- We are developing INDV-2000 (Selective Orexin-1 Receptor Antagonist), a non-opioid treatment for moderate to severe opioid use disorder.

- We are developing INDV-1000 (Selective GABAb Positive Allosteric Modulator) for the treatment of alcohol use disorder in collaboration with ADDEX therapeutics.

- In 2023, we completed the acquisition of Opiant, a specialty pharmaceutical company developing medicines for addictions and drug overdose. In addition to OPVEE (nalmefene) nasal spray, which the FDA approved on May 22, 2023, Opiant's pipeline included a medicine in development for acute cannabinoid overdose.

- We are developing CT-102 (digital therapeutic) for the treatment of OUD in collaboration with Click Therapeutics.

See "*Item 4. Information on the Company—B. Business Overview Background—5. Pipeline*," for more information.

Identifying, selecting and acquiring promising products or product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual acquisition or license of a particular product or product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. In addition, we face substantial competition from historically innovative companies, as well as companies with greater financial resources than us, for such acquisition targets. If we are unable to identify, select and acquire suitable products or product candidates from third parties or acquire businesses at valuations and on other terms acceptable to us, or if we are unable to raise the capital required to acquire businesses or new products, our business and prospects will be limited.

In addition, any growth through business development will depend upon us identifying and obtaining product candidates, our ability to develop those product candidates and the availability of funding to acquire, complete the development of, obtain regulatory approval for and commercialize these product candidates. Doing so is complex and we may not be able to successfully manage the risks or other anticipated and unanticipated problems in connection with an acquisition or in-licensing, and may not be able to realize the anticipated benefits of any acquisition or in-licensing for a variety of reasons, including the possibility that a product candidate proves not to be safe or effective in later clinical trials, a product fails to reach its forecast commercial potential or the integration of a product or product candidate gives rise to unforeseen difficulties and expenditures. It is common for multiple products and product candidates to be evaluated for the same indication by multiple parties at the same time, and we cannot predict whether the expected commercial potential for our products will come to fruition. Any failure in identifying and managing these risks and uncertainties effectively would have a material adverse effect on our business, prospects, results of operations and financial condition.

Moreover, any product candidate we acquire may require additional, time-consuming development or regulatory efforts prior to commercial sale or prior to expansion into other indications, including pre-clinical studies if applicable, and extensive clinical testing and approval by the FDA and applicable foreign regulatory authorities. All product candidates are prone to the risk of failure that is inherent in pharmaceutical product development, including the possibility that the product candidate will not be shown to be sufficiently safe and/or effective for approval by regulatory authorities. In addition, we cannot assure that any such products that are approved will be manufactured or produced economically, successfully commercialized or widely accepted in the marketplace or be more effective or desired than other commercially available alternatives. Any failure in identifying and managing these risks and uncertainties effectively would have a material adverse effect on our business, prospects, results of operations and financial condition, and any unsuccessful effort may require us to write down prior investments.

31

See also "*We receive substantial revenue from our key proprietary products and our success depends on our ability to successfully commercialize new products.*"

***Acquisitions, partnerships, joint ventures, dispositions, and other business combinations or strategic transactions involve several inherent risks, any of which could result in the benefits anticipated not being realized and could have an adverse effect on our business, financial condition, and results of operations.***

Acquisitions are an important part of our growth model and we regularly consider and enter into strategic transactions, including mergers, acquisitions, investments and other growth, market and geographic expansion strategies, with the expectation that these transactions will result in increases in sales, cost savings, synergies and various other benefits. For example, in March 2023 we acquired Opiant Pharmaceuticals in exchange for $146 million in cash and potential future payments of up to $68 million upon the completion of certain sales milestones pursuant to a contingent value rights agreement. See "*Item 4. Information on the Company—A. History and Development of the Company—Note 18. Acquisition of Opiant.*" We made a number of other acquisitions in 2023.

In the future, our ability to acquire additional companies or products synergistic with our current businesses may be limited by antitrust regulators who may be particularly vigilant in our markets because we serve at-risk populations and because we already market several products in the space.

We may fail to realize anticipated benefits from such transactions or partnerships, or any future ones, we may be exposed to additional liabilities or compliance violations of any acquired business or joint venture and we may be exposed to litigation in connection with any transaction. Furthermore, we may have trouble identifying suitable acquisition targets in the future. Our ability to deliver the expected benefits from any strategic transactions is subject to numerous uncertainties and risks, including our acquisition assumptions; our ability to integrate personnel, labor models, financial, supply chain and logistics, IT and other systems successfully; disruption of our ongoing business and diversion of management time; the need to hire additional management and other critical personnel; and increasing the scope, geographic diversity and complexity of our operations.

In addition, the integration of acquired businesses may create complexity in our financial systems and internal controls and make them more difficult to manage or cause us to fail to meet our financial reporting obligations. Any impairment of goodwill or other assets acquired in a strategic transaction or charges to earnings associated with any strategic transaction as well as any failure by the acquired business to produce the expected margins or cash flows, may materially reduce our profitability. Furthermore, we may finance these strategic transactions by incurring additional debt or raising equity, which could increase leverage or impact our ability to access capital in the future.

***We may be subject to adverse public opinion.***

The pharmaceutical industry is frequently subject to adverse publicity on many topics, including product recalls and research and discovery methods, as well as political controversy over pharmaceutical pricing, and the impact of novel techniques and therapies on humans, animals, and the environment, among others. We manufacture and market buprenorphine-based medications for the treatment of moderate-to-severe opioid use disorder. Negative publicity about us or our products, or about the industry as a whole, may adversely affect our corporate reputation, which could impact our operations, impair our ability to gain market acceptance for our products or lead to government intervention, which in turn could have an adverse impact on our business, prospects, results of operations and financial condition.

32

For example, our 2020 settlement with the DOJ created substantial adverse publicity and may have made it more difficult for some to distinguish our company, which works to address the opioid crisis, from those companies that created or exacerbated the opioid crisis. See *"Item 4: Information on the Company—A. History and Development of the Company."* In announcing the settlement, the DOJ made a point to note that our medicines are opioids:

> Suboxone is a drug product approved for use by recovering opioid addicts to avoid or reduce withdrawal symptoms while they undergo treatment for opioid-use disorder. Suboxone contains buprenorphine, a powerful opioid. "Combatting the opioid crisis is a Department of Justice priority," said Principal Deputy Associate Attorney General Claire M. Murray. "Today's announced resolution and related actions hold accountable entities and individuals that unlawfully marketed opioid-addiction products."

This and other potential adverse publicity may reduce the willingness of third parties to do business with us, including credit providers and other investors, technology licensors, advocacy organizations, or potential employees, and may harm our ability to engage with policymakers on public policy issues critical to our business. For instance, in recent years, some state and federal officials were unwilling to meet with us to discuss policy issues while we were under government investigation, as were some third party groups.

### *Failure to retain key personnel or attract new personnel could have an adverse effect on us.*

We rely upon several key executives and employees who have an in-depth and long-term understanding of the industry and the disease space and our technologies, products, programs, collaborative relationships and strategic goals. Key personnel include experienced employees with specific expertise and the ability to compliantly interact with healthcare providers, key opinion leaders, and key decision makers across the healthcare industry.

In particular, we must compete with other pharmaceutical and life sciences companies to recruit, hire, train and retain sales and marketing personnel as well as research and development personnel. Competition for such personnel in the pharmaceutical and biotechnology industries is intense, and there can be no assurance that we will be able to recruit or retain such personnel. If our sales force and sales organization are not appropriately sized to promote any current or potential future products adequately, the commercial potential of our current products and any future products may be diminished. The inability to recruit, hire, train and retain research and development personnel could negatively affect our ability to formulate and develop new products.

We do not carry "key person" insurance. The loss of the services of any of our key executives or employees could delay or prevent the successful completion of some of our vital activities. Any employee may terminate his or her employment at any time without notice or with only short notice and without cause or good reason. The resulting loss of institutional knowledge may have a material adverse effect on our operations and future growth.

The current industry-wide challenging labor environment may have a potential negative impact on the Group's attrition rate and its ability to recruit for certain key positions in some geographies. We have attempted to mitigate this by establishing various tools, including development, performance management and reward programs, to develop, retain, and recruit key personnel, but there can be no assurance that we will be successful.

As a result of the above factors, any failure to retain key personnel or attract new personnel could have a material adverse effect on our business, prospects, results of operations and financial condition.

33

### Risks Related to Intellectual Property

*We may incur substantial costs as a result of litigation or other proceedings relating to patents and other intellectual property rights, and we may be unable to protect our rights to, or commercialize our products.*

Litigation and other similar proceedings, such as *inter partes* reviews in the U.S. (which are initiated by third parties to challenge the validity of a patent) relating to infringement, validity or misappropriation of patent and other intellectual property rights in the pharmaceutical and life sciences industry are common. We may receive notifications of challenges to the validity of our patents or alleged infringement of patents owned by third parties. For example, we incurred significant costs in connection with the ANDA proceedings relating to SUBOXONE Film in the U.S. from 2013 through 2023. If we choose to go to court to prevent a third party from infringing our patents, our licensed patents or our partners' patents (where we have the right to do so), that allegedly infringing third-party has the right to ask the court to rule that these patents are invalid and/or should not be enforced against that third-party.

Separately, other third parties may allege that patents on our other products or product candidates are not valid. These lawsuits are expensive and, as with the SUBOXONE ANDA litigation, could cost the Group several million dollars per year, and time-consuming, even if we are ultimately successful in stopping the infringement of these patents. In addition, there is a risk that a court will decide that these patents are not valid or not infringed and that we do not have the right to prevent the other party from using the patented subject matter. There can be no assurance that these, or other litigation that we may file in the future, will be successful in preventing the infringement of our patents, that we will be able to successfully defend the validity of our patents, that any such litigation will be cost-effective, or that the litigation will have a satisfactory result for us. In addition, such litigation diverts the attention of management and development personnel. Failure to stop infringement of our patents or an unsatisfactory result in litigation would adversely affect our business and results of operations.

Additionally, when enforcing such patents, we risk being subject to potential liability as a result of counterclaims and related damages, among other things. For example, Dr. Reddy's Laboratories ("DRL") and Alvogen pursued claims for wrongful injunction damages, and further asserted antitrust counterclaims against the Group, after the Group sought to enforce particular patent claims against DRL and Alvogen. The Group reached settlements with DRL and Alvogen in 2022 and 2023, respectively. See "*Item 18. Financial Statements—Audited Consolidated Financial Statements— Note 19. Provision and Other Liabilities.*"

A third-party may claim that we or our manufacturing or commercialization partners are using inventions covered by the third-party's patent rights, or that we or such partners are infringing, misappropriating or otherwise violating other intellectual property rights, and may go to court to stop us from engaging in our ordinary course operations and activities, including manufacturing or selling our products. There is a risk that a court could decide that we or our partners are infringing, misappropriating or otherwise violating third-party patents or other intellectual property rights, which could have a material adverse effect on our business and results of operations. In addition, such litigation diverts the attention of management and development personnel.

We may initiate or defend legal proceedings relating to our patents alongside a collaborator or third-party with an interest or right in the relevant patents. In this scenario, our strategy for asserting or defending our rights might be impacted by that of our co-claimant or co-defendant which, in turn, may have an adverse impact on our existing commercial relationship.

In the pharmaceutical and life sciences industry, like other industries, it is not always clear to industry participants, including the Group, which patents cover various types of products or methods. The coverage of patents is subject to interpretation by the courts, and the interpretation is not always uniform. If we are sued for patent infringement, we would need to demonstrate that our products or methods do not infringe the patent claims of the relevant patent and/or that the patent claims are invalid or

34

unenforceable, which we may not be able to do, and which could in turn result in our being required to pay substantial sums. These sums potentially include damages, legal fees, and increased damages if we are found to have infringed such rights willfully. Further, if a patent infringement suit is brought against us, our research, development, manufacturing, or sales activities relating to the product or product candidate that is the subject of the suit may be delayed, materially affected, or terminated by the grant of an injunction against us.

We cannot be certain that others have not filed patent applications for inventions covered by our licensors' or our issued patents or pending applications, or that we or our licensors were the first inventors. Our competitors may have filed, and may in the future file, patent applications covering subject matter similar to those of the Group. Any such patent application may have priority over our or our licensors' patents or applications and could further require us to obtain rights to patent rights covering such subject matter. In the U.S., if another party has filed a patent application on inventions similar to those of the Group, we may have to participate in an interference or deviation proceeding declared by the USPTO to determine the priority of invention in the U.S. The costs of these proceedings could be substantial, and it is possible that such efforts would be unsuccessful, resulting in a loss of our U.S. patent position with respect to such inventions.

As a result of patent infringement claims, or in order to avoid potential infringement claims, we or our collaborators may choose to seek, or be required to seek, a license from the third-party, which would be likely to include a requirement to pay license fees or royalties or both. These licenses may not be available on acceptable terms, or at all. Even if a license can be obtained on acceptable terms, the rights may be non-exclusive, which would potentially give our competitors access to the same intellectual property rights. If we are unable to enter into a license on acceptable terms, we, or our collaborators, could be prevented from commercializing one or more of our product candidates, or forced to modify such product candidates, or cease some aspect of our business operations, which could adversely affect our business, prospects, results of operations or financial condition.

The cost to us of any patent litigation or other proceedings, even if resolved in our favor, could be substantial. Some of our competitors may be able to sustain the costs of complex patent and other intellectual property litigation more effectively than we can because they have substantially greater resources than the Group. In addition, any uncertainties resulting from the initiation and continuation of any litigation could have a material adverse effect on our ability to raise the funds necessary to continue its operations.

Any of the foregoing could have a material adverse effect on our business, prospects, results of operations and financial condition.

### We may not be able to protect our intellectual property rights throughout the world which could have an adverse effect on our business, results of operations and financial condition.

Filing, prosecuting and defending patents relating to all of our product candidates and technologies throughout the world would be prohibitively expensive. Competitors may use our technologies in jurisdictions where we have not obtained patent protection to develop their own products, and further, may export otherwise infringing products to territories where we have patent protection but where enforcement is more difficult. These products may compete with our future products in jurisdictions where we do not have any issued patents and our patent claims or other intellectual property rights may not be effective or sufficient to prevent them from so competing.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, which could make it difficult for us to stop infringement of our patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions could result in substantial costs and divert efforts and attention from other aspects of our

35

business, which could adversely affect our operations and financial condition. Moreover, our patent rights can be challenged in post-grant or *inter partes* review. For example, our patents for SUBLOCADE were challenged in the EU patent office under two separate European opposition proceedings. However, both of those proceedings were dismissed.

*Failure to obtain and maintain patents and protect other proprietary rights, including in-licenses of such rights from third parties, may adversely affect us.*

Our success depends, in large part, on our ability to obtain and maintain patent and other intellectual property protection, particularly for our drug, compound, product, delivery, formulation and methods of treatment technologies and associated manufacturing processes in relation to both our products and our product candidates. The process of obtaining patents can be lengthy and expensive. We own, or in-license, several patent rights in the U.S. and other countries covering certain products and have also developed brand names and trademarks for other products. We will be able to protect our proprietary rights from unauthorized use by third parties only to the extent that our proprietary technologies and future products are covered by valid and enforceable patents or are effectively maintained as trade secrets or confidential information within the Group. Our existing patents, and any future patents we obtain, may not be sufficiently broad to prevent others from using our technologies or from developing competing products and technologies. If third parties disclose or misappropriate our proprietary rights, it may materially and adversely impact our business, prospects, results of operations and financial condition. Moreover, our ability to obtain and enforce patents and other proprietary rights is critical to our business strategy and success.

The patent positions of many pharmaceutical and life sciences companies are highly uncertain and involve complex legal and factual questions. In some cases, the legal principles that apply to these cases may be changing or unresolved. As a result, the validity and enforceability of our patents cannot be predicted with certainty. In addition, we cannot guarantee that:

- we were the first to make the inventions covered by each of our issued patents and pending patent applications;

- we were the first to file patent applications for these inventions;

- patents will be granted in connection with any of our currently pending or future applications;

- other companies will not independently develop similar or alternative technologies or duplicate any of our technologies by inventing around our claims;

- a third-party will not challenge our proprietary rights, and if challenged that a court will hold that our patents are valid and enforceable;

- any patents issued to us or our collaboration partners will cover our products as ultimately developed, or provide us with any competitive advantages, or will not be challenged by third parties;

- we will develop additional proprietary technologies that are patentable; or

- the patents of others will not have an adverse effect on our business.

We also rely on trade secrets and other unpatented confidential information to maintain our competitive position but there can be no assurance that others may not independently develop the same or similar products or technologies, and may also obtain patents and other intellectual property protection for them. We have sought to protect trade secrets and confidential information, in some cases through the provisions of confidentiality and non-use agreements with our employees, consultants, advisers and partners. Nevertheless, it may not always be possible to prevent the disclosure of our trade secrets and other confidential information and for us to obtain an adequate remedy in the event of unauthorized disclosure or use of such information. In addition, if our employees, consultants or partners develop

36

inventions or processes independently that may be applicable to our products or technologies under development, such inventions and processes will not necessarily become our property, but may remain the property of those persons or their employers or the persons may be entitled to compensation in respect of those inventions. Protracted and costly litigation could be necessary to enforce and determine the scope of our proprietary rights.

We have entered into several collaborative arrangements for the development and commercialization of products including Aquestive in relation to SUBOXONE Film, Aelis Farma for the development of a potential product to treat cannabis use disorder, and Curia for the production of SUBLOCADE. In connection with such arrangements, we have shared certain of our proprietary knowledge with our partners and it may not be possible or practical to prevent our partners from developing similar or functionally equivalent products. Any disputes between us and such partners may threaten our ability to continue using such proprietary knowledge and, in turn, could impact our ability to market our products. We have also engaged in collaborations, sponsored research agreements and other arrangements with academic researchers and institutions, some of which have received and may receive funding from government agencies. Although we have sought to retain ownership of all intellectual property rights pertaining to inventions that may result from such collaborations, there can be no assurance that governments, institutions, researchers or other third parties will not also attempt to claim certain rights to such inventions.

If we fail to obtain and maintain sufficient intellectual property protection for our current and future products and technologies and if third parties disclose or misappropriate our proprietary rights, our ability to successfully and fully exploit these products and technologies could be adversely affected, which in turn would adversely affect our business, prospects, results of operation and financial condition.

### Risks Related to Regulatory or Legal Matters

*The regulatory approval process is expensive, time-consuming, and uncertain and may prevent us or our partners from obtaining approvals for the commercialization of some or all of our product candidates. Further, the FDA or other regulatory agencies may not agree with our regulatory approval strategies or components of our filings for our products and may not approve, or may delay the approval of, our products.*

The research, development, testing, manufacturing, approval, labeling, advertising and promotion, distribution and import and export of pharmaceutical products are subject to extensive regulation, and regulations differ from country to country. We must obtain government approvals before marketing or selling our products. Approval in one jurisdiction does not ensure approval in other jurisdictions. The regulatory approval process is lengthy, expensive and uncertain, and we may be unable to obtain approval for our product candidates. The FDA in the U.S., and comparable regulatory agencies in other jurisdictions, impose substantial and rigorous requirements for the development, manufacture and commercialization of products, the satisfaction of which can take a significant number of years and can vary substantially based upon the type, complexity and novelty of the product.

For example, in the U.S., the process for obtaining marketing approval for a drug or biologic product candidate generally includes (a) conducting preclinical laboratory and animal testing and submitting the results to the FDA in an investigational new drug application (IND) requesting approval to test the product candidate in human clinical trials; (b) conducting adequate and well-controlled human clinical trials to establish the safety and efficacy of the product candidate in the desired indication; (c) submitting an NDA, biologics license application (BLA), or supplemental NDA/BLA, as appropriate and (d) completing inspections by the FDA of the facilities where the product candidate is manufactured, analyzed and stored to demonstrate compliance with cGMP, and any requested FDA audits of the clinical trial sites that generated the data supporting the application.

In addition, regulation is not static, and regulatory agencies, including the FDA, evolve in their staff, interpretations, and practices and may impose more stringent requirements than currently in effect, which

37

may adversely affect our plans for product development, approval, manufacture and/or commercialization. The approval procedure and the time required to obtain approval also vary among countries. Regulatory agencies may have varying interpretations of the same data, and approval by one regulatory agency does not ensure approval by regulatory agencies in other jurisdictions. In addition, the ultimate decision by the FDA or other regulatory agencies regarding drug approval may not be consistent with prior communications due to the evolution of new information or changes in clinical practice during the development and registration processes.

The product approval process can last many years, be very costly and still be unsuccessful. For example, the development of SUBLOCADE from concept to commercial launch took approximately eight years. Regulatory approval by the FDA or other regulatory agencies can be delayed, limited or not granted at all. A product may fail to demonstrate safety and efficacy for each target indication in accordance with applicable regulatory agencies' standards for many reasons, including:

- data from preclinical testing and clinical trials may be interpreted by applicable regulatory agencies in ways different from how we or our licensees interpret it;

- regulatory agencies may not agree with our or our licensees' regulatory approval strategies, plans for accelerated development timelines, components of our or our licensees' filings such as clinical trial designs, conduct and methodologies, or the sufficiency of our or our licensees' submitted data to meet their requirements for product approval;

- regulatory agencies might not approve our or our licensees' manufacturing processes or facilities, or those of the contract research organizations (CROs) and contract manufacturing organizations who conduct research or manufacturing work on our or our licensees' behalf;

- failure by our clinical investigational sites and the records kept at such sites, including any clinical trial data, to be in compliance with the FDA's good clinical practices (GCP), or other applicable legislation governing GCP, or to pass FDA, European Medicines Agency or other relevant regulatory agency's inspections of clinical trials;

- regulatory agencies may change their requirements for approval or post-approval marketing; and

- adverse medical events during the trials could lead to requirements that trials be repeated or extended, or that a program be terminated or placed on clinical hold, even if other studies or trials relating to the program are successful.

In addition, disruptions at the FDA and other regulatory agencies that are unrelated to our Company or our products could cause delays to the regulatory approval process for our products. For example, in June 2020, the FDA noted that it was continuing to ensure timely review of applications for medical products during the COVID-19 pandemic in line with its user fee performance goals; however, if a prolonged U.S. government shutdown occurs as a result of political or economic conditions or if a future pandemic were to be more severe, the FDA's ability to timely review and process regulatory submissions could be significantly impacted.

Further, any adverse events or other data generated during the course of clinical trials of our product candidates and/or our currently marketed products could result in action by FDA or an equivalent regulatory authority. Such safety findings may restrict our ability to sell or adversely affect the commercialization of currently marketed products. Specifically, clinical trial safety data could result in FDA requiring changes to the clinical development program, labeling, including additional warnings or additional boxed warnings, or requiring us to take other actions that could have an adverse effect on patient and prescriber acceptance of our products. See also "*We are subject to ongoing obligations and continued regulatory review by the FDA and equivalent foreign regulatory agencies, and we may be subject to penalties and litigation and large incremental expenses if we fail to comply with regulatory requirements or experience problems with our products.*"

38

Any failure to obtain, or delay in obtaining, regulatory approval for our products will prevent or delay their commercialization and could have a material adverse effect on our business, financial condition, cash flows and results of operations. In addition, any failure to obtain, or delay in obtaining, approval for our products could have a material impact on our shareholders' confidence in the strength of our development capabilities and/or our ability to generate significant revenue from our development program and could result in a significant decline in our share price. Further, even product candidates that receive regulatory approval may face additional regulatory hurdles or otherwise be unable to achieve expected market acceptance. See "*The FDA, the DEA, or other regulatory agencies may impose limitations or post-approval requirements on approvals for our products*" and "*Our ability to generate revenues from our products is subject to attaining significant market acceptance among physicians, patients, and healthcare payors.*"

**The FDA, the DEA, or other regulatory agencies may impose limitations or post-approval requirements on approvals for our products.**

Even if regulatory approval to market a product is granted by the FDA or other regulatory agencies, the approved label for the product may not be consistent with our initial expectations or commercial plans. The FDA or other regulatory agencies may impose limitations on the clinical data that may be included in the label for the product or the indicated uses for which, or the manner in which, the product may be marketed, or may impose additional post-approval requirements. Our business could be materially adversely affected if we do not complete these post-approval requirements and, as a result, the FDA or other regulatory agencies require us to change the label for such product, or if such post-approval requirements significantly restrict the marketing, sale or use of such product.

Regulators may require us to make changes to our label, even following approval. For example, in January 2022 the FDA issued a warning about dental problems associated with buprenorphine medicines dissolved in the mouth to treat opioid use disorder and required that all manufacturers of these products provide a warning in their prescribing label and their patient Medication Guide. Following such change, the Group has been named as a defendant in lawsuits filed in the Northern District of Ohio and other federal district courts in which individual plaintiffs claim that Suboxone caused them to suffer dental cavities, tooth loss, or other damage to their teeth. See '*Item 18. Financial Statements—Audited Consolidated Financial Statements—Note 21. Legal Proceedings.*"

We may be required to include, as part of an NDA, a proposed REMS the goal of which is to mitigate potential risks that may be associated with the use of a product and to inform patients and prescribers of those risks. We may also be required to include a plan for communication with healthcare providers, restrictions on a drug's distribution, or a medication guide to provide information to consumers about the drug's risks and benefits. For example, the FDA requires separate REMS for SUBLOCADE and SUBOXONE Film because they have distinct REMS goals. The goal of the REMS program for SUBLOCADE is to mitigate the risk of serious harm or death that could result from intravenous self-administration by a patient, whereas the goals for the shared Buprenorphine Transmucosal Products of Opioid Dependence (BTOD) REMS for which SUBOXONE is a part of are to (1) mitigate the risks of accidental overdose, misuse and abuse and (2) inform prescribers, pharmacists and patients of the serious risks associated with buprenorphine-containing products. Other products that we sell in the future may become subject to a REMS specific to the product or shared with other products in the same class of drug. Depending on the nature of the REMS, the cost to implement the REMS may be high and the impact to the business may be significant.

FDA and other regulatory agencies may require post-approval or post-marketing studies as a condition for approval. For example, we were required to conduct seven post-marketing requirement studies and three post-marketing commitment studies in connection with the approval of SUBLOCADE. Likewise for OPVEE, Indivior is required to carry out four pediatric assessment studies and four post-marketing requirement studies to assess the risks of dodecyl maltoside (DDM).

39

In the EU or UK, we may be required to adopt a risk management plan and our products could be subject to specific risk minimization measures, such as restrictions on prescription or supply, the conduct of post-marketing safety or efficacy studies, or the distribution of patient and/or prescriber educational materials.

In addition, post-marketing obligations in the form of further clinical trials may be imposed to further expand on the evaluation of the risk/benefit profile of the product relative to any potential safety concerns. These trials typically occur after approval and according to pre-specified timelines set by regulatory authorities. Depending on the nature of the post-marketing commitment, trial completion can be a lengthy and expensive process. Failure to comply with any of these requirements may potentially lead to suspension of the marketing authorization for the product and other penalties. The costs and other consequences of non-compliance with any of the post-approval obligations described above could have an adverse impact on its business, prospects, results of operations and financial condition.

Further, if a product for which we obtain regulatory approval is a controlled substance or has been shown to have a drug abuse liability, it will not become commercially available until after the DEA (or other applicable regulatory authority) provides its final schedule designation for the product, and may take longer and may be more restrictive than we expect or may change after its initial designation. In addition, a final designation that is more restrictive than we expect could adversely affect our ability to commercialize such product and could materially adversely affect our business, financial condition, cash flows and results of operations.

In addition, legislation and regulatory policies relating to post-approval requirements and restrictions on promotional activities for pharmaceutical products, or FDA, DEA or other regulatory agency regulations, guidance or interpretations with respect to such legislation or regulatory policy, may change, which may impact the development and commercialization of our products.

*We are subject to ongoing obligations and continued regulatory inspection by the FDA and equivalent foreign regulatory agencies, and we may be subject to penalties and litigation and large incremental expenses if we fail to comply with regulatory requirements or experience problems with our products.*

The FDA and other regulatory authorities periodically inspect manufacturing facilities and the sponsor's and manufacturer's records to assess compliance with cGMP. Evidence of non-compliance with the statutory and regulatory requirements may result in suspension of manufacturing, product seizure, withdrawal of the product from the market, administrative, civil and criminal penalties, among other enforcement remedies both in the U.S. and abroad. See "*We are subject to risks related to the manufacture and distribution of our products globally.*"

Additionally, the FDA and other regulatory authorities track information on side effects and adverse events reported during clinical studies and after marketing approval. We are required to file periodic safety update reports with the authorities concerning adverse events. If, upon review, an authority determines that any events and/or reports indicate a trend or signal, they can require a change in a product label, restrict sales and marketing, require post-approval safety studies, require a labor-intensive collection of data regarding the risks and benefits of marketed products and ongoing assessments of those risks and benefits, and/or require other actions. Such safety findings could potentially lead to the withdrawal or suspension of the product from the market. The FDA also periodically inspects our records related to safety reporting. Following such inspections, the FDA may issue non-compliance notices on FDA Form 483 and warning letters that could cause us to modify certain activities. An FDA Form 483 notice, if issued, can list conditions FDA investigators believe may have violated relevant FDA standards. Failure to adequately and promptly correct the observations can result in a warning letter or other regulatory enforcement action. See also "*We are subject to risks related to the manufacture and distribution of our products globally and must meet stringent current Good Manufacturing Practices.*"

40

The FDA also regulates advertising and promotional activities for products in the U.S., requiring advertising, promotional materials and labeling to be truthful and not misleading, and products to be marketed only for their approved indications and in accordance with the provisions of the approved label. The FDA actively investigates allegations of pre-approval and off-label promotion in order to enforce regulations prohibiting these types of activities. The FDA routinely issues informal and more formal communications such as untitled letters or warning letters regarding companies' activities.

The manufacture, quality control, labeling, packaging, safety surveillance, adverse event reporting, storage, advertising, promotion and record-keeping for products are subject to extensive and ongoing regulatory requirements which are becoming increasingly stringent. If we become aware of previously unknown problems or potential new safety risks associated with any of our products, a regulatory agency may impose restrictions on our products, our contract manufacturers or on us. If we, our products and product candidates, or the manufacturing facilities for our products and product candidates, fail to comply with applicable regulatory requirements, regulatory agencies have wide-ranging powers of enforcement, including the power to impose monetary penalties. In such instances, we could experience a significant drop in the sales of the affected products, our product revenues and reputation in the marketplace may suffer, and we could become the target of lawsuits, each of which could have a material adverse effect on our business, prospects, results of operations and financial condition.

The regulations, policies or guidance of regulatory agencies may change and new or additional statutes or government regulations may be enacted that could prevent or delay regulatory approval of our product candidates or further restrict or regulate post-approval activities.

As a result of the breadth of these laws and regulations and the lack of definitive legal guidance in certain areas, it is possible that some of our business activities could be subject to challenge. Such challenges, irrespective of the underlying merit or the ultimate outcome of the matter, could have a material adverse effect on our business, prospects, reputation, results of operations and financial condition. Similarly, if we are unable to achieve and maintain regulatory compliance, we will not be permitted to market our drugs, which would materially adversely affect our business, results of operations and financial condition.

***Guidelines published by professional societies, insurance carriers, physician groups, science foundations, and other organizations may affect the use of the Group's products.***

Government agencies promulgate regulations and guidelines directly applicable to us and to our products. In addition, professional societies, practice management groups, insurance carriers, physicians' groups, private health and science foundations, and organizations involved in various diseases also publish guidelines and recommendations to healthcare providers, administrators and payers, as well as patient communities. Recommendations by government agencies or other groups and organizations may relate to such matters as usage, dosage, route of administration and use of related therapies. In the U.S., for example, a growing number of organizations are providing assessments of the value and pricing of biopharmaceutical products, and even organizations whose guidelines have historically been focused on clinical matters have begun to incorporate analyses of the cost effectiveness of various treatments into their treatment guidelines and recommendations. In addition, value assessments may come from private organizations that publish their findings and offer recommendations relating to the reimbursement of products by government and private payers. Some companies and payers have announced pricing and payment decisions based in part on the assessments of private organizations. In addition, government health technology assessment organizations in many countries make reimbursement recommendations to payers in their jurisdictions based on the clinical effectiveness, cost-effectiveness and service effects of new, emerging and existing medicines and treatments. Such recommendations have included and may in the future include reimbursement for certain of our products for a narrower indication than was approved by applicable regulatory agencies or may include recommending against reimbursement entirely. Such recommendations or guidelines may affect our reputation, and any recommendations or guidelines that result in decreased use, dosage or reimbursement of our products could have a material adverse effect on our product sales, business and results of operations. In addition, the perception that such

41

recommendations or guidelines will result in decreased use and dosage of our products could adversely affect the market price of our ordinary shares.

*Product liability and product recalls could have a material adverse effect on us.*

The testing, manufacturing, marketing and sale of pharmaceutical products entail a risk of product liability claims, product recalls, litigation and associated adverse publicity. Unanticipated side effects of, or manufacturing defects in, our products could exacerbate a patient's condition or could result in serious injury or impairments or even death. This could result in product liability claims and/or recalls of one or more of our products. In many countries, including in EU member states and the UK, national laws provide for strict (no-fault) liability.

Product liability claims may be brought by individuals seeking relief for themselves, or by or on behalf of groups seeking to represent a class of injured patients. Further, third-party payors, either individually or as a putative class or group action, may bring actions seeking to recover monies spent on products. The risk of product liability claims may also increase if we are subject to regulatory action by the FDA, the European Medicines Agency (the "EMA"), the UK Medicines and Health products Regulatory Agency ("MHRA"), or other competent authorities, or following a product recall. The cost of defending such claims is expensive even when the claims are without merit. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, an adverse judgment in a product liability suit, even if insured or eventually overturned on appeal, could generate substantial negative publicity about our products and business and inhibit or prevent the commercialization of other products.

For example, the Group has been named as a defendant in more than 30 lawsuits that have been consolidated into a multi-district litigation in the Northern District of Ohio (see *In Re Suboxone (Buprenorphine/Naloxone) Film Products Liability Litigation*) in which individual plaintiffs claim that Suboxone caused them to suffer dental cavities, tooth loss, or other damage to their teeth. The plaintiffs generally allege that the Group failed to properly warn physicians of the risk of dental injury, and further allege that Suboxone products were defectively designed. The plaintiffs generally seek compensatory damages, as well as punitive damages and attorneys' fees and costs. Product liability cases such as these typically involve issues relating to medical causation, label warnings and reliance on those warnings, scientific evidence and findings, actual, provable injury and other matters. These cases are in their preliminary stages.

Moreover, although we carry product liability insurance, current coverage may not be adequate. Further, product liability insurance is difficult to obtain and may not be available in the future on acceptable terms or at all. Product recalls may be issued at our discretion or at the discretion of our suppliers, government agencies and other entities that have regulatory authority over pharmaceutical sales. Any recall of our products could materially adversely affect our business by rendering us unable to sell that product for some time and by adversely affecting our reputation. In addition, product liability claims, product complaints or product quality issues reported by us (or others) to authorities as required by local regulations could result in an investigation (conducted by the FDA, the EMA, or the competent authorities of EU member states or other national authorities) into the safety or efficacy of our products, our manufacturing processes and facilities, or our marketing programs. An investigation could potentially lead to a recall of our products or more serious enforcement actions including seizure, injunction or criminal charges, proposed changes to the indications for which they may be used or suspension or withdrawal of approval. The Group has no insurance coverage for product recalls. Any of the foregoing could have a material adverse effect on our business, prospects, results of operations and financial condition. Further, product liability insurance may not be available for many claims relating to our opioid drug products due to contractual exclusions in our insurance policies.

42

*We are subject to federal, state and foreign healthcare laws and regulations and implementation or changes to such healthcare laws and regulations could adversely affect our business and results of operations.*

We are subject to extensive federal, state and foreign healthcare regulation. The healthcare system is highly regulated in the U.S., the EU, the UK and other countries where we operate and, as a pharmaceutical company that participates in government-regulated healthcare programs, we are subject to complex laws and regulations. Violation of the healthcare laws that we are subject to, or any other federal, state or foreign regulations, may subject us to significant administrative, civil and/or criminal penalties, damages, disgorgement, fines, exclusion, imprisonment, additional reporting requirements, and/or oversight from federal or other healthcare programs that could require the restructuring of our operations. Any of these could have a material adverse effect on our business and financial results. Any action against us for violation of these laws, even if we ultimately are successful in our defense, will cause us to incur significant legal expenses and divert our management's attention away from the operation of our business.

The U.S. and some foreign jurisdictions are considering or have enacted several legislative and regulatory proposals that change the healthcare system in ways that could impact our profitability. In the U.S. and abroad there is significant interest in implementing regulations and legislation with the stated goals of containing healthcare costs, improving quality, and/or expanding access. The pharmaceutical industry has been a focus of these efforts and has been significantly affected by major legislative initiatives, particularly in the U.S.

For example, the Affordable Care Act substantially changed the way healthcare is financed by both governmental and private insurers, and continues to significantly impact the U.S. pharmaceutical industry. Congress has enacted laws that modified certain provisions of the Affordable Care Act such as removing penalties, starting January 1, 2019, for not complying with the Affordable Care Act's individual mandate to carry health insurance. It is unclear how any future modifications to the Affordable Care Act or its implementing regulations, judicial challenges related to the Affordable Care Act, or other future healthcare reforms will affect our business.

In addition, drug pricing by pharmaceutical companies in the U.S. has come under increased scrutiny. Specifically, there have been state and U.S. congressional inquiries into pricing practices by pharmaceutical companies. For example, Congress launched an inquiry into pharmacy benefit managers and their practices which are believed by some to have led to consolidation, lack of transparency, and spread pricing. U.S. policymakers have also studied the impact rebates (i.e., the return of part of the purchase price of a prescription drug in exchange for favorable formulary placement) may play in driving up overall drug prices. Significant developments that may adversely affect pricing in the U.S. include drug pricing and Medicare reforms by Congress, regulatory changes to Medicare Part B (physician-administered drugs) and Medicare Part D (prescription drug benefit), additional changes relating to the Affordable Care Act, and trends in the practices of managed care groups and institutional and governmental purchasers.

The pharmaceutical industry also faces uncertainty regarding the continuation of current drug pricing policy. For example, on November 20, 2020, HHS finalized the "rebate rule" by publishing regulations removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Medicare Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers. Legislation has delayed the implementation of the rebate rule until January 1, 2032.

Congress and the Biden Administration continue to seek new legislative and/or administrative measures to control drug costs. The American Rescue Plan Act of 2021 requires the HHS Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain high Medicare spend drugs and biologicals per year starting in 2026, penalizes manufacturers of

43

certain Medicare Parts B and D drugs for price increases above inflation, and makes several changes to the Medicare Part D benefit, including a limit on annual out-of-pocket drug costs starting at $2,000 in 2025, a $35 monthly cap on insulin payments, and a change in manufacturer liability under the program that could negatively affect us. Congress continues to examine various policy proposals that may result in pressure on the prices of prescription drugs in government health programs.

Governments across the world continue to consider and take action to lower drug prices. In the U.S., there is bi-partisan support for drug pricing reforms at both federal and state levels, which include potential legislative and regulatory actions to encourage the import of drugs, to price drugs according to a defined international pricing reference, to encourage more competition, and to undertake other initiatives. These, together with federal and state government fiscal constraints resulting from the COVID-19 pandemic which constrain public benefit health programs, pose direct and indirect downward pressure risk on drug prices. The Group continues to monitor potential legislative and regulatory changes and their impacts, advocating for the Group's products based on scientific studies and patient-centered outcomes. However, certain potential legislative and regulatory drug pricing changes could have an adverse impact on the Group's financial performance and results in the future.

In Europe, legislators, policymakers, and healthcare insurance funds continue to propose and implement cost-containing measures to keep healthcare costs down, due in part to the attention being paid to healthcare cost containment in Europe. Certain of these changes could impose limitations on the prices we will be able to charge for our products and any approved product candidates or the amounts of reimbursement available for these products from governmental agencies or third-party payers, which may increase the tax obligations on pharmaceutical companies such as ours, or may facilitate the introduction of generic competition with respect to our products.

With the intent of lowering prescription drug prices in the U.S., federal and state governments in the U.S. have enacted and continue to consider additional legislation and regulation applying international reference pricing to prescription drugs, otherwise limiting the pricing of prescription drugs, and authorizing the importation of drugs from countries outside the U.S. Such measures could have a material effect on our business, results of operations and financial condition.

The implementation of cost containment measures or other healthcare reforms may prevent us from being able to generate revenue, maintain profitability, or commercialize our current products and/or those for which we may receive regulatory approval in the future.

*Failure to comply with payment and reporting obligations under the Medicaid Drug Rebate program or other governmental pricing programs in the U.S. could result in additional reimbursement requirements, penalties, sanctions and fines.*

In the U.S., we participate in the Medicaid Drug Rebate and Medicare Part D programs and, by virtue of such participation, are also required by federal law to participate in the 340B Program and Federal Supply Schedule pricing program. These programs require us to pay certain rebates based on pricing data, such as (among others) average manufacturer price and best price, reported by us to the various federal agencies administering the programs.

Pricing and rebate calculations vary among products and programs. The calculations are complex and the calculation methodology is often subject to interpretation by us, governmental or regulatory agencies and the courts. If we become aware that our reporting for a prior period was incorrect or has changed as a result of the recalculation of the pricing data, we are obliged to resubmit the corrected data. Such restatements and recalculations can increase our costs for complying with the laws and regulations governing the various programs. Any corrections to our rebate calculations could result in either additional or reduced rebate liability for past periods, depending on the nature of the correction. Price recalculations may also affect the ceiling price at which we are required to offer our products to certain covered healthcare entities, such as safety-net providers under the 340B Program, as well as the prices under which our products are made available to federal government purchasers such as the U.S. Department of

44

Veterans Affairs and the Department of Defense under the Veterans Health Care Act of 1992, as amended ("VHCA").

We are liable for errors associated with our submission of pricing data. In addition to retroactive rebates and the potential for 340B Program and VHCA refunds, if we are found to have knowingly submitted any false price or product information to the government, we may be liable for civil monetary penalties. Any failure to submit data on a timely basis could result in a civil monetary penalty for each day the information is late beyond the due date. In the case of the Medicaid Drug Rebate program, such failure could also be grounds for CMS to terminate our Medicaid drug rebate agreement, pursuant to which we participate in the Medicaid program. In the event that CMS terminates our rebate agreement, no federal payments would be available under Medicaid or Medicare Part B for our covered outpatient drugs. As another example, we can be subjected to civil monetary penalties under, or termination from, the 340B Program if we knowingly and intentionally overcharge covered entities.

CMS and HHS-OIG have previously indicated that they intend to pursue more aggressively companies that fail to report pricing data to the government in a timely manner. Governmental agencies may also make changes in program interpretations or requirements or conditions of participation, some of which may have implications for amounts that we previously estimated or paid. There can be no assurance CMS or any other government agency will find that our submissions are complete and correct.

Any of the foregoing could have a material adverse effect on our business, prospects, results of operations and financial condition.

***We are subject, directly or indirectly, to a variety of U.S. and international laws and regulations related to fraud and abuse and transparency. Enforcement actions under such laws have increased in recent years. If we fail to comply, or have not fully complied, with such laws, we could face substantial penalties.***

In the U.S., we are subject directly, or indirectly through our customers and other third parties, to various federal, state and local fraud and abuse and transparency laws. Our sales, marketing, patient support and medical activities may be subject to scrutiny under these laws. The U.S. federal healthcare program Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving anything of value to induce (or in return for) the referral of business, including the purchase, recommendation or prescription of a particular drug reimbursable under Medicare, Medicaid or other federally financed healthcare programs. The statute has been interpreted to apply to arrangements between pharmaceutical companies on one hand and patients, prescribers, purchasers and formulary managers on the other. Although there are several statutory exemptions and regulatory safe harbors protecting certain common manufacturer business arrangements and activities from prosecution and administrative sanction, the exemptions and safe harbors are drawn narrowly and are subject to regulatory revision or changes in interpretation by the DOJ and HHS-OIG. Practices or arrangements that involve remuneration may be subject to scrutiny if they do not qualify for an exemption or safe harbor. Violations of the federal Anti-Kickback Statute may be established without providing specific intent to violate the statute, and may be punishable by civil, criminal, and administrative fines and penalties, damages, imprisonment, and/or exclusion from participation in federal healthcare programs. For example, in August 2018 the United States District Court for the Western District of Virginia unsealed a declined *qui tam* complaint alleging causes of action under the federal and state False Claims Acts against certain entities within the Group predicated on best price issues and claims of retaliation. See "*Item 18. Financial Statements —Audited Consolidated Financial Statements—Note 21. Legal Proceedings*" under the caption "False Claims Act Allegations."

The federal civil False Claims Act prohibits, among other things, any person from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment of federal funds, or knowingly making, or causing to be made, a false statement to get a false claim paid. A claim resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim. The False Claims Act also permits a private individual acting as a "whistleblower" to bring actions on behalf of

45

themselves and the federal government alleging violations of the statute and to share in any monetary recovery. Violations of the False Claims Act may result in significant financial penalties (including mandatory penalties on a per claim or statement basis), treble damages and exclusion from participation in federal healthcare programs.

Pharmaceutical companies are subject to other federal false claims and statements laws, some of which extend to non-government health benefit programs. For example, the healthcare fraud provisions under the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations, or HIPAA, impose criminal liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, including private third party payors, or falsifying or covering up a material fact or making any materially false or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Violations of HIPAA fraud provisions may result in criminal, civil and administrative penalties, fines and damages, including exclusion from participation in federal healthcare programs.

The majority of individual states also have statutes or regulations similar to the federal anti-kickback law and the False Claims Act, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Other states restrict whether and when pharmaceutical companies may provide meals or other items of value to healthcare professionals or engage in other marketing-related activities, and certain states and cities require the identification or licensing of sales representatives.

The Physician Payment Sunshine Act requires tracking of payments and transfers of value to physicians and teaching hospitals and ownership interests held by physicians and their families, and reporting to the federal government and public disclosure of these data. Since 2022, reporting is also required regarding payments and transfers of value provided to physician assistants, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, and certified nurse-midwives. A number of states now require pharmaceutical companies to report expenses relating to the marketing and promotion of pharmaceutical products and to report gifts and payments to healthcare providers in the states. Government agencies and private entities may inquire about our marketing practices or pursue other enforcement activities based on the disclosures in those public reports.

We are further subject in a similar manner to federal and state data privacy and security laws, such as HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, and state breach reporting requirements. Collectively, these laws may affect, among other things, our current and proposed research, sales, marketing and educational programs, as well as other possible relationships with customers, pharmacies, physicians, payers, and patients. We are subject to similar data privacy and security laws in Europe and other countries, including the EU General Data Protection Regulation (2016/679), or GDPR, under which fines of up to €20.0 million or up to 4% of the annual global revenue of the infringer, whichever is greater, could be imposed for significant non-compliance. We are also subject to *qui tam*, or whistleblower lawsuits, under the False Claims Act. Compliance with these laws, including the development of a comprehensive compliance program, is difficult, costly and time-consuming.

Because of the breadth and evolving interpretations and requirements of these laws, the narrowness of available statutory and regulatory exemptions, and the wide array of U.S. and international authorities with overlapping regulatory jurisdiction, it is possible that some of our business activities could be subject to challenge under one or more of such laws. Any action against us alleging violation of these laws, whether brought by law enforcement, regulatory agencies or private *qui tam* actions brought by individual whistleblowers in the name of the government, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business, even if we successfully defend against those actions. If any enforcement actions are instituted against us, and we are not successful in defending ourselves or asserting our rights, those actions could have an impact on our business, including the imposition of significant civil, criminal and administrative sanctions, damages, disgorgement, monetary fines, possible exclusion from participation in Medicare, Medicaid and other federal healthcare programs, imprisonment, integrity oversight and reporting obligations, contractual damages, reputational

46

harm, diminished profits and future earnings, and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

*Failure to comply with anti-corruption laws and regulations, anti-money laundering laws and regulations, and/or economic sanctions could result in us becoming subject to fines or penalties.*

We are subject to various federal and foreign laws and regulations regarding anti-bribery, anti-corruption, anti-money laundering, and economic sanctions. These include the U.K. Bribery Act of 2010 and the U.S. Foreign Corrupt Practices Act of 1977, as amended, which prohibits, among other things, payments, offers, or promises made for the purpose of improperly influencing any act or decision of a foreign official. The nature of our business means that we engage in significant interactions with foreign officials. We are also subject to economic sanctions and export controls rules and regulations imposed by, amongst others, the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of Commerce, other agencies of the U.S. government, HM Treasury and other agencies of the UK government, the European Union, and the United Nations. Any expansion, broadened or changed interpretation, variation, or addition to these rules and regulations could impose significant compliance costs on us.

We have mechanisms in place to procure compliance with applicable anti-corruption, anti-money laundering, and economic sanctions rules and regulations, and applicable self-regulatory industry codes by region that the Group has committed to follow. However, there can be no assurance that our policies and procedures will be followed at all times or will effectively detect and/or prevent violations of applicable compliance regimes by our employees, consultants, sub-contractors, agents and partners. As a result, in the event of non-compliance, we could be subject to legal proceedings, fines and/or civil or criminal penalties, the disgorgement of profits, damage to our reputation and resulting loss of revenue and profits, which could have a material adverse impact on our business, financial conditions and operations.

*The pharmaceutical sector is facing increased government scrutiny from competition and pricing authorities around the world, and any failure to comply, may expose us to significant damages and commercial restrictions that can materially and adversely affect our business.*

We are required to comply with competition laws in the territories where we do business around the world. Compliance with these laws has been the subject of increasing focus and activity by regulatory authorities (and private plaintiffs, where they have enforcement rights under the law), both in the U.S. and Europe, in recent years. Violations of such laws may have a material adverse effect on our reputation, business, financial condition, and results of operations. Our company has faced and may in the future face investigations and/or legal proceedings alleging that actions purportedly taken by our company violated such laws. For example, we were a party to civil claims settled in 2023 brought by state officials and private plaintiffs alleging that we violated U.S. federal and/or state antitrust and consumer protection laws. See "*Item 18. Financial Statements—Audited Consolidated Financial Statements—Note 21 "Legal Proceedings—Intellectual Property Related Matters – Antitrust Litigation and Consumer Protection."* We may face additional claims from state officials and private plaintiffs in the future, and any such claims could materially and adversely affect our business. Also, on November 20, 2020, we entered into a Stipulated Order for Permanent Injunction and Equitable Monetary Relief in the U.S. District Court for the Western District of Virginia, Abingdon Division, with the FTC. As part of the resolution with the FTC, for a ten-year period Indivior Inc. is required to make specified disclosures to the FTC and is prohibited from certain conduct. We reached a similar settlement with the Attorneys General of 41 States and the District of Columbia on June 13, 2023. See "*Item 10. Additional Information—C. Material Contracts.*"

Companies operating in the pharmaceutical industry also face challenges to the validity or enforceability of listed patents and frequently agree to settlements of patent litigation. Regulatory authorities in the U.S. and Europe, including the FTC and the European Commission, increasingly scrutinize patent settlements. Additionally, competition law authorities may send formal or informal requests for information about particular settlement agreements, and there is a risk that governmental

47

authorities, customers, other downstream purchasers or others may commence actions alleging violations of antitrust laws based on our settlement agreements.

The U.S. Congress and certain state legislatures in the U.S. have also passed, or proposed passing, legislation that could adversely impact the ability to settle patent litigation. For example, the State of California has enacted legislation that prohibits, with certain exceptions and safe harbors, various types of patent litigation settlements, and imposes substantial monetary penalties on companies and individuals who do not comply.

Following calls in recent years from policymakers and other stakeholders in many countries for governmental intervention to address the high prices of certain pharmaceutical products, we may become, from time to time, subject to governmental investigations, claims or other legal or regulatory actions regarding our pricing and/or other alleged exclusionary practices. It is not possible to predict the ultimate outcome of any such investigations, claims or proceedings or what other investigations or lawsuits or regulatory responses may result from such assertions, which could have a material adverse effect on our reputation, business, financial condition, and results of operations.

### Risks Related to our Financial Condition and Tax Matters

*Weakness in the economy, geopolitics, market trends, disruptions in our supply chain, uncertainty and other conditions in the markets in which we operate, particularly in the U.S., may adversely affect the profitability and financial stability of our customers, and could negatively impact our sales growth and results of operations.*

Our financial performance depends in part on general economic and geopolitical conditions in the geographic markets in which we operate, particularly in the U.S. where we generated 83% of our revenue in fiscal 2023. Further, as a global business, we are also subject to changes in economic conditions and cost inflation, interest rates, credit and capital markets, foreign exchange rates, political conditions, and tax policies. For example, in 2022, the U.S. experienced price inflation at its highest levels in 40 years. Global supply chain challenges continue to challenge all industries. Armed conflicts may compound supply chain challenges, possibly including shortages of materials and labor, increased demand for goods and services, constricted logistics capacity, and rising commodity and energy prices. Our agreements with some customers and government purchasers may limit our ability to raise prices commensurate with these cost increases. The Group has noted lead time extension, constricted capacity and minor disruption in some supply components. Numerous industries have suffered from supply chain disruptions or labor shortages that may affect us in unexpected ways. If major delays or shortages occur, the delivery of products to our patients could be disrupted and impact the Group's short-term financial performance. Any of these geopolitical or macroeconomic trends may have an adverse effect on our profitability, ability to generate revenue or fund operations, and ability to raise capital, which in turn could have a material adverse effect on our business, financial condition, and results of operations.

We may also be affected by other factors. While OUD rates remain high in the U.S., our largest market, authorities report increased abuse of other drugs including sedatives and anesthetics such as xylazine (also known as 'tranq') and ketamine, and amphetamines and stimulants such as methamphetamine, and our addiction and overdose recovery products are not indicated to treat the abuse of such drugs. Also, OUD rates might also be adversely affected by the actions of governments to better restrict the manufacture of opioids outside the U.S. and the illegal import of such drugs into the U.S.

*The recent pandemic and governmental and societal responses thereto adversely affected our business, results of operations, and financial condition, and future pandemics or the outbreak of other health epidemics could further harm our business, results of operations, and financial condition.*

48

The COVID-19 pandemic had a significant impact on the global healthcare delivery system. Many healthcare systems had to restructure operations to prioritize caring for COVID-19 patients and limit or cease other activities. The severe burden on healthcare systems caused by this pandemic impaired the ability of many clinical research sites to start new studies, enroll new patients and monitor patients in clinical trials. Health care provider offices and institutions experienced workforce disruption, including the inability to hire staff and challenges maintaining appropriate staffing. The lack of access to healthcare providers caused delays in appropriate diagnosis, treatment and ongoing care for some patients, which could subsequently impact prescribing and use of our products. The effects of any future pandemic or other health epidemic, and government measures taken in response, may have a significant impact, both direct and indirect, on businesses and commerce, as significant reductions in business related activities may occur, supply chains may be disrupted, and manufacturing and clinical development activities may be curtailed or suspended.

Many governments, including in the U.S., UK, and Canada, imposed stringent restrictions to seek to mitigate, or slow, the spread of COVID-19, including restrictions on international and local travel, public gatherings and participation in business meetings, as well as closures of workplaces, schools, and other public sites, and are continuing to encourage "social distancing." Although most of these restrictions have been lifted, some of these restrictions remain and it is possible that some or all of these measures could be reinstated if a new pandemic were to occur.

Possible future pandemics may negatively affect us in a variety of ways, including restrictions on access to HCPs by our sales force, disruptions to the supply of our products to patients if we experience either a significant absence of our employees and/or employees at our contract manufacturing organizations, vendors and service providers due to infection and/or government containment measures, and/or capacity issues at our airfreight and road logistics providers. In addition, possible future pandemics may result in overall fewer patient visits to healthcare provider offices for non-pandemic reasons or essential treatments, as patients become unable or unwilling to make visits due to overburdened healthcare systems, safety concerns, quarantines and other travel restrictions, or elect to have remote consultations with their providers. This trend also impaired our ability to enroll new patients in clinical trials and the development of real-world evidence for our existing products that are used for regulatory submissions and to supplement our label. Any of the above factors could have a material adverse effect on our business, financial condition, and results of operations.

### *Our insurance coverage may not be adequate.*

Our business exposes us to potential product liability and professional indemnity claims and other risks which are inherent in the research, pre-clinical and clinical evaluation, manufacturing, sales and marketing and use of pharmaceutical products. We have public liability (general liability) and product liability insurance. However, product liability insurance may be unavailable for many claims involving our opioid drug products due to contractual exclusions in our insurance policies. We also have insurance covering losses from property damage and business interruption, third-party named suppliers, marine and cargo, directors' and officers' liability, clinical trials, automobile (fleet vehicles), employers' liability, personal accident and travel, and cybersecurity.

We believe the insurance coverage currently in place is generally appropriate for a business of our current size, nature and financial position. However, there is no certainty that coverage limits and indemnity provisions will be adequate to cover all potential claims that could arise against us in the conduct of our business nor that claims will arise from insurable risks. In addition, there are areas where insurance coverage, while potentially available, would carry premiums that are not commercially reasonable and/or may be difficult to obtain or maintain on commercially reasonable terms. Product liability insurance, particularly for buprenorphine products, is difficult to obtain and may not be available in the future on acceptable terms or at all. A successful claim or claims against us in excess of or outside the ambit of our insurance coverage may have a material adverse effect on our business, prospects, results of operations and financial condition.

49

*Our term loan contains certain covenants that could limit our ability to plan for or respond to changes in our business.*

The Group has a $243.8 million term loan extended pursuant to a credit agreement. The credit agreement includes a minimum liquidity requirement of the larger of $100 million or 50% of the outstanding loan balance as well as several restrictive covenants that, among other things, and subject to certain exceptions and baskets, limit our ability and/or our subsidiaries' ability to:

- incur or assume liens or additional debt or provide guarantees in respect of obligations of other persons;

- pay dividends or distributions or redeem or repurchase capital stock;

- prepay, redeem or repurchase or amend or modify the terms of certain debt;

- make loans, investments, acquisitions (including certain acquisitions of exclusive licenses) and capital expenditures;

- enter into agreements that restrict distributions from our subsidiaries;

- enter into transactions with affiliates;

- sell, transfer or exclusively license certain assets, including material intellectual property, and capital stock of our subsidiaries;

- consolidate or merge with or into, or sell substantially all of our assets to, another person;

- engage in new material lines of business; and

- amend or modify our organizational documents.

Our failure to comply with the terms of our term loan could lead to an event of default under the term loan that could result in an acceleration where all amounts outstanding under the term loan would become immediately due and payable. We can provide no assurance that assets of the borrower group who are party to the Term Loan would be sufficient to repay in full any of those. In addition, if we are unable to repay those amounts, our creditors could proceed against any collateral granted to them to secure repayment of those amounts.

Further, the term loan matures in 2026 and there can be no assurance that we will be able to refinance our existing term loan at maturity, or obtain other or additional financing on attractive terms. Our involvement in the opioid industry has in the past, and may in the future, limit the number of business partners willing to lend to us. See *"Item 3. Key Information—D. Risk Factors—We may be subject to adverse public opinion."*

*We may not be able to generate sufficient cash to service all of our indebtedness and may be forced to take other actions to satisfy our obligations under our indebtedness.*

We have a $243.8 million term loan and approximately $492 million of contractual liabilities due over the next four years, mostly related to the settlement of prior litigation. See *'Item 18. Financial Statements - Audited Consolidated Financial Statements—Note 19, Provision and Other Liabilities."*

Our ability to make scheduled payments on our indebtedness or our other obligations or to refinance our indebtedness depends on our financial condition and operating performance and our ability to generate cash, which is subject to prevailing economic, industry and competitive conditions and to certain financial, business and other factors discussed in these "Risk Factors," many of which are beyond our control. In addition, we may elect to prepay some of our contractual liabilities due to governmental parties in order to reduce reporting and other requirements associated with such settlements. Any such

50

prepayment would use a substantial portion of our cash and further reduce our ability to make scheduled payment on our other indebtedness.

Our term loan will mature in 2026. At the maturity of our term loan and any other debt which we incur, if we do not have sufficient cash flows from operations and other capital resources to pay our debt obligations, or to fund our other liquidity needs, or if we are otherwise restricted from doing so due to corporate, tax or contractual limitations, we may be required to refinance our indebtedness. If we are unable to refinance all or a portion of our indebtedness or obtain such refinancing on terms acceptable to us, we may be forced to reduce or delay our business activities or capital expenditures, sell assets or raise additional debt or equity financing in amounts that could be substantial. The type, timing and terms of any future financing will depend on our cash needs and the prevailing conditions in the financial markets. We can provide no assurance that we will be able to accomplish any of these measures in a timely manner or on commercially reasonable terms, if at all.

Our ability to restructure or refinance our debt will depend in part on our financial condition at such time. Any refinancing of our debt could be at higher interest rates than our current debt and may require us to comply with more onerous covenants, which could further restrict our business operations. The terms of existing or future debt instruments may restrict us from adopting some of these alternatives. Furthermore, we may be unable to find alternative financing, and even if we could obtain alternative financing, it might not be on terms that are favorable or acceptable to us. If we are not able to refinance our debt, obtain additional financing or sell assets on commercially reasonable terms or at all, we may not be able to satisfy our debt obligations. In that event, borrowings under other debt agreements or instruments that contain cross-default or cross-acceleration provisions may become payable on demand, and we may not have sufficient funds to repay all our debts, including the term loan.

If our cash flows and capital resources are insufficient to fund payments of interest or principal on our outstanding debt or our obligations, we could face substantial liquidity problems and might be required to reduce or delay capital expenditures, sell assets or business operations, seek additional capital or restructure or refinance our term loan. We cannot ensure that we would be able to take any of these actions, that these actions would be successful and permit us to meet our scheduled obligations or that these actions would be permitted under the terms of existing or future debt agreements, including the agreement governing our term loan. In addition, any failure to make payments of interest and principal on our outstanding term loan on a timely basis would likely result in a reduction of our credit rating, which could harm our ability to incur additional indebtedness.

### *Changes to our credit ratings and outlook may reduce access to capital and increase borrowing costs.*

The Group's credit ratings are based on several factors, including our financial strength, business prospects (including markets in which we compete, number of products with commercial sales, market share of our products, level of competition, remaining patent life of products being sold commercially, R&D pipeline and stages of those assets), developments with our pending litigation, and factors outside of our control, such as conditions affecting our industry generally, the market's perception of our environmental, social and governance actions and prospects, or the introduction of new rating practices and methodologies. We cannot provide assurances that our current credit ratings will remain in effect or that the ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. If credit rating agencies lower, suspend or withdraw their ratings, the market price or marketability of our securities may be adversely affected. Pressure on the credit ratings could also arise from higher shareholder payouts or larger acquisitions than we have currently planned that result in increased leverage, or in a deterioration in the credit metrics used by the rating agencies to assess creditworthiness. In addition, any change in ratings could make it more difficult for the Group to raise capital on acceptable terms, impact the ability to obtain adequate financing and result in higher interest costs on future financings.

51

*Our effective tax rate may increase, and changes in tax rules and regulations, or interpretations thereof, may adversely affect our financial condition.*

As a global biopharmaceutical company, we are subject to taxation in several different jurisdictions. As a result, our effective tax rate is derived from a combination of applicable tax rates in the various places where we operate. In preparing our financial statements, we estimate the amount of tax that will become payable in each of these places. Our effective tax rate may fluctuate depending on several factors, including, but not limited to, the distribution of our profits or losses between the jurisdictions where we operate and differences in the interpretation of tax laws. In addition, the tax laws of any jurisdiction in which we operate may change in the future, which could impact our effective tax rate. Tax authorities in the jurisdictions in which we operate may audit us. If we are unsuccessful in defending any tax positions adopted in our submitted tax returns, we may be required to pay taxes for prior periods, interest, fines or penalties, and may be obligated to pay increased taxes in the future, any of which could have a material adverse effect on our business, financial condition, cash flows and results of operations.

Our effective tax rates could be affected by numerous factors, such as changes in tax laws, regulations, administrative practices, principles and interpretations, the mix and level of earnings in a given taxing jurisdiction or our ownership or capital structures. Any current or future proposed changes to the tax rules that apply to corporations could materially affect our tax obligations and effective tax rate. In addition, the Organisation for Economic Co-operation and Development (OECD) has achieved widespread political agreement to work towards the implementation of a global minimum tax. As a result, it is possible that the Group's consolidated effective tax rate will increase in the short term. It is difficult to predict whether and when tax law changes will be enacted that would have a material adverse effect on our business, financial condition, results of operations and cash flows.

The application of tax law is subject to interpretation and is subject to audit by taxing authorities. Additionally, administrative guidance can be incomplete or vary from legislative intent, and therefore the application of the tax law is uncertain. While we believe the positions taken by the Group comply with relevant tax laws and regulations, taxing authorities could interpret our application of certain laws and regulations differently. Future tax controversy matters may result in previously unrecorded tax expenses, higher future tax expenses or the assessment of interest and penalties.

*Our deferred tax assets may not be realized.*

On December 31, 2023 we had $268 million of deferred tax assets consisting of $116 million of net deferred tax assets in the U.S. and $147 million of net deferred tax assets in the UK, respectively.

It is possible that some or all of such deferred tax assets will not be realized, especially if we incur losses in either the U.S. or the UK in the future. Losses may arise from unforeseen operating events. Unless we are able to generate sufficient taxable income in the future, a substantial reduction in the carrying value of either our U.S. or UK deferred tax assets may be required, which would materially increase our expenses in the period the reduction is recognized and materially adversely affect our business, financial condition, and results of operations.

*If a U.S. person is treated as owning at least 10% of our ordinary shares, such holder may be subject to adverse U.S. federal income tax consequences.*

If a U.S. person is treated as owning (directly, indirectly, or constructively) at least 10% of the value or voting power of our ordinary shares, such person may be treated as a "United States shareholder" with respect to each "controlled foreign corporation" in our group. Because our group includes one or more U.S. subsidiaries, certain of our non-U.S. subsidiaries could be treated as controlled foreign corporations (regardless of whether or not we are treated as a controlled foreign corporation). A United States shareholder of a controlled foreign corporation may be required to report annually and include in its U.S. taxable income its pro rata share of "Subpart F income," "global intangible low-taxed income," and investments in U.S. property by controlled foreign corporations, regardless of whether we make any distributions. An individual that is a United States shareholder with respect to a controlled foreign

52

corporation generally would not be allowed certain tax deductions or foreign tax credits that would be allowed to a U.S. corporation that is a United States shareholder with respect to a controlled foreign corporation. Failure to comply with these reporting and tax payment obligations may subject a United States shareholder to significant monetary penalties and may prevent the statute of limitations from starting with respect to such shareholder's U.S. federal income tax return for the year for which reporting was due. We cannot provide any assurances that we will assist investors in determining whether any of our non-U.S. subsidiaries is treated as a controlled foreign corporation or whether any investor is treated as a United States shareholder with respect to any such controlled foreign corporation or furnish to any United States shareholders information that may be necessary to comply with the aforementioned reporting and tax paying obligations. A United States investor should consult its advisors regarding the potential application of these rules to an investment in our ordinary shares.

<u>Risks Related to Our Ordinary Shares</u>

*Our ordinary shares are subject to market price volatility and the market price may decline disproportionately in response to developments that are unrelated to our operating performance.*

The market price of our ordinary shares has been, and in the future, may be volatile and subject to wide fluctuations as a result of a variety of factors including, but not limited to general economic conditions, developments with our pending litigation, period to period variations in operating results or changes in revenue or profit estimates by us, market and industry participants, and/or financial analysts, our failure to meet our stated guidance, our failure to comply with the rules under the Sarbanes-Oxley Act related to accounting controls and procedures, the discovery of material weaknesses and other deficiencies in our internal control and accounting procedures, and the other factors discussed in these risk factors. The market price could also be adversely affected by developments unrelated to our operating performance, such as the operating and share price performance of other companies that investors may consider comparable to us, speculation about us in the press and/or the investment community, unfavorable press, strategic actions by competitors (including acquisitions and restructurings, new competing products, and new generic products), changes in market conditions, regulatory changes and broader market volatility and movements. Any or all of these factors could result in material fluctuations in the price of our ordinary shares, which could result in investors getting back less than they invested or a total loss of their investment.

We currently maintain our primary listing on the London Stock Exchange (the "LSE") in addition to our listing on Nasdaq. We are exploring the potential benefits of transitioning our primary listing to Nasdaq, and if we were ever to do so, volatility in our share price may increase as a result of turnover in our shareholder base.

In addition, where the market price of a company's shares has been volatile, the shareholders of such company may file securities class action litigation against that company based on various claims, such as securities fraud and other violations of securities laws. The defense and disposition of litigation of this type could result in substantial costs and divert resources and the time and attention of our management, which could materially and adversely affect our business or financial condition. See also the discussion of similar, but less common, UK litigation under the caption "*UK shareholder claims*" in "*Item 18. Financial Statements—Audited Consolidated Financial Statements—Note 21. Legal Proceedings.*"

*Our ordinary shares are listed to trade on more than one stock exchange,  and this may result in price variations.*

Our ordinary shares are listed on both the LSE and Nasdaq. From time to time, dual-listing may result in price variations between the exchanges due to a number of factors. Our ordinary shares trade in U.S. dollars on Nasdaq and in GBP on the LSE. In addition, the exchanges are open for trading at different times of the day and the two exchanges also have differing vacation schedules. Differences in the trading schedules, as well as volatility in the exchange rate of the two currencies, among other factors, may result

53

in different trading prices for our ordinary shares on the two exchanges. Other external influences may have different effects on the trading price of our ordinary shares on the two exchanges.

*We may in the future transition our primary listing to the U.S., which could cause volatility in our share price and shareholder base.*

We currently maintain a premium listing on the London Stock Exchange (the "LSE") and are listed on the Global Select Market of The Nasdaq Stock Market LLC ("Nasdaq"). We are a member of various indices of listed companies such as the FTSE 250 and the FTSE 350.

We are exploring the benefits of transitioning our primary listing to Nasdaq, and if we do so, such a change would require approval by a special resolution of a majority of not less than 75% of the votes attaching to Indivior PLC's shares voted on the resolution (whether in person or by proxy) at a General Meeting. However, if we were to change our primary listing from the LSE:

- we would no longer be eligible to be a member of the FTSE 250 and other indices; and

- we would not necessarily be eligible for inclusion in certain U.S. indices in the near term until we achieve certain trading volume thresholds on Nasdaq, among other requirements, and moreover, we cannot guarantee that once eligible, we will be included in any index in the U.S.

If we transition our primary listing to the U.S., then certain institutional holders of our ordinary shares may no longer be permitted to hold our ordinary shares (pursuant to their internal investment mandate, for example, relating to FTSE 250 status and LSE premium listing status), and certain similarly situated U.S. investors may not immediately be able to invest in our ordinary shares (pursuant to their investment mandates, for example, due to our lack of inclusion in U.S.-centric indices). Any such mismatch between supply and demand could cause the price of our ordinary shares to become more volatile and could impact our ability to meet certain criteria for inclusion on U.S. indices.

*The rights afforded to our shareholders are governed by English law. Not all rights available to shareholders under U.S. law will be available to holders of our ordinary shares.*

Indivior PLC is organized under the laws of England and Wales. The rights of holders of our ordinary shares are governed by English law and our articles of association (the "Articles"), and these may not provide the level of legal certainty and transparency afforded by incorporation in a U.S. state.

Also, there can be no assurance that English law will not change in the future or that it will serve to protect investors in a similar fashion afforded under corporate law principles in the U.S., which could adversely affect the rights of investors. Rights afforded to shareholders under English law differ in certain respects from the rights of shareholders in typical U.S. companies. In particular, English law currently significantly limits the circumstances in which the shareholders of English companies may bring derivative actions (i.e., legal actions brought by a shareholder on behalf of a company against a third-party). Under English law, in most cases, only Indivior PLC may be the proper plaintiff for the purposes of maintaining proceedings in respect of wrongful acts committed against it and, generally, neither an individual shareholder, nor any group of shareholders, has any right of action in such circumstances. In addition, English law does not afford appraisal rights to dissenting shareholders in the form typically available to shareholders in a U.S. company. See "*Item 10. Additional Information—B. Memorandum and Articles of Association.*"

It may not be possible for shareholders outside the UK to enforce any judgments in civil or commercial matters or any judgments in securities laws of countries other than the UK against some or all of the directors or executive officers of Indivior PLC who are resident in the UK or countries other than those in which judgment is made.

54

*Our business strategy may involve future transactions that may harm the market price of our ordinary shares or require us to seek additional funds, and such funding may not be available on commercially favorable terms or at all and may cause dilution to our existing shareholders. The issuance of additional ordinary shares in connection with future acquisitions, any share incentive or share option plan, or otherwise, may dilute all other shareholdings.*

In order to achieve our business strategy, we regularly review potential transactions related to technologies, products or product rights, and businesses that are complementary to our business, including mergers and acquisitions, licenses and collaborations, and development and supply, commercialization or co-promotion arrangements, among others. We may choose to enter into one or more of these or other transactions at any time, that may cause substantial fluctuations in the market price of our ordinary shares. Moreover, depending upon the nature of any transaction, we may experience a charge to earnings, which could also materially adversely affect our results of operations and could harm the market price of our ordinary shares.

In order to finance such transactions, we may require additional funds, and we may seek such funds through various sources, including debt and equity offerings, corporate collaborations, bank borrowings, arrangements relating to assets, monetization of royalty streams or other financing methods or structures. In particular, we may, for these and other purposes, issue additional equity or convertible equity securities which would cause our shareholders to suffer dilution to their percentage ownership of the Group, or the market price of our ordinary shares may be adversely affected. The source, timing and availability of any financings will depend on global economic conditions, credit and financial market conditions, interest rates and other factors. If we issue additional equity securities or securities convertible into equity securities, our shareholders will suffer dilution of their investment, and it may adversely affect the market price of our ordinary shares.

In addition, the Companies Act 2006 (of England and Wales) provides that the directors of an England and Wales public limited company may only allot shares (or grant rights to subscribe for or convertible into shares) with the prior authorization of the company's shareholders, such authorization stating the maximum amount of shares that may be allotted under such authorization and specify the date on which such authorization will expire, being not more than five years, each as specified in the articles of association or relevant shareholder resolution. Furthermore, subject to certain limited exceptions, the Companies Act 2006 generally provides that the shareholders of a company have statutory pre-emption rights when new shares in such company are allotted and issued for cash. However, it is possible for such statutory pre-emption right to be disapplied by either the articles of association of the company, or by shareholders passing a special resolution at a general meeting, being a resolution passed by at least 75% of the votes cast. Such a disapplication of statutory pre-emption rights may not be for more than five years from the date of adoption of the articles of association, if the disapplication is contained in the articles of association, or from the date of the special resolution, if the disapplication is by a special resolution. On May 4, 2023, our shareholders authorized our Board to allot additional shares and disapply pre-emption rights in respect of certain additional share issuances, in each case applying until the earlier of (i) the close of business on June 30, 2024; or (ii) the conclusion of Indivior PLC's annual general meeting to be held in 2024. If we are unable to obtain renewal of these existing authorities from our shareholders, or are otherwise limited by the terms of new share issuance and/or disapplication of statutory preemption rights authorities approved by our shareholders, our ability to issue additional shares to effect or to fund acquisition or other transaction opportunities, or to otherwise raise capital, could be adversely affected.

If we issue additional debt securities, our existing debt service obligations will increase further. If we are unable to generate sufficient cash to meet these obligations and need to use existing cash or liquidate investments in order to fund our debt service obligations or to repay our debt, we may be forced to curtail our operations. We cannot be certain that additional financing will be available from any of these sources when needed or, if available, will be on acceptable terms. If we fail to obtain additional capital when we need it, we may not be able to execute our business strategy successfully and may have to give up rights to our product platforms, and/or products, or grant licenses on terms that may not be favorable to us.

55

*If securities or industry analysts do not publish research or publish inaccurate or unfavorable research about our business, our share price and trading volume could decline.*

The trading market for our ordinary shares depends in part on the research and opinions that securities or industry analysts publish about us or our business which we do not control. If one or more of the analysts who cover us downgrade our rating, lower our price target, or publish inaccurate or unfavorable research about our business, our share price could decline. If one or more of these analysts cease coverage of our company or fail to publish reports on our company regularly, demand for our ordinary shares could decrease, which might cause our share price and trading volume to decline. Further, of the four analysts who currently cover us, only one is U.S. based and, if we were to move our primary securities exchange listing from the LSE to Nasdaq, these analysts may decline to continue to cover us.

*We may not pay dividends in the future. Our ability to pay dividends or make other returns of capital in the future depends, among other things, on our financial performance.*

There can be no guarantee that our historical performance will be repeated in the future, particularly given the competitive nature of the industry in which we operate, and our revenue, profit and cash flow may significantly underperform market expectations. If our cash flow underperforms market expectations, then our capacity to pay a dividend or make other returns of capital (including, without limitation, share repurchases) may be negatively impacted. Any decision to declare and pay dividends or to make other returns of capital will be made at the discretion of the Board and will depend on, among other things, applicable law, regulation, restrictions (if any) on the payment of dividends and/or capital returns in our financing arrangements, our financial position, retained earnings/profits, working capital requirements, finance costs, general economic conditions and other factors that the Board deems significant from time to time.

We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future, including due to limitations that are currently imposed by our credit agreement. Any return to shareholders therefore likely will be limited to the increase in the price of our ordinary shares, if any. Similarly, while we announced a $100 million share repurchase program on July 28, 2021, an additional $100 million share repurchase program on April 8, 2022, and a third $100 million share repurchase program on November 17, 2023, any future repurchase of shares is subject to the discretion of our Board and will depend on similar factors as those that affect decisions to pay dividends. There can be no assurance the Group will repurchase any additional shares beyond the programs already announced.

<u>Risks Related to Information Security and Data Privacy</u>

*Business interruptions or breaches of data security could disrupt our product sales and delay the development of our product candidates.*

We are increasingly dependent on information technology systems and infrastructure, including mobile technologies, to operate our business. In the ordinary course of our business, we collect, store and transmit confidential information, including intellectual property, proprietary business information and personal information. It is critical that we do so in a secure manner to maintain the confidentiality and integrity of such confidential information. While we have implemented processes to collect, store, and transmit such information in a secure manner, there can be no assurance that any measures we take will prevent potential cyber-attacks or security breaches that could adversely affect the confidentiality and integrity of such confidential information.

Like many companies, we have experienced breaches of our data security, including phishing attacks and malware. To date, none have had a material effect on our business strategy, results of operations or financial condition. Were we to have a cybersecurity incident, it is reasonably likely that it could have a

56

material adverse effect on our business and financial results. While we have taken a number of steps to prevent further cybersecurity incidents, we cannot estimate how likely any such incident would be.

We also use a number of third-party vendors who have or could have access to our confidential information. The size and complexity of our information technology systems, and those of third-party vendors with whom we contract, make such systems potentially vulnerable to breakdown, malicious intrusion, security breaches, ransomware, and other cyber-attacks, all of which would be costly to remedy. In addition, the use of mobile devices or cloud-based systems that access confidential information increases the risk of data security breaches, which could lead to the loss of confidential information, trade secrets or other proprietary information. Failures of or disruptions to our systems or the systems of third parties on whom we rely, particularly if prolonged, could result in breaches of data security and/or a loss of key data which would adversely affect our reputation, business and results of operations. While we have implemented security measures to protect our data security and information technology systems, such measures may not prevent the adverse effect of such events.

For additional information regarding how we manage information resources and threats, see _"Item 16K. Cybersecurity."_

***We are required to maintain the privacy and security of personal information in compliance with privacy and data protection regulations worldwide. Failure to meet the requirements could result in fines, penalties, or private actions, harm our business and damage our reputation with customers, suppliers, and associates.***

We rely on systems, networks, products, and services, some of which are managed by third-party service providers to protect our information. Increased information security threats, more sophisticated cyber-attacks and a growing base of diversified threat actors continually pose a risk to all systems and data.

Additionally, we collect, store, and process personal information relating to many stakeholders, including our customers, suppliers, and associates. This information is increasingly subject to a variety of U.S. and international laws and regulations, such as the General Data Protection Regulation, as enacted in the European Union, the Data Protection Act in the UK, Canada's Personal Information Protection and Electronic Documents Act, the California Consumer Privacy Act, Virginia's Consumer Data Protection Act, the Colorado Privacy Act, the Connecticut Data Privacy Act, the Utah Consumer Privacy Act, the Montana Consumer Data Privacy Act, the Oregon Consumer Privacy Act, the Texas Data Privacy and Security Act, and other emerging privacy and cybersecurity laws internationally, at the federal level in the U.S., and across various U.S. states, that may carry significant potential penalties for noncompliance.

The FTC also sets expectations for failing to take appropriate steps to keep consumers' personal information secure or failing to provide a level of security commensurate to promises made to individuals about the security of their personal information (such as in a privacy notice) may constitute unfair or deceptive acts or practices in violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"). The FTC expects a company's data security measures to be reasonable and appropriate in light of the sensitivity and volume of consumer information it holds, the size and complexity of its business, and the cost of available tools to improve security and reduce vulnerabilities. Individually identifiable health information is considered sensitive data that merits stronger safeguards. With respect to privacy, the FTC also sets expectations that companies honor the privacy promises made to individuals about how a company handles consumers' personal information; any failure to honor promises, such as the statements made in a privacy policy or on a website, may also constitute unfair or deceptive acts or practices in violation of the FTC Act. While we do not intend to engage in unfair or deceptive acts or practices, the FTC has the power to enforce promises as it interprets them, and events that we cannot fully control, such as data breaches, may result in FTC enforcement. Enforcement by the FTC under the FTC Act can result in civil penalties or enforcement actions.

57

These data privacy and data protection laws and regulations are typically intended to protect the privacy of personal information that is collected, processed, transmitted, and stored. In many cases, these laws apply not only to third-party transactions, but also to transfers of information between a company and its subsidiaries. While we have invested and continue to invest significant resources to comply with data privacy regulations, many of these regulations are new, complex, and subject to interpretation. Noncompliance with these laws could result in negative publicity, damage to our reputation, penalties, or significant legal liability. We could be adversely affected if legislation or regulations are revised or extended to require changes in our business practices or if governing jurisdictions interpret or implement their legislation or regulations in ways that negatively affect our business. The landscape of federal and state laws regulating personal information is constantly evolving, and compliance with these laws requires a flexible privacy framework and substantial resources, and compliance efforts will likely be an increasing and substantial cost in the future.

<u>Risks Related to Our International Status and Operations</u>

*We are subject to various risks related to the local and international nature of our business, including domestic and foreign laws, regulations, and standards. Failure to comply with such laws and regulations or the occurrence of unforeseen developments such as litigation could adversely affect our business.*

Our business operates in several countries including the U.S., UK, Canada, France, Germany, Italy, and Australia and our products are available in 37 countries worldwide. As a result, we are subject to specific risks of conducting business in different jurisdictions across these countries and other parts of the world. Our business is subject to a wide array of domestic and international laws, regulations and standards in jurisdictions where we operate, including advertising and marketing regulations, anti-bribery and corruption/money laundering laws, anti-competition regulations, data protection (including payment card industry data security standards) and cybersecurity requirements (including protection of information and incident responses), environmental protection laws, foreign exchange controls and cash repatriation restrictions, government business regulations applicable to us as a government contractor or supplier selling to governmental agencies, import and export requirements, intellectual property laws, labor laws, product compliance laws, supplier regulations regarding the sources of supplies or products, tax laws, zoning laws, unclaimed property laws and laws as well as regulations and standards applicable to other commercial matters. In particular, occupational health and safety or consumer product safety regulation may require that we take appropriate corrective action, including but not limited to product recall, in respect of products that we have distributed. Managing a product recall or other corrective action can be expensive and can divert the attention of management and other personnel for significant time periods. Moreover, we are also subject to audits and inquiries by government agencies in the normal course of business.

Failure to comply with any of these laws, regulations and standards could result in civil, criminal, monetary and non-monetary penalties as well as potential damage to the Group's reputation. Changes in these laws, regulations and standards, or in their interpretation, could increase the cost of doing business, including, among other factors, as a result of increased investments in technology and the development of new operational processes. Furthermore, while we have implemented policies and procedures designed to facilitate compliance with these laws, regulations, and standards, and applicable self-regulatory industry codes by region that the Group has committed to follow, but there can be no assurance that neither we nor our associates, contractors or agents will not violate such laws inadvertently, regulations and standards or our policies. Any product recall or other corrective action may negatively affect customer confidence in the relevant Group member's products and the Group itself, regardless of whether it is successfully implemented. Any such failure to comply or violation could individually or in the aggregate materially adversely affect our business, financial condition, results of operations and cash flows.

58

*We are exposed to risks related to currency exchange rates.*

We are incorporated in England and Wales but present our financial statements in U.S. dollars. Based on the country where sales originate, we derived 83%, 81%, and 76% of our net revenues from the U.S. in 2023, 2022, and 2021, respectively. We also conduct business in the U.K., Europe and Australia, among other places. As a result, our agreements with customers not based in the U.S. often involve payments denominated in currencies other than U.S. dollars, which creates foreign currency translation risk. Our operating results are therefore subject to currency fluctuations in translating revenues and costs from those foreign currencies to U.S. dollars. Additionally, if in the future we expand our sales and operations into new markets, different currencies could expose us to additional currency translation risks. These risks increase with the strengthening of the U.S. dollar.

We generally do not actively hedge exchange rate fluctuations, although we attempt to balance large non-U.S. dollar liabilities with a similarly sized assets in the same currency, which is sometimes referred to as a natural hedge. To the extent that we do not hedge our exposure to foreign currency exchange rate fluctuations, or to the extent that such hedging is structured ineffectively or does not offset our exposure to exchange rate fluctuations, our business, financial condition, and results of operations could be materially adversely affected.

Exchange rate fluctuations between local currencies and the U.S. dollar also create risk in other ways, including but not limited to: (i) increasing the U.S. dollar cost of non-U.S. research and development expenses and the cost of sourced product components outside the U.S. (in the case of a weakening of the U.S. dollar); (ii) decreasing the value of our revenues denominated in other currencies (in the case of a strengthening of the U.S. dollar); (iii) distorting the value of non-U.S. dollar transactions and cash deposits; and (iv) affecting commercial pricing and profit margins of our products. These effects can have an adverse impact on our results of operations and financial condition and may also make it more difficult for investors to understand the relative strengths or weaknesses of our underlying business on a period-over-period comparative basis.

## Risks Related to Being a Publicly-Traded Company in the U.S.

*If we fail to maintain an effective system of internal control over financial reporting ("ICFR"), fail to comply with Section 404 of the Sarbanes-Oxley Act, or if we identify a material weakness, then we may not be able to accurately report our financial results or prevent fraud and, as a result, shareholders could lose confidence in our financial and other public reporting, which would harm our business and the trading price of our ordinary shares and may cause other increases in operating costs.*

We will be required to comply with the internal control evaluation and certification requirements of Section 404 by the end of our 2024 fiscal year. We have incurred, and expect that we may further incur, significant additional accounting, legal, and other expenses in connection with this transition that may negatively impact our results of operations. If we fail to maintain effective ICFR for any reason, such failure could harm our reputation, operations, financial reporting or financial results and could result in our conclusion that our ICFR is not effective. In addition, if it is determined that we are not in compliance with Section 404, we may be required to implement new internal control procedures and re-evaluate our financial reporting.

Any failure to implement required new or improved controls, or difficulties encountered in their implementation could cause us to fail to meet our reporting obligations. In addition, any testing by us, as and when required, conducted in connection with Section 404 or any subsequent testing by our independent registered public accounting firm, as and when required, may reveal deficiencies in our ICFR that are deemed to be material weaknesses or that may require prospective or retroactive changes to our financial statements or identify other areas for further attention or improvement. Inferior ICFR could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our ordinary shares.

A material weakness is a deficiency, or a combination of deficiencies, in ICFR, such that a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. In other words, a material weakness means there is a risk the financial information we report contains material errors, or that we might be unable to detect fraud. Any system of internal controls, however well-designed and operated, is based in part on certain assumptions and can provide only reasonable, not absolute, assurances that the objectives of the system are met. If we cannot conclude that we have effective ICFR, investors could lose confidence in the reliability of our financial statements, which could lead to a decline in the trading price of our ordinary shares. Failure to comply with reporting requirements could also subject us to sanctions and/or investigations by Nasdaq or the SEC or other regulatory authorities.

*We are a foreign private issuer. Should we no longer qualify as a foreign private issuer in the future, we may incur significant additional expenses. Also, as a foreign private issuer, we are not subject to SEC proxy rules but are subject to Exchange Act reporting obligations that, to some extent, are more lenient and less frequent than those of a domestic U.S. issuer. As a foreign private issuer, we are permitted to follow certain home country corporate governance practices in lieu of certain requirements applicable to domestic U.S. issuers. This may afford less protection to holders of our ordinary shares.*

As of June 30, 2023, 59,852,653 shares were held for the benefit of 806 shareholders who were U.S. residents, comprising approximately 43.41% of our issued share capital. Because not more than 50% of our ordinary shares were held by shareholders resident in the U.S., we qualify as a "foreign private issuer" within the meaning of Rule 405 of the Securities Act, as amended (the "Securities Act") and Rule 3b-4 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). We thus are exempt from certain provisions of the Exchange Act that are applicable to U.S. public companies, including: (i) the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act; (ii) the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and (iii) the rules under the Exchange Act requiring the filing with the SEC of quarterly reports on Form 10-Q containing unaudited financial and other specified information, or current reports on Form 8-K, upon the occurrence of specified significant events. Foreign private issuers are required to file their annual report on Form 20-F within 120 days after the end of each fiscal year, while U.S. domestic issuers are required to file their annual report on Form 10-K within 60-90 days after the end of each fiscal year, depending on various factors. Foreign private issuers are also exempt from compliance with Regulation Fair Disclosure, which is aimed at preventing issuers from making selective disclosures of material information.

In addition, as a foreign private issuer whose shares are on Nasdaq, we are permitted to follow certain home country corporate governance practices in lieu of certain Nasdaq requirements. As a company incorporated in the U.K. and which has a premium listing on the main market of the London Stock Exchange, we may follow our home country's practice with respect to, among other things, Nasdaq rules requiring shareholders to approve equity compensation plans and material revisions thereto. As a result of the above, shareholders may not have the same protections afforded to shareholders of companies that are not foreign private issuers.

The determination of foreign private issuer status is made annually on the last business day of an issuer's most recently completed second financial quarter. Accordingly, we will next make a determination with respect to our foreign private issuer status on June 30, 2024.

There is a risk that we could lose our foreign private issuer status if more than 50% of our issued ordinary share capital is held by U.S. residents. If we lose our foreign private issuer status, we would become subject to the extensive periodic and ongoing disclosure and reporting requirements under the U.S. securities laws that apply to domestic issuers, including preparing consolidated financial statements in accordance with U.S. generally accepted accounting principles (U.S. GAAP, in addition to those prepared in accordance with IFRS as required by the listing rules made by the UK Listing Authority under

60

the UK Financial Services and Markets Act 2000 (as set out in the UK Financial Conduct Authority's Handbook of Rules and Guidance), as amended (the "Listing Rules")), and preparing quarterly financial statements. We would also be subject to the proxy statement requirements under Section 14 of the Exchange Act, and our officers, directors and principal shareholders would be subject to the reporting and "short-swing" profit recovery provisions of Section 16 of the Exchange Act. The regulatory and compliance costs to us under U.S. securities laws as a U.S. domestic issuer will be significantly greater than the costs incurred as a foreign private issuer. If we are required to report as a domestic issuer, we may incur additional expenses which could have an adverse effect on our results of operations.

*We will change the financial reporting standards that we apply to our financial statements from IFRS to U.S. generally accepted accounting principles, or "U.S. GAAP" should we no longer qualify as a foreign private issuer ("FPI"), and may voluntarily do so sooner and, as a result, some of our financial data may not be easily comparable to historical financial results.*

Should we lose FPI status, SEC rules will require us to transition from IFRS to U.S. GAAP and we will report our financial statements under U.S. GAAP for periods following our loss of FPI status. We may elect to do so sooner. In connection with this transition, we have invested significant resources and time to convert historical financial statements prepared under IFRS from prior fiscal years into U.S. GAAP financial statements.

There have been and there may in the future be significant differences between U.S. GAAP and IFRS, including differences related to intangible assets, capitalized development costs, acquired in-process research and development costs, lease accounting, and income tax. As a result, our financial information and reported earnings for future periods within a fiscal year or any interim period could be significantly different if they are prepared in accordance with U.S. GAAP. Consequently, if we begin reporting in U.S. GAAP, you may not be able to meaningfully compare our financial statements under U.S. GAAP with our historical financial statements under IFRS.

*Changes in accounting standards and subjective assumptions, estimates and judgments by management related to complex accounting matters, could significantly affect our financial results or financial condition.*

Accounting standards, including both IFRS and U.S. GAAP, and related accounting pronouncements, implementation guidelines and interpretations with regard to a wide range of matters that are relevant to our business, such as revenue recognition, asset impairment, inventories, lease obligations, self-insurance, tax matters, pensions and litigation, and impairment of goodwill and other intangible assets are complex and involve many subjective assumptions, estimates and judgments. See, for example, "*Item 5. Operating and Financial Review and Prospects—E. Critical Accounting Estimates.*" Further, these estimates may be more sensitive, particularly regarding assumptions pertaining to the difference between gross revenue and net revenue, than others in our industry or in other industries. Changes in accounting standards or their interpretation or changes in underlying assumptions and estimates or judgments could significantly change our reported or expected financial performance or financial condition.

*The obligations associated with being a company publicly traded in the U.S. require significant resources and management attention, and changing laws, regulations and standards are creating uncertainty for U.S. public companies.*

As a company publicly traded in the U.S., we incur legal, accounting and other expenses that we did not previously incur. We are subject to the reporting requirements of the Exchange Act and the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") which contain certain exemptions for FPIs, the listing requirements of Nasdaq, and other applicable securities rules and regulations. The Exchange Act requires that we file annual and other reports with respect to our business, financial condition, and results of operations. The Sarbanes-Oxley Act requires, among other things, that we establish and maintain effective ICFR. Furthermore, the establishment and the maintenance of the corporate infrastructure demanded of a company publicly traded in the U.S. may, in certain circumstances, divert management's

61

attention from implementing our growth strategy, which could prevent us from improving our business, financial condition, and results of operations. We have made, and will continue to make, enhancements to our ICFR and accounting systems in order to meet our reporting obligations as a company publicly traded in the U.S. However, the measures we take may not be sufficient to satisfy these obligations. In addition, compliance with these rules and regulations has increased our legal and financial compliance costs and has made some activities more time-consuming and costly. These additional obligations may have a material adverse impact on our business, financial condition, results of operations and cash flow.

In addition, changing laws, regulations and standards relating to corporate governance, ESG matters, and public disclosure create uncertainty for public companies in the U.S., increasing legal and financial compliance costs and making some activities more time-consuming. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We have invested, and expect to continue to invest, resources to comply with evolving laws, regulations and standards, and this investment may result in increased operating expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us and our business, financial condition, results of operations and cash flow could be adversely affected.

In addition, as a company publicly traded in the U.S., our shareholders may file securities class action litigation against that company based on various claims such as securities fraud and other violations of securities laws when the market price of a company's shares has been volatile. The defense and disposition of litigation of this type could result in substantial costs and divert resources and the time and attention of our management, which could materially and adversely affect our business or financial condition. See also the discussion of similar, but less common, UK litigation under the caption "UK shareholder claims" in *"Item 18. Financial Statements—Audited Consolidated Financial Statements—Note 21. Legal Proceedings."*

### *Corporate responsibility expectations, specifically related to environmental, social and governance ("ESG") matters, may impose additional costs and expose us to new risks.*

Comprehensive public ESG (Environmental, Social, Governance) and sustainability reporting have become more broadly expected by investors, shareholders and third parties and in many cases becoming mandatory. Certain organizations, including those that provide corporate governance and other corporate risk information to investors and shareholders have developed, and others may in the future develop, scores and ratings to evaluate companies and investment funds based upon ESG or "sustainability" metrics. Moreover, the standards by which ESG matters are measured are developing and evolving, and certain areas are subject to assumptions that could change over time.

Many investment funds focus on positive ESG business practices and sustainability scores when making investments and may consider a company's ESG or sustainability scores as a factor in making an investment decision. In addition, investors, particularly institutional investors, can use these scores to benchmark companies against their peers and if a company is perceived as lagging, may make voting decisions, or take other actions, to hold these corporations and their boards of directors accountable. Board diversity, social issues such as the U.K.'s Equality, Diversity and Inclusion (EDI) factors, and sustainability are ESG topics that are receiving heightened attention from investors, shareholders, lawmakers and listing exchanges, as are claims of corporate greenwashing related to ESG and sustainability communications. Ongoing focus on corporate responsibility matters by investors and other parties as described above may impose additional costs or expose us to new risks.

62

From time to time, we may announce certain initiatives, including goals, regarding our focus areas, which include environmental matters, responsible sourcing, promoting access to medicines, social investments, and diversity and inclusion. We may face reputational damage in the event our corporate responsibility initiatives or objectives do not meet the standards expected by our investors, shareholders, lawmakers, listing exchanges or other constituencies, if we are unable to achieve an acceptable ESG or sustainability rating from third-party rating services, if we fail or are perceived to have failed in the achievement of our initiatives or goals whether due to changes in our business or otherwise or if we fail to accurately report our progress on such initiatives and goals. A low ESG or sustainability rating by a third-party rating service could also result in the exclusion of our ordinary shares from consideration by certain investors who may elect to invest with our competitors instead.

Any of the above factors could have a material adverse effect on our reputation, business, financial condition, and results of operations. While we monitor a broad range of ESG issues, there can be no certainty that we will manage such issues successfully, or that we will successfully meet the expectations of investors, employees, consumers and other stakeholders.

63

## ITEM 4: INFORMATION ON THE COMPANY

### A.        History and Development of the Company

Indivior is a global pharmaceutical company working to help change patients' lives by developing medicines to treat substance use disorders ("SUD"), serious mental illnesses, and opioid overdose. As a pioneer in developing evidence-based treatments for opioid use disorder ("OUD"), our vision is that the millions of people across the globe suffering from substance use disorders and serious mental illness will have access to evidence-based treatment to change lives. As a leader in addiction, Indivior is dedicated to transforming SUD from a global human crisis to a recognized and treated chronic disease.

Building on its portfolio of leading OUD treatments, Indivior has a pipeline of product candidates designed to both expand on its heritage in this category and potentially address other chronic conditions and co-occurring disorders of SUD, including alcohol use disorder and cannabis use disorder, and co-morbidities, including schizophrenia. We entered the opioid overdose reversal market with our 2023 acquisition of Opiant Pharmaceuticals and our launch of OPVEE (nalmefene) nasal spray for opioid overdose reversal.

Headquartered in the U.S. in Richmond, Virginia, Indivior employs more than 1,100 individuals globally and its portfolio of products is available in 37 countries worldwide.

Our core products include the following approved treatments:

- SUBLOCADE (buprenorphine extended-release) monthly injection;

- SUBOXONE Film (buprenorphine and naloxone sublingual film);

- SUBOXONE Tablet (buprenorphine and naloxone sublingual tablets); and

- SUBUTEX Tablet (buprenorphine sublingual tablets),

all of which are treatments for OUD,

- OPVEE (nalmefene) nasal spray for opioid overdose reversal; and

- PERSERIS (risperidone) extended-release injectable suspension for the treatment of schizophrenia in adults in the U.S.

Product availability varies across the 37 countries in which Indivior treatments are available, including in terms of dosage form, strength and indication.

The Group sells its products in the United States and in other selected areas of the world, such as much of Europe, Canada, Australia and through distribution partners in other parts of the world. Our core geographic market (based on the country where the sale originates) is the U.S., which accounted for 83%, 71%, and 76% of net revenues for the years ended December 2023, 2022, and 2021, respectively.

Our business was initially developed and managed as a separate division of Reckitt Benckiser Group PLC ("RB" and, together with its subsidiaries, the "RB Group"), a public limited company incorporated under the laws of England and Wales. Indivior PLC was incorporated on September 26, 2014 for the purpose of acquiring the specialty pharmaceutical business unit from RB (the "Demerger"). Following the Demerger, which was effective on December 23, 2014, Indivior PLC has operated as a standalone business.

The treatment of OUD as a therapeutic area emerged in the early 1920s. The U.S. government's efforts to address OUD through supply regulation and control, and to address public health concerns through scientific innovation, influenced a gradual shift in research interest towards developing a treatment for opioid dependence or OUD, as the disorder is presently known.

64

In 1966, RB led the breakthrough discovery of buprenorphine and developed, in partnership with the U.S. National Institute on Drug Abuse ("NIDA"), buprenorphine for the treatment of opioid dependence. SUBUTEX Tablet (buprenorphine sublingual tablet) was our first approved product specifically indicated for the treatment of opioid dependence. SUBUTEX Tablet was launched in the French market in February 1996 by Schering-Plough, which licensed the global marketing rights to the buprenorphine products from RB Group. Shortly thereafter, SUBUTEX Tablet was approved in additional EU countries. SUBOXONE Tablet (buprenorphine/naloxone) sublingual tablet was approved across the EU by the EMA in September 2006.

In the U.S., the enactment of the Drug Addiction and Treatment Act of 2000 ("DATA 2000") was a significant development in the history of addiction treatment. Previously, treatment options for opioid dependence in the U.S. were limited: either abstinence-based programs that have a high rate of relapse, or methadone clinics (the only medication-assisted treatment option). Methadone clinics in the U.S. provide daily dosing and may be unpopular with opioid-dependent individuals owing to inconvenience and the significant societal stigma associated with methadone. As a result, many opioid-dependent individuals remained untreated.

Under DATA 2000, office-based physicians who had completed appropriate training were able to obtain a federal waiver to treat a limited number of opioid-dependent patients with medications specifically approved by the U.S. Food and Drug Administration (FDA) for the treatment of opioid dependence, and to prescribe and/or dispense these medications in their office-based settings. By permitting treatment for opioid dependence in the privacy of physicians' offices with take-home doses, DATA 2000 was significant in creating access to treatment and beginning to treat OUD as a medical condition like other chronic diseases.

In December 2022, Congress enacted the Mainstreaming Addiction Treatment Act (MAT Act) which eliminated the requirement for a health care practitioner (HCP) to apply for a separate waiver through the Drug Enforcement Administration (DEA) to dispense certain treatments (including buprenorphine) for maintenance or detoxification of patients with OUD. Indivior believes the elimination of these requirements as part of this legislation will help to normalize the view of addiction as a chronic brain disease and expand access to evidence-based buprenorphine treatment. The Group supports efforts to encourage more HCPs to provide medication for OUD.

*Launch of SUBUTEX Tablets, SUBOXONE Tablets, and SUBOXONE Film in the U.S.*

The FDA approved SUBUTEX Tablet (buprenorphine) and SUBOXONE Tablet (buprenorphine/naloxone) in October 2002 and we launched sales of these products in the U.S. in 2003. Subsequently, in August 2010, the FDA approved SUBOXONE Film (buprenorphine/naloxone) sublingual film, which dissolves more quickly than SUBUTEX and SUBOXONE Tablets. We discontinued the U.S. distribution of SUBUTEX Tablets in 2011 and SUBOXONE Tablets in 2013.

Our SUBOXONE Film product already faces four generic competitors in the U.S. We are aware of one competitor that has received FDA approval but is unable to enter the market until January 31, 2025, and another with an application pending before the FDA. Despite the launches of these generic formulations of tablets and film and branded competition, SUBOXONE Film has maintained a meaningful share of the buprenorphine-based opioid dependence treatment market (by mg volume) of approximately 18% - 19% in 2023.

In 2020, the Group's U.S. sales force ceased promoting SUBOXONE Film as part of the Resolution Agreement with the Department of Justice ("DOJ"), discussed below, and ceased all detailing of the product in that year, though it remains available for sale.

*Launch of SUBLOCADE in the U.S.*

The FDA approved SUBLOCADE (buprenorphine extended-release) injection for subcutaneous use in 2017 and we launched sales of this product in 2018. As the first long-acting buprenorphine-based

65

injectable approved by the FDA for the treatment of moderate to severe OUD, SUBLOCADE became the largest product by net revenue for the Group by the second quarter of 2022.

*Launch of Perseris in the U.S.*

The FDA approved PERSERIS as the first once-monthly subcutaneous extended-release injectable suspension of risperidone indicated for the treatment of schizophrenia in adults in 2018. We launched commercial sales of PERSERIS in the U.S. in 2019.

*Approval and Launch of OPVEE for Overdose Reversal in the U.S.*

In May 2023, the FDA approved OPVEE (nalmefene) nasal spray for the emergency treatment of known or suspected opioid overdose induced by natural or synthetic opioids in adults and pediatric patients aged 12 years and older, as manifested by respiratory and/or central nervous system depression. OPVEE (nalmefene) nasal spray is intended for immediate administration as emergency therapy in settings where opioids may be present. OPVEE (nalmefene) nasal spray is not a substitute for emergency medical care.

We acquired OPVEE as part of our acquisition of Opiant Pharmaceuticals, discussed below. We began marketing OPVEE in the U.S. in October 2023.

In October 2023, we were awarded a contract by the U.S. Biomedical Advanced Research and Development Authority (BARDA) (i) for the procurement of finished, packaged OPVEE held as vendor-managed inventory (VMI) as a medical countermeasure in the event of a synthetic opioid community or mass casualty event, and (ii) to support FDA-required post-marketing requirement studies, a three-year stability study to support shelf-life extension, and real world evidence studies.

The contract with BARDA was funded under the 2004 Project BioShield Act as part of a national preparedness effort to counter opioid overdose emergencies. BARDA will use authority granted under Project BioShield and $32.4 million in Project BioShield-designated funding to support this preparedness effort. This funding covers technical expertise for further clinical development and regulatory approval of OPVEE for use in children under 12 years of age and an initial purchase of OPVEE. The contract also has options for purchases and delivery of OPVEE over 10 years at guaranteed pricing through 2033. Product delivered pursuant to the contract is expected to become part of the U.S. Strategic National Stockpile, which is the United States' national repository of antibiotics, vaccines, chemical antidotes, antitoxins, and other critical medical supplies. The role of the U.S. Strategic National Stockpile is to supplement state and local supplies during public health emergencies.

*Seasonality*

Sales of the Group's products can vary over time and tend to be higher in January as persons suffering from addiction resolve to take action, and lower in the latter part of the year as such person may defer taking action. Sales can also be affected by prescriber availability or relative unavailability during the summer and fall holiday seasons.

*Agreements with DOJ, FTC and HHS-OIG Regarding Marketing and Promotional Practices*

In 2020 the Group and certain of its subsidiaries reached agreements with the DOJ, the U.S. Federal Trade Commission ("FTC"), the U.S. Attorney's Office for the Western District of Virginia, and U.S. state attorneys general to resolve potential criminal and civil liability arising from an indictment brought in 2019 by a grand jury in the Western District of Virginia, a civil lawsuit in which the DOJ partially intervened and an investigation by the FTC, all of which generally concerned Indivior, Inc. and certain of its subsidiaries' marketing and promotional practices related to SUBOXONE Film, and SUBOXONE Tablet. The 2019 indictment followed a federal criminal grand jury investigation that began in 2013.

As part of the agreement with the DOJ ("Resolution Agreement"), a wholly owned subsidiary of Indivior PLC pleaded guilty to a single count of making false statements relating to healthcare matters in

66

2012 in violation of 18 U.S.C. Section 1035 related to SUBOXONE Film, and was excluded from participating in government healthcare programs. The exclusion did not pertain to the rest of the Group and did not limit access to our medications for patients in the U.S. Under the terms of the agreements, DOJ dismissed all charges in the 2019 indictment against the rest of the Group and its subsidiaries and the Group agreed to make payments to federal and state authorities totaling $600 million (plus applicable interest of 1.25% on a portion of that total amount), of which $263 million (including interest) has been paid.

As part of the resolution, the Group and Indivior Inc. agreed to significant compliance and reporting obligations under the Resolution Agreement with DOJ and a stipulated injunction with the FTC, and Indivior Inc. agreed to a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG). See (i) "*Item 3.D. Risk Factors—*"*Compliance with the terms and conditions of our Corporate Integrity Agreement, the Resolution Agreement with the U.S. Attorney's Office for the Western District of Virginia and the U.S. Department of Justice's Consumer Protection Branch, and the Stipulated Order for Permanent Injunction and Equitable Monetary Relief with the FTC, requires significant resources and management time and, if we fail to comply, we could be subject to criminal charges, penalties, or, under certain circumstances, excluded from government healthcare programs, which would materially adversely affect our business,*" (ii) '*Item 18. Financial Statements—Audited Consolidated Financial Statements*' (iii) "*Note 19—Provisions and Other Liabilities,*" and (iv) "*Item 10. Additional Information—C. Material Contracts.*" We have filed copies of the Resolution Agreement, the Corporate Integrity Agreement, and the Stipulated Order for Permanent Injunction and Equitable Monetary Relief between the FTC and Indivior Inc. as Exhibits Nos. 4.3, 4.4, and 4.5, respectively, to this annual report. We have complied and continue to comply with our reporting obligations under each of the agreements and our obligations to make investments in our Global Integrity & Compliance Program to promote compliance and drive continuous learning and evolution of an effective compliance program.

*Outside the U.S.*

In Europe, generic versions of the SUBUTEX Tablets have been available since 2010 and SUBOXONE Tablets since 2018. Despite strong competition, our group's total oral buprenorphine medication-assisted treatment ("BMAT") market share (by mg volume) remained significant at 51%, 49%, and 50% in 2023, 2022, and 2021, respectively. In Canada, our SUBOXONE Tablets product faces two generic competitors. In addition, we face competition from branded oral buprenorphine-based tablets and historically well-established methadone oral formulations.

We currently distribute SUBLOCADE (under the name SUBUTEX Prolonged Release in Europe) in the U.S., Australia, Canada, Finland, Germany, and Sweden. Israel, New Zealand, Italy, Norway, Denmark, and Switzerland have approved SUBLOCADE (under the name SUBUTEX Prolonged Release) and we are exploring commercial launch in those countries in the near future.

We distribute SUBOXONE Film in the U.S., Canada, Israel, Denmark, Finland, Germany, Italy, Norway, Sweden, Australia, and Malaysia.

We distribute SUBOXONE Tablets in 35 countries including Europe, the U.K., Canada, and Australia, and SUBUTEX Tablets in 18 countries worldwide, primarily in Europe, including France, UK, Germany, and Italy.

*Development Pipeline*

In addition to our commercially available products we have a pipeline of new drug candidates for the treatment of cannabis use disorder ("CUD"), opioid use disorder ("OUD"), and alcohol use disorder ("AUD"), which are either licensed, optioned, or owned outright. Our acquisition of Opiant Pharmaceuticals also included an early-stage pipeline asset, discussed below.

67

Our capital expenditures for the years ended 2023, 2022, and 2021 were $8 million, $5 million and $4 million, respectively. These capital expenditures, were primarily for equipment used in the manufacture of our products. The Group funded these expenditures from its existing cash balances.

Purchase of intangible assets for the years ended 2023, 2022, and 2021 were $171 million, $1 million, and $30 million, respectively and were funded from existing cash balances. The 2023 intangible asset purchases include $126 million related to the in-process research and development value for OPVEE (nalmefene) nasal spray recognized through the Opiant acquisition. Refer to *"Item 18. Financial Statements—Note 27 Acquisition of Opiant"*. Additionally, 2023 intangible assets purchases include $21 million for the acquisition of INDV-2000 (oral Orexin-1 receptor antagonist) from C4X Discovery and $15 million to secure the global rights to develop, manufacture, and commercialize Alar Pharmaceuticals Inc.'s ("Alar") portfolio of buprenorphine-based ultra long-acting injectables, including a lead asset (INDV-6001) which is potentially the first three-month long-acting injectable for OUD. In 2021, the intangible assets purchase of $30 million reflects a payment made to Aelis Farma for an exclusive option and license agreement to develop its leading compound (AEF0117) targeting cannabis use disorders.

### Acquisition of Opiant Pharmaceuticals and Entry into the U.S. Overdose Reversal Market

The Group entered the opioid overdose reversal market in the U.S. with its acquisition of Opiant Pharmaceuticals, Inc., a Delaware corporation ("Opiant"), which it completed on March 2, 2023. On May 22, 2023, the FDA approved OPVEE (nalmefene) nasal spray for the emergency treatment of known or suspected opioid overdose induced by natural or synthetic opioids in adults and pediatric patients aged 12 years and older, as manifested by respiratory and/or central nervous system depression. OPVEE (nalmefene) nasal spray is intended for immediate administration as emergency therapy in settings where opioids may be present. OPVEE (nalmefene) nasal spray is not a substitute for emergency medical care. Opiant's early-stage pipeline included a medicine in development for acute cannabinoid overdose.

### Acquisition of INDV-2000 (oral Orexin-1 receptor antagonist - non opioid mechanism for OUD) from C4X Discovery

Previously, our rights to INDV-2000 were structured as an exclusive worldwide license. On July 31, 2023, we acquired full rights to the patents and other assets underlying this potential product in exchange for a payment of approximately $20.5 million. As a result, we no longer have any obligation to pay future development or sales milestones or a royalty on net sales of this product candidate.

### Acquisition of Long-Acting Injectable Technology from Alar Pharmaceuticals

On October 11, 2023, the Group secured global rights to develop, manufacture, and commercialize Alar Pharmaceuticals Inc.'s ("Alar") portfolio of buprenorphine-based long-acting injectables, including lead asset INDV-6001, which is potentially the first three-month long-acting injectable buprenorphine for the treatment of OUD. Under the agreement, the Group made an upfront payment of $10 million, which is in addition to the $5 million option payment made by the Group in the first quarter of 2023. Alar would be entitled to potential milestone payments if various developmental, regulatory, and commercial goals are achieved, and entitled to royalties in the low double digit to mid-teens as a percentage of net revenue.

### Acquisition of Manufacturing Facility

On November 1, 2023, the Group acquired an aseptic manufacturing facility in Raleigh, North Carolina for upfront consideration of $5 million in cash and assumption of certain contract manufacturing obligations. While currently being used to provide contract manufacturing for certain third parties, over time the Group plans to phase out that contract manufacturing and further develop the site to secure the long-term production and supply of SUBLOCADE and PERSERIS.

68

**Indivior Global Integrity & Compliance Program**

Indivior has developed and maintained a compliance function and program dating back to before the demerger from RB Group. It has since undergone continuous improvement and enhancement of its capabilities, including:

- hiring an executive committee level Chief Integrity and Compliance Officer in 2018 who reports directly to the CEO and also to the Board;

- using external consultants to evaluate and assist with evolution of its Global Integrity & Compliance Program; and

- accelerating the build-out of its updated Integrity & Compliance team structure, including hiring additional credentialed personnel.

This team now includes more than 20 professionals who have established and support implementation of the defined and communicated "Indivior Global Integrity & Compliance Program Framework" which is based on the elements of an effective compliance program as defined by governing authorities. Our Integrity & Compliance team assesses risk and assists in meeting the obligations under the CIA, the Resolution Agreement, and the FTC Order. It is responsible for administering our Code of Conduct and related healthcare compliance policies, procedures and guidance with integrated controls. In addition, it works to ensure an appropriate tone at the top, develops various integrity and ethics initiatives, including business-led risk monitoring, educates on relevant risks to help support strong risk monitoring, conducts risk assessments and mitigation, and is responsible for administering the Group's Global Integrity & Compliance Program, together with the executive committee who are the members of the Indivior Compliance Committee.

*Other Information*

The Group's legal name is Indivior PLC. Indivior PLC is a public limited company incorporated under the laws of England and Wales that was incorporated on September 26, 2014. The principal legislation under which the Group operates is the Companies Act. The registered office address of Indivior PLC is: 234 Bath Road, Slough, Berkshire, UK, SL1 4EE and its telephone number is +1 (804) 379-1090. The Group's website is https://www.indivior.com/.

Our ordinary shares are listed on the premium listing segment of the Official List of the UK Financial Conduct Authority (the "Official List") and traded on the Main Market of the London Stock Exchange and on the Global Select Market of The Nasdaq Stock Market LLC under the ticker symbol "INDV."

There has been no public takeover offer as of the date of this annual report by third parties in respect of the Group's shares or by the Group in respect of other companies' shares which have occurred during the last and current financial year, other than in respect of acquisitions by the Group in the ordinary course pursuant to its business strategy.

The Group is subject to the information reporting requirements of the Exchange Act applicable to foreign private issuers, and under those requirements files reports with the SEC. The SEC maintains a website at http://www.sec.gov from which this annual report and those other reports or other information may be accessed. We also make our electronic filings with the SEC available at no cost on the Group's Investor Relations website, www.indivior.com/en/investors, as soon as reasonably practicable after we file such material with, or furnish it to, the SEC.

As a foreign private issuer, we are exempt from the rules under the Exchange Act related to the furnishing and content of proxy statements, and our officers, directors, and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file annual, quarterly, and current reports and financial statements with the SEC as frequently or as promptly as U.S. companies

69

whose securities are registered under the Exchange Act. However, for so long as we are listed on a U.S. exchange and are registered with the SEC, we will file with the SEC, within 120 days after the end of each fiscal year, or such applicable time as required by the SEC, an annual report on Form 20-F containing financial statements audited by an independent registered public accounting firm, and will furnish to the SEC, on a Form 6-K, all financial statements and other information required to be furnished on Form 6-K.

**B.      Business Overview**

**Industry overview**

*Substance use and its impact*

According to the United Nations Office on Drugs and Crime World Drug Report 2022, an estimated 269 million people worldwide had abused drugs at least once in the previous year, representing nearly one in every 19 people.

People who use drugs regularly are likely to experience negative health consequences. They are also more at risk of contracting infectious diseases such as HIV and hepatitis C, and to experience overdose and suffer premature death. Furthermore, an association exists between SUD and co-occurring or comorbid mental health disorders (for example, depression, anxiety or psychosis). There is also an association between SUD and socioeconomic disadvantage, low educational attainment, increased difficulty in finding and remaining in employment, and financial instability and poverty.

Globally, drug use killed almost half a million people in 2019, while SUD resulted in 18 million years of healthy life lost, mostly due to opioids.

The threat SUD poses to global health has long been recognized, and as such strengthening the prevention and treatment is included in the United Nations' Sustainable Development Goals for 2030.

Overdose deaths continue to climb in the United States. According to the U.S. Center for Disease Control & Prevention (CDC), there were 111,355 overdose deaths in the 12-month period ending April 2023, compared with 110,394 deaths in the 12-month period ending March 2022. OUD is increasingly dangerous – in the 12-month period ending in May 2023, 80,818 people in the U.S. reportedly died of an opioid overdose, of which 90% (or 73,657 people) were linked to illicit synthetic opioids.

70



*Source: U.S. Centers for Disease Control and Prevention, 2015-2022 Dec period, 2023 August period*

### Substance use disorder: the disease

Substance Use Disorder ("SUD") has been described as a "medical disorder that affects the brain and changes behavior." Various substances may be involved including alcohol, illicit drugs, prescription medications, and even some over-the-counter medicines.

The National Institute on Drug Abuse ("NIDA"), the Substance Abuse and Mental Health Services Administration ("SAMHSA") and the National Institutes of Health ("NIH") all describe SUD as a long-term and relapsing condition characterized by the individual compulsively seeking and using drugs despite adverse consequences.

Since SUD is marked by periods of recovery and symptom recurrence, or relapse, it resembles other chronic diseases like hypertension and type-2 diabetes. These diseases are lifelong conditions that require continual effort to manage. Symptoms will likely return during periods where treatment compliance is low or absent, and symptoms will likely diminish when compliance to treatment begins again in earnest.

In 2021, 46.3 million people aged 12 or older (or 16.5 percent of the population) met the applicable DSM-5 criteria for having a substance use disorder in the past year, including 29.5 million people who were classified as having an alcohol use disorder and 24 million people who were classified as having a drug use disorder, according to SAMHSA's 2021 Survey on Drug Use and Health.

There is no single cause of SUD; people begin using substances for many reasons and one person's path to addiction may look drastically different from that of another. The prevailing view is that no one thing can predict someone's risk of developing a SUD—rather, the interaction of the person's unique biology and their environment both influences how the drug will impact a person's susceptibility to becoming addicted.

### Opioid use disorder

Opioids are a major concern in many countries because of the severe health consequences associated with their use, including non-fatal and fatal overdose.

71

https://www.sec.gov/Archives/edgar/data/1625297/000162529724000017/indv-20231231.htm#id39cb0e1a10249e1ab7b8f77d921d68a_1981

OUD is a growing global public health crisis which still carries significant stigma in many countries. OUD is often perceived as a moral failing and sign of personal weakness rather than a chronic and relapsing disease affecting the brain that can be managed and respond to treatment. As a consequence, we believe coherent action to deal with sufferers and addiction is generally lacking.

According to the United Nations' World Drug Report 2022, approximately 61.3 million people used opioids for non-medical purposes in 2020, corresponding to 1.2% of the global population, and the number of users worldwide has nearly doubled over the past decade. In the U.S., in 2020, an estimated 9.5 million people used opioids non-medically in the past year. Of these, more than 900,000 used heroin.

In addition, the number of deaths from opioid overdose in the U.S. continues to increase. The majority of opioid-related overdose deaths in the U.S. are now the result of fentanyl being ingested as a substitute for heroin or with drugs such as cocaine and methamphetamine that had been adulterated, or "cut," with the opioid. Fentanyl is 30 to 50 times more potent than heroin and can cause rapid and profound respiratory depression. Individuals may not be aware that they have been exposed to fentanyl-laced drugs including heroin, prescription opioids, or psychostimulants.

Against the context of the dramatic rise in deaths from opioid overdose, Indivior is doing more to understand the interaction between fentanyl and buprenorphine. According to a peer-reviewed study conducted by the University of Leiden in Leiden, Netherlands and completed in 2019, sustained high-plasma concentrations of buprenorphine (similar to those provided by SUBLOCADE at steady-state) significantly reduced fentanyl-induced respiratory depression in opioid-tolerant participants.

The European market is smaller than the U.S. market with an estimated 1 million opioid-dependent individuals, the majority of whom are heroin users. The European market is relatively mature with numbers of patients in treatment being largely stable over the last five years. There are currently approximately 514,000 patients in treatment, but there is also an emerging patient population of opioid analgesic-dependent patients who are currently under-diagnosed. Initial estimates, which we believe are conservative, suggest that in 2017 there were approximately 2 million individuals dependent on prescription opioid analgesics in the UK, France, Germany, Spain, Italy, Sweden, Finland, Canada, Israel, and Australia.

According to the Australian Institute of Health and Welfare, in 2022 on an average day, 55,741 clients received pharmacotherapy treatment for their opioid dependence across Australia. There is increasing awareness among healthcare providers in Australia of the misuse of opioid analgesics and the need for treatment. Recent policy changes to address this concern in Australia include re-classifying products containing Codeine so that they must be dispensed by a pharmacist rather than being available over the counter.

Similarly, according to the Canadian Centre on Substance Use and Addiction, approximately 9.6% of Canadian adults who used opioid medications, or 351,000 persons, reported problematic use, and approximately 153,000 are in treatment according to data from IQVIA (a health information provider). Outside of the U.S., Canada, and Australia, approximately 269 million people aged 15 to 64 suffer from drug use disorders or drug dependence, according to the United Nations Office on Drugs and Crime. Treatment services are generally very underdeveloped (with the exception of Australia and New Zealand), the key challenge being to convince governments to treat addiction as a chronic medical disease rather than a social disorder.

### Treatment for Opioid Use Disorder

Medication for opioid use disorder ("MOUD") is the use of medications, in combination with counseling and behavioral therapies, to provide a "whole patient" approach to the treatment of substance use disorders. Medications used in MOUD are approved by the FDA and MOUD programs are clinically driven and tailored to meet each patient's needs.

72

Research shows that a combination of medication and psychosocial support can successfully treat these disorders, and for some people struggling with addiction, MOUD can help sustain recovery. MOUD is also used to prevent or reduce opioid overdose.

MOUD is primarily used for the treatment of addiction to opioids such as heroin and prescription pain relievers that contain opiates. The prescribed medication normalizes brain chemistry, blocks the euphoric effects of opioids, relieves physiological cravings, and normalizes body functions without the negative and euphoric effects of the substance. MOUD has been shown to be more effective than medication or counseling alone in treating OUD.

A common misconception about MOUD is that some of the medicines used simply substitute one drug for another. However, these medications may restore healthy brain function, which leads to improvements in behaviors associated with addiction. Longer-term use of these medications is associated with improved outcomes.

Treatment methods in the EU differ from those in the U.S. While U.S. patients can obtain a 30-day prescription and self-administer treatment, such as SUBOXONE Film, prescribed by a treating physician, supervised dosing in the EU requires a daily visit to the clinic for many patients. Methadone and generics are also generally more broadly available as social funding puts pressure on prices, and treatment is more highly regulated. However, the harm reduction mindset is now changing towards recovery and the EU has begun to recognize the need to implement treatment systems that allow patients to return to a more normal lifestyle.

### Treatment access

Despite the prevalence of SUD, including opioid misuse, and the existence of effective treatments, including medication for opioid use disorder, most people who need treatment do not seek or receive it. Figures show that only 20% of people with OUD in the U.S. are being treated for it.

People in urgent need of treatment are often unaware of their treatment options, have limited access to treatment and counseling, or simply do not seek it out because they are afraid of being stigmatized. In addition, access is also limited by numerous legal restrictions for pharmacological treatment, inadequate training of clinicians, and the number of HCPs who are willing to treat this population.

### Focus on the Criminal Justice System

In the U.S., a substantial share of persons suffering from OUD repeatedly cycle through the criminal justice system. Further, persons exiting the criminal justice system have been shown to be 40 times more likely to suffer from opioid overdose than persons in the general population.

While as recently as 2019 buprenorphine was rarely available to patients in criminal justice settings, such treatment is increasingly becoming available. The shift has been spurred by research findings and pronouncements from industry and professional medical societies that evidence-based treatment for OUD in correctional settings saves lives, which in turn has shaped changes in law and policy. Treatment for OUD in correctional settings has been shown to reduce overdose deaths by 75%, reduce recidivism by 32%, and reduce transmission of HIV and hepatitis.

Public policy is trending toward increasing treatment of SUD and serious mental illness in criminal justice settings. Congress continues considering legislation authorizing Medicaid coverage of persons in correctional settings. The Centers for Medicare & Medicaid Services (CMS) has published guidance to states on how they can apply to the agency for Medicaid funding to support treatment of patients with OUD and mental illness in the criminal justice system up to 90 days pre-release.

The U.S. Department of Justice (DOJ) issued guidance in April 2022 underscoring the rights of persons with OUD to treatment under the Americans with Disabilities Act, including in correctional

73

settings. States have been increasingly enacting legislation and appropriations, and seeking federal waiver authority, to expand treatment availability in criminal justice settings.

### Other industry areas

In addition to OUD treatments, we have launched OPVEE (nalmefene) nasal spray for overdose reversal and have a pipeline of new drug candidates for the treatment of cannabis use disorder ("CUD") and alcohol use disorder ("AUD") and acute cannabinoid overdose, see "Pipeline," below.

Also, as noted above, the Group acquired a manufacturing facility in 2023. The purpose of the acquisition was to secure the long-term production and supply of SUBLOCADE and PERSERIS. However, as part of this transaction, the Group assumed certain contractual obligations to manufacture certain products for others for the duration of certain contracts.

### Opioid Overdose Reversal

A large and growing addressable market for opioid overdose reversal agents exists in the U.S., driven by sales into community-based and first responder institutions, including fire departments, emergency medical services, law enforcement, other community groups, as well as directly to patients via retail pharmacies. The co-prescribing of opioid overdose reversal agents alongside prescription opioids has also driven growth.

The Group entered the opioid overdose reversal market in the U.S. with its acquisition of Opiant in March 2023. In May 2023, the FDA approved OPVEE (nalmefene) nasal spray for the emergency treatment of known or suspected opioid overdose induced by natural or synthetic opioids in adults and pediatric patients aged 12 years and older, as manifested by respiratory and/or central nervous system depression. OPVEE (nalmefene) nasal spray is intended for immediate administration as emergency therapy in settings where opioids may be present. OPVEE (nalmefene) nasal spray is not a substitute for emergency medical care.

### Cannabis Use Disorder

Worldwide, an estimated 209 million individuals used cannabis in 2020, corresponding to more than 4.0% of the global population aged 15–64, according to the United Nations' World Drug Report 2022. The annual prevalence of the use of cannabis remains highest in North America (14.5%), the subregion of Australia and New Zealand (12.1%), and West and Central Africa (9.4%). In the last decade, the number of cannabis users worldwide has increased by nearly 18%.

In the U.S. 2022, 70.3 million people aged 12 or older (or 24.9%) used illicit drugs in the past year. Marijuana was the most used illicit drug, with 22.0% of people aged 12 or older (or 61.9 million people) using it in the past year.

The most recent Global Burden of Disease study published by The Lancet, which included 195 countries over the 1990-2016 period, estimated that 22.1 million people met the diagnostic criteria for CUD (289.7 cases per 100,000 people). Cannabis is the most commonly used substance of abuse in the U.S. after alcohol and tobacco. Nearly 50 million people used marijuana in the U.S. in 2020 and 14.2 million people in the U.S. had a CUD during the same period.

Cannabis remains the most widely used illicit drug worldwide. The increase in cannabis users goes in parallel with a long-term trend of increase of THC (tetrahydrocannabinol, the principal psychoactive ingredient) concentrations in seized cannabis in Europe and the U.S. In the states that have legalized cannabis in the U.S. (cannabis is legal for adult recreational use in 24 states and Washington, D.C. and for medical use in 38 states and Washington, D.C.), there has been a diversification of cannabis products, different methods of use, and changes in the potency of THC content in the available products.

A common assumption about the risk for CUD among users is that it is rare. However, recent U.S. data suggests that 3 out of 10 cannabis users eventually developed CUD (as defined in the DSM-IV). The

74

risk of progression from cannabis use to CUD also increases with frequency of use. In the U.S., adults with CUD, on average, use cannabis 6.2 out of 10 days over a year, and about 1 in 19 non-dependent weekly cannabis users progressed to dependence within a year.

### Alcohol Use Disorder

According to a 2018 report from the WHO, in 2016 the harmful use of alcohol resulted in about three million deaths, or 5.3% of all deaths around the world.

An estimated 5.1% of the global burden of disease is attributable to alcohol consumption. Alcohol is also associated with significant societal costs, including those related to violence, child neglect and abuse, and absenteeism in the workplace. Therapeutic approaches, including pharmacotherapy, play a pivotal role in treating patients with alcohol use disorders but are commonly underutilized.

Globally an estimated 237 million men and 46 million women suffer from alcohol-use disorders with the highest prevalence among men and women in the European region (14.8% and 3.5%) and the Americas region (11.5% and 5.1%). According to the 2022 National Survey on Drug Use and Health (NSDUH), 29.5 million people ages 12 and older in the U.S. (10.5% in this age group) had alcohol use disorder in the past year. A study by the National Institute on Alcohol Abuse and Alcoholism (NIAAA), published recently in the Journal of the American Medical Association, shows that after increasing approximately 2.2% per year over the previous two decades, alcohol-related deaths spiked 25.5% between 2019 and 2020, totaling nearly 100,000 deaths. Meanwhile, alcohol-associated liver disease deaths increased by 22.4% with alcohol-related traffic deaths increasing by 14%.

### Schizophrenia

Schizophrenia is a mental disorder characterized by continuous or relapsing episodes of psychosis, an abnormal condition of the mind that results in difficulties determining what is real and what is not real. Major symptoms include hallucinations (typically hearing voices), delusions, and disorganized thinking. Other symptoms include social withdrawal, decreased emotional expression, and apathy.

Schizophrenia affects an estimated 2.1 million people in the U.S., according to the National Institute of Mental Health. Adherence is a major problem leading to relapse and often hospitalization. Between 20-40% of schizophrenia patients attempt suicide, between 5-13% actually die of suicide, and 41.7% of patients who suffer from schizophrenia have a substance use disorder comorbidity.

The estimated excess economic burden of schizophrenia in the U.S. doubled between 2013 and 2019, and was $343.2 billion in 2019, including $251.9 billion in indirect costs (73.4%), $62.3 billion in direct health care costs (18.2%), and $35.0 billion in direct non–health care costs (10.2%). The largest drivers of indirect costs were caregiving ($112.3 billion), premature mortality ($77.9 billion), and unemployment ($54.2 billion). Cost offsets, representing $6.0 billion (1.7%), were subtracted from direct non–health care costs.

The patient journey for someone with schizophrenia is difficult. The symptoms of schizophrenia itself can impair a person's ability to understand or perceive their own illness, which is one key reason why people with schizophrenia stop taking their medication.

Epidemiological and clinical studies have shown that psychiatric disorders like schizophrenia, but also including borderline and antisocial personality disorders, bipolar, depression and anxiety disorders are highly co-morbid with substance use disorders, a condition referred to as "dual" or "co-occurring" disorders. The presence of co-occurring conditions increases severity and complicates recovery from addiction, and a natural outgrowth of increased severity is to recognize a multidisciplinary and holistic approach to the treatment of patients suffering from substance use disorders.

Schizophrenia requires ongoing treatment to manage symptoms and prevent relapse. Treatments include antipsychotic medications and supportive psychosocial treatment. Anti-psychotic medicines have

a large and established market with an estimated 70 million prescriptions and over $20 billion in U.S. gross sales in the recent 12 months ending October 2022, according to data from IQVIA and Symphony Healthcare. Long-acting injectable ("LAI") antipsychotics were prescribed more than 2.1 million times and make up annual sales of approximately $8.1 billion in gross sales in the U.S. grew at a compound annual growth rate of approximately 14% over the past five years, according to the same sources. Treatment of schizophrenia drives a majority of LAI prescriptions, and risperidone is one of the most commonly used antipsychotic used to treat schizophrenia.

We began marketing PERSERIS, (risperidone) extended-release injectable suspension in the U.S. in 2019. This product is an extended-release monthly formulation of risperidone, one of the most widely prescribed drugs for the treatment of schizophrenia, according to data from Symphony Healthcare.

## Products of the Indivior Group

Our core marketed products are described below:

| Product | Active Ingredients | Delivery Method | Main Markets | 2023[1] Global Net Sales (in millions) | |
|---|---|---|---|---|---|
| *Opioid Use Disorder* | | | | | |
| **Long-Acting Injectable** | | | | $ | 630.0 |
| SUBLOCADE and SUBUTEX PRO extended-release Injectable | Buprenorphine | Extended-release injectable suspension | U.S., Australia, Canada, Israel, Finland, Germany, New Zealand, and Sweden. | | |
| **Sublingual** | | | | $ | 421.0 |
| SUBOXONE Film | Buprenorphine and Naloxone | Sublingual film that adheres under the tongue or on the inside of the cheek for direct absorption into the bloodstream | U.S., Canada, Israel, Denmark, Finland, Germany, Italy, Norway, UK, Sweden, Australia, and Malaysia | | |
| SUBUTEX Tablet | Buprenorphine | Sublingual tablet that is placed under the tongue to dissolve | 18 countries worldwide, primarily in Europe, including France, UK, Germany, and Italy | | |
| SUBOXONE Tablet | Buprenorphine and Naloxone | Sublingual tablet that is placed under the tongue to dissolve | 35 countries worldwide | | |
| *Opioid Overdose Reversal* | | | | | |
| OPVEE (nalmefene) nasal spray[1] | Nalmefene | Nasal spray | U.S. | | NM[2] |
| *Schizophrenia* | | | | | |
| PERSERIS extended-release Injectable | Risperidone | Extended-release injectable suspension | U.S. | $ | 42.0 |

_____
(1)   See "Item 5.A - Operating Results" for data for each of the last three financial years.
(2)   We launched OPVEE (nalmefene) nasal spray in the U.S. in the fourth quarter of 2023.

### SUBLOCADE Long-acting injectable (buprenorphine) extended-release injection

As the first long-acting buprenorphine-based injectable approved by the FDA for the treatment of moderate to severe OUD, SUBLOCADE is a highly differentiated treatment. Our RECOVER extension study, which was a 24-month observational study of individuals who participated in the Phase 3

76

SUBLOCADE study, assessed life changes in patients with OUD who received SUBLOCADE as part of a randomized clinical efficacy study. It showed that SUBLOCADE may translate into (1) increased abstinence from illicit opioids compared to placebo; (2) improved patient-reported quality-of-life outcomes (such as health status, employment and insurance status, and healthcare resource utilization); and (3) improved recovery post-treatment. Administration of monthly subcutaneous injections of SUBLOCADE also eliminates the risk of missing daily doses that might result in subtherapeutic plasma levels (see below), potentially leading to relapse to opioid-seeking and opioid-taking behaviors. Finally, because SUBLOCADE may only be administered by a healthcare practitioner via a closed distribution system whereby the patient never has access to the drug, it is expected to reduce the potential for diversion or misuse.

The logic that underpins this technology lies in a deep understanding of the relationship between buprenorphine plasma levels, whole-brain mu-opioid receptor occupancy (MOR) in the brain, and the key clinical pharmacodynamic effects of withdrawal suppression and opioid blockade. Clinical studies confirmed that the minimum threshold plasma concentration of buprenorphine needed to effectively block the subjective drug-liking effects of a full opioid agonist such as hydromorphone is 2 ng/mL, which translated into at least 70% MOR occupancy for the entire one-month period. These unique pharmacokinetic and pharmacodynamic properties of SUBLOCADE also translated into clinical efficacy and safety and better patient outcomes.

The expected benefits of these levels of receptor occupancy/opioid blockade are that:

- Patients would likely experience substantially reduced levels of cravings associated with addiction;

- Patients should receive no gratification from abuse of opioids;

- Levels of adherence and compliance with treatment should be significantly improved because it is administered once monthly and late administration of up to 14 days is not expected to affect clinical efficacy;

- It is designed to protect patients right from the start of treatment, through every day of the month, including moments of vulnerability;

- For physicians, there should be positive clinical and patient outcomes using this technology;

- For physicians and wider society, there should be reduced levels of potential diversion and abuse compared to sublingual buprenorphine—once injected, the buprenorphine cannot easily be extracted and diverted; and

- For payors, the benefit should come in reduced costs from higher compliance, better clinical outcomes and reduced abuse and diversion.

We currently distribute SUBLOCADE (under the name SUBUTEX Prolonged Release in Europe) in the U.S., Australia, Canada, Finland, Germany, and Sweden. Israel, New Zealand, Italy, Norway, Denmark, and Switzerland have approved SUBLOCADE (under the name SUBUTEX Prolonged Release) and we are exploring commercial launch in those countries in the near future.

### SUBOXONE Film (buprenorphine and naloxone) sublingual film

SUBOXONE Film was initially launched in the U.S. in 2010 and is currently sold in the U.S. and more than 30 other countries. It is one of only four products currently approved by the FDA for the treatment of opioid dependence pursuant to DATA 2000 in both the induction and maintenance phases of treatment (although several are approved for "treatment of opioid dependence"). SUBOXONE Film was developed as an alternative to the sublingual tablet.

77

SUBOXONE Film was developed through an exclusive agreement with Aquestive (formerly known as Monosol), utilizing its proprietary technology, to deliver SUBOXONE Film in a fast-dissolving sublingual film.

SUBOXONE Film containing 2 mg buprenorphine and 0.5 mg naloxone, and 8 mg buprenorphine and 2 mg naloxone, was first approved for the maintenance treatment of opioid dependence in the U.S. in August 2010, in Australia in December 2010, and in Malaysia in July 2013. Additional dosage strengths of SUBOXONE Film containing 4 mg buprenorphine and 1 mg naloxone, and 12 mg buprenorphine and 3mg naloxone, were subsequently approved in the U.S. in August 2012 and in Australia in May 2014. SUBOXONE Film was also approved in the U.S. in April 2014 for use in the induction phase of buprenorphine-based treatment of opioid dependence. In addition, on September 22, 2021 the FDA approved the buccal (against the cheek) route of administration for SUBOXONE Sublingual Film. Patients may now choose either sublingual or buccal administration.

The Group's U.S. sales force ceased promoting SUBOXONE Film as required by the Resolution Agreement with the DOJ and ceased all detailing of the product in 2020, though it remains available for sale. For more information, see "*Item 18. Financial Statements—Audited Consolidated Financial Statements—Note 19. Provisions and Other Liabilities*" and "*Item 10. Additional Information—C. Material Contracts.*"

### SUBOXONE Tablet (buprenorphine and naloxone) sublingual tablet

SUBOXONE Tablet is a fixed-dose combination of buprenorphine and naloxone in the ratio of four parts buprenorphine to one part naloxone. SUBOXONE Tablet was designed to discourage intravenous abuse of the tablet formulation in patients dependent on full opioid agonists (e.g., heroin and morphine). Naloxone is a potent antagonist at opioid receptors.

SUBOXONE Tablet containing 2 mg buprenorphine and 0.5 mg naloxone, and 8 mg buprenorphine and 2 mg naloxone, was approved in the U.S. by the FDA in October 2002 as an orphan drug for maintenance treatment of opioid dependence.

SUBOXONE Tablet is approved in 37 countries and currently distributed in 35 countries. We discontinued distribution of SUBOXONE Tablet in the U.S. market in March 2013.

### SUBUTEX Tablet (buprenorphine) sublingual tablet

SUBUTEX Tablet containing 0.4 mg, 2 mg, and 8 mg buprenorphine was first approved for the treatment of opioid dependence in France in July 1995 and was launched in the French market in February 1996. In April 2003, 2 mg and 8 mg tablets were subsequently approved in the U.S. and launched but were discontinued from sale in the U.S. market in September 2011. We currently distribute SUBUTEX tablets 18 countries worldwide, primarily in Europe, including France, UK, Germany, and Italy, but not in the U.S.

### OPVEE (nalmefene) nasal spray

On May 22, 2023, the FDA approved OPVEE (nalmefene) nasal spray for the emergency treatment of known or suspected opioid overdose induced by natural or synthetic opioids in adults and pediatric patients aged 12 years and older, as manifested by respiratory and/or central nervous system depression. OPVEE (nalmefene) nasal spray is intended for immediate administration as emergency therapy in settings where opioids may be present. OPVEE (nalmefene) nasal spray is not a substitute for emergency medical care. OPVEE contains 2.7 mg nalmefene.

Nalmefene works quickly by blocking the brain opioid receptors. In a clinical model of opioid-induced respiratory depression in opioid-experienced, non-dependent subjects, OPVEE had an onset of action of 2.5 to 5 minutes and fully reversed respiratory depression as early as 5 minutes after OPVEE administration. Other clinical data include a terminal plasma half-life of approximately 11 hours. While the

78

duration of action of nalmefene is as long as most opioids, a recurrence of respiratory depression is possible.

We believe that a large and growing addressable market for opioid overdose reversal agents exists in the U.S. driven by sales into community-based and first responder institutions, as well as directly to patients via pharmacies. The current addressable market in the U.S. is substantial, to ensure an opioid overdose reversal agent is available for all first responders, including fire departments, emergency medical services, federal law enforcement, local law enforcement, and other community groups. We also expect the primary customers for OPVEE to include state health departments, substance abuse centers, federal agencies, and consumers through pharmacies fulfilling physician-directed or standing order prescriptions. The co-prescribing of opioid overdose reversal agents alongside prescription opioids has also driven market growth.

*PERSERIS Long-acting injectable (risperidone) extended-release injection*

PERSERIS (risperidone extended-release) is a novel sustained-release formulation of risperidone administered monthly for the treatment of schizophrenia. Risperidone is a well-established medicine for schizophrenia.

PERSERIS consists of a two-syringe system the contents of which are mixed immediately prior to administration. One syringe contains the delivery system and the other contains the sterile drug substance risperidone. PERSERIS' extended-release delivery system forms a subcutaneous (under the skin) depot that provides sustained levels of risperidone over one month. Clinically relevant levels were reached after the first injection of PERSERIS without use of a loading dose or any supplemental oral risperidone. Initial peak risperidone plasma levels occur within four to six hours of dosing and are due to an initial release of the drug during the depot formation process.

The FDA approved PERSERIS in 90 mg and 120 mg doses in 2018 and we launched it in the U.S. in 2019.

**Competition**

We operate in a highly competitive industry. While we seek patent and trademark protection where appropriate, several of our branded products face competition from generic products in key markets as well as competition from alternative products and treatments.

For example, SUBLOCADE is patent protected in the U.S., Australia, Canada, the UK, Ireland, France, Germany, Italy, Spain, Denmark, Finland, Norway, the Netherlands, Switzerland, Sweden, Israel, Japan, Mexico and New Zealand. However, Camurus, in partnership with its U.S. marketing partner Braeburn, recently obtained FDA approval of its long-acting injectable buprenorphine product BRIXADI® in the U.S. Outside the U.S., this product (marketed as BUVIDAL®) enjoys first mover advantage in all countries except Canada. It is well established in the Nordics (Norway, Sweden, Finland, and Denmark) and Australia, and available in other parts of Europe.

Our SUBOXONE Film product already faces four generic competitors in the U.S. We are aware of one competitor that has received FDA approval but is unable to enter the market until 2024, and another with an application pending before the FDA. We have seen our market shares of film decline to an average share of 19% during 2023 and expect further declines if other competing products become available or if existing participants choose to disrupt the market in line with industry analogs. We no longer promote SUBOXONE Film in the U.S. as discussed above.

In contrast, no generic competition is present in Australia. In Europe and Canada, we have recently launched SUBOXONE Film and it enjoys patent protection until 2030.

Our SUBOXONE Film and SUBOXONE and SUBUTEX Tablets face generic competition in most markets. In Europe, generic versions of the SUBUTEX Tablets have been available since 2010 and

79

SUBOXONE Tablets since 2018. In addition, we face competition from branded oral buprenorphine-based tablets and historically well-established methadone oral formulations. In Canada, our SUBOXONE Tablets product faces two generic competitors. We have seen our market share of SUBOXONE Tablets eroding overtime. Further, our SUBOXONE Film and SUBOXONE and SUBUTEX Tablets face competition from branded oral buprenorphine-based tablets and historically well-established methadone oral formulations.

OPVEE is the first nalmefene nasal spray approved by the FDA for the emergency treatment of known or suspected opioid overdose in adults and pediatric patients aged 12 years and older, as manifested by respiratory and/or central nervous system depression. OPVEE (nalmefene) nasal spray is intended for immediate administration as emergency therapy in settings where opioids may be present. OPVEE (nalmefene) nasal spray is not a substitute for emergency medical care. It competes with branded and generic naloxone nasal sprays including Narcan® (naloxone HCI) Nasal Spray 4 mg (which is not available without a prescription), 4 mg naloxone generic equivalents, and KLOXXADO® (naloxone HCI) Nasal Spray 8 mg. It also competes with naloxone or nalmefene administered by syringe and over-the-counter ("OTC") intranasal naloxone HCI.

We launched our PERSERIS long-acting injectable for the treatment of schizophrenia in the U.S. in February 2019. While it enjoys patent protection, PERSERIS faces competition from other long-acting injectables, including existing products from competitors such as Johnson and Johnson, Otsuka, Teva and Alkermes, as well as potential future entrants, in addition to a heavily genericized oral market.

The introduction of generic or branded products that compete with the Group's products or heightened competition amongst existing participants could impact both the market share of the Indivior Group's products and pricing and, therefore, adversely impact its results of operations. The introduction of generic products typically leads to a loss of sales of a branded product and/or a decrease in the price at which branded products can be sold. In addition, legislation enacted in the U.S. and several EU countries allows for, and in a few instances in the absence of specific instructions from the prescribing physician, mandates the dispensing of generic products rather than branded products where a generic version is available.

**Research and Development**

We invest in research and development to create innovative medications and services that address the needs of patients with the complex chronic condition of SUD. These efforts include the development of new medications that are designed to minimize diversion and misuse, increase compliance with treatment, support public health, improve patient outcomes and expand access to treatment for areas of SUD where no pharmacotherapy is currently available.

Chronic addictive behaviors are characterized by compulsive drug and alcohol use, loss of control over drug-seeking and drug-taking, and an intense drive to take the drug at the expense of other behaviors, with little regard for subsequent consequences. From a psychiatric perspective, SUD has aspects of both impulse control disorders and compulsive disorders. In addictive and compulsive disorders, which have prominent motivational drivers, dysfunction in the brain's cortical regions significantly affects cognitive regulatory processes such that the individual fails to inhibit self-defeating urges or desires appropriately. This failure to resist repetitive, maladaptive behaviors is a key clinical feature of SUD, and aspects of decision-making are compromised either directly (i.e., a dysfunctional inhibitory system) or indirectly (i.e., a dysfunctional reward system).

Indivior has a long history of supporting the SUD treatment community: it discovered buprenorphine in 1966 and has been involved in manufacturing and supplying buprenorphine to patients as a treatment for OUD. Indivior has built a portfolio of treatments for OUD and a pipeline of new molecules to address other chronic conditions and co-occurring disorders of SUD. Indivior launched the first buprenorphine-based medication for the treatment of OUD in France in 1996. The Group's medications are now available in 37 countries and include buprenorphine sublingual tablets (SUBUTEX), buprenorphine and naloxone sublingual tablets (SUBOXONE), buprenorphine and naloxone sublingual film (SUBOXONE Film), and

80

the first FDA-approved once-monthly injectable buprenorphine formulation (SUBLOCADE). All along, Indivior has invested in education programs on evidence-based treatment models that have helped change modern addiction medicine and transform the perception of SUD from a global human crisis to a chronic disease that should be recognized and treated.

Our research and development personnel also have experience in opioid overdose reversal as a result of our acquisition of Opiant Pharmaceuticals, Inc. in March 2023. Members of our Research and Development staff contributed to the development and regulatory approval of OPVEE (nalmefene) nasal spray for the emergency treatment of known or suspected overdose induced by natural or synthetic opioids in adults and pediatric patients aged 12 years and older. On September 27, 2023, the U.S. Biomedical Advanced Research and Development Authority (BARDA) awarded us a $32 million contract to support FDA-required post-marketing requirement studies, 3-year stability studies to support shelf-life extension, real world evidence studies, and procurement of packaged OPVEE held as vendor-managed inventory (VMI) as a medical countermeasure in the event of a synthetic opioid community or mass casualty event.

Indivior also launched the first FDA-approved once-monthly injectable risperidone formulation (PERSERIS) for the treatment of schizophrenia.

Our research and development team is led by our Chief Scientific Officer, Dr. Christian Heidbreder, a leading authority on the development of SUD treatments, and consists of approximately 100 persons distributed across the following sub-functions:

- **Global Chemistry, Manufacturing, and Controls ("CMC")** includes capabilities spanning formulation development, analytical development, chemical development, process development, and technology transfer. Indivior CMC facilities based in Hull (United Kingdom) and Fort Collins (Colorado, USA) are equipped with cutting-edge technologies including pilot plant storage, formulation laboratories, analytical laboratories, chemistry laboratories, stability chambers, office spaces, and support spaces. These facilities are also built to environmental and energy-saving standards, including the installation of a solar panel farm to increase use of renewable energy.

- **Global Medicines Development** encompasses all required functions to support clinical and nonclinical development, from early to late stage clinical development including pivotal Phase 3 trials and post-marketing commitment and requirement studies: (1) medical, scientific writing, publications and communication; (2) clinical development and operations; (3) data and statistical sciences; (4) clinical pharmacology and nonclinical sciences; (5) epidemiology, health economics and outcomes research; (6) clinical, medical and safety compliance, and (7) drug discovery and translational medicine.

- **Global Regulatory Affairs** focuses on (1) regulatory strategy; (2) regulatory CMC and compliance; (3) regulatory operations; (4) global labeling and advertisement/promotion; and (5) local regulatory affairs.

- **R&D Strategy and Business Operations** enhances organizational coordination, and value-based decision-making for the research and development pipeline, through resource planning, optimization of systems, processes, and support of portfolio governance.

Our research and development function endeavors to conduct all clinical trials (Phase I through Phase IV) in partnership with Clinical Research Organizations. During Phase II and Phase III of clinical trials, because the formulation of the medication must be finalized and the scalability of production proven, we engage contractors with the relevant capabilities. During the various phases of clinical trials, the number of participants in, and consequently the expenses related to, the project increase significantly. Please refer to "*Item 5. Operating and Financial Review and Prospects*" for further details of research and development expenses during the financial periods included in this annual report.

81

*Pipeline*

Our research and development activities are focused on building on our leadership position in the treatment of SUD. Through active collaborations and partnerships, we are investing to advance research into the development of molecules to treat cannabis use disorder ("CUD"), opioid use disorder ("OUD") and alcohol use disorder ("AUD"). However, our pipeline reflects only potential products, and any product requires completion of clinical trials to demonstrate safety and efficacy, and approval by the FDA. See "*Item 3.D—Risk Factors—Clinical trials for the development of products, including our key pipeline products, may be unsuccessful and our product candidates may not receive authorization for manufacture and sale.*"

*AEF0117 Synthetic CB1 Specific Signaling Inhibitor for Cannabis Use Disorder*

In June 2021, we formed a strategic partnership with French company Aelis Farma ("Aelis"). This partnership gives Indivior an exclusive option for AEF0117, Aelis' first-in-class synthetic Signaling Specific inhibitor (SSi) engineered to modulate the cannabinoid type 1 (CB1) receptor (CB1-SSi) for the treatment of CUD. Aelis Farma is currently conducting a clinical Phase 2B trial which is a randomized, double-blind, placebo-controlled, prospective, multicenter study conducted in the U.S. on 330 treatment-seeking adult volunteers with a cannabis use of five days or more per week who meet diagnostic criteria for moderate to severe CUD. The primary efficacy end point is the response to treatment defined as one day or less of cannabis use per week from week five to week 12. Other CMC, nonclinical toxicology, and clinical work-streams are progressing in parallel. During the option period, Aelis is fully in charge of clinical and nonclinical development activities.

The estimated last subject last visit for the Phase 2B trial is in the second quarter of 2024 with the final clinical study report in the third quarter of 2024. Upon completion of this Phase 2B trial and end-of-Phase 2 meeting with the FDA, which we expect to occur in late 2024 or early 2025, Indivior will have the opportunity to exercise the option for $100 million in exchange for an exclusive global license to develop, manufacture, and commercialize AEF0117 and would assume responsibility and costs for all future development, regulatory, commercial, and manufacturing activities. Upon commercialization, we would also pay Aelis Farma a tiered royalty on net sales ranging from low teens to no more than 20%).

The U.S. patents for AEF0117 expire in 2033 and 2039, and the former patent might be extended until 2038. AEF0117, if approved, would address the growing need for treatments targeting CUD. There are no FDA-approved medications for CUD. We believe AEF0117 is the most advanced new chemical entity under investigation and, if approved for use by the FDA, represents a unique opportunity to address a growing public health need.

*INDV-2000 Selective Orexin-1 Receptor Antagonist for Opioid Use Disorder*

We are developing INDV-2000 (Selective Orexin-1 Receptor Antagonist), as a non-opioid treatment for moderate to severe OUD. The development plans of INDV-2000 based on two Phase 1 clinical trials (single and multiple ascending dose studies) were successfully discussed during a November 3, 2023, end-of-Phase 1 meeting with the FDA paving the way to the initiation of a clinical Phase 2 proof-of-concept study in the second quarter of 2024. Supportive clinical and non-clinical studies as well as formulation development and manufacturing activities are currently ongoing.

Previously, our rights to INDV-2000 were structured as an exclusive worldwide license. On July 31, 2023, we acquired full rights to the patents and other assets underlying this potential product in exchange for a payment of approximately $20.5 million. As a result, we no longer have any obligation to pay future development or sales milestones or a royalty on net sales of this product candidate.

The U.S. patents for INDV-2000 expire in 2037.

82

*INDV-1000 Selective GABAb Positive Allosteric Modulator for AUD*

We are developing INDV-1000 (Selective GABAb Positive Allosteric Modulator) for the treatment of AUD in collaboration with ADDEX Therapeutics. It is in the pre-clinical development phase. Two lead molecules and a potential back-up have been identified, synthesized and fully characterized in *in vitro* and *in vivo* pharmacological experiments. A lead clinical candidate selection is planned for June 2024

Our rights to INDV-1000 are structured as an exclusive worldwide license. Upon commercialization, we would pay to ADDEX a tiered royalty on net sales generally ranging from single digits to low teens.

*INDV-5004 - Drinabant Injection for Acute Cannabinoid Overdose ("ACO")*

Drinabant is a selective, high affinity cannabinoid CB-1 receptor antagonist that we are developing for the treatment of ACO. The combination of rising use of cannabis, wider availability driven by legalization, and the development of highly potent cannabis strains has led to an increase in the prevalence of patients presenting to the emergency department with ACO and cannabinoid hyperemesis syndrome. There are currently no FDA approved treatments for ACO.

In a proof of principle study that Sanofi completed with 36 patients, oral drinabant blocked both subjective and objective psychological effects of inhaled delta9-tetrahydrocannabinol ("THC"). Sanofi also generated extensive safety data in Phase 1 and 2 studies with more than 700 subjects for up to 24 weeks.

A collaboration with the National Center for Advancing Translational Sciences (NCATS) is enabling us to optimize a drug product formulation of INDV-5004 and conduct toxicology and safety IND-enabling studies. Good Laboratory Practice (GLP) safety and a Phase 1 development package will be initiated in the first quarter of 2024.

In December 2018, we signed an exclusive global licensing agreement with Sanofi for the development and commercialization of drinabant for the treatment of acute cannabinoid overdose. The agreement contemplates potential development milestone payments of up to $8.1 million, a tiered royalty on net sales ranging from mid-single digits to low teens, and potential sales milestone payments of up to $36 million. INDV-5004 remains in development.

The United States Patent and Trademark Office (USPTO) issued Patent No. 11,471,437 entitled "Compositions and methods for treating cannabinoid hyperemesis syndrome with a cannabinoid receptor antagonist" for INDV-5004. This patent covers INDV-5004 as a method of treatment for CHS using drinabant administered as a parenteral formulation and expires in 2040.

*Acquisition of Long-Acting Injectable Technology from Alar Pharmaceuticals*

On October 11, 2023, the Group secured global rights to develop, manufacture, and commercialize Alar Pharmaceuticals Inc.'s ("Alar") portfolio of buprenorphine-based long-acting injectables, including lead asset INDV-6001, which is potentially the first three-month long-acting injectable buprenorphine for the treatment of OUD. Under the agreement, the Group made an upfront payment of $10 million, which is in addition to the $5 million option payment made by the Group in the first quarter of 2023. Alar would be entitled to potential milestone payments if various developmental, regulatory, and commercial goals are achieved, and entitled to royalties in the low double digit to mid-teens as a percentage of net revenue.

*Partnership with Click Therapeutics*

On September 7, 2023, we announced the execution of a new collaboration agreement with Click Therapeutics for the development and commercialization of prescription digital therapeutics to treat SUD, beginning with OUD. Through a novel mobile application, CT-102, the collaboration aims to help close major gaps in OUD treatment, such as access to high-quality, personalized psychosocial treatment. Click will lead development with an iterative, patient-centric and evidence-based approach that leverages the company's end-to-end development capabilities and proprietary technology platform. This phased

83

process is designed to ensure CT-102 will be launched as a best-in-class therapy supported by compelling evidence that will drive broad access and adoption. These efforts will start with a preliminary exploration phase to explore and define the product scope that will best match the needs of patients, providers and payers. The target completion of the exploration phase is in the third quarter of 2024.

**Manufacturing**

*Raw Materials*

*Active Pharmaceutical Ingredients ("API")*

The Group sources a large portion of its active pharmaceutical ingredients from its own manufacturing facilities. The API used in our buprenorphine products are manufactured at our Fine Chemical Plant ("FCP") located in Hull, United Kingdom. The FCP manufactures the buprenorphine hydrochloride ("HCl") and the buprenorphine base active pharmaceutical ingredients ("buprenorphine") used in the formulation of SUBLOCADE long-acting injection, SUBOXONE Film, SUBUTEX Tablet, and SUBOXONE Tablet. The FCP has the capacity to produce all of our current buprenorphine HCl requirements with approximately 30% demonstrated capacity remaining. A third-party manufacturer performs an additional purification step for the crystallized buprenorphine base that we use to make SUBLOCADE (sold under the name SUBUTEX Prolonged Release outside the U.S.). We believe there are adequate supplies of the raw materials used to manufacture buprenorphine, and the ingredient is readily available from other suppliers (although it would require significant time to qualify and obtain regulatory approval to change suppliers).

We procure the naloxone HCl active pharmaceutical ingredient mainly from two suppliers for both SUBOXONE Tablet and SUBOXONE Film, although the ingredient is readily available from other suppliers (although it would require significant time to qualify and obtain regulatory approval to change suppliers).

Buprenorphine and products containing buprenorphine are classified as Schedule III controlled narcotics in the U.S. and require permits for import and export. An annual importation assessment value for buprenorphine and products containing buprenorphine is set by each importing country through the International Narcotics Control Board (the "INCB"). Once the assessment value has been reached for a given country, no additional import permits may be issued unless proper justification for an assessment value increase is provided to the respective country's governing body, which reports to the INCB. While this process has not impacted product supply to our patients in the past, it presents a manufacturing and product supply risk that must be monitored and managed closely.

We procure risperidone mainly from a single supplier for PERSERIS. While the ingredient is readily available from other suppliers, it would require significant time to qualify and obtain regulatory approval to change suppliers.

We procure the active ingredient (nalmefene) and the absorption enhancer (dodecyl maltoside) for OPVEE from single suppliers.

*SUBLOCADE*

SUBLOCADE (buprenorphine extended-release) injection for subcutaneous use is manufactured under an agreement with Curia (formerly known as AMRI). We provide the buprenorphine base, polymer and syringe assembly used in the manufacture of SUBLOCADE.

Curia has two manufacturing facilities located in Burlington, Massachusetts and Albuquerque, New Mexico. Manufacture of all SUBLOCADE output for the U.S. market is approved at both facilities, while output intended for the rest of the world is only approved at the Burlington facility. We are developing plans to obtain approval to manufacture SUBLOCADE for the rest of the world at the Albuquerque facility.

84

We rely on third parties to fill syringes with the API and polymer, to package the products, and to perform quality assurance and quality testing.

In addition, on November 1, 2023, the Group acquired an aseptic manufacturing facility in Raleigh, North Carolina for upfront consideration of $5 million in cash and assumption of certain contract manufacturing obligations. While currently being used to provide contract manufacturing for certain third parties, over time the Group plans to phase out that contract manufacturing and further develop the site to secure the long-term production and supply of SUBLOCADE and PERSERIS. However, it will take considerable time and investment in equipment and validation testing before we can make regulatory submissions to gain approval for commercial manufacture of SUBLOCADE at this site. See "*Item 3.D.—Risk Factors—We rely on third parties to manufacture commercial supplies of most of our products, whose facilities and processes must meet stringent regulatory requirements.*"

### SUBOXONE Film

SUBOXONE Film is manufactured under an exclusive license and supply agreement with Aquestive Therapeutics (formerly known as MonoSol RX). Under the terms of the agreement, Aquestive is the exclusive global manufacturer and primary packager of SUBOXONE Film and is prohibited from developing any other film product containing buprenorphine without our written consent. We provide both the buprenorphine HCl and the naloxone HCl used in the manufacture of SUBOXONE Film.

Aquestive has two manufacturing facilities located in Portage, Indiana. Manufacture and primary packaging of all SUBOXONE Film output for most markets is now approved at both facilities.

### SUBOXONE and SUBUTEX Tablets

We contract with Reckitt Benckiser Group PLC ("RB") to manufacture SUBOXONE and SUBUTEX Tablets. We provide both buprenorphine HCl and naloxone HCl used in the manufacture of SUBOXONE and SUBUTEX Tablets. RB manufactures and performs the packaging of all SUBOXONE and SUBUTEX tablets globally at its facility in Hull, United Kingdom.

### OPVEE (nalmefene) nasal spray

We have contracted for the commercial supply of OPVEE with Summit BioSciences. SpecGx LLC provides the nalmefene and Neurelis, Inc. provides the dodecyl maltoside (an absorption enhancer) used in the manufacture of OPVEE. Our license agreement with Neurelis obligates us to pay a tiered low to mid-single digit royalty on net sales, and potential sales milestones of up to $5 million for the sale of each of nalmefene, naloxone, or naltrexone products.

### PERSERIS Long-Acting Injectable

PERSERIS has two components. Syringe A, also known as the liquid syringe, contains the delivery system and is manufactured under a supply agreement with Curia. Syringe B, also known as the powder syringe, contains risperidone active pharmaceutical ingredient (API) and is manufactured under a supply agreement with Patheon Pharmaceuticals, LLC ("Patheon"). Patheon has a manufacturing facility located in Greenville, North Carolina and Curia has a manufacturing facility located in Burlington, Massachusetts.

The finished product is later terminally sterilized after packaging into cartons. We provide the API, polymer, and syringe assembly used in the manufacture of Syringe A and Syringe B, respectively. Contents in Syringe A and Syringe B are mixed before administering to the patient. We rely on third parties to fill syringes with the API and polymer, to package the products, to perform site quality assurance testing, and terminally sterilize the products.

Manufacturing capacity for PERSERIS is currently single sourced. However, with the November 2023 acquisition of the Raleigh, North Carolina manufacturing site, we are developing plans to add PERSERIS Syringe A manufacturing to the site as a second source of supply. As described above with SUBLOCADE, it will take considerable time and investment in equipment and validation testing before we can make

regulatory submissions to gain approval for commercial manufacturing of PERSERIS Syringe A at this site. See "*Item 3.D.—Risk Factors—We rely on third parties to manufacture commercial supplies of most of our products, whose facilities and processes must meet stringent regulatory requirements.*"

### Other Products

We sold the TEMGESIC product line globally in 2021 (other than North America) but continue to supply TEMGESIC to the purchaser of that business. We contract with the RB Group to manufacture and package TEMGESIC and globally at its facility in Hull, United Kingdom. We provide the API used in the manufacture of this product.

### Additional Manufacturing and Distributions Processes

We outsource to third parties certain aspects of the manufacturing and distribution process, including: (i) packaging our products with tamper evident pouches or child resistant components, in cardboard cartons, (ii) terminally sterilizing products that are not able to be manufactured under aseptic conditions, and (iii) securely storing products, fulfilling orders, and providing other customer service functions.

### Acquisition of Manufacturing Facility

On November 1, 2023, the Group acquired an aseptic manufacturing facility in Raleigh, North Carolina for upfront consideration of $5 million in cash and assumption of certain contract manufacturing obligations. The site will be further developed to secure the long-term production and supply of SUBLOCADE and PERSERIS Syringe A.

## Sales, Marketing and Distribution

Our sales, marketing, and distribution processes for our products begin with a focus on the patient. Our products are intended for patients who suffer from OUD, opioid overdose, or schizophrenia, each a highly stigmatized disease or disease state. These patients are found not just in private physician offices, but also in emergency rooms, hospitals, addiction or rehabilitation centers, organized health systems ("OHSs") and, frequently, as part of their journey with addiction, as incarcerated individuals in the criminal justice system. Accordingly, we focus our sales and marketing efforts not just on physicians in private practice but also to healthcare providers situated in these diverse treatment environments.

Our sales, marketing, and distribution efforts vary by market.

### United States

We derive approximately 83% of our net revenues, and an even larger portion of our profitability, from the U.S. market. Unlike many markets in the rest of the world, the U.S. market is not a single payor market. Instead, our activities are directed at a patchwork of federal and state agencies, organized health systems, criminal justice systems, and healthcare providers who provide treatment and assistance for patients suffering from OUD and schizophrenia.

### Payors and Reimbursement

We have dedicated professionals responsible for obtaining access and eliminating barriers to care at the national, regional, and state payor level, including every state Medicaid program. We have coverage from approximately 90% of payors for our OUD and schizophrenia products, including almost all commercial insurance payors, and the Veterans' Administration, the Department of Defense, and the Bureau of Indian Affairs.

A significant portion of our customers are reimbursed through the Medicaid plans of states and the District of Columbia, primarily because most individuals suffering from OUD are not employed or do not have employer-based health coverage.

86

We have begun offering OPVEE to various government entities and community agencies. These organizations typically receive grant funding related to the opioid epidemic which can be used for overdose reversal medications.

*Organized Health Systems ("OHS")*

Many patients who use our products are found at OHSs, such as hospitals and managed care organizations. OHS are an important channel for our products because they have the resources and administration to appropriately handle controlled substances that are prescribed, delivered, and stored, and are equipped to administer the requirements applicable to our products, including REMS. Our OHS Access Team and Key Account Team call on key decision makers at OHSs to expand access to our products. Our goal is to ensure access to our products by establishing treatment protocols (both medical and logistical), removing barriers to access, gaining formulary access where needed, and ensuring that protocols are in place to ensure compliance with applicable DEA, state, and local requirements regarding the storage of controlled substances. As part of this process, the sales team focuses on effectively communicating the scientific rationale and the benefits of our products, appropriately balanced with safety information, and the OHS Access Director Team and medical team focus on potentially better adherence, increased continuity of care, and overall cost and resource optimization in the total treatment plan.

*Criminal Justice Systems ("CJS")*

We also have dedicated teams for customers in the CJS, including various types of prisons, such as state departments of corrections, county jails, and federal prisons, along with specialty treatment courts. A specialty treatment court is a court with expertise in substance abuse disorders which may offer alternative and deferred prosecution arrangements for appropriate persons.

For prisons, our dedicated teams attempt to increase access to our products, overcome logistical barriers to care, and promote particular products, but do not call on HCPs behind the walls of the prisons.

For specialty treatment courts, our Criminal Justice Access Directors educate judges, prosecutors, social workers, and patients about the benefits of our products. The patient is ultimately referred to an HCP, either in a private office or federally qualified health center, where the decision to use medication for OUD, such as SUBLOCADE, is the patient's decision with the assistance of his or her HCP. At these referral sites and locations, our sales personnel coordinate with the HCPs and their staff to ensure understanding of the scientific rationale and the benefits of our products, appropriately balanced with safety information.

*Commercialization Activities*

Our commercial activities in the U.S. are currently focused on SUBLOCADE long-acting injectable, PERSERIS long-acting injectable and OPVEE nasal nalmefene spray. We do not promote SUBOXONE Film in the U.S. Our sales organization in the U.S. comprises approximately 275 trained and experienced pharmaceutical professionals, which we call Clinical Specialists, who are managed by Area Sales Managers. Clinical Specialists act as a vital link between the various stakeholders within the addiction community, including key opinion leaders, counselors, treatment advocates, pharmacists, nurses and healthcare providers in specialized treatment centers. We believe that our clear focus on patient needs helps deepen customer relationships which then allows the team the time to engage in clinical and logistical discussions that dramatically improve patient access to treatment with SUBLOCADE and PERSERIS.

Our Clinical Specialists are supported by dedicated and experienced professionals in our managed care group who create access to treatment for patients by partnering with U.S. commercial payors and federal, state, and local governmental payors.

OPVEE

87

Our commercialization efforts for OPVEE initially are not targeted at patients or HCPs. Instead, we expect the primary customers for OPVEE will be:

- first responders, including state and local law enforcement and in some cases, emergency medical services;

- state and county health departments, and municipalities;

- community groups, including schools and substance abuse centers;

- emergency departments;

- the federal government and its agencies;

- correctional institutions; and

- consumers through pharmacies fulfilling physician-directed or standing order prescriptions.

Our commercialization strategy for OPVEE includes ensuring access to OPVEE via inclusion in state standing orders, enabling public funding, establishing relevant state emergency medical protocols, and securing adjustments to state Good Samaritan laws, through the work of our government affairs and medical teams.

In October 2023 we were awarded a contract by BARDA for the procurement of finished, packaged OPVEE held as vendor-managed inventory (VMI) as a medical countermeasure in the event of a synthetic opioid community or mass casualty event. We expect product delivered pursuant to the contract to become part of the U.S. Strategic National Stockpile, which is the United States' national repository of antibiotics, vaccines, chemical antidotes, antitoxins, and other critical medical supplies. The role of the Strategic National Stockpile is to supplement state and local supplies during public health emergencies. The contract also has options for purchases and delivery of OPVEE over 10 years at guaranteed pricing through 2033.

Ultimately, or goal is to establish OPVEE as a differentiated brand by developing real world evidence, driving awareness by providing education to key stakeholders, and establishing OPVEE as the standard of care.

*Advocacy, Education, and Patient Support*

We collaborate with patient organizations, stakeholders and policymakers to achieve our vision that the millions of people across the globe suffering from substance use disorders and serious mental illness will have access to evidence-based treatment to change lives. Our advocacy agenda focuses on expanding access to treatment, advancing treatment equity, and increasing focus on patients in correctional settings.

Our educational and engagement efforts have focused on expanding the availability of treatment options beyond the clinical setting in the U.S. in order to give patients the flexibility to receive appropriate treatment in the privacy of a physician's office.

We also advocate for access to evidence-based treatment in correctional settings to ensure that resources are focused where challenges are greatest.

Equity in treatment is a barrier to care for patients. For instance, patients in correctional settings sit outside the insurance system and are ineligible by federal law for Medicaid benefits. We work to advance initiatives to increase patient access to medical care while incarcerated as well as access to care and coverage as they re-enter their communities. We also advocate to eliminate other barriers to care, including prior authorizations, step edits, and deductibles.

88

We have various programs to help patients access our products. For example, we sponsor a commercial co-pay assistance program that helps patients meet co-payment obligations imposed by their commercial insurance.

Additionally, we sponsor an insurance reimbursement hub to facilitate the dispensing of our products that HCPs and pharmacies may access via telephone to confirm coverage and level of benefits. We also provide patient access specialists to problem solve access issues, coverage, and coding (after a product has been ordered).

There has been enhanced scrutiny of company-sponsored patient assistance programs, both from government enforcement and payors.

*Medical Affairs*

Our Medical Affairs Team, which supports HCPs and health administrators and includes Medical Science Liaisons and Medical Outcomes Value Liaisons responsible for responding to unsolicited off-label questions, clarifying data related to our products, working with study investigators, and developing and delivering real world evidence regarding the usage and potential benefits or risks of a medical product derived from an analysis of real-world data.

*Marketing*

Our marketing efforts are focused on reaching the sufferers of the diseases that our products treat and the HCPs who treat them. In each of our markets, our commercial activities are supported by strategic planning, business analytics and measurement, and quarterly territory plans, ensuring that each market and sales territory is effectively resourced to maximize market access, and to increase appropriate use of our products.

In the U.S., our marketing team is responsible for claims development as well as developing marketing and sales materials, product websites, conference presentations and presence, and media plans which are reviewed by our Promotions Review Committee (PRC) consisting of medical, regulatory, and legal team members to assess compliance with rules and regulations as appropriate. We also provide reimbursement support for our U.S. markets. In addition, we have established strong marketing expertise in increasing disease state and treatment awareness, embedded in various platforms including grassroots, digital and traditional media. We employ third party vendors, such as advertising agencies, market research firms and suppliers of marketing and other sales support-related services, to assist with our commercial activities.

The challenges that we face in the sales process for our products include:

- understanding of the science that underpins the SUBLOCADE and PERSERIS value propositions,

- considerations related to buprenorphine being a controlled substance that is subject to regulation in the countries where our products are marketed,

- SUBLOCADE having been approved by the FDA with a REMS,

- SUBLOCADE requiring secure, refrigerated storage and the requirement that SUBLOCADE and PERSERIS be administered by an HCP, and

- developing strategies to ensure market acceptance of OPVEE, competing with an established product, and serving customers, most of which are expected to be incremental to our existing customer base.

89

To assist our sales and marketing efforts, we invest in data infrastructure and related professionals to derive insights from our data. These insights allow us to prioritize our marketing efforts, identify obstacles and barriers to treatment, and suggest new approaches.

*Distribution*

We distribute our products in 37 countries. Based on the country where sales originate, we derived 83%, 81%, and 76% of our net revenues from the United States in 2023, 2022, and 2021, respectively.

The distribution of our buprenorphine products is more complicated than other specialty pharmaceutical products because buprenorphine is regulated in the U.S. as a Schedule III drug by the FDA, and similarly restricted by law enforcement authorities in the rest of the world. Additionally, certain products, like SUBLOCADE, utilize a restricted delivery network. Additionally, to ensure proper administration, SUBLOCADE and PERSERIS may only be administered by an HCP and are not dispensed to the patient directly. To ensure that our products are available to HCPs and patients, we utilize specialty distributors and a network of several hundred specialty pharmacies that are equipped to adhere to these special requirements.

In contrast, SUBOXONE Film may be dispensed directly to a patient by a pharmacy with an appropriate DEA license. Accordingly, a substantial portion of our sales are to pharmaceutical wholesalers, specialty pharmacies, and distributors who, in turn, sell our products to pharmacies, hospitals, and other customers, including federal and state entities.

Our three largest customers (which are wholesale pharmaceutical companies in the U.S.) accounted for 54%, 55%, and 57% of global net revenues in 2023, 2022, and 2021. Our largest customer accounted for 19%, 22%, and 21% of our net revenues in 2023, 2022, and 2021. These customers are our primary purchases of SUBOXONE Film in the U.S., and as sales of SUBLOCADE grow, which is sold mostly through specialty pharmacists and specialty distributors, the relative importance of these three largest customers declines.

*Logistics*

We use central third-party logistics and warehouses that comply with applicable local regulations for storage and distribution of our products into the supply chain. Our third-party logistics provider specializes in integrated operations that include warehousing and transportation services that can be scaled and customized to our needs based on market conditions and the demands and delivery service requirements for our medicines and materials. Their services eliminate the need to build dedicated internal infrastructures that would be difficult to scale without significant capital investment. Our third-party logistics provider warehouses all medicines in controlled FDA-registered facilities in the U.S., or which meet applicable requirements outside the U.S. Orders are prepared and shipped through an order entry system to ensure adequate supply and delivery of our medicines.

**Rest of the World**

Our commercial activities are currently focused on SUBLOCADE long-acting injectable (also called SUBUTEX Prolonged Release), SUBUTEX Tablet, SUBOXONE Tablet and SUBOXONE Film. Depending on the size and demands of the relevant markets, dedicated teams of clinical liaisons, health policy liaisons, or a combination of both, work to accelerate access to treatment for patients.

In Canada and in approved markets in Europe and Australia, we have a field force of sales specialists. In markets where these products either are not approved or are unable to be promoted under local regulation, we have medical affairs personnel responsible for responding to medical information requests and for providing information consistent with local treatment protocols with respect to such products. In certain European markets, we have a sales team and a team of medical science liaisons supporting our rolling launches of SUBLOCADE and SUBOXONE Film.

90

Outside the U.S. and Europe, we directly market SUBLOCADE, SUBOXONE Film, and SUBOXONE Tablets in in Canada and SUBLOCADE, SUBOXONE Film, and SUBUTEX Tablets in Australia. We also utilize distributors in certain markets outside the U.S. where we do not market our products directly.

We distribute our products internationally using contracted third-party distribution services:

- in Canada, we use a single distribution partner; and

- in Europe, we use 2 distribution hubs, one in the UK and one in France, and 13 pre-wholesalers that sell our product on consignment. Additionally, we have 12 distribution partners across Europe.

- Outside North America and Europe we have 3 pre-wholesalers that sell our product on consignment, and nine distributors across 12 countries.

**Intellectual Property**

We own or license several patents and patent rights in the U.S. and other countries covering or relating to certain of the products and pipeline products mentioned above and have created brand names and also registered trademarks where appropriate for our products. Generally, and where possible, we rely upon patent protection to ensure market exclusivity for the life of the patent. We consider the overall protection of our patents, trademarks, and license rights to be of material value and take actions to protect these rights from infringement or misuse where appropriate.

The majority of an innovative product's commercial value is usually realized during the period in which the product has market exclusivity. In the branded pharmaceutical industry, an innovator's product's market exclusivity is generally determined by two forms of protection: patent rights held by the innovator company; and any regulatory forms of exclusivity to which the innovator is entitled. In the U.S. and some other countries, when market exclusivity expires and generic versions of a product are approved and marketed, there are often very substantial and rapid declines in the branded product's sales. The rate of this decline varies by country and by therapeutic category; however, following patent expiration, branded products often continue to have some market viability based either upon the goodwill generated by the product name, which typically benefits from trademark protection, or upon the difficulties associated with replicating the product formulation or bioavailability.

Patents are a key determinant of market exclusivity for most branded pharmaceuticals as they can provide the innovator with the right to exclude others from practicing an invention related to the product. Patents may cover, among other things, the active ingredient(s), various uses of a drug product, pharmaceutical formulations, drug delivery mechanisms, the manufacture of products and processes for the manufacture of products, and intermediate compounds useful in the manufacture of products. Protection for aspects of individual products extends for varying periods in accordance with the expiry dates of patents in the various countries. The protection afforded, which may also vary from country to country, depends upon the type of patent, its scope of coverage and the availability of meaningful legal remedies in the country. However, patents and other forms of protection can never protect us from all forms of competition, such as from similar products or from alternatives. See, for example, "*Item 4.Information on the Company—B. Business Overview—3. Competition.*"

Many developed countries provide certain non-patent incentives for the development of pharmaceuticals. For example, the U.S., EU and Japan each provides for a minimum period of time after the approval of certain new drugs during which the regulatory agency may not rely upon the innovator's data to approve a competitor's generic copy. Regulatory exclusivity is also available in certain markets as incentives for research on new indications, orphan drugs (drugs that demonstrate promise for the diagnosis or treatment of rare diseases or conditions) and medicines that may be useful in treating pediatric patients. Regulatory exclusivity is independent of any patent rights and can be particularly important when a drug lacks broad patent protection. However, most regulatory forms of exclusivity do not prevent a second innovative competitor from gaining regulatory approval prior to the expiration of

91

regulatory exclusivity when the second innovative competitor has conducted its own safety and efficacy studies on its drug, even when that drug is identical to that marketed by the first innovator.

We estimate the likely market exclusivity period for each of our branded products on a case-by-case basis. It is not possible to predict with certainty the length of market exclusivity for any of our branded products because of the complex interaction between patent and regulatory forms of exclusivity, the relative success or lack thereof of potential competitors' experience in product development and inherent uncertainties concerning patent litigation. There can be no assurance that a particular product will enjoy market exclusivity for the full period of time that we currently estimate or that the exclusivity will be limited to the estimate.

We also rely on trade secrets, know-how and inventions, which are not protected by patents and try to protect this information by entering into confidentiality agreements with parties that have access to it, such as our corporate partners, collaborators, licensees, employees, and consultants. We also license or assign certain intellectual property rights to third parties.

The Group (generally Indivior UK Limited) also owns or licenses, patent rights (i.e. granted patents or pending applications) in certain key jurisdictions in respect to our products and pipeline products. The patent rights listed below are those which are critical to our products:

92

| Product | Patent Type | Application or Patent No. | Expiration Date |
|---|---|---|---|
| SUBLOCADE | Method | 9,272,044 | June 6, 203 |
| | | 10,198,218 | June 6, 203 |
| | | 10,592,168 | June 6, 203 |
| | | 10,646,484* | June 15, 203 |
| | | 11,000,520 | November 6, 203 |
| | | 11,839,611 | November 6, 203 |
| | | 17/283,931 | October 11, 203 |
| | Formulation | 8,921,387 | January 6, 203 |
| | | 8,975,270 | Sept. 5, 203 |
| | | 9,498,432 | June 6, 203 |
| | | 9,782,402 | June 6, 203 |
| | | 9,827,241 | June 6, 203 |
| | | 10,558,394 | June 25, 203 |
| | Means Plus Function | 17/985,253 | November 6, 203 |
| PERSERIS | Method | 9,186,413 | February 13, 202 |
| | | 10,058,554 | September 26, 202 |
| | | 10,376,590 | February 13, 202 |
| | | 11,712,475 | February 13, 202 |
| | | 17/424,321 | January 21, 204 |
| | Formulation | 9,180,197 | February 13, 202 |
| | | 9,597,402 | September 26, 202 |
| | | 10,010,612 | February 13, 202 |
| | | 10,406,160 | September 26, 202 |
| | | 11,013,809 | February 13, 202 |
| | | 11,110,093 | September 26, 202 |
| | Means Plus Function | 18/083,774 | February 13, 202 |
| | Device | 11,478,407 | July 20, 203 |
| | | 11,578,498 | July 20, 203 |
| | | 18/515,859 | July 20, 203 |
| OPVEE | Formulation and Methods | 11,458,091 | July 10, 203 |
| | | 17/055,647 | May 15, 203 |
| | | 17/881,306 | August 4, 204 |
| | Formulations | 17/881,191 | November 9, 203 |
| | Methods | 17/291,979 | November 7, 203 |
| | | 18/174,858 | November 7, 203 |

*Licensed Technology*

The U.S. Patent and Trademark Office (USPTO) issued Patent No. 11,458,091 which includes claims covering combinations of nalmefene and Intravail® (dodecyl maltoside, an absorption enhancer) in a nasal formulation which expires in 2038. In addition, we license certain patents and other intellectual property, including Intravail® from Neurelis, Inc. (f/k/a Aegis Therapeutics, LLC). Our license agreement obligates us to pay certain development milestones, which are not material, a tiered low to mid-single digit royalty on net sales, and potential sales milestones of up to $5 million each for the sale of certain nalmefene, naloxone, or naltrexone products that incorporate the Intravail® absorption enhancer. We also use Intravail® in OPVEE.

**Regulatory Overview**

Our activities are subject to a rigorous regulatory framework on a local and international level that conditions and affects our activities. The process of obtaining regulatory approvals and the subsequent compliance with applicable laws, regulations and other requirements require the expenditure of substantial time and financial resources. The following is a summary of the regulatory landscape applicable to our business and the reimbursement schemes applicable to our products in the key markets in which we operate.

**United States**

*Overview*

Pharmaceutical companies operate in a highly regulated environment. In the U.S., we must comply with laws, regulations and other requirements promulgated by numerous federal and state authorities, including the FDA and other agencies and divisions of the Department of Health and Human Services, the Drug Enforcement Agency ("DEA"), and other agencies of the DOJ, the Consumer Product Safety Commission, the Environmental Protection Agency, the U.S. Bureau of Customs and Border Protection (the "CBP"), and state agencies such as boards of pharmacy. Applicable legal requirements govern to varying degrees the research, development, manufacturing, commercialization and sale of our prescription pharmaceutical products, including pre-clinical and clinical testing, approval, production, labeling, sale, distribution, import, export, post-market surveillance, advertising, dissemination of information and promotion. Failure to comply with applicable legal requirements can result in product recalls, seizures, injunctions, refusal to approve or withdrawal of approval of product applications, monetary fines or criminal prosecution.

*Food and Drug Administration*

The FDA's authority to regulate pharmaceuticals comes primarily from the Federal Food, Drug, and Cosmetic Act ("FFDCA"). In addition to reviewing NDAs for branded drugs and additional new drug applications ("ANDAs") for generic drugs, the FDA has the authority to ensure that pharmaceuticals introduced into interstate commerce are neither "adulterated" nor "misbranded." Adulterated means that the product or its manufacture does not comply with FDA quality and related standards. A drug is adulterated if, among other things: (i) it is prepared under unsanitary conditions such that it may have been contaminated or may cause injury to patients, (ii) its manufacture does not comply with cGMP, (iii) it does not comply with an official compendium, (iv) its strength, purity or quality differs from that which it purports to possess, or (v) if it is manufactured, processed or held in a facility which refuses FDA inspection. Misbranded means, among other things, that the labeling of, or advertising or promotional materials for, the product contains false or misleading information, fails to conform to the FDA approval for the drug, or fails to include required information about risks.

In order to market and sell a new drug product in the U.S., a drug manufacturer must file with the FDA an NDA that shows the safety and effectiveness of the new drug. In order to market and sell a generic version of an already-approved drug product, a drug manufacturer must file an ANDA that shows that the generic version is, with narrow exceptions, the same active ingredient, dosage form, strength and route of administration as a previously approved reference product, and "bioequivalent" to that reference product, meaning that it is absorbed at the same rate and to the same extent as the reference product. The FDA classifies certain generic drugs as "therapeutically equivalent," meaning that they are expected to have the same clinical effect and safety as the branded drug product. Alternatively, a manufacturer may submit an NDA under FFDCA section 505(b)(2) for a drug product that has some differences from an already-approved drug product, but that relies in whole or in part on the findings of safety and/or effectiveness of a previously approved reference product, or on medical literature. A section 505(b)(2) NDA must demonstrate that the proposed product is safe and effective notwithstanding the differences from the approved drug product.

94

*Research, Development and NDA process*

The path leading to FDA approval of an NDA for a new drug begins when the drug product is merely a chemical formulation in the laboratory. In general, the process involves the following steps:

(i) completion of formulation, laboratory and animal testing in accordance with good laboratory practices ("GLP"), which characterizes the drug product from a pre-clinical perspective and provides preliminary evidence that the drug product is safe to test in human beings;

(ii) filing with the FDA an Investigational New Drug Application ("IND") which once effective will permit the conduct of clinical trials (testing in human beings under adequate and well-controlled conditions) in the U.S.;

(iii) designing and conducting clinical trials to show the safety and efficacy of the drug product in accordance with good clinical practice ("GCP") and other requirements;

(iv) submitting the NDA for FDA review, which generally must include data from at least two well-controlled clinical trials demonstrating safety and effectiveness, as well as characterization of the drug product and a description of the manufacturing process, controls and facilities;

(v) satisfactory completion of FDA pre-approval inspections regarding the conduct of the clinical trials and manufacturing at the designated facility or facilities in accordance with current Good Manufacturing Practices ("cGMP");

(vi) if applicable, completion of an FDA Advisory Committee meeting in which the FDA requests views and recommendations from outside experts in evaluating the NDA;

(vii) final FDA approval of the full prescribing information, labeling and packaging of the drug product; and

(viii) in some cases, commitments to meet post-approval requirements, including ongoing monitoring and reporting of adverse events related to the drug product, implementation of a Risk Evaluation and Mitigation Strategy ("REMS") program, if applicable, and conduct of any agreed post-marketing requirement or post-marketing commitment studies.

Clinical trials are typically conducted in four sequential phases, although they may overlap. The four phases are as follows:

(i) Phase I trials are typically small (fewer than 100 study subjects and often involving healthy volunteers) and are primarily designed to determine the pharmacokinetics and toxicity of the drug product.

(ii) Phase II trials usually involve 100 to 300 participants and are designed to determine whether the drug product produces any clinically significant effects in patients with the intended disease or condition and to provide further information about safety and dosing. If the results of these trials show promise, then larger Phase III trials may be conducted.

(iii) Phase III trials are often multi-institution studies that involve a large number of participants and are designed to show efficacy and safety in the intended treatment population. Phase III (and some Phase II) trials are designed to be pivotal trials. The goal of a pivotal trial is to establish the safety and efficacy of a drug product with sufficient robustness for purposes of regulatory approval.

(iv) Phase IV studies are conducted following approval. In some cases, the FDA requires post marketing requirement studies or post-marketing commitment studies after the NDA has been approved. Such post-marketing clinical studies or surveillance programs are intended to obtain more information about the risks of harm, benefits and optimal use of the drug product by

95

evaluating the results of the drug product in a larger number of patients. The FDA may require post-approval studies either at the time of approval or, if it becomes aware of new safety information, after approval.

A drug manufacturer may conduct clinical trials either in the U.S. or outside the U.S., but in all cases must comply with GCP and must ensure that there is: (i) a legally effective informed consent process when enrolling participants; (ii) an independent review by an Institutional Review Board or ethics committee to minimize and manage the risks of harm to participants; and (iii) ongoing monitoring and reporting of adverse events related to the drug product.

In addition, under the Pediatric Research Equity Act 2003 ("PREA") as amended, all NDAs must include assessments on a drug in pediatric patients unless the applicant receives a waiver or deferral. A drug sponsor may also seek to conduct a clinical trial of a drug product on pediatric patients based on a written request from the FDA in order to obtain a form of marketing exclusivity as permitted under the Best Pharmaceuticals for Children Act 2002, as amended. Under PREA, FDA may require post-approval studies assess the safety and effectiveness of the indication in pediatric patients.

The path leading to FDA approval of a section 505(b)(2) NDA for a drug product that has differences from an already approved product is somewhat shorter. In a section 505(b)(2) NDA, the drug sponsor relies, in whole or in part, on investigations to which the sponsor does not have a right of reference to establish that its proposed product is safe and effective. For example, a section 505(b)(2) NDA may rely on published literature or on the FDA's prior finding of safety and effectiveness of another company's product. Section 505(b)(2) NDAs are typically used for new products with differences from previously approved products such as in dosage forms, dosage strengths, route of administration or indication and where, therefore, an ANDA may not be used. New clinical trial data may also be needed to establish that the proposed product is safe and effective given its differences.

Under the U.S. Prescription Drug User Fee Act 1992, as amended, the FDA has the authority to collect fees from drug manufacturers who submit NDAs and section 505(b)(2) NDAs for review and approval. For U.S. fiscal year 2024, the user fee rate has been set at $4,048,695 for an NDA and $2,024,348 for an NDA not requiring clinical data, generally certain section 505(b)(2) NDAs.

*ANDA process*

The path leading to FDA approval of an ANDA is very different from that of an NDA. By statute, the drug manufacturer does not complete pre-clinical studies and safety and efficacy clinical trials, and instead focuses on a showing of sameness and bioequivalence to a previously approved Reference Listed Drug ("RLD"), typically a branded drug approved under an NDA. Sameness means, with limited exceptions, the same active ingredient or ingredients, dosage form, strength, route of administration and labeling. Bioequivalence is generally established by studies that involve comparing the absorption rate and concentration levels of a generic drug in the human body to that of the RLD. In the event that the generic drug behaves in the same manner in the human body as the RLD, the two drug products are considered bioequivalent. The FDA considers a generic drug therapeutically equivalent, and therefore the drug is generally substitutable under state pharmacy dispensing law, where it is shown to be the same as and bioequivalent to the RLD. Legislation enacted in most states in the U.S. allows or, in some instances mandates, that a pharmacist dispense an available generic drug that has been rated therapeutically equivalent when filling a prescription for a branded product, in the absence of specific contrary instructions from the prescribing physician. ANDA filings must include information on manufacturing processes, controls, and facilities comparable to an NDA.

In 2010, Congress passed into law the Generic Drug User Fee Act to address the FDA's backlog, which at the time was over 2,000 ANDA filings. This legislation granted the FDA authority to collect, for the first time, user fees from generic drug manufacturers who submit ANDA filings for review and approval, and the fees collected help the FDA fund the drug approval process. For U.S. fiscal year 2024, the user fee rate is set at $1,729,629 for an ANDA submitted by a large size operation generic applicant. The FDA

96

will also collect from generic drug manufacturers a separate fee where they reference a so-called Drug Master File for a contract manufacturer, and separate annual manufacturing facility fees for API and finished drug products.

Aside from the backlog described above, the timing of FDA approval of ANDA filings depends on other factors, including whether an ANDA holder has challenged any listed patents to the reference listed drug (the "RLD") and whether the RLD is entitled to one or more periods of non-patent data or marketing exclusivity under the FFDCA, as discussed elsewhere in this section.

*Patent and non-patent exclusivity periods*

A sponsor of an NDA is required to identify in its application any patent that claims the drug or a use of the drug subject to the application. Upon NDA approval, the FDA lists these patents in a publication referred to as the Orange Book. Any person that files a section 505(b)(2) NDA that relies upon reference to an approved NDA for which the patents are listed, or an ANDA to secure approval of a generic version of the previously approved drug, must make a certification in respect of listed patents. If the ANDA or section 505(b)(2) NDA applicant certifies that there are no listed patents or that the listed patents have expired, the FDA may approve the application immediately. If the applicant certifies that the patents have not expired, the FDA may only approve the application upon expiry of the patents. Alternatively, the applicant may certify that the listed patents are invalid, unenforceable and/or not infringed by the proposed drug. The applicant must give notice to the holder of the NDA for the RLD and the patent holder (if different) of the bases upon which the patents are challenged. If the NDA holder or patent owner sues the applicant for infringement within 45 days, the FDA may not approve the ANDA or section 505(b)(2) NDA until the earliest of: (i) 30 months after receipt of the notice by the holder of the NDA for the RLD; (ii) entry of a district court of appellate court judgment holding the patent invalid, unenforceable or not infringed; (iii) such other time as the court may order; or (iv) the expiry of the patent. If an infringement suit is not initiated within 45 days of notice to the NDA holder, the FDA may approve the application immediately.

A key motivation for ANDA applicants to challenge patents is the 180-day market exclusivity period ("generic exclusivity") granted to the developer of a generic version of a product that is the first to submit an ANDA with a Paragraph IV certification. For a variety of reasons, there are situations in which a company may not be able to take advantage of an award of generic exclusivity. The determination of when generic exclusivity begins and ends is complicated and is subject to several forfeiture provisions.

The holder of the NDA for the RLD may also be entitled to certain non-patent exclusivity during which the FDA cannot accept for filing or approve an application for a competing generic product or section 505(b)(2) NDA product. Generally, if the RLD is a new chemical entity, the FDA may not accept for filing any application that references the innovator's NDA for five years from the approval of the innovator's NDA. However, this five-year period is shortened to four years where an applicant's ANDA includes a Paragraph IV certification, and the 30-month stay on FDA approval is lengthened accordingly. In other cases, where the innovator has provided certain clinical study information essential for approval, the FDA may accept for filing, but may not approve, an ANDA or section 505(b)(2) application that references the corresponding aspect of the innovator's NDA for a period of three years from the approval of the innovator's NDA. Certain additional periods of exclusivity may be available, such as orphan exclusivity if the RLD is indicated for use in a rare disease or condition, or pediatric exclusivity if the RLD is studied for pediatric patients based on a written request from the FDA.

*Risk Evaluation and Mitigation Strategies ("REMS")*

The FDA has the authority to require the manufacturer to provide a REMS that is intended to ensure that the benefits of a drug product (or class of drug products) outweigh the risks of harm. The FDA may require that a REMS include elements to assure safe use to mitigate a specific serious risk of harm, such as requiring that prescribers have particular training or experience or that the drug product is dispensed in certain healthcare settings. The FDA has the authority to impose civil penalties on or take other

97

enforcement action against any drug manufacturer who fails properly to implement an approved REMS. Separately, there are prohibitions on a drug manufacturer using an approved REMS to delay generic competition. The FDA has been active in instituting class-wide and product-specific REMS for opioid drug products.

The FDA requires a REMS for SUBOXONE Film and for SUBLOCADE Injection. SUBOXONE Film is part of the Buprenorphine Transmucosal Products for Opioid Dependence ("BTOD") shared REMS program, the goals of which are to: 1) mitigate the risks of accidental overdose, misuse, and abuse, and 2) inform prescribers, pharmacists, and patients of the serious risks associated with buprenorphine-containing products. The goal of the SUBLOCADE REMS program is to mitigate the risk of serious harm or death that could result from intravenous self-administration by ensuring healthcare settings and pharmacies are certified and only provide SUBLOCADE directly to a healthcare provider for administration by a healthcare provider to the patient.

Other products for which the Group secures NDA approval in the U.S. in the future may become subject to a REMS specific to the product or shared with other products in the same class of drug, if FDA determines that additional steps beyond labeling are required to help ensure the benefits of the medication outweighs its risks.

*Quality assurance requirements*

The FDA enforces requirements to ensure that the methods used in, and the facilities and controls used for, the manufacture, processing, packaging, and holding of drugs conform to cGMP. The cGMP requirements that the FDA enforces are comprehensive and cover all aspects of manufacturing operations, from receipt of raw materials to finished product distribution, and are designed to ensure that the finished products meet all the required identity, strength, quality, and purity characteristics. Ensuring compliance requires a continuous commitment of time, money, and effort in all operational areas.

The FDA conducts pre-approval and post-approval inspections of facilities engaged in the development, manufacture, processing, packaging, testing, and holding of the drugs subject to NDAs and ANDA filings. Prior to approval, if the FDA concludes that the facilities to be used do not or did not meet cGMP, it will not approve the application. Corrective actions to remedy the deficiencies must be performed and are usually verified in a subsequent inspection.

The FDA also conducts periodic post-approval inspections of drug manufacturing facilities to assess their cGMP status. Adverse inspections can lead to FDA inspection observations, warning letters, seizure, recalls, injunctions, and shutdown of facilities. In addition, where products or components for manufacturing are being imported into the U.S., the FDA may issue an import alert to prevent shipments into the country. In addition, if the FDA concludes that a company is not in compliance with cGMP requirements, sanctions may be imposed that include preventing that company from receiving the necessary licenses to export its products, preventing further approvals for applications involving the facility or facilities and issue and classifying that company as an "unacceptable supplier," thereby disqualifying that company from selling products to governmental agencies.

*Reporting requirements*

Pharmaceutical manufacturers are subject to adverse event reporting requirements during clinical trials and following approval, with expedited reporting for certain serious adverse events and periodic reporting for other adverse events. To comply with these requirements, manufacturers must have robust procedures for surveillance, receipt, evaluation, and reporting of adverse events. Manufacturers must also submit annual reports to FDA for each approved product, and field alert reports where there is a quality or labeling issue with a product already distributed to the market.

98

*Labeling and marketing*

For all pharmaceuticals sold in the U.S., the FDA and other regulatory and law enforcement bodies also regulate sales and marketing to ensure that drug product claims made by manufacturers are not false, misleading or otherwise improper. Manufacturers are required to file copies of all product-specific promotional materials with the FDA's Office of Prescription Drug Promotion at the time of their first use. Failure to implement a robust internal company review process and to comply with FDA requirements regarding labeling and promotion increases the risk of enforcement action by the FDA, the DOJ, or the states.

In addition, the FDA has the authority to require labeling changes after approval of a drug if it becomes aware of new safety information.

### Import and export requirements

To import pharmaceuticals into the U.S., the importer must file an entry notice and bond with the Customs and Board Protection ("CBP"). All drugs are subject to FDA examination before release by the CBP. Any article that appears to be in violation of the FFDCA may be refused admission and a notice of detention and hearing may be issued. If the FDA ultimately refuses admission, the CBP may issue a notice for redelivery and assess liquidated damages for up to three times the value of the drugs.

Products for export from the U.S. are subject to foreign countries' import requirements and the exporting requirements of the FDA. For example, international sales of drugs manufactured in the U.S. that are not approved by the FDA for use in the U.S. are subject to FDA export requirements. FDA will provide a certificate of pharmaceutical product ("eCPP") directly to a requesting country to provide assurance that the product has been approved for export from the U.S. and that the manufacturing facilities are in compliance with cGMP. To obtain this certificate, the drug manufacturer must apply to the FDA.

### Drug Enforcement Administration

The U.S. Drug Enforcement Agency ("DEA") is the federal agency in the U.S. responsible for enforcement of the Controlled Substances Act ("CSA"). The CSA classifies drugs and other substances based on identified potential for dependence and abuse. Schedule I controlled substances are those with a high abuse potential and have no currently accepted medical use; thus they cannot be lawfully marketed or sold. Schedule II/IIN substances have a high potential for abuse which may lead to severe psychological or physical dependence. Many narcotics and stimulants are Schedule II controlled substances. Schedule III/IIN substances have a potential for abuse less than substances in Schedules I or II and abuse may lead to moderate or low physical dependence or high psychological dependence. Examples of Schedule III substances are products containing not more than 90 milligrams of Codeine per dosage (Tylenol® with Codeine) and buprenorphine, the active ingredient in SUBLOCADE and SUBOXONE. Consequently, the manufacture, storage, distribution, and sale of these substances are all highly regulated.

DEA regulations make it extremely difficult for a manufacturer in the U.S. to import finished dosage forms of controlled substances manufactured outside the U.S., particularly for Schedule II controlled substances and narcotics in other Schedules. These rules reflect a broader enforcement approach by the DEA to regulate the manufacture, distribution and dispensing of legally produced controlled substances. Accordingly, drug manufacturers who market and sell finished dosage forms of controlled substances in the U.S. often manufacture or have them manufactured in the U.S.

The DEA also requires drug manufacturers to design and implement a system that identifies suspicious orders of controlled substances, such as those of unusual size, those that deviate substantially from a normal pattern and those of unusual frequency, prior to completion of the sale. A compliant suspicious order monitoring system includes well-defined due diligence, "know your customer" efforts and order monitoring.

To meet its responsibilities, the DEA conducts periodic inspections of registered establishments that handle controlled substances. Annual registration is required for any facility that manufactures, tests, distributes, dispenses, imports or exports any controlled substance. The facilities must have the security, control and accounting mechanisms required by the DEA to prevent loss and diversion. Failure to maintain compliance, particularly as manifested in loss or diversion, can result in regulatory action. The DEA may seek civil penalties, refuse to renew necessary registrations or initiate proceedings to revoke those registrations. In certain circumstances, violations could lead to criminal proceedings.

Individual states also regulate controlled substances, and manufacturers, distributors and third-party active pharmaceutical ingredient suppliers and manufacturers, are subject to such regulation by several states with respect to the manufacture and distribution of these products.

*Government benefit programs*

Statutory and regulatory requirements for Medicaid, Medicare, Tricare (the uniformed services healthcare program for active duty service members, active duty family members, National Guard and Reserve members and their family members, retirees and retiree family members, survivors, and certain former spouses worldwide) and other government healthcare programs govern provider reimbursement levels for government beneficiaries, including requiring that pharmaceutical companies pay rebates to individual states based on Medicaid utilization of the manufacturer's products. The federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds.

From time to time, legislative or regulatory changes are made to government healthcare programs that impact our business. For example, the Medicare Prescription Drug Improvement and Modernization Act 2003 ("Medicare Part D") created a new outpatient prescription drug coverage program for people with Medicare through a new system of private market drug benefit plans. This law provides an outpatient prescription drug benefit to seniors and individuals with disabilities in the Medicare program.

Further, the Inflation Reduction Act of 2022, or IRA, among other things, requires the U.S. Department of Health and Human Services Secretary to negotiate, with respect to Medicare units and subject to a specified cap, the price of a set number of certain high Medicare spend drugs and biologicals per year starting in 2026, penalizes manufacturers of certain Medicare Parts B and D drugs for price increases above inflation, and makes several changes to the Medicare Part D benefit, including a limit on annual out-of-pocket costs, and a change in manufacturer liability under the program. Congress continues to consider various policy proposals that may result in pressure on the prices of prescription drugs in the government health programs.

In addition, the Patient Protection and Affordable Care Act ("Affordable Care Act") has changed the way healthcare services are delivered and financed by both government and private insurers in the U.S. The overall impact of the Affordable Care Act reflects several uncertainties; the impact to our business is largely attributable to changes in the Medicare Part D coverage gap, the imposition of an annual fee on branded prescription pharmaceutical manufacturers and increased rebates payable to state Medicaid programs. There are several other provisions in the legislation that collectively have additional impact, including originator average manufacturer price for new formulations and the expansion of the ceiling prices under section 340B of the Public Health Services Act, as amended (the "340B Program") to new entities.

Further, federal policy makers have taken and are expected to continue to try to take steps toward expanding healthcare coverage beyond the Affordable Care Act, which could have ramifications for the pharmaceutical industry. Additional legislative changes, regulatory changes, or guidance could be adopted, which may impact marketing approvals and reimbursement for our products. For example, there has been increasing legislative, regulatory, and enforcement interest in the U.S. with respect to drug pricing practices. There have been several inquiries by the U.S. Congress and proposed and enacted federal and state legislation and regulatory initiatives designed to, among other things, bring more

100

transparency to product pricing, evaluate the relationship between pricing and manufacturer patient programs, and reform government healthcare program reimbursement methodologies for drug products.

### Healthcare fraud and abuse laws; Privacy

We are subject to various federal, state, and local laws targeting fraud and abuse in the healthcare industry. For example, in the U.S., there are federal and state anti-kickback laws that prohibit the payment or receipt of kickbacks, bribes or other remuneration intended to induce the purchase or recommendation of healthcare products and services covered by government healthcare programs or reward past purchases or recommendations. In addition, the federal False Claims Act prohibits presenting or causing to be presented a false claim for payment by a federal healthcare program, and this law has been interpreted to include claims caused by improper drug manufacturer product promotion or the payment of kickbacks. Under the Sunshine Act and related provisions of the Affordable Care Act, we must report to the federal government information on payments and transfers of value made to physicians and certain healthcare institutions, and on drug samples distributed. In addition, if we receive protected patient health information, it may be subject to federal or state privacy laws. Violations of these laws can lead to civil and criminal penalties, including fines, imprisonment, and exclusion from participation in federal healthcare programs. These laws apply to hospitals, physicians and other potential purchasers of our products and are potentially applicable to us as both a manufacturer and a supplier of products reimbursed by federal healthcare programs. In addition, some states in the U.S. have enacted compliance and reporting requirements that apply to drug manufacturers.

We must comply with the FCPA worldwide and similar anti-bribery laws in non-U.S. jurisdictions such as the U.K. Bribery Act of 2010, which generally prohibit companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. Because of the predominance of government-sponsored healthcare systems around the world, most of our customer relationships outside the U.S. are with governmental entities and are therefore subject to such anti-bribery laws. See also, *"Item 3.D. Risk Factors—We are subject, directly or indirectly, to a variety of U.S. and international laws and regulations related to fraud and abuse and transparency. Enforcement actions under such laws have increased in recent years. If we fail to comply, or have not fully complied, with such laws, we could face substantial penalties."*

## European Union and UK

### Overview

In the EU and UK, medicinal products are subject to extensive pre- and post-marketing regulation by regulatory authorities at both the EU and national levels. Additional rules also apply at the national level relating specifically to controlled substances.

Following a referendum in 2016, the UK formally left the EU on January 31, 2020 and the transition period, during which EU laws continued to apply to the UK, expired on December 31, 2020.

A significant proportion of the regulatory framework in the UK applicable to medicinal products is currently derived from European Union Directives and Regulations, and since January 1, 2021, the EU laws which have been transposed into UK law through secondary legislation continue to be applicable in the UK as retained EU law, although any new EU law developments have ceased to apply in the UK from that date. The divergence between the UK and the EU regimes may increase as time passes, including for example, with respect to EU law developments to which the UK is not subject, such as the Clinical Trials Regulation. There have been no new significant legislative enactments in the UK since its exit from the EU with respect to medicinal products which would materially deviate the UK's overall regulatory position from the EU law at the time the UK exited the EU. However, there are important procedural and other differences, such as the requirement to obtain a UK-specific marketing authorization, for example.

There are several ongoing UK government consultations relevant to medicinal products, most notably with respect to clinical trials and the future regulatory landscape in the UK is uncertain.

101

The position in Northern Ireland differs in certain respects from that of the rest of the United Kingdom (England, Scotland, and Wales) as Northern Ireland has chosen to retain some EU rules following the UK's departure from the EU.

*Clinical trials and marketing approval*

Clinical trials of medicinal products in the EU must be conducted in accordance with EU and national regulations and the International Council for Harmonization ("ICH") guidelines on GCP. Prior to commencing a clinical trial, the sponsor must obtain a clinical trial authorization from the competent authority and a positive opinion from an independent ethics committee. The application for a clinical trial authorization must include, among other things, a copy of the trial protocol and an investigational medicinal product dossier containing information about the manufacture and quality of the medicinal product under investigation.

Under the EU Regulation on Clinical Trials (Regulation (EU) 536/2014) which came into force as of January 31, 2022, and replaces the existing Directive 2001/20/EC, a centralized procedure is in place where the sponsor submits the application for a clinical trial through an EU portal. The application is then evaluated and approved or rejected by the respective member state where the trial is to take place. If more than one member state is concerned, the application will be reviewed in a coordinated process with one member state acting as "reporting" member state. Any subsequent substantial changes to the trial protocol or other information submitted with the clinical trial applications must be approved by the member states concerned. The EU Regulation on Clinical Trials provides for certain transitional rules for clinical trials applied for before it came into effect and gives sponsors a choice as to whether to apply the previous rules until January 31, 2023.

The UK regulatory framework in relation to clinical trials is derived from secondary national UK legislation implementing the EU Directive 2001/20/EC. The UK is not subject to the new EU Regulation on Clinical Trials and the details of the future regulation of clinical trials in the UK are as yet uncertain.

After completion of the required clinical testing, a drug manufacturer must obtain a marketing authorization in line with Regulation EC 726/2004 (and as transposed into national laws) before it may place its medicinal product on the market in the EU. There are various application procedures available depending on the type of product involved. The centralized procedure gives rise to marketing authorizations that are valid throughout the EU and, by extension (after national implementing decisions), in Norway, Iceland and Liechtenstein, which, together with the EU member states, comprise the EEA. Applicants file marketing authorization applications with the EMA where they are reviewed by a relevant scientific committee, in most cases the Committee for Medicinal Products for Human Use ("CHMP"). The EMA forwards CHMP opinions to the European Commission, which uses them as the basis for deciding whether to grant a marketing authorization. The centralized procedure is compulsory for medicinal products that (i) are derived from biotechnology processes; (ii) contain a new active substance (not yet approved on November 20, 2005) indicated for the treatment of certain diseases, such as HIV/AIDS, cancer, diabetes, neurodegenerative disorders, viral diseases or autoimmune diseases and other immune dysfunctions; (iii) are orphan medicinal products; or (iv) are advanced therapy medicinal products, such as gene or cell therapy medicines.

For those medicinal products for which the centralized procedure is not available, the applicant must submit marketing authorization applications to the national medicines regulators through one of three procedures: (i) a national procedure, which results in a marketing authorization in a single EU member state; (ii) the decentralized procedure, in which applications are submitted simultaneously in two or more EU member states; and (iii) the mutual recognition procedure, which must be used if the product has already been authorized in at least one other EU member state, and in which the EU member states are required to grant an authorization recognizing the existing authorization in the other EU member state, unless they identify a serious risk to public health. A national procedure is only possible for one-member state; as soon as an application is submitted in a second member state the mutual recognition or

102

decentralized procedure will be triggered. Marketing authorizations granted under a national procedure are also initially valid for five years but can be renewed indefinitely.

Marketing authorization applications for generic medicinal products do not need to include the results of pre-clinical and clinical trials but can instead refer to the data included in the marketing authorization of a reference product for which regulatory data exclusivity has expired. If a marketing authorization is granted for a medicinal product containing a new active substance, that product benefits from eight years of data exclusivity during which generic marketing authorization applications referring to the data of that product may not be accepted by the regulatory authorities, and a further two years of market exclusivity during which such generic products may not be placed on the market. The two-year period may be extended to three years if during the first eight years a new therapeutic indication with significant clinical benefit over existing therapies is approved.

In the UK, the EU centralized procedure described above no longer applies and a separate application will be required to the UK Medicines and Healthcare products Regulatory Agency ("MHRA") for a UK marketing authorization. The MHRA may consider marketing authorizations approved in the European Economic Area (EEA) member states through decentralized or mutual recognition procedures, which may accelerate the process of granting a marketing authorization in the UK.

In the EU, companies developing a new medicinal product must agree to a Pediatric Investigation Plan ("PIP") with the EMA and must conduct pediatric clinical trials in accordance with that PIP unless a waiver applies, for example because the relevant disease or condition occurs only in adults. The marketing authorization application for the product must include the results of pediatric clinical trials conducted in accordance with the PIP, unless a waiver applies, or a deferral has been granted, in which case the pediatric clinical trials must be completed at a later date. Products that are granted a marketing authorization on the basis of the pediatric clinical trials conducted in accordance with the PIP are eligible for a six-month extension of the protection under a supplementary protection certificate (if any is in effect at the time of approval). This pediatric reward is subject to specific conditions and is not automatically available when data in compliance with the PIP are developed and submitted. In the UK, after January 1, 2021, PIP applications were required to be submitted separately to the MHRA though EU PIPs agreed prior to that date were adopted as UK PIPs as at that date. The UK MHRA PIP application system mirrors the EU system and the MHRA has said it will continue to follow the EU guidelines on such applications. The MHRA will take account of whether an EU PIP is already granted when deciding whether to grant a UK PIP. The MHRA strongly encourages parallel submission to EMA and MHRA.

### Pharmacovigilance and risk management

The holders of a marketing authorization are subject to extensive pharmacovigilance and risk management obligations under Directive 2001/83/EC and Regulation EC 726/2004.

According to EMA, pharmacovigilance "is the science and activities relating to the detection, assessment, understanding and prevention of adverse effects or any other medicine-related problem." In the EU and the UK, the holders of a marketing authorization must establish and maintain a pharmacovigilance system with the overall aim to monitor and ensure the safety of a medicinal product and appoint an individual qualified person for pharmacovigilance who is responsible for oversight of that system. They are also required to establish and maintain a pharmacovigilance system master file detailing the pharmacovigilance system. On request, the system master file must be made available to the competent authorities for inspection. In the UK, if the qualified person does not reside or operate in the UK, there will need to be a national pharmacovigilance contact person who does reside or operate in the UK. Key pharmacovigilance obligations include the recording of suspected serious adverse reactions to the medicinal product in and outside the EU and promptly reporting them through the centralized EudraVigilance database. In addition, the holders of a marketing authorization are required to submit periodic safety update reports ("PSURs").

103

All new marketing authorization applications must include an RMP describing the risk management system that the holder of the marketing authorization will put in place and documenting measures to prevent or minimize the risks associated with the product. The regulatory authorities may also impose specific obligations as a condition of the marketing authorization. Such risk-minimization measures or post-authorization obligations may include additional safety monitoring, more frequent submission of PSURs or the conduct of additional clinical trials or post-authorization safety studies.

*Promotional restrictions*

In the EU and UK, all advertising and promotional activities for the product must be consistent with the approved summary of product characteristics, and therefore all off-label promotion is prohibited. Direct-to-consumer advertising of prescription medicines is also prohibited. Although general requirements for advertising and promotion of medicinal products are established under EU and UK legislation, the details are governed by national regulations and can differ from one country to another.

*Manufacturing and importing*

Medicinal products may only be manufactured in the EU, or imported into the EU from another country, by the holder of a manufacturing authorization. The manufacturer or importer must comply with the EU GMP and have a qualified person who is responsible for certifying that each batch of product placed on the market in a member state has been manufactured in accordance with the laws in force in that member state and in accordance with the requirements of the marketing authorization. If a medicinal product is imported from outside the EU, each batch of product must undergo a full qualitative analysis, a quantitative analysis of at least all the active substances and all the other tests or checks necessary to ensure the quality of medicinal products in accordance with the requirements of the marketing authorization. Manufacturing facilities are subject to periodic inspections by the competent authorities for compliance with EU GMP and may, if products are produced for another market, also be subject to inspections under the GMP requirements applicable in that market. The position in the UK is broadly equivalent, save that a UK specific manufacturer's license is required from the MHRA (in addition to the UK marketing authorization), which also requires compliance with EU GMP. For the purposes of EU legislation, the UK is now classified as a "third country."

The manufacture, import, export, storage, distribution, and sale of controlled substances are subject to additional regulation at the national level in the EU and UK. In many EU member states, the regulatory authority responsible for medicinal products is also responsible for controlled substances. In the UK and in certain EU member states, responsibility is split and in the UK the Home Office is responsible for controlled substances while the MHRA is responsible for medicinal products. Generally, any company manufacturing or distributing a medicinal product containing a controlled substance in the EU or UK will need to hold a controlled substances license from the competent national authority and will be subject to specific record-keeping and security obligations. Separate import or export certificates are required for each shipment into or out of the country.

*Pricing and reimbursement*

Pricing and reimbursement remain mostly within the discretion of the respective member state. However, the member states must at least comply with the Transparency Directive (Directive 89/105/EEC), which primarily provides procedural obligations. Governments influence the price of medicinal products in the EU and the UK through pricing and reimbursement rules and control of national healthcare systems that fund a large part of the cost of those products to patients. Some member states operate positive and negative list systems under which products may only be marketed once a reimbursement price has been agreed. To obtain reimbursement or pricing approval, some of these member states may require the completion of clinical trials that compare the cost-effectiveness of a particular product candidate to currently available therapies. Other countries allow companies to fix their own prices for medicinal products but monitor and control company profits. Such differences in national pricing regimes may create price differentials across Europe. The downward pressure on healthcare costs in general,

104

particularly prescription medicines, has become intense. As a result, barriers to entry of new products are becoming increasingly high and patients are unlikely to use a drug product that is not reimbursed by their government.

In addition, in most European countries, physicians are encouraged or even required to prescribe generic rather than branded products and many governments also advocate generic substitution by requiring or permitting pharmacists to substitute a different company's generic version of the branded drug product that was originally prescribed.

**Rest of the world**

*Current markets*

After the U.S. and Europe, our largest markets are Canada and Australia, where we market our products pursuant to standards set by Health Canada and the Therapeutic Goods Administration, respectively. We also market our products in certain other developed countries. The laws, guidelines and standards promulgated by the relevant regulatory authorities that regulate the development, testing, manufacturing, marketing, and selling of pharmaceuticals in each of these jurisdictions are broadly similar to those in the U.S. and Europe, although the precise requirements vary from country to country.

We also market our products in various emerging markets, where regulatory review and oversight processes continue to evolve. At present, such countries typically require prior regulatory approval or marketing authorization from large, developed markets (such as the U.S., European Union, Canada and Australia) before they will initiate or complete their review. Some countries also require the applicant to conduct local clinical trials as a condition of marketing authorization. Many emerging markets continue to implement measures to control drug product prices, such as implementing direct price controls or advocating the prescribing and use of generic drugs.

**Environmental**

Our Fine Chemical Plant manufactures the buprenorphine hydrochloride ("HCl") and buprenorphine base active pharmaceutical ingredient used in the formulation of SUBLOCADE long-acting injection, SUBOXONE Film, SUBUTEX Tablet, SUBOXONE Tablet, and TEMGESIC.

In November 2023, we acquired an approximate 80,000 square foot manufacturing plant in Raleigh, N.C. (the "Raleigh Plant"). The Raleigh Plant currently manufactures pharmaceutical products for third party customers.

The FCP uses caustic materials as part of the manufacturing process, as well as a thermal reaction; however, these aspects of the process are tightly controlled and, we believe, represent low risk to the surrounding environment. Unlike the FCP, the Raleigh Plant does not use hazardous chemicals as part of its manufacturing processes.

Our operations, like those of other pharmaceutical companies, involve the use of substances regulated under environmental laws, primarily in manufacturing processes and, as such, we are subject to numerous federal, state, local and non-U.S. environmental protection and health and safety laws and regulations. Environmental laws are complex, frequently amended and have generally become more stringent over time. Environmental agencies may require that we reimburse the government for costs incurred at these sites or otherwise pay for the cost of investigation and clean-up of these sites, including compensation for damage to natural resources. Also, certain environmental laws can impose liability on the current or former owners or operators of real property or facilities for the costs of investigation, removal or remediation of hazardous substances or materials at such properties, or at properties to which parties have disposed of hazardous substances. These laws can impose liability without regard to fault, and such liability may be joint or several with the previous owners or operators.

105

## Human Capital

Our goal is to be an employer of choice and provide a fair, equitable, and conducive working environment free from discrimination and harassment. Indivior regards its employees as fundamental to its long-term success and provides a variety of training, development, and communication programs to ensure its business activities are always conducted in line with its guiding principles and stakeholder expectations.

At Indivior, we value our distinctive culture and believe it is a key source of sustainable competitive advantage. We believe diversity and inclusion in its broadest sense supports innovation, continuous improvement of quality, and increased speed and efficiency in meeting the various needs of patients, customers and stakeholders.

Our Diversity and Inclusion Policy, which applies to the Board and our workforce, reflects our beliefs and values. Supporting and promoting the diversity of our people is an important priority for the Group, and we have focused on developing an inclusive culture that values all employees regardless of their age, disability, gender, race, sexual orientation, or other protected characteristics. We achieve this through an ongoing focus on creating an environment that allows our talented people to prosper and a framework of policies and practices that promote equal opportunities in all areas of employment.

Our 50+ person Culture & Inclusion Champions network is well established and has helped us to implement many initiatives aimed at strengthening our diversity and inclusion practices and building on our culture. We also conduct an annual survey of employees to monitor engagement levels and act on feedback received through this process. In 2023, we were awarded the Great Place To Work Certification for all countries entered: Australia, Canada, France, Germany, Italy, the United Kingdom, and the United States.

The table below sets forth the average monthly number of persons employed by the Group, including Directors, by business function during the years indicated.

| Business function | 2023 | 2022 | 2021 |
|---|---|---|---|
| Operations | 735 | 675 | 573 |
| Management | 208 | 178 | 164 |
| Research and development | 108 | 75 | 65 |
| Average number of employees | 1,051 | 928 | 802 |

On December 31, 2023 the Group employed 1,164 people worldwide. Of these, 849 were located in the United States, 283 were located in Europe, the Middle East, Africa, or Canada, and 32 were located in Australia.

Certain of our employees are represented by unions or works councils. We believe that we have a good relationship with our employees and with the unions and works councils that represent certain employees.

We strive to promote diversity, inclusion, and equal opportunity across the organization. As of the date of filing this Annual Report, women or minorities hold 30% (3 of 10) of the seats on our Board of Directors. As of December 31, 2023, 51% of our employees were women. Additionally, 34% of senior managers (including members of our Executive Committee who are not directors of Indivior PLC and directors of each subsidiary company) were women.

## Corporate Governance

We provide information with respect to our Board of Directors, Executive Officers, and corporate governance policies and principles on our Investor Relations website, www.indivior.com/en/investors. Specifically, the Group makes available on its website, under the headings *"About Us — Corporate*

106

*Governance'* (i) its codes of conduct or ethics for the Board, senior financial officers, and employees, and (ii) the terms of reference (committee charters) of the Group's board committees. If the Group makes changes in, or provides waivers from, the provisions of any of its codes of ethics that the SEC requires it to disclose, the Group intends to disclose these events in the "*Corporate Governance*" section of its Investor Relations website.

## C.   Organizational Structure

Indivior PLC is the ultimate holding company of the Group. The following table sets out details of the Group's significant subsidiaries as of December 31, 2023:

| Name | Country of incorporation or registration | Proportion of Ownership Interest |
|---|---|---|
| Indivior Finance (2014) LLC | U.S. | 100% |
| Indivior Finance S.àr.l | Luxembourg | 100% |
| Indivior Inc. | U.S. | 100% |
| Indivior Jersey Finance LLC | U.S.* | 100% |
| Indivior Jersey Finance (2021) Limited | Jersey | 100% |
| Indivior Treatment Services, Inc. | U.S. | 100% |
| Indivior UK Finance No 1 Limited | England and Wales | 100% |
| Indivior UK Finance No 2 Limited | England and Wales | 100% |
| Indivior UK Finance No 3 Limited | England and Wales | 100% |
| Indivior UK Limited | England and Wales | 100% |
| Indivior US Holdings Inc. | U.S. | 100% |
| RBP Global Holdings Limited | England & Wales | 100% |

* Indivior Jersey Finance LLC is registered in the U.S. state of Delaware, but also has a principal place of business in Jersey.

## D.   Property, Plant and Equipment

The following table contains information regarding existing or planned material tangible fixed assets owned or leased by the Group.

| Location | Tenure | Principal use | Size |
|---|---|---|---|
| Richmond, Virginia | Lease | Office space | 72,602 square feet |
| Hull, England | Owned[1] | Office space, research, and manufacturing facility | 70,808 square feet |
| Fort Collins, Colorado | Lease | Office space and research facility | 41,600 square feet |
| Slough, England | Lease | Office space | 20,912 square feet |
| Santa Monica, California | Lease | Office space | 7,863 square feet |
| London, England | Lease | Office space and research facility | 1,696 square feet |
| Raleigh, North Carolina | Owned | Manufacturing, warehousing, and research and development facility | 79,633 square feet |

_____
(1)   The Hull, England property is leased for 150 years and accounted for as owned.

107

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### 1. GENERAL INFORMATION

Indivior PLC (the "Company") and its subsidiaries (together, "Indivior" or the "Group") are predominantly engaged in the development, manufacture and sale of buprenorphine-based prescription drugs for the treatment of opioid dependence, and co-occurring disorders (the "Indivior Business").

The Company is a public limited company incorporated and domiciled in England, United Kingdom on September 26, 2014, and is the holding company for the Group. The address of the registered office and company number are 234 Bath Road, Slough, Berkshire, SL1 4EE, U.K. and 09237894, respectively.

Indivior PLC is the ultimate holding company of the Group. The following table sets out details of the Group's significant subsidiaries:

| Name | Country of incorporation or registration | Proportion of Ownership Interest |
|---|---|---|
| Indivior Finance (2014) LLC | U.S. | 100% |
| Indivior Finance S.àr.l | Luxembourg | 100% |
| Indivior Inc. | U.S. | 100% |
| Indivior Jersey Finance LLC | U.S.* | 100% |
| Indivior Jersey Finance (2021) Limited | Jersey | 100% |
| Indivior Treatment Services, Inc. | U.S. | 100% |
| Indivior UK Finance No 1 Limited | England and Wales | 100% |
| Indivior UK Finance No 2 Limited | England and Wales | 100% |
| Indivior UK Finance No 3 Limited | England and Wales | 100% |
| Indivior UK Limited | England and Wales | 100% |
| Indivior US Holdings Inc. | U.S. | 100% |
| RBP Global Holdings Limited | England & Wales | 100% |

* Indivior Jersey Finance LLC is registered in the U.S. state of Delaware, but also has a principal place of business in Jersey.

The principal accounting policies adopted in the preparation of these financial statements are set out below. Unless otherwise stated, these policies have been consistently applied to all years presented.

### 2. BASIS OF PREPARATION AND ACCOUNTING POLICIES

The annual financial statements of the Group have been prepared in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board. The financial statements are presented in U.S. dollars ($) and are prepared on a historical cost basis except where otherwise stated. Amounts denoted in "m" represent millions and "k" represent thousands. The financial statements were approved by the Board of Directors on March 5, 2024.

**Adoption of new and revised standards**

The following new IFRS standards have been adopted by the Group from January 1, 2023:

*International Tax Reform - Pillar Two Model Rules - Amendments to IAS 12*

In December 2021, the Organisation for Economic Co-Operation and Development ("OECD") released the Global Anti-Base Erosion (Pillar Two) model rules, which provide a framework for the introduction of a global minimum effective tax rate of 15%, applicable to large multinational groups. In May 2023, the International Accounting Standards Board issued 'International Tax Reform—Pillar Two Model Rules, Amendments to IAS 12'. The amendments mandate a temporary exception to the accounting for deferred taxes arising from Pillar Two tax legislation and introduce additional disclosure

F-8

https://www.sec.gov/Archives/edgar/data/1625297/000162529724000017/indv-20231231.htm#id39cb0e1a10249e1ab7b8f77d921d68a_1981

requirements for affected entities. The Group has applied this IAS 12 amendment; refer to Note 7 for details.

### *IFRS 17 Insurance Contracts*

IFRS 17 was issued in May 2017 as a replacement for IFRS 4 Insurance Contracts and applies to annual reporting periods beginning on or after January 1, 2023. IFRS 17 establishes the principles for the recognition, measurement, presentation and disclosure of insurance contracts within the scope of the standard. The Group has assessed its contractual arrangements considering the requirements of IFRS 17 and determined that all significant contracts with insurance-like features such as leases and parent-subsidiary guarantees are excluded from the scope of the standard. Accordingly, IFRS 17 did not impact the consolidated financial statements.

### New accounting standards issued but not yet effective

Certain new accounting standards, amendments to accounting standards and interpretations have been published that are not mandatory for December 31, 2023 reporting periods and have not been early adopted by the Group. These standards, amendments or interpretations are not expected to have a material impact on the entity in the current or future reporting periods and on foreseeable future transactions.

### Going concern assessment

The Directors have considered the Company's and the Group's financial plan, in particular with reference to the period to June 2025 (the going concern period).

The Directors have assessed the Group's ability to maintain sufficient liquidity to fund its operations, fulfill financial and compliance obligations as set out in Note 19, and comply with the minimum liquidity covenant in the Group's term loan for the going concern period. A base case model was produced reflecting:

•   Board reviewed financial plans for the period; and

•   settlement of liabilities and provisions in line with contractual terms, which are expected to be fully approved by the courts as agreed.

The Directors also assessed a "severe but plausible" downside scenario which included the following key changes to the base case within the going concern period:

•   the risk that SUBLOCADE will not meet revenue growth expectations in the U.S. by modeling a 10% decline on forecasts;

•   an accelerated decline in U.S. SUBOXONE film sales to generic analogues; and

•   a further decline in rest of the world sublingual product net revenue.

Under both the base case and the downside scenario, sufficient liquidity exists and is generated from operations such that all business and covenant requirements are met for the going concern period. As a result of the analysis described above, the Directors reasonably expect the Group to have adequate resources to continue in operational existence for at least one year from the approval of these financial statements and therefore consider the going concern basis to be appropriate for the accounting and preparation of these financial statements.

### Basis of consolidation

The consolidated financial statements include the results of the Company and its subsidiaries. Subsidiaries are those investees, including structured entities, the Group controls because the Group (i) has power to direct the relevant activities of the investees that significantly affect their returns, (ii) has

F-9

exposure, or rights, to variable returns from its involvement with the investees, and (iii) has the ability to use its power over the investees to affect its returns. Subsidiaries are consolidated from the date on which control is transferred to the Group (acquisition date) and are deconsolidated from the date on which control ceases. Intra-Group transactions, outstanding balances payable or receivable and unrealized income and expense on transactions between Group entities have been eliminated on consolidation. All subsidiaries have year ends which are co-terminous with the Company's. For IFRS reporting, subsidiaries' accounting policies are consistent with the policies adopted by the Group.

**Accounting policies**

### Foreign currency translation

The financial statements of each Group entity are measured using the currency of the primary economic environment in which the entity operates (the functional currency), which is generally the local currency with the exception of treasury and holding companies where the functional currency is the U.S. dollar. The Group's presentation currency is the U.S. dollar.

Foreign currency transactions are translated into the functional currency using exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of foreign currency transactions and from the remeasurement of monetary assets and liabilities denominated in foreign currencies are recognized within SG&A in the consolidated income statement.

The exchange rates used for the translation of currencies into U.S. dollars that have the most significant impact on the Group's results were:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| GBP year-end exchange rate | 1.2731 | 1.2083 | 1.3532 |
| GBP average exchange rate | 1.2435 | 1.2386 | 1.3763 |
| EUR year-end exchange rate | 1.1037 | 1.0698 | 1.1378 |
| EUR average exchange rate | 1.0814 | 1.0545 | 1.1840 |

The financial statements of subsidiaries with different functional currencies are translated into U.S. dollars on the following basis:

- Assets and liabilities at the year-end rate.

- Profit and loss account items at the weighted average exchange rate for the year.

Exchange differences arising from translation of retained earnings and the net investment in foreign entities are recognized in the statement of comprehensive income on consolidation.

### Revenue

Net revenue is generated from sales of pharmaceutical products, net of accruals for returns, discounts, incentives and rebates ("allowances"). Direct customers are often wholesalers, specialty pharmacies and specialty distributors of pharmaceutical products; indirect customers are often government-sponsored programs or commercial insurers with whom the Group has separate pricing and formulary agreements.

Net revenue is recognized when a contractual promise to a customer (performance obligation) has been fulfilled by transferring control over pharmaceutical products to the direct customer, substantially all of which is upon receipt of the products by the customer, and therefore all revenue is recognized at a "point in time." The amount of net revenue recognized is based on the consideration expected in exchange for pharmaceutical products, including reductions in revenue for rebates expected to be paid to indirect customers. The consideration Indivior receives may be fixed or variable. Variable consideration is

F-10