# Exhibit 9





August 19, 2022

HP-2022-20

# Unwinding the Medicaid Continuous Enrollment Provision: Projected Enrollment Effects and Policy Approaches*

## KEY POINTS

- After expiration of the COVID-19 public health emergency (PHE), Medicaid's continuous enrollment provision will come to an end.  Using longitudinal survey data and 2021 enrollment information, we currently project that 17.4 percent of Medicaid and Children's Health Insurance Program (CHIP) enrollees (approximately 15 million individuals) will leave the program based on historical patterns of coverage loss.
- Approximately 9.5 percent of Medicaid enrollees (8.2 million) will leave Medicaid due to loss of eligibility and will need to transition to another source of coverage. Based on historical patterns, 7.9 percent (6.8 million) will lose Medicaid coverage despite still being eligible ("administrative churning"), although HHS is taking steps to reduce this outcome.
- Children and young adults will be impacted disproportionately, with 5.3 million children and 4.7 million adults ages 18-34 predicted to lose Medicaid/CHIP coverage. Nearly one-third of those predicted to lose coverage are Latino (4.6 million) and 15 percent (2.2 million) are Black.
- Almost one-third (2.7 million) of those predicted to lose eligibility are expected to qualify for Marketplace premium tax credits.  Among these individuals, over 60 percent (1.7 million) are expected to be eligible for zero-premium Marketplace plans under the provisions of the American Rescue Plan (ARP).  Another 5 million would be expected to obtain other coverage, primarily employer-sponsored insurance.
-  An estimated 383,000 individuals projected to lose eligibility for Medicaid would fall in the coverage gap in the remaining 12 non-expansion states – with incomes too high for Medicaid, but too low to receive Marketplace tax credits.  State adoption of Medicaid expansion in these states is a key tool to mitigate potential coverage loss at the end of the PHE.
- States are directly responsible for eligibility redeterminations, while CMS provides technical assistance and oversight of compliance with Medicaid regulations.  Eligibility and renewal systems, staffing capacity, and investment in end-of-PHE preparedness vary across states. HHS is working with states to facilitate enrollment in alternative sources of health coverage and minimize administrative churning.  These efforts could reduce the number of eligible people losing Medicaid compared to the estimates above.
- The Inflation Reduction Act of 2022 extends the ARP's Marketplace premium tax credit provisions until 2025, providing a key source of alternative coverage for those losing Medicaid eligibility.

\* This Issue Brief was corrected on March 3, 2023, to correct Figures 3 and 4.

## INTRODUCTION

The Families First Coronavirus Response Act (FFCRA) mandated continuous Medicaid enrollment throughout the federal COVID-19 public health emergency (PHE) period for nearly all of those enrolled in Medicaid on or after the date of enactment on March 18, 2020, through the end of the month in which the PHE declaration ends.  In exchange for meeting these and other provisions, the FFCRA temporarily increased the federal medical assistance percentage (FMAP) by 6.2 percentage points, which all states received.  The continuous enrollment provision suspended Medicaid's regular eligibility renewal and redetermination process by prohibiting termination of ineligible individuals as a condition of receiving the temporary increased FMAP except for those who voluntarily disenroll or are no longer a state resident.[*]  A temporary increase in federal matching also applies to the Children's Health Insurance Program (CHIP) during the PHE, and the continuous enrollment provision applied to states running CHIP as part of combined Medicaid/CHIP programs.[†]  At the end of the PHE states will have 12 months to initiate redeterminations of Medicaid and CHIP eligibility for all enrollees and two additional months (14 months total) to complete all pending actions. State Medicaid programs vary with respect to their staffing, administrative capacity, and sophistication of enrollment and renewal systems.

The nation's uninsured rate declined to a historic low of 8.0% in the first quarter of 2022, due in part to the continuous enrollment provision in Medicaid as well as strong enrollment outreach efforts and expanded Marketplace subsidies under the American Rescue Plan (ARP).[1] Between February 2020 and December 2021, Medicaid enrollment grew by approximately 15.5 million individuals, from 71.2 million to 86.7 million (a 21.8 percent increase).[2]  Many of these individuals gained Medicaid eligibility due to pandemic-related changes in income and employment, while others may have enrolled in Medicaid during this time due to a change in family composition (e.g., the addition of a child), disability, or pregnancy status.  Research indicates that Medicaid enrollment growth during the pandemic was primarily driven by increased retention of existing enrollees rather than new applications.[3,4]

Coverage changes in Medicaid are common, and even short gaps in insurance can have negative effects on access to care.[5,6]  A recent analysis found that 21 percent of Medicaid enrollees changed coverage within one year, with 8 percent disenrolling and reenrolling in Medicaid within the year.[7]  Changes in Medicaid coverage occur for several reasons, including loss of Medicaid eligibility due to income fluctuations or changes in family circumstances, becoming eligible for a different source of coverage (e.g., through an employer ), or *administrative churning*.  Administrative churning refers to the loss of Medicaid coverage despite ongoing eligibility, which can occur if enrollees have difficulty navigating the renewal process, states are unable to contact enrollees due to a change of address, or other administrative hurdles.

Based on typical coverage changes in Medicaid that would have occurred without the continuous enrollment provision, and the economic and labor market fluctuations that occurred during the PHE, many current enrollees will no longer be eligible for Medicaid after the PHE ends and will need to transition to a different source of coverage (sometimes referred to as "unwinding" the coverage protections of the COVID-19 PHE).  Additionally, some enrollees may be at risk of Medicaid coverage loss due to administrative reasons. The risk of administrative churning may be particularly high after the PHE due to the volume of redeterminations states must conduct and the time since Medicaid agencies last communicated with many beneficiaries.  Previous

---

[*] States are required to review eligibility only once every 12 months for beneficiaries whose eligibility is based on Modified Adjusted Gross Income (MAGI) methodologies and at least once every 12 months for non-MAGI beneficiaries.

[†] The enhanced federal match rate for CHIP is the result of the standard calculation of CHIP's FMAP, which is based on Medicaid's FMAP.  The continuous enrollment provision does not apply to people enrolled in separate CHIP programs. See: https://www.medicaid.gov/state-resource-center/downloads/covid-19-faqs.pdf

analyses have projected the estimated number of individuals likely to lose Medicaid coverage at the end of the PHE, with one study predicting a range of 5 to 14 million individuals and another predicting 12.9 to 15.8 million individuals leaving Medicaid.[8,9]  The U.S. Department of Health and Human Services (HHS) is leveraging all of its programs and divisions in a robust stakeholder engagement strategy to ensure individuals remain connected to coverage.  The Centers for Medicare and Medicaid Services (CMS) is working closely with state Medicaid agencies, Marketplaces, navigators, health plans, and many others.  These efforts are outlined later in the Discussion section.

This issue brief presents current HHS projections of transitions in coverage due to the sunset of the continuous enrollment provision at the end of the PHE; describes administrative actions underway to mitigate coverage losses; and highlights legislative options that could help promote seamless coverage transitions at the end of the PHE.

## METHODS

The objectives of this analysis were to predict the range of estimates for how many Medicaid enrollees are likely to lose coverage when the PHE ends, assess whether coverage loss is likely to be due to loss of eligibility or due to administrative churning, and identify alternative coverage options available to those who lose Medicaid.

This analysis used the Survey for Income and Program Participation (SIPP), based on data from March 2015 to November 2016.  The SIPP is a nationally representative, longitudinal panel survey in which respondents are followed across multiple years (4 years in total for each panel) and income and health insurance enrollment information is collected monthly.  In our analysis, the 21-month timespan from March 2015 to November 2016 was treated as an analogous period to the PHE lasting March 2020 through December 2021.  Based on the 2015-2016 data, we estimated Medicaid eligibility and enrollment in December 2016 (analogous to December 2021, the projected end of the PHE) among those enrolled in Medicaid for at least one month between March 2015 and November 2016, the 21-month PHE simulation period.  Once someone enrolled in Medicaid during the PHE, we treated them as enrolled until the end of the PHE.

We classified our study sample of those "ever in Medicaid" during the 21-month period from March 2015 through November 2016 into three categories at the end of the PHE: (1) those still eligible and enrolled in Medicaid; (2) those eligible for Medicaid but no longer enrolled (i.e., not enrolled due to administrative churning); and (3) those no longer eligible for Medicaid (i.e., not eligible due to income or a change in categorical status).[‡]  In addition to enrollment, we also estimated eligibility for Medicaid and CHIP based on January 2021 modified adjusted gross income (MAGI) percent-of-poverty limit rules, which captures variation by state and eligibility group (infants, children 1-5, children 6-18, pregnant beneficiaries, adult parents/caregivers, other adults, and beneficiaries 65 or older).  We assume individuals receiving Supplemental Security Income (SSI) remained automatically enrolled in Medicaid.[§] For all SIPP estimates, references to Medicaid include CHIP except where otherwise noted.

Among those ineligible for Medicaid at the end of the PHE, we assessed enrollment and eligibility for subsidized Marketplace coverage, employer-sponsored insurance (ESI), and other coverage based on 2021 ARP eligibility criteria. Individuals were deemed eligible for subsidized Marketplace coverage if they were not

_____

[‡] In this brief, the term "eligible" refers to individuals that could obtain Medicaid coverage based on the Medicaid eligibility requirements in their state but does not mean that an individual is enrolled in Medicaid coverage.

[§]Eligibility predictions do not account for medically needy pathways or other optional pathways for seniors or those with disabilities. Those who reported being enrolled in Medicaid in December 2016 were classified as eligible for Medicaid regardless of whether they were predicted to be eligible based on these rules.

eligible for Medicaid, had incomes above 100% of the federal poverty level (FPL), and did not have access to minimum essential coverage (MEC).[**]  To calculate zero-premium Marketplace coverage options under the ARP among subsidy-eligible individuals, we applied estimates of the proportion of the uninsured population eligible for zero-premium plans based on American Community Survey data and county-level premium rates.[10] Medicaid coverage enrollment and eligibility estimates were calculated by Medicaid expansion status, age, race and ethnicity, income, and sex.

We consider several alternative scenarios and time frames for coverage changes, depending on the rate of administrative churning compared to historical rates, and how quickly states choose to conduct their redeterminations after the expiration of the PHE.

All estimates presented in this brief have been projected forward to account for the difference in Medicaid enrollment between December 2016 and December 2021.  The primary limitation of this analysis is that the data are based on historical data.  Although differences in Medicaid enrollment are accounted for, differences in population changes or economic conditions between 2014-2016 and now are not.  Therefore, estimates may not reflect the present-day distribution of income or rates of administrative churning.  Also, due to the unknown expiration date of the PHE, our analysis, which is based on an end date of the PHE of December 2021, will slightly underestimate the total population affected by the end of the continuous enrollment provision.  In addition, while the SIPP data shows actual insurance enrollment in December 2016, in the post-PHE period, it is likely to take recently-disenrolled people time to identify and enroll in other available coverage options.  Estimates of zero-dollar premium availability were based on population-level averages for the subsidy-eligible uninsured population as a whole, rather than based on individual income and premiums; accordingly, these projections are not precise estimates and should be interpreted with caution. Finally, all references to Medicaid eligibility or enrollment in the SIPP analysis include CHIP. However, while many children continue to be eligible for CHIP after losing Medicaid, our analysis did not separately estimate eligibility for CHIP versus Medicaid at the end of the PHE, or distinguish between states with separate CHIP programs and those that are combined with Medicaid, since the SIPP did not have adequate sample size for reliable state estimates.

## RESULTS

An estimated 80.1 million individuals were enrolled in Medicaid *at some point* during the 21-month study period (2015-2016). This estimate is lower than actual December 2021 Medicaid/CHIP enrollment of 86.7 million, but all remaining estimates in this report were adjusted to account for this difference in enrollment.

*Total Medicaid Disenrollment*

Figure 1 shows the predicted proportion of Medicaid enrollees that maintained Medicaid enrollment, were ineligible for Medicaid, or experienced administrative churning (i.e., were eligible for Medicaid but not enrolled) based on 2015/2016 SIPP data.  Approximately 9.5 percent of enrollees (8.2 million of 86.7 million) were predicted to be ineligible for Medicaid after the PHE, while 7.9 percent (6.8 million of 86.7 million) were predicted to lose coverage despite being eligible for Medicaid.  Combined, this leaves 82.7 percent (or 71.7 million people) predicted to be eligible and maintain enrollment in Medicaid post-PHE, and 15 million total predicted to leave the program from loss of eligibility or administrative churning.  The primary reasons for Medicaid eligibility loss were changes in income, changes in family composition, or moving to another state.

_____

[**]MEC was defined as coverage as of December 2016 in Medicare, CHAMPUS, VA, TRICARE, or health insurance provided by someone outside of the household. Coverage provided through "other" insurance or the Indian Health Service were not classified as MEC. Income determinations were based on December 2015 MAGI rules.

**Figure 1. Predicted Eligibility, Ineligibility, and Administrative Churn Among Medicaid Enrollees at End of PHE**

Source: Analysis of SIPP treating March 2015-Nov. 2016 as analogous to March 2020-Dec. 2021 PHE, among enrollees ever-enrolled in Medicaid during the 21-month period.

*Potential Trajectories of Administrative Churning*

We estimated five different scenarios based on varying degrees of administrative churning and redetermination time frames to estimate how disenrollment will be impacted. Scenarios 1-4 assume an even rate of redeterminations processed over the 12 months of 2021, while scenario 5 assumes states process redeterminations over a six-month timeframe.  The scenarios were:

1.  A "*n*o churning" scenario in which only those who are no longer eligible for Medicaid are disenrolled. While this scenario is not realistic since it assumes zero percent administrative churning among still-eligible individuals, it provides a sense of how many people are likely to lose Medicaid even if renewal were fully optimized and no eligible individuals left the program.  In this scenario, a total of 8.2 million individuals will lose Medicaid coverage at the end of the PHE due to a change in Medicaid eligibility and 684,000 individuals would leave Medicaid each month during the first year after the PHE expiration.
2.  A "low churning" scenario in which those who are no longer eligible for Medicaid are disenrolled (8.2 million), and administrative churning is half of the 2016 historical rate.  This scenario would result in total disenrollment (administrative churning plus eligibility loss) of 11.6 million individuals and monthly disenrollment of 968,000 individuals over 12 months.
3.  A "*typical churning*" scenario in which the 8.2 million individuals who are no longer eligible for Medicaid are disenrolled and churning rates match the historical average in 2016 SIPP data. This scenario reflects the primary estimates ("Base Case") presented throughout this brief. Under this scenario, a total of 15 million individuals are predicted to leave Medicaid, with monthly disenrollment of 1.3 million individuals over 12 months.
4.  A "*high churning*" scenario in which we assume those who are no longer eligible for Medicaid are disenrolled, as well as 50 percent excess administrative churning above historical rates.  This scenario could occur if there is substantial beneficiary confusion, high rates of moving or changes in residence, and/or overloaded state Medicaid eligibility systems.  This scenario would result in total disenrollment of 18.4 million individuals, with monthly disenrollment of 1.5 million individuals over 12 months.
5.  A "*high churning*" six-*month redetermination scenario* in which we assume those who are no longer eligible are disenrolled as well as 50 percent excess administrative churning processed over a six-

month timeframe.  This would result in the same total disenrollment as in scenario 4 (18.4 million individuals) but monthly disenrollment of 3.1 million individuals over six months.

Figure 2 plots actual monthly Medicaid enrollment from January 2020 – December 2021 and projects total Medicaid eligibility loss during 2022 under the above five scenarios.  The projections in Figure 2 account for new monthly enrollment (based on January-April 2021 enrollment rates), but do not account for individuals who were disenrolled from Medicaid at the end of the PHE who may re-enroll over the course of 2022.  The scenarios shown in Figure 2 result in a range of total Medicaid enrollment estimates by December 2022, from 74 million under a high churning scenario to 84 million under a scenario with a zero rate of churning. Accounting for new enrollment, we predict that net totals of 5.8 million, 9.3 million, and 12.7 million would leave the program from loss of eligibility or administrative churning across low, medium, and high levels of historical churning, respectively.

**Figure 2. Projected Medicaid Coverage Loss During 12 Months of 2022 Under Alternative Assumptions About Rates of Administrative Churning**



Source: Analysis of SIPP treating March 2015-Nov. 2016 as analogous to March 2020-Dec. 2021 PHE, among enrollees ever-enrolled in Medicaid during the 21-month period. New monthly Medicaid enrollment in 2021 based on monthly enrollment January-April 2021.

*Demographics and State Patterns of Individuals Leaving Medicaid*

Among the 8.2 million individuals predicted to be ineligible for Medicaid in the post-PHE period, 5.4 million (66 percent) resided in states that expanded Medicaid under the Affordable Care Act (ACA) as of 2021, while 2.8 million (34 percent) resided in non-expansion states (Table 1).  Among the 6.8 million individuals predicted to be disenrolled despite being eligible for Medicaid, 4.7 million (69%) resided in expansion states and 2.1 million (31%) resided in non-expansion states (Table 1).

Table 1. Predicted Medicaid Coverage Loss at the end of the PHE by Medicaid Expansion Status

| Characteristic | Loss of Medicaid Eligibility | | Disenrolled Despite Being Eligible for Medicaid (Administrative Churning) | |
|---|---|---|---|---|
| **State Expansion Status** | N | % | N | % |
| **Expansion** | 5,400,000 | 66% | 4,700,000 | 69% |
| **Non-Expansion** | 2,800,000 | 34% | 2,100,000 | 31% |

Children and young adults, as well as Latino and Black individuals, are predicted to be impacted disproportionately. Children ages 0-17 make up nearly one in five of the individuals predicted to be ineligible for Medicaid and over half of the 6.8 eligible but disenrolled individuals (i.e., administrative churning), while young adults ages 18-34 comprise more than one in three of those predicted to lose Medicaid eligibility and nearly one-quarter of those predicted to experience administrative churning (Table 2). Further, Latino individuals comprise over one quarter of those predicted to be ineligible for Medicaid and over one-third of those predicted to experience churning, while Black individuals comprise fourteen percent of those predicted to lose Medicaid eligibility and 15 percent of those predicted to experience churning (Table 2). Those with incomes 138-250% FPL comprise nearly 40% of those predicted to be ineligible for Medicaid, while those with incomes less than 100% FPL comprise over half of those predicted to experience administrative churning.

Table 2. Predicted Medicaid Coverage Loss at the end of the PHE by Age, Race, Sex, and Income

| Characteristic | Loss of Medicaid Eligibility | | Disenrolled Despite Being Eligible for Medicaid (Administrative Churning) | |
|---|---|---|---|---|
| **Age** | N | % | N | % |
| **0-17** | 1,399,000 | 17.1% | 3,896,000 | 57.1% |
| **18-24** | 1,387,000 | 16.9% | 823,000 | 12.1% |
| **25-34** | 1,763,000 | 21.5% | 737,000 | 10.8% |
| **35-44** | 1,120,000 | 13.7% | 511,000 | 7.5% |
| **45-54** | 967,000 | 11.8% | 390,000 | 5.7% |
| **55-64** | 777,000 | 9.5% | 288,000 | 4.2% |
| **65+** | 791,000 | 9.6% | 173,000 | 2.5% |
| **Race/Ethnicity** | | | | |
| **Latino** | 2,190,000 | 26.7% | 2,409,000 | 35.3% |
| **White non-Latino** | 3,967,000 | 48.4% | 2,648,000 | 38.8% |
| **Black non-Latino** | 1,125,000 | 13.7% | 1,027,000 | 15.1% |
| **Asian/Native Hawaiian/Pacific Isl.** | 501,000 | 6.1% | 394,000 | 5.8% |
| **Multi-racial, other** | 420,000 | 5.1% | 342,000 | 5.0% |
| **Sex** | | | | |
| **Male** | 4,298,000 | 52.4% | 2,880,000 | 42.2% |
| **Female** | 3,906,000 | 47.6% | 3,937,000 | 57.8% |
| | | | | |
| **Income*** | | | | |
| **<100% FPL** | 691,000 | 8.4% | 3,761,000 | 55.2% |
| **>100-138% FPL** | 555,000 | 6.8% | 1,077,000 | 15.8% |
| **>138-250% FPL** | 3,038,000 | 37.0% | 1,714,000 | 25.1% |
| **>250-400% FPL** | 2,032,000 | 24.8% | 264,000 | 3.9% |
| **>400% FPL** | 1,889,000 | 23.0% | 2,000 | 0.0% |

*Modified Adjusted Gross Income (MAGI) in December 2016 as a percentage of the federal poverty level (FPL).

Figures 3 and 4 show rates of Medicaid eligibility loss and administrative churning within each age, income, and racial and ethnic group. As evident in Figure 3, the majority of children losing coverage are likely still eligible for Medicaid or CHIP. State-level CHIP policies may play a role in how many children lose Medicaid coverage at the end of the PHE. Fewer children will become ineligible for Medicaid or CHIP at the end of the PHE in states with more generous CHIP eligibility limits. Additionally, more children are likely to experience churning in states where there are greater administrative barriers to transitioning from Medicaid to CHIP. For example, most states have a separate CHIP program and charge an enrollment fee or premiums in CHIP.[11] In these states, children are less likely to be automatically enrolled in CHIP compared to states that operate joint programs or don't charge premiums or fees, increasing the risk of administrative churning among children. In states with combined Medicaid/CHIP programs, coverage transitions should be more seamless.

**Figure 3. Predicted Medicaid Coverage Loss Due to Eligibility Loss versus Administrative Churning, by Age**



Note: Each bar adds to 100%, showing the percentage breakdown of predicted Medicaid coverage loss due to administrative churning versus loss of eligibility.
Source: Analysis of SIPP treating March 2015-Nov. 2016 as analogous to March 2020-Dec. 2021 PHE, among enrollees ever-enrolled in Medicaid during the 21-month period. Projections are from the Base Case scenario.

**Figure 4. Predicted Medicaid Coverage Loss Due to Eligibility Loss versus Administrative Churning, by Race and Ethnicity**



Note: Each bar adds to 100%, showing the percentage breakdown of predicted Medicaid coverage loss due to administrative churning versus loss of eligibility.
Source: Analysis of SIPP treating March 2015-Nov. 2016 as analogous to March 2020-Dec. 2021 PHE, among enrollees ever-enrolled in Medicaid during the 21-month period.  Projections are from the Base Case scenario.

### *Loss of Medicaid Eligibility and Alternative Coverage Options*

Alternative health insurance options are available for the majority of individuals who become ineligible for Medicaid or CHIP after the end of the PHE (Figure 5).  In our study population, approximately 3.6 million of the individuals predicted to be ineligible for Medicaid at the end of the PHE were enrolled in ESI and 1.4 million individuals were enrolled in other insurance, including Marketplace coverage without Advanced Premium Tax Credits (APTCs), Medicare, military health insurance, non-Marketplace nongroup coverage, and insurance classified as "other" in SIPP after losing Medicaid.   Another one-third of the individuals ineligible for Medicaid at the end of the PHE (2.7 million of 8.2 million) were potentially eligible for post-ARP premium tax credits (Table 3).[††]  Of this group, 1.6 million were eligible for APTCs and cost-sharing reductions (incomes 100-250% FPL), and 1.7 million were eligible for APTCs and also likely eligible for a zero-premium Marketplace plan.

An estimated 383,000 individuals ineligible for Medicaid at the end of the PHE fell in the coverage gap and were not enrolled in or eligible for any insurance (Figure 5 and Appendix Table 1). These individuals earned less than 100% FPL and resided in the 12 non-expansion states, meaning that their incomes were too high for their

---

[††] Under the ARP, ACA marketplace premium subsidies are substantially enhanced for people at every income level and offered to those with income above 400% FPL for the first time. These enhanced and expanded premium tax credits will expire at the end of 2022.

state's Medicaid program but too low (<100% FPL) to qualify for subsidized Marketplace coverage.  Under the ARP the only individuals not potentially eligible for some type of subsidized coverage are generally those in the Medicaid coverage gap.[‡‡]

**Figure 5. Predicted Health Coverage Enrollment and Eligibility among those Predicted to Lose Medicaid Eligibility after the PHE**



Source: Analysis of SIPP treating March 2015-Nov. 2016 as analogous to March 202-Dec. 2021 PHE, among enrollees ever enrolled in Medicaid during the 21-month period.  Projections are from the Base Case scenario.

**Table 3. Marketplace Eligibility among those Predicted to Lose Medicaid Eligibility after the PHE**

| Income | Potentially Eligible for APTCs* | Eligible for Zero-Premium Marketplace Plan** | Eligible for APTCs and CSRs |
|---|---|---|---|
| <100% | 0 | 0 | 0 |
| 100 - 138% | 259,000 | 259,000 | 259,000 |
| >138 - 250% | 1,306,000 | 1,156,000 | 1,306,000 |
| >250 - 400% | 552,000 | 219,000 | 0 |
| >400% FPL | 573,000 | 22,000 | 0 |
| TOTAL | 2,689,000 | 1,656,000 | 1,565,000 |

APTCs = Advanced Premium Tax Credits.  CSRs = Cost Sharing Reductions.
* Under the ARP, there is no upper income limit on APTC availability, though in practice some higher income individuals may not receive any APTCs because their premiums are below the required income share under the ACA even without an APTC.
**Based on applying the zero-premium eligibility proportion among uninsured non-elderly adults using CPS data in ASPE brief "Access to Marketplace Plans with Low Premiums on the Federal Platform Part II: Availability Among Uninsured Non-Elderly Adults Under the American Rescue Plan" to the number of individuals predicted to lose Medicaid eligibility but be eligible for Marketplace premiums within each income band. This group overlaps with those eligible for cost-sharing reductions (CSRs) and both groups are a subset of those potentially eligible for APTCs.

---

[‡‡] Under the ARP, there is no upper income limit on APTC availability, though in practice some higher income individuals may not receive any APTCs because their premiums are below the required income share under the ACA even without an APTC

## DISCUSSION

Using pre-pandemic Medicaid enrollment from national survey data as an approximation for the PHE, we currently project that 9.5 percent (8.2 million) of individuals enrolled in Medicaid as of December 2021 will lose Medicaid eligibility at the end of the PHE and need to transition to another source of coverage. An additional 7.9 percent (6.8 million) are projected to lose Medicaid coverage despite still being eligible, due to administrative churning. In our analysis, two-thirds of those predicted to lose Medicaid eligibility (5.0 million of the 8.2 million) were projected to enroll in ESI or other non-Marketplace coverage. Among those without ESI, the majority would be eligible for low or no-cost coverage through the Marketplace, with the exception of those who fall in the Medicaid coverage gap in states that have not expanded Medicaid. Children and young adults, as well as Latino and non-Latino Black populations, are expected to be disproportionately affected by Medicaid coverage loss once the PHE ends, and seamless transitions to CHIP will play an important role for many in maintaining coverage.

Overall, this means that while our model projects that as many as 15 million individuals could leave Medicaid after the PHE, approximately one third (5 million) are likely to obtain other coverage outside the Marketplace (primarily ESI) and nearly 3 million (20 percent) would have a subsidized Marketplace option. Additionally, some individuals who lose Medicaid eligibility at the end of the PHE may regain it during the unwinding period and some individuals who lose coverage despite being eligible (i.e., experience churning) may re-enroll.

These findings highlight the importance of administrative and legislative actions to reduce the risk of coverage losses after the continuous enrollment provision ends. Successful policy approaches must address the different reasons for coverage loss. Broadly speaking, one set of strategies is needed to increase the likelihood that those losing Medicaid eligibility *acquire other coverage*, and a second set of strategies is needed to *minimize administrative churning* among those still eligible for coverage. Importantly, some administrative churning is expected under all scenarios, though reducing the typical churning rate by half would result in the retention of 3.4 million additional enrollees. The next section discusses some of the administrative actions the CMS is currently taking, as well as opportunities for legislation that can reduce the risk of coverage loss after the PHE.

### Administrative Actions

CMS is working closely with state Medicaid agencies, Marketplaces, navigators and assisters, beneficiary and consumer advocates, health plans, agents and brokers, departments of insurance, and many others as part of a robust stakeholder engagement strategy to ensure individuals remain connected to coverage.

**Working with State Medicaid Agencies to Reduce Churning:** States are directly responsible for eligibility redeterminations for Medicaid beneficiaries, while CMS provides oversight of compliance with Medicaid regulations and technical assistance. For over a year, CMS has coordinated with state Medicaid and CHIP agencies to develop state unwinding plans that will minimize churning and maximize coverage retention. CMS has hosted regular workgroups, bi-weekly and individual calls with states, and developed a variety of guidance documents, tools, and resources for state use in planning efforts. In March 2022, CMS released a new suite of guidance and planning and communications tools that offer states a roadmap to restore routine eligibility and enrollment operations after the PHE ends and promote continuity of coverage.[12] This guidance includes outlining strategies for working with managed care plans such as working with plans to obtain and update beneficiary contact information; sharing renewal files with plans to conduct outreach and provide support to individuals enrolled in Medicaid during their renewal period; enabling plans to conduct outreach to individuals who have recently lost coverage for procedural reasons; and permitting plans to assist individuals to transition to and enroll in ACA Marketplace coverage if ineligible for Medicaid or CHIP.

When the PHE ends, states will have a 12-month unwinding period to initiate renewals of eligibility for all individuals enrolled in Medicaid and CHIP. The Administration has committed to providing states with 60 days advanced notice before the expiration of the PHE to support state planning. States are expected to prioritize eligibility and enrollment work in a manner that prevents inappropriate terminations and promotes smooth transitions to other coverage for individuals no longer eligible for Medicaid, CHIP, or a Basic Health Program (BHP).§§ CMS has also strongly encouraged states to spread their eligibility redeterminations over the full 12-month unwinding period to help achieve manageable workloads, reduce the risk of administrative churning, and achieve a renewal schedule that is sustainable in future years.

There are many actions states can take to minimize churning during unwinding, including adopting strategies to streamline enrollment and renewal processes, investing in resources and staff to process the volume of eligibility determinations, and implementing additional efforts to update enrollee contact information. States can expand the number of data sources used at redetermination to increase the number of individuals renewed based on available information. For example, Medicaid enrollees who also receive Supplemental Nutrition Assistance Program (SNAP) benefits often have recent verified information on file that could assist in approving and renewing Medicaid coverage. State Medicaid agencies could use SNAP data to expedite application processing. For non-MAGI beneficiaries who must complete a renewal form, states can use pre-populated renewal forms to reduce the burden on enrollees. States can also extend the period for enrollees to provide information needed to redetermine their eligibility and provide beneficiaries with the same minimum of 30 days to return the form that is required for MAGI beneficiaries. For the unwinding period, states may seek time-limited authority under section 1902(e)(14)(A) of the Social Security Act to pursue strategies to streamline the renewal process, reduce churning, and ease the administrative burden states may experience in light of challenges including that many enrollees have moved during the pandemic and a significant time has passed since agencies last communicated with many of them. This will not only support state efforts to promote continuity of coverage in Medicaid/CHIP but also facilitate seamless coverage transitions, particularly for Medicaid-enrolled children who become eligible for coverage in a separate CHIP.

Finally, among the 12 states that have not yet expanded Medicaid, Medicaid expansion to low-income adults is another critical tool to reducing the risk of coverage losses after the PHE. A recent ASPE report documented the coverage gains in states that recently expanded Medicaid since 2019,[1] and if the remaining non-expansion states were to follow suit, this would provide a needed alternative form of coverage for the estimated 383,000 individuals in the coverage gap who are projected to lose insurance after the PHE. More broadly, 3.8 million uninsured nonelderly adults with incomes below 138% FPL would become newly eligible for Medicaid if their states were to expand the program.[13]

**Outreach to Those Losing Medicaid Eligibility:** CMS, in partnership with state Medicaid agencies and state-based Marketplaces, is deploying a multifaceted strategy to facilitate continuity of coverage for consumers who are no longer eligible for Medicaid/CHIP coverage. CMS is examining a variety of improvements to federal Marketplace policies and systems to streamline the consumer experience in transitioning from Medicaid/CHIP coverage to private insurance, such as improving the notices consumers receive in the mail and streamlining verification processes to limit the number of people required to provide additional paper documentation during the application process.

_____

§§ Section 1331 of the Affordable Care Act gives states the option of creating a Basic Health Program (BHP), a health benefits coverage program for low-income residents who do not qualify for Medicaid, CHIP, or other minimum essential coverage and have income between 133 percent and 200 percent of the federal poverty level (FPL). Two states, New York and Minnesota, have implemented BHPs which together cover approximately 1 million individuals.

Medicaid and CHIP agencies can also help people who are no longer eligible start the process of transitioning to other health insurance by providing information about coverage options and linking people to enrollment assistance.  CMS is working with state Medicaid agencies to ensure states are securely sending Marketplaces accurate and complete contact information to allow CMS to effectively increase outreach to individuals no longer eligible for Medicaid/CHIP coverage.

Additionally, navigators and other assistance personnel will maintain a critical physical and virtual presence in communities across the U.S. to help consumers understand basic concepts and rights related to health coverage, provide enrollment assistance, and work with individuals to link coverage to care.  CMS is broadening pathways for enrollment assistance and increasing funding to navigator grantees to support new requirements during unwinding.  Specifically, CMS allocated a total of $100M to federal Marketplace navigator grantee organizations for the 2022-2023 budget period, including $12.5M in support of additional direct outreach, education, and enrollment activities for unwinding.

CMS is also providing information to people with Medicaid coverage to prepare for the restart of yearly Medicaid/CHIP eligibility reviews, including on the importance of updating contact information and checking the mail for renewal forms, and coverage options in the event a beneficiary is no longer eligible for Medicaid/CHIP.

More broadly, HHS is leveraging all of its programs and divisions – including the Indian Health Service, the Community Health Center Program, regional offices, and public affairs – to inform and engage external stakeholders. This includes creating a website (Medicaid.gov/unwinding) where stakeholders can access an unwinding toolkit printed in multiple languages and template social media graphics to use in outreach to beneficiaries, among other resources; a website (Medicaid.gov/renewals) where beneficiaries can get connected to their state's eligibility website in order to update their contact information; and hosting monthly information calls for beneficiaries, consumer advocates, providers, state officials, and other stakeholders where they can learn about new resources related to the unwinding process.

*Legislative Opportunities*

In addition to administrative actions, there are also legislative opportunities to help mitigate coverage loss at the end of the PHE:

Extend the ARP's Marketplace subsidies past 2022: The Inflation Reduction Act of 2022 extends the ARP's enhanced and expanded subsidies to individuals obtaining Marketplace coverage. These subsidies were previously scheduled to expire at the end of 2022. The law is projected to save 13 million Marketplace enrollees an average of $800 per year on health insurance costs.[14] Prior ASPE analyses have shown the impacts of the ARP on lowering Marketplace premiums and improving plan affordability. The ARP subsidy provisions enable three in five uninsured consumers and four in five current Marketplace enrollees to find a zero-premium plan (after premium tax credits) on HealthCare.gov.[15]  The 2022 Open Enrollment Period resulted in the highest-ever Marketplace enrollment of 14.5 million,[16] and surveys indicate that an additional 2 million adults reported Marketplace enrollment in early 2022 compared to 2020, accounting for approximately half of the 4 million total adults who gained health coverage during this period.[1] This extension of the ARP's premium tax credit in the Inflation Reduction Act will allow millions of people, including newly disenrolled Medicaid beneficiaries, to continue to benefit from the enhanced and expanded premium subsidies and maintain access to zero- and low-premium Marketplace plans.[17]

**Expand Twelve-Month Continuous Eligibility Provisions in Medicaid:** Continuous eligibility policies can mitigate both Medicaid coverage loss and administrative churning by guaranteeing continued eligibility for Medicaid over a 12-month period regardless of changes in income or circumstances. States currently have the

option of providing 12-months of continuous eligibility for children enrolled in Medicaid or CHIP, and over half of states have done so.[18] Currently, 12 months of continuous eligibility for Medicaid-enrolled adults is only available via section 1115 demonstrations, and only two states have done so to date (New York, which still maintains the policy, and Montana, which no longer has this policy in effect). The process for states to provide 12 months of continuous eligibility for adults could be streamlined through new legislation creating a state plan option.  Alternatively, legislation could mandate that states provide 12-month continuous Medicaid/CHIP eligibility for adults and children.  To promote continuous eligibility for the pregnant population enrolled in Medicaid, the American Rescue Plan (ARP) included a temporary option for states to use federal matching funds to extend continuous Medicaid and CHIP eligibility for pregnant beneficiaries from 60 days up to 12 months postpartum. This option became available to states on April 1, 2022, and will last five years.

## CONCLUSION

Unwinding the PHE's continuous enrollment provision in Medicaid will lead to millions of current enrollees no longer being eligible for the program, and administrative churning could put millions of additional people at risk for losing Medicaid coverage even though they are still eligible. HHS is taking a wide range of proactive steps to reduce the number of individuals who are at risk of becoming uninsured due to the unwinding of the PHE.  Facilitating enrollment in alternative health insurance coverage among those determined ineligible for Medicaid through coordination with state and federal Marketplaces and enhanced outreach and education efforts will help minimize potentially harmful gaps in health insurance coverage.  Efforts by states and community groups, in collaboration with CMS, can reduce the risk of administrative churning among those still eligible for Medicaid coverage.  Finally, the extension of the enhanced ARP premium subsidies in the Inflation Reduction Act will increase affordability and access to alternative health insurance at the end of the PHE, helping preserve the historic coverage gains in ACA-related coverage in 2021 and 2022.[1,19]  In the post-PHE period, tracking enrollment will be critical to monitoring progress and directing resources to minimize interruptions in coverage.

HP-2021-20

## APPENDIX

Appendix Table 1. Enrollment and Eligibility in Alternative Health Insurance among Those Predicted to Lose Medicaid Eligibility after the PHE

| Income (% FPL) | Not APTC Eligible | | | APTC Eligible | | | Ineligible for Medicaid or Marketplace APTCs (Coverage Gap) *** |
|---|---|---|---|---|---|---|---|
| | Affordable ESI Offer but not enrolled | Enrolled in ESI | Enrolled in other non-Marketplace coverage that precludes APTCs | Potentially Eligible for APTCs* | Eligible for Zero Premium Marketplace Plan** | Eligible for APTCs and CSRs | |
| <100% | 78,000 | 164,000 | 177,000 | 0 | 0 | 0 | 383,000 |
| 100 - 138% | 0 | 82,000 | 214,000 | 259,000 | 259,000 | 259,000 | |
| >138 - 250% | 85,000 | 1,105,000 | 540,000 | 1,306,000 | 1,156,000 | 1,306,000 | |
| >250 - 400% | 37,000 | 1,156,000 | 288,000 | 551,000 | 219,000 | 0 | |
| >400% FPL | 29,000 | 1,088,000 | 199,000 | 573,000 | 22,000 | 0 | |
| TOTAL | 229,000 | 3,595,000 | 1,418,000 | 2,689,000 | 1,656,000 | 1,565,000 | 383,000 |

Notes:
** Under the ARP, there is no upper income limit on APTC availability, though in practice some higher income individuals may not receive any APTCs because their premiums are below the required income share under the ACA even without an APTC.
**Based on applying the zero-premium eligibility proportion among uninsured non-elderly adults using CPS data in ASPE brief "Access to Marketplace Plans with Low Premiums on the Federal Platform Part II: Availability Among Uninsured Non-Elderly Adults Under the American Rescue Plan" to the number of individuals predicted to lose Medicaid eligibility but be eligible for Marketplace premiums within each income band. This group overlaps with those eligible for cost-sharing reductions (CSRs).
*** Some of these categories are partially overlapping and therefore sum to greater than the total.

# REFERENCES

[1] Lee A, Ruhter J, Peters C, De Lew N, Sommers BD. National Uninsured Rate Reaches All-Time Low in Early 2022. (Issue Brief No. HP-2022-23). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. August 2022.

[2] Monthly Medicaid & CHIP Application, Eligibility Determination, and Enrollment Reports & Data. Accessed at: https://www.medicaid.gov/medicaid/national-medicaid-chip-program-information/medicaid-chip-enrollment-data/monthly-medicaid-chip-application-eligibility-determination-and-enrollment-reports-data/index.html

[3] Centers for Medicare & Medicaid Services. CMS Releases August Medicaid and CHIP Enrollment Trends Snapshot Showing Continued Enrollment Growth. June 21, 2021. Accessed at: https://www.cms.gov/newsroom/press-releases/new-medicaid-and-chip-enrollment-snapshot-shows-almost-10-million-americans-enrolled-coverage-during

[4] Khorrami P and Sommers BD. Changes in US Medicaid Enrollment During the COVID-19 Pandemic. May 5, 2021. Accessed at: https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2779458

[5] Sugar S, Peters C, DeLew N, Sommers BD. Medicaid Churning and Continuity of Care: Evidence and Policy Considerations Before and After the COVID-19 Pandemic (Issue Brief No. HP-2021-10). Washington, DC: Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. April 12, 2021. Accessed at: https://aspe.hhs.gov/reports/medicaid-churning-continuity-care

[6] Abdus, S. Part-year Coverage and Access to Care for Nonelderly Adults https://journals.lww.com/lww-medicalcare/Fulltext/2014/08000/Part_year_Coverage_and_Access_to_Care_for.6.aspx

[7] Medicaid and CHIP Payment and Access Commission. An Updated Look at Rates of Churn and Continuous Coverage in Medicaid and CHIP. October 2021. Accessed at: https://www.macpac.gov/wp-content/uploads/2021/10/An-Updated-Look-at-Rates-of-Churn-and-Continuous-Coverage-in-Medicaid-and-CHIP.pdf

[8] Williams E, Rudowitz R and Corallo B. Kaiser Family Foundation. May 10, 2022. Accessed at: https://www.kff.org/medicaid/issue-brief/fiscal-and-enrollment-implications-of-medicaid-continuous-coverage-requirement-during-and-after-the-phe-ends/

[9] Buettgens M and Green A. What Will Happen to Medicaid Enrollees' Health Coverage after the Public Health Emergency? Urban Institute. March 9, 2022. Accessed at: https://www.urban.org/research/publication/what-will-happen-medicaid-enrollees-health-coverage-after-public-health-emergency

[10] Branham, D.K, Conmy, A.B., DeLeire, T., Musen, J., Xiao, X., Chu, R.C., Peters, C., and Sommers, B.D. (March 29, 2021). Access to Marketplace Plans with Low Premiums on the Federal Platform, Part I: Availability Among Uninsured Non-Elderly Adults and HealthCare.gov Enrollees Prior to the American Rescue Plan (Issue Brief No. HP-2021-07). Washington, DC: Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. Accessed at: https://aspe.hhs.gov/pdfreport/access-to-low-premiums-issue-brief.

[11] Kaiser Family Foundation. Medicaid and CHIP Eligibility, Enrollment, and Cost Sharing Policies as of January 2020: Findings from a 50-State Survey. https://www.kff.org/report-section/medicaid-and-chip-eligibility-enrollment-and-cost-sharing-policies-as-of-january-2020-findings-from-a-50-state-survey-premiums-and-cost-sharing/.

[12] Medicaid.gov. Unwinding and Returning to Regular Operations after COVID-19. https://www.medicaid.gov/resources-for-states/coronavirus-disease-2019-covid-19/unwinding-and-returning-regular-operations-after-covid-19/index.html.

[13] Rudich J, Branham DK, Peters C, and Sommers BD. Estimates of Uninsured Adults Newly Eligible for Medicaid If Remaining 12 Non-Expansion States Expand Medicaid: 2022 Update (Data Point No. HP-2022-06). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. February 2022. Accessed at: https://www.aspe.hhs.gov/reports/updated-estimates-medicaid-eligibility-non-expansion-states

[14] Executive Office of the President, Office of Management and Budget. Statement of Administrative Policy H.R. 5376 – Inflation Reduction Act of 2022. August 6, 2022. https://www.whitehouse.gov/wp-content/uploads/2022/08/SAP-H.R.-5376.pdf.

[15] Branham DK, Eibner C, Girosi F, Liu J, Finegold K, Peters C, and Sommers BD. Projected Coverage and Subsidy Impacts If the American Rescue Plan's Marketplace Provisions Sunset in 2023 (Data Point No. HP-2022-10). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. March 23, 2022 Accessed at: https://www.aspe.hhs.gov/reports/impacts-ending-american-rescue-plan-marketplace-provisions

[16] Lee A, Chu RC, Peters C, and Sommers BD. Health Coverage Changes Under the Affordable Care Act: End of 2021 Update. (Issue Brief No. HP-2022-17). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. April 2022. Accessed at: https://aspe.hhs.gov/reports/health-coverage-changes-2021-update

[17] Branham DK, Eibner C, Girosi F, Liu J, Finegold K, Peters C, and Sommers BD. Projected Coverage and Subsidy Impacts If the American Rescue Plan's Marketplace Provisions Sunset in 2023 (Data Point No. HP-2022-10). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. March 23, 2022. Accessed at: https://aspe.hhs.gov/reports/impacts-ending-american-rescue-plan-marketplace-provisions

[18] Medicaid.gov. Continuous Eligibility for Medicaid and CHIP Coverage. September 2021. Accessed at: https://www.medicaid.gov/medicaid/enrollment-strategies/continuous-eligibility-medicaid-and-chip-coverage/index.html.

[19]Lee A, Chu RC, Peters C, and Sommers BD. Health Coverage Changes Under the Affordable Care Act: End of 2021 Update. (Issue Brief No. HP-2022-17). Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. April 2022. Accessed at: https://aspe.hhs.gov/reports/health-coverage-changes-2021-update

HP-2022-20

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of the Assistant Secretary for Planning and Evaluation**

200 Independence Avenue SW, Mailstop 447D
Washington, D.C. 20201

For more ASPE briefs and other publications, visit:
aspe.hhs.gov/reports



**SUGGESTED CITATION**
Issue Brief No. HP-2022-20. "Unwinding the Medicaid Continuous Enrollment Provision: Projected Enrollment Effects and Policy Approaches" Washington, DC: Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services. August 19, 2022

**COPYRIGHT INFORMATION**
All material appearing in this report is in the public domain and may be reproduced or copied without permission; citation as to source, however, is appreciated.

_____

Subscribe to ASPE mailing list to receive email updates on new publications:
aspe.hhs.gov/join-mailing-list

For general questions or general information about ASPE:
aspe.hhs.gov/about