# Exhibit 11

**S&P Global**
Market Intelligence

# Indivior PLC LSE:INDV

# Special Call

## Tuesday, July 9, 2024 1:00 PM GMT

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Table of Contents

Call Participants ...................................................................................... 3

Presentation ...................................................................................... 4

Question and Answer ...................................................................................... 6

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**Jason Thompson**
*Vice President of Investor Relations*

**Mark Crossley**
*CEO & Executive Director*

**ANALYSTS**

**Carl Edward Byrnes**
*Northland Capital Markets, Research Division*

**Chase Richard Knickerbocker**
*Craig-Hallum Capital Group LLC, Research Division*

**Max Stephen Herrmann**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

**Paul Cuddon**
*Deutsche Bank AG, Research Division*

**Thibault Boutherin**
*Morgan Stanley, Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

**Operator**

Good day, and thank you for standing by. Welcome to the Indivior Business Update Conference Call. [Operator Instructions] Please be advised that today's conference is being recorded.

I would now like to hand the conference over to your speaker today, Jason Thompson. Please go ahead.

**Jason Thompson**
*Vice President of Investor Relations*

Thank you, Nadia, and good morning, good afternoon, everyone, and thanks for joining us on short notice. Before we begin, allow me to remind you that our presentation includes forward-looking statements. Actual results may differ materially from those statements, and we list some of the factors that might cause results to differ at the end of the press release that we put out this morning.

I'll now turn the call over to our CEO, Mark Crossley.

**Mark Crossley**
*CEO & Executive Director*

Thank you, Jason, and thanks, everyone, for joining us on short notice. Before turning to my prepared remarks, today is obviously a disappointing day for Indivior and its shareholders. We're facing greater transitory headwinds to our business than anticipated, but I want to highlight our conviction in the underlying value of the company.

We remain highly confident that the underlying fundamentals of our business and our strategy remain intact and that we're on a path to help patients in this largely undertreated market while generating substantial shareholder value.

I know many of you will have questions about today's news, so I plan to make some brief opening remarks pertaining to the 3 business updates in the release. After that, we'll open up the call to questions, but would ask that the questions are limited to these 3 topics. We're still early on in the close process, and we'll report complete Q2 and half year results on July 25.

Turning to today's news. As you've, no doubt, read by now, we detailed 3 items in our announcement. First, we're revising our fiscal year 2024 guidance primarily based on externalities that continue to impact SUBLOCADE net revenue in the second quarter and that we now know will continue to be factors in the second half of the year. Second, we've made the decision to immediately discontinue the sales and marketing of PERSERIS based on anticipated changes in the market that crystallized in the second quarter and that will make it no longer financially viable. This decision will affect our people and our patients, and we're supporting them through this -- those impacted through the transition.

Third, we've reached the settlement agreement with the end payor plaintiffs in the Roanoke antitrust case that was due to come to trial on July 15. I will take each of these in turn to provide more context, starting with the dynamics around SUBLOCADE. First, as we flagged with our Q1 results, the impacts of Medicaid disenrollments have proven incredibly difficult to forecast given the unprecedented removal of emergency measures after a 4-year period in place. Despite positive signs early in the quarter, including SUBLOCADE enrollment and dispense trends that were in line with our expectations, we had another major wave of Medicaid disenrollments that were higher than our expectations as the quarter progressed. The dynamic was further exacerbated by the spillover impact from the loss of patients in Change Healthcare cyberattack in the prior quarter who did not return to treatment as we had expected.

The net impact was that we saw lower overall patient starts and refills in the quarter than we planned. As a reminder, our patient base is disproportionately impacted by these dynamics given the large mix of Medicaid patients that are treated by SUBLOCADE. This concentration, combined with the chaotic nature of opioid use disorder is resulting in an amplified short-term effect to our SUBLOCADE business.

Based on CMS guidance, we noted on our Q1 call that we expected Medicaid disenrollments would be completed at the end of the second quarter. This was not the case and the impact is now likely to persist through the third quarter with some states being given extensions to complete the reenrollment process.

As of today, our best expectation based on the data is that the balance between Medicaid disenrollments and reenrollments will stabilize during the fourth quarter so that this dynamic will cease to be a drag on our business as we look to 2025 and beyond.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

A second factor impacting our expectations for the second quarter was the channel inventory of SUBLOCADE remained at the historically low levels we saw at the end of the first quarter.

Based on the latest market intelligence, we now believe we're seeing a permanent reduction in SUBLOCADE stocking levels in the channel. In short, the specialty pharmacies and specialty distributors have gotten comfortable with holding less inventory. We believe this is due to the maturity and efficiency of our supply network, coupled with the shortened lead times associated with our mostly institutional customer base, organized health systems and justice systems.

As with the Medicaid dynamics I just discussed, this negatively impacts our fiscal year 2024 SUBLOCADE net revenue expectations, but should cease to be a drag on our reported financials as we look to 2025. An additional factor which impacted on our expectations for SUBLOCADE net revenue in the second quarter was slower-than-expected activation of new justice system accounts. Overall, net revenue in the channel remained extremely strong at plus 85% compared with the year ago quarter, but was nevertheless below our planning. We believe this is a timing issue as a number of these new accounts have less resources than the federal accounts and larger justice system entities that we activated in our first wave of efforts to penetrate the justice system.

Important, we're confident that this timing issue does not undermine the potential for SUBLOCADE to address the large unmet need in this important and growing new channel for SUBLOCADE, which represents 25% of our revenue. It's also important to step back and recognize that despite the transitory impacts I've just highlighted, we're still expecting strong double-digit year-over-year growth for SUBLOCADE in fiscal year 2024, up 25% at the midpoint of our guidance.

This speaks to the strong underlying demand for this paradigm-changing treatment. And based on this demand and the powerful fundamental drivers we see in the years ahead, we remain wholly confident in delivering our intermediate and peak net revenue expectations for SUBLOCADE. This means we expect to achieve a net revenue run rate of $1 billion as we exit 2025 and to ultimately meet our target of greater than $1.5 billion in peak net revenue guidance.

This, together with delivering our peak net revenue target for OPVEE of $150 million to $250 million, will in turn underpin the successful delivery of our medium-term profitable growth framework. Turning to our decision to discontinue PERSERIS. This is not a decision we took lightly. We believe in the strong differentiation of PERSERIS and its attractive therapeutic profile. This is evidenced in the continued healthy year-over-year growth we saw in the second quarter despite the increased competition.

However, what we now face is a changed market landscape brought about by provisions in the Inflation Reduction Act that are expected to result in intensified category management, including both price reductions and volume impacts. This view was crystallized in the second quarter as we received details on the implementation of the IRA, including how this would affect Medicaid Part D planned coverage and rebates.

Having received the details we consulted with third-party experts in the field, including health plan providers currently covering PERSERIS and analyze various scenarios. This analysis unfortunately resulted in the conclusion that there will be no financially viable means to move forward with PERSERIS in 2025. We're therefore making the incredibly difficult decision to immediately cease all promotion of PERSERIS. Unfortunately, this decision impacts approximately 130 of our team members.

We'll do everything in our power to support these employees impacted by this decision and to help ensure a smooth transition for PERSERIS patients to another treatment. Finally, regarding today's news of a settlement with the above discussed end payors, we've consistently stated that our guiding principle and strategy with legacy litigation matters is to create certainty for all stakeholders at the right value. We believe this settlement is in the best interest of shareholders as it avoids the uncertainty of a jury trial and a potentially large damages award if we were to lose. This agreement will terminate the trial that was scheduled to begin on July 15.
We'll take a charge of $85 million in the second quarter, which we will exclude from adjusted results and funding from our existing cash balance. With that briefing, we'll now take your questions.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And now we're going to take our first question and it comes from the line of Max Herrmann from Stifel.

**Max Stephen Herrmann**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

A couple of questions, if I may. Firstly, just in terms of the settlement with the end payors, I believe you are settling with 4 of the insurers, but I know you've mentioned there were 7 end payors remaining. And so those 3 others are still outstanding. Have you had settlement discussions with them? And is there any clarity on what further settlement payments might be to resolve this issue? That's the first question.

And then the second one just on SUBLOCADE. In terms of the expectations here, I guess my surprise here is that actually you were very aggressive at the start of this year on the outlook for SUBLOCADE despite the fact there was dynamics in the market that were impacting a changing environment, should I say. And so I'm kind of surprised at that aggression and why that has now -- I mean I know the reasons you explained, but isn't this really -- the underlying issue is Brixadi competition, and that is where new patients are actually being competed, whereas previously, you didn't have any competition for new patients. Those are my questions.

**Mark Crossley**
*CEO & Executive Director*

Thanks for those questions, Max. And I think the key here, let's first start with the settlement. There are 2 groups. There's 5 counterparties that have been settled with this mediated settlement today. That leaves 2 groups remaining, Humana and its affiliates and the Centene and its affiliates. Neither of those cases have trial dates and they're very early in the litigation process, and we'll evaluate those cases as more information becomes available and things move along. So we have the resolution with the 5 and the other 2 remain outstanding.

As it relates to SUBLOCADE and expectations, when we set guidance at the beginning of the year, we did it knowing there were a couple of known headwinds and a lot of tailwinds in the market, the known headwinds was we had the Medicaid renewal and we had competition in its early entry of the market, and we had significant tailwinds where a strategy, a structure that was working, increased sales force, increased funding in the market and we put out our guidance based on reasonable building blocks that we thought were in place.

What we've seen is that the transitory nature of the Medicaid reentry and Change Healthcare have disproportionately impacted us beyond our planning assumptions, both in the first quarter, but then in the second quarter when it came to disruption, disenrollment and return of patients from that disruption.

Our planning assumptions with regards to competition are in line with expectations with regards to where we are. So what it really is that we're seeing is if we think about the current LAI market, SUBLOCADE is getting 77% of all new patient starts based on our data. So why isn't that playing out in the numbers as much, Max. I think the key here is in this chronic relapsing disease with the average length of treatment at 6 months, there is a normal amount of having to replace patients that fall out of treatment on a normal basis.

When you look at the [indiscernible] and the fact that the dynamic is exacerbated by these transitory patient disruptions and the fact that SUBLOCADE had over 150,000 patients over the last 12 months, versus a competitor with a very small base in HCP activation in initial patients, it disproportionately impacts the established player. And that's what we're seeing is with the Medicaid change -- with the Medicaid impacting 25% of lives covered, we're seeing a disproportionate impact to our base business. I hope that's helpful.

**Max Stephen Herrmann**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

Yes. Just on the Centene and Humana remaining litigation, what are the sort of timelines then for those in terms of going for court cases, are they going to be combined? Or is this 2 individual cases? And what are the timings of it going to court?

**Mark Crossley**
*CEO & Executive Director*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Yes, it's still very early with both. They're both in 2 separate jurisdictions, so they are separate, and we don't expect them to be combined. We do not have a current timeline when it comes to those reaching a courtroom. But it is very early stages of the litigation process.

**Operator**

And the next question comes from the line of Thibault Boutherin from Morgan Stanley.

**Thibault Boutherin**
*Morgan Stanley, Research Division*

My first one was on the Medicaid disenrollment dynamic. Just wanted to understand what visibility you have on the timing. If you could help us how -- about the complexity around the procedures to reenroll patients basically, what do they have to go through? How long does it take? I guess, in a nutshell, how complicated it is for patients who dropped to get back on coverage on Medicaid.

Related to this, I just had a question on -- do you have conversations with officials, legislators, politicians around this Medicaid disenrollment? Because as you mentioned, 25% drop in patients, it's quite dramatic and must have quite big consequences in terms of public health in the U.S. So I was just wondering, is there a political focus on this issue.

And maybe just last question is on the dynamic you mentioned SUBLOCADE 77% share of new patients, but the thing is, can you just remind us what is the speed of churn of the patient population? How [indiscernible] basically the turnover on this operation? Because presumably, I think it was 5, 6 months average treatment, which means that actually, this new patient share for Brixadi can translate into actual market share relatively quickly if the turnover of patients is quite high.

**Mark Crossley**
*CEO & Executive Director*

Certainly. So let me start with your first question, Thibault. I think what we see with regards to Medicaid reenrollment visibility on timing. I think the first part of this is it is incredibly, incredibly difficult to forecast this with what we're seeing. What we're seeing is states finalize their renewals, you see patients holding out to the last date, almost in anticipation of losing it. When people are falling out of coverage, there's an estimate that 69% of those falling out of coverage are due to procedural reasons.

And so the time and pace at which they're re-enrolling, it's just very complicated to forecast that. And then we've seen the extension of the renewal process, which is pushed into Q3 for 8 of the 11 remaining states with Alaska and D.C. in 2025 and New York not scheduled. So a lot of lack of precision and inability to forecast what is really a one-off item that is kind of unprecedented with no analog. So very tough to forecast this.

When you look with regards to conversation of politics and enrollments, listen, I've read the headlines, and I know people are considering this at the government level. And so I'll leave those discussions to the government authorities that are dealing that and partnering with CMS.

When it comes to SUBLOCADE and the churn of patients, I think you're right. If I think about churn when it comes to disruption and re-enrollment, in this very unique patient base, that's a bit more chaotic than an average Medicaid patient, the process of managing paperwork to reenroll is not as normal of a process as it would be for you or me. And so that process can be extended and take longer than we expect.

And just in the [indiscernible] space as a whole, as you talked, the average length of treatment is about 6 months now on SUBLOCADE. So when you look at just the normal churn of patients out of treatment, you already are having to replace a significant amount of patients as you grow with that 77% of new starts. And now with the base of patients impacted by losing about 25% of the Medicaid lives, you're having to offset even more of that to continue the growth.

**Operator**

Now we will take our next question and it comes from the line of Paul Cuddon from Deutsche.

**Paul Cuddon**
*Deutsche Bank AG, Research Division*

I've just got 1 question -- 2 questions actually. But firstly, on the changes in the Inflation Reduction Act. So I just wonder if you could provide a little bit more detail on why that is specifically affecting kind of PERSERIS or is it a risperidone issue? I suppose if it is a

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

risperidone issue, to what extent could it sort of translate in the future to buprenorphine and buprenorphine-related compounds? And then I'll ask my other one after that.

**Mark Crossley**
*CEO & Executive Director*

Yes, Paul. So the Inflation Reduction Act, listen, I think this is a well-intended law change that's meant to increase competition with regards to price and pass some of that along to the payors. It's resulting in increased management of the category, which is impacting both price as well as volume as the category is managed with PERSERIS's lack of scale in the market, what we see is not getting to profitability for a long period of time that we believe makes the product not financially viable. So it's increased complexity, there's competition in the market.

There's the impacts of this increased payor management that combined are making this not financially viable and it's in the best interest of shareholders to make this decision despite the tough impacts it has on our team members as well as our patients. When it relates to -- is there a carryover to buprenorphine, I think the uniqueness of schizophrenia is it has a higher patient base in Medicare, which is impacted by this rule change. SUBLOCADE has less than 5% of its volume that flows through that payor channel. So its impact is much less.

**Paul Cuddon**
*Deutsche Bank AG, Research Division*

And then secondly, the slower-than-expected activation of criminal justice system. I mean do you have any sense that this is a channel that competitor products might be going after for. Could they be sort of trialing or testing kind of your competitor's product? Or do you think that SUBLOCADE will remain kind of the preferred treatment option given the dose and the fentanyl-based kind of efficacy?

**Mark Crossley**
*CEO & Executive Director*

Paul, I think, listen, I think logically, competition will go to this channel and seek to bring their product in as they have in the large regional health centers. But what we're seeing in this activation is not related to competition. This is just moving from the very large federal and state level jails into the next level down and the sheer administrative sort of work that has to be done where they have a smaller back office to work on it, is impacting the timelines.

And we didn't see this dynamic when we were activating the regional health systems when we went to the smaller. And so it's a new dynamic, and when you have to comply with -- they still have to comply with the federal, the state laws, they have to put in place the REMS and the protocols and get funding and set up this injection, it's just taking longer than expected. We have over 250 of these new systems that are in sort of activation and planning mode that we're partnering with and it's just that we're shifting those out the timeline a bit. It's not that we have any less conviction in bringing them into eventually prescribing the product.

**Paul Cuddon**
*Deutsche Bank AG, Research Division*

And just one kind of very quick one as well. Just on the balance sheet and current cash position. When I think about the $85 million settlement, the $20 million restructuring charges, cash position at the start of the year and the potential need to kind of take the option on the Aelis Farma assets and from the Phase III trial? I mean, how do you think of capital allocation priorities versus R&D versus buybacks over the next 12 months?

**Mark Crossley**
*CEO & Executive Director*

Yes. We continue as a Board and the management team to actively manage this. And obviously, we are at the tail end of an ongoing buyback now. And given the current share price, we'll actively assess the merits of a buyback in partnership with the Board moving forward.

**Operator**

And the next question comes from the line of Chase Knickerbocker from Craig-Hallum.

**Chase Richard Knickerbocker**
*Craig-Hallum Capital Group LLC, Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So just to kind of dig in a little bit on the lower inventory stocking levels. It just happens to kind of be in the year when you're facing some competition on SUBLOCADE. Can you just kind of speak to if this is in any way related to stocking of obviously, the competitive drug.

And then, Mark, I hate to ask the same question again, but I think it's really important for investors to kind of understand the confidence in these disenrollments kind of evening out in 4Q. And we kind of heard a lot about how it's kind of hard to forecast. Can you just again walk through your guys' thinking and what gives you confidence for this headwind not carrying over after 4Q of this year and abating as we kind of start the new year next year?

**Mark Crossley**
*CEO & Executive Director*

Let me start with the second one first and then move on to the inventory question. I think what we're working off of is the planning associated that CMS has published out there with when states have their deadline for completing their renewals. And when we look at that, what we see is of the remaining folks, you see 8 of those coming off and ending their renewals by November of 2024 leaving Alaska and D.C., which have been scheduled for 2025 according to CMS.

And then New York, which is obviously a large account, but it's listed in under development. And so the predominant amount of states will be done by November of this year, and we expect that assuming they meet the timelines that CMS have forecasted, that then this becomes a thing of the past as we move into 2025 to normal sort of growth.

With regards to the lower inventory, I think the biggest thing we're hearing from our counterparties and our SPs and SDs is that it is -- there is a more efficient supply chain. They're very comfortable with more frequent orders and willing to take a reduction in working capital associated with that efficiency as they become comfortable in moving those up. Could there be an impact of competition and additional SKUs out there in the category. I think there could be. But what we're hearing is it has to do with their comfort in shorter order times and so they're reducing their overall stocking levels in line with what we saw in Q1.

**Chase Richard Knickerbocker**
*Craig-Hallum Capital Group LLC, Research Division*

And can you just speak to kind of how you'd expect those -- the 25% of covered lives that have had coverage impacted, how would you expect them to kind of, I guess, come back to having coverage under Medicaid and obviously, having SUBLOCADE once again available to them, is there going to be a tail of an impact kind of after the states complete these renewal processes? Or is this something where kind of when those deadlines are reached, you would expect things to kind of return to normal?

**Mark Crossley**
*CEO & Executive Director*

Yes. It's a great question, Chase. I think of the disenrollments that we've seen to date, Kaiser puts out the drivers on what has led to these. And what we've seen is 69% of the disenrollments that we've seen, the 25% of the lives that have fallen out of coverage are due to procedural reasons, and this could be procedural reasons on paperwork is late, paperwork incomplete. It could be that they've lost contact information of some of the patients.

So you'd expect a portion of those to phase and come back as we look forward, which potentially could be a tailwind in the second half or into 2025.

**Chase Richard Knickerbocker**
*Craig-Hallum Capital Group LLC, Research Division*

Got it. And then just last for me, the remaining 32% of those covered lives maybe are lost to having Medicaid coverage? And then just lastly, when we look at health systems versus criminal justice, can you just benchmark us on what 2024 full year expectations are for each segment is criminal justice driving the vast majority of growth with some of these Medicaid headwinds?

**Mark Crossley**
*CEO & Executive Director*

Certainly. So I think when you think about the remaining lives, listen, we're expecting [indiscernible] to $74 million. That increased to $94 million through the emergency protocols. We're expecting that to kind of settle out somewhere around and what we're seeing from experts is it should settle around the original pre-emergency levels. So we're looking at the experts on this, that specialize in this, and that's what we're hearing from them.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

When we think about health systems versus CGS, despite the impacts that we're seeing from the transitory nature, which are impacting the regional health systems disproportionately, we're still seeing growth in that channel. But obviously, CGS, which has grown 85% in the quarter, we're seeing disproportionate growth in that subchannel because it's not impacted by those measures.

So we'll see more growth there. It's about 25% of our business, and we expect a higher rate of growth, but we expect growth across both that are delivering I know 25% at the midpoint of our guidance.

**Operator**

Now we're going to take our last question and it comes from the line of Carl Byrnes from Northland Capital Markets.

**Carl Edward Byrnes**
*Northland Capital Markets, Research Division*

Considering your comments regarding Medicare -- Medicaid, excuse me, disenrollment abating towards the end of the year, third quarter, fourth quarter and then normalizing going into '25. Are you comfortable with SUBLOCADE exhibiting or posting 25-plus percent growth in fiscal '25, again, considering Medicare eligibles successfully reenrolling along the tying into exiting the year with the $1 billion run rate.

**Mark Crossley**
*CEO & Executive Director*

I think, Carl, when it comes to specific guidance for 2025, I think we'll wait and close out this year and give that guidance. But we have reinforced our conviction that we will exit 2025 at $1 billion run rate, that medium-term guidance that we've given in the past and we still have conviction in the greater than $1.5 billion peak net revenue guidance. So we still reaffirm those.

**Operator**

Now we're going to take our next question and the question comes from the line of Max Herrmann from Stifel.

**Max Stephen Herrmann**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

I just wanted a point of clarification. Are you saying that 25% of lives in total under coverage will -- lost from Medicaid? Or is it 25% of Medicaid covered lives? Just wanted a clarification on that.

**Mark Crossley**
*CEO & Executive Director*

The stat I was trying to give Max, and I apologize if it wasn't direct with. To date, we've lost 25% of Medicaid covered lives. So not specific to OUD and trying to translate that to our patients. But of covered lives, you've lost 25% to date with still a number to go in Q3.

**Max Stephen Herrmann**
*Stifel, Nicolaus & Company, Incorporated, Research Division*

In general, not related specifically to Indivior?

**Mark Crossley**
*CEO & Executive Director*

Correct. Correct. And we think it's a disproportionate impact to our patient base, given the chaotic nature of what they're dealing with suffering from opioid use disorder.

**Operator**

We show no more questions. Please go ahead, sir.

**Mark Crossley**
*CEO & Executive Director*

All right. Thank you, Nadia, and thanks again, everyone, for joining on short notice. We'll plan on speaking with everyone again in one-to-ones and then with the results on July 25. Thanks again for joining.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

That does conclude our conference for today. Thank you for your participation. You may now all disconnect. Have a nice day.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.