**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| IN RE INDIVIOR PLC SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Case No.  3:24-cv-554 (HEH)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   FACTUAL BACKGROUND .................................................................................... 4

III.  LEGAL STANDARD .............................................................................................. 6

IV.   DEFENDANTS REPEATEDLY MADE FALSE AND MISLEADING STATEMENTS
      DURING THE CLASS PERIOD .............................................................................. 7

      A.   Plaintiff Adequately Pleads That Statements About SUBLOCADE Were False
           and Misleading ............................................................................................... 7

           1.   Disclosure of the Risk of Negative Impact From Medicaid Disenrollments
                Was Contradicted by Crossley's Promise of When the Impact Would
                Resolve ................................................................................................. 8

           2.   Any Purported Opinion Statements Are Actionable ................................. 9

           3.   The Truth-on-the-Market Defense is Not Available ............................... 10

           4.   Defendants' Misstatements Are Not Protected by the Safe Harbor ......... 12

      B.   Plaintiff Adequately Pleads That Statements About PERSERIS Were False and
           Misleading .................................................................................................... 15

      C.   Defendants Misrepresented that PERSERIS Was Capturing a Disproportionate
           Share of the New-to-Brand Prescriptions Market .............................................. 20

V.    PLAINTIFF ADEQUATELY ALLEGES SCIENTER .................................................. 21

      A.   As Substantiated by Confidential Witnesses, Information Known to Defendants
           Contradicted Their Public Statements .............................................................. 22

           1.   Defendant Crossley .............................................................................. 22

           2.   Defendant Preblick ............................................................................... 24

           3.   Defendant Simkin ................................................................................. 26

      B.   The Close Proximity Between the May and June 2024 Presentations and the
           Corrective Disclosure on July 9, 2024, Bolsters the Inference of Scienter ......... 26

      C.   SUBLOCADE Was the Core of Indivior's Business ......................................... 27

      D.   Defendants Made Virtually All of Their False and Misleading Statements on
           Conference Calls, or in Presentations to Analysts and Investors........................ 28

      E.   Crossley's and Simkin's Stock Sales Were Suspicious in Timing and Amount .. 28

i

VI.    PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY............... 30

VII.   CONCLUSION.................................................................................................... 30

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **Amended Complaint or AC** | Amended Complaint for Violation of Federal Securities Laws (December 5, 2024) (ECF No. 34) |
| **Class Period** | February 22, 2024 to July 8, 2024 |
| **Company** | Indivior PLC |
| **Complaint** | Complaint for Violation of Federal Securities Laws (August 2, 2024) (ECF No. 1) |
| **Defendants** | Indivior PLC, Mark Crossley, Ryan Preblick and Richard Simkin |
| **Defs.' Ex.** | Exhibit to Declaration of David M.J. Rein in Support of Defendants' Motion to Dismiss the Amended Complaint (January 10, 2025) (ECF No. 37-1) |
| **CW** | confidential witness |
| **Individual Defendants** | Mark Crossley, Ryan Preblick and Richard Simkin |
| **OUD** | opioid use disorders |
| **Teva** | Teva Pharmaceuticals, Inc. |
| **FFCRA** | Families First Coronavirus Response Act |
| **CAA** | Consolidated Appropriations Act |
| **IRA** | Inflation Reduction Act of 2022 |
| **HHS** | U.S. Department of Health and Human Services |
| **CMS** | Centers for Medicare & Medicaid Services |
| **LAI** | long-acting injectables |
| **FY** | full year |
| **Q2** | second quarter |
| **DB** | Defendants' Motion to Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6); Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (January 10, 2025) (ECF Nos. 36-37) |
| **Lead Plaintiff or Plaintiff** | David Hanshew |
| **Indivior** | Indivior PLC |
| **PHE** | public health emergency |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u–4) |
| **SEC** | United States Securities and Exchange Commission |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **Van Dec.** | Declaration of Austin P. Van in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint, filed herewith |
| **CAA** | Consolidated Appropriations Act |

iii

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................................9, 18

*Alpha Cap. Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)..........................................................................20

*Arnlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) .......................................................................................27

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) .................................................................................16, 28

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021)..........................................................................................................24

*Covey v. Assessor of Ohio Cnty.*,
777 F.3d 186 (4th Cir. 2015) ......................................................................................................6

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ......................................................................................................6

*Epstein v. World Acceptance Corp.*,
2015 WL 2365701 (D.S.C. May 18, 2015)................................................................................7

*Feinberg v. T. Rowe Price Group, Inc.*,
2018 WL 3970470 (D. Md. Aug. 20, 2018) ............................................................................11

*Franks v. Ross*,
313 F.3d 184 (4th Cir. 2002) ....................................................................................................30

*Goldfarb v. Mayor and City Council of Baltimore*,
791 F.3d 500 (4th Cir. 2015) ....................................................................................................12

*In re 2U, Inc. Sec. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) .........................................................................10, 14

*In re Cable & Wireless, PLC*,
321 F. Supp. 2d 749 (E.D. Va. 2004) .......................................................................................17

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
738 F. Supp. 2d 614 (D. Md. 2010).........................................................................................13

*In re Emergent BioSolutions Inc. Sec. Litig.*,
2023 WL 5671608 (D. Md. Sept. 1, 2023)...................................................................8, 16, 27

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ...................................................................9, 13, 14, 15

*In re James River Grp. Holdings, Ltd. Sec. Litig.*,
2023 WL 5538218 (E.D. Va. Aug. 28, 2023).....................................................................21, 28

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021), *aff'd*, 31 F.4th 898 (4th Cir. 2022) ...................................15

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................................................28

*In re Mun. Mortg. & Equity, LLC, Sec. and Derivative Litig.*,
876 F. Supp. 2d 616 (D. Md. 2012) .......................................................................................12

*In re Orbital Scis. Corp. Sec. Litig.*,
58 F. Supp. 2d 682 (E.D. Va. 1999) .................................................................................28, 29

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)..........................................................................27

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. Jan. 14, 2022)...........................................................................8

*In re SCANA Corp. Sec. Litig.*,
2019 WL 1427443 (D.S.C. Mar. 29, 2019) .............................................................................14

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) (30%)...................................................................................28, 29

*In re Under Armour Sec. Litig.*,
409 F. Supp. 3d 446 (D. Md. 2019).........................................................................................12

*In re Unicapital Corp. Sec. Litig.*,
149 F. Supp. 2d 1353 (S.D. Fla. 2001) ...................................................................................19

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ..................................................................................................27

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) ..........................................................................7, 21, 27

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021) ............................................................................ *passim*

*Lambert v. Austin Ind.*,
544 F.3d 1192 (11th Cir. 2008) ....................................................................................8, 14, 24, 25

*Longman v. Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999) ...................................................................................12

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)...............................................................................................17

*Nayani v. LifeStance Health Grp., Inc.*,
   641 F. Supp. 3d 57 (S.D.N.Y. 2022)........................................................................6

*Nieman v. Duke Energy Corp.*,
   2013 WL 4004274 (W.D.N.C. July 26, 2013)...........................................................7

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 51 (2d Cir. 2019)..................17, 18

*Ollila v. Babcock & Wilson Enters.*,
   2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .............................................................14

*Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)..........................................................................................10, 18

*Pardi v. Tricida, Inc.*,
   2022 WL 3018144 (N.D. Cal. July 29, 2022)......................................................10, 19

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
   2021 WL 1439680 (E.D. Va. Mar. 24, 2021) ..........................................................27

*Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
   61 F.4th 369 (4th Cir. 2023) .............................................................................9, 13

*S.E.C. v. Goldstone*,
   952 F. Supp. 2d 1060 (D.N.M. 2013) .....................................................................12

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024)................................................................23, 24

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) ............................................................6, 8, 16, 21

*Sinnathurai v. Novavax, Inc.*,
   645 F. Supp. 3d 495 (D. Md. 2022) ................................................................. *passim*

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999) (40%)..........................................................................28

*Tchatchou v. India Globalization Cap. Inc.*,
   2021 WL 307415 (D. Md. Jan. 29, 2021)................................................................19

*Teachers' Ret. Sys. of La. v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ...................................................................................6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).................................................................................................21

*United States ex rel. Sheldon v. Forest Lab'ys, LLC*,
    No. CV ELH-14-2535, 2024 WL 4544567 (D. Md. Oct. 22, 2024) .......................12

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008)....................................................................................20

*Vaitkuviene v. Syneos Health, Inc.*,
    2020 WL 5742714 (E.D.N.C. Aug. 7, 2020)...........................................................14

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)...............................................................................................17

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B)...............................................................................................6

Exchange Act Section 10(b) ......................................................................................6, 30

PSLRA ......................................................................................................................6, 7, 21

**Rules**

Fed. R. Civ. P. 15(a) .......................................................................................................30

Rule 9(b) ............................................................................................................................6

Rule 10b-5..........................................................................................................................6

Rule 12(b)(6)..................................................................................................................7, 11

## I.    PRELIMINARY STATEMENT[1]

During the Class Period, Defendants knowingly misled investors about multiple aspects of Indivior's business.  *First*, Indivior's CEO, Defendant Crossley, promised on April 25, 2024, that the "headwind" of Medicaid disenrollments adversely affecting SUBLOCADE sales "***will*** go away in the back half [of 2024]" (¶52) when he already knew at that time that the negative impact of Medicaid disenrollments on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast."  (¶¶61, 112).  Crossley knew about these forecasting complexities well before he disclosed them in July 2024 because the Medicaid renewal process was well underway by April 2024 (¶129), and Crossley concededly monitored that process.  (¶61).

*Second*, despite knowing of negative prescriber feedback and the negative impact of legislation on sales, Defendants misleadingly asserted that they remained confident about PERSERIS's performance.  Crossley misleadingly expressed confidence in PERSERIS when he repeatedly touted the drug's "*positive* anecdotal prescriber feedback."  (¶¶94, 104).  In fact, Crossley knew but did not disclose that the feedback from physicians regarding PERSERIS was overwhelmingly *negative*, and thus such feedback *undermined* rather than supported Crossley's reassurance that PERSERIS could successfully compete against UZEDY.  (¶¶74, 79, 84, 91, 92).  Crossley knew about this negative feedback because he met with physicians in territories like North Carolina (as per CW-2; ¶¶76-77) where negative feedback was rampant and UZEDY was outselling PERSERIS by about nine to one (as per CW-4; ¶¶83-86).  Indeed, unbeknownst to Indivior investors, UZEDY was outperforming PERSERIS to such an extent that just over four

---

[1] "¶__" or "¶¶__" refer to AC paragraphs.  Capitalized terms not defined have the meanings assigned in the AC.  All internal quotes and citations are omitted and emphasis is added unless otherwise indicated.  "Van Dec." refers to the accompanying Declaration of Austin Van.

weeks after Crossley projected $60 million in 2024 PERSERIS revenue on June 5, 2024 (¶122), Defendants announced on July 9, 2024, that they were immediately ceasing all marketing and sales of PERSERIS due in part to the "highly competitive market." (¶¶58-59).

Likewise, despite knowing of the negative impact of the IRA legislation on PERSERIS sales during the Class Period, Defendants never adjusted PERSERIS revenue guidance during the Class Period, and instead misleadingly asserted throughout the Class Period that they remained confident about PERSERIS's projected net revenue. In particular, Defendant Preblick continued to express confidence in April and May 2024 that Indivior would meet PERSERIS net revenue guidance of $55 million to $65 million in 2024 (¶¶108, 119) even though starting in March 2024, the negative impact of the IRA legislation on PERSERIS reimbursements had become a regular topic of discussion on weekly phone calls in which Preblick periodically participated. (¶77). Indeed, on July 9, 2024—only weeks after Preblick's expression of confidence in PERSERIS sales in the May 2024 Presentation—Defendants disclosed that PERSERIS was no longer financially viable in part because the IRA intensified "payor management in the treatment category in which PERSERIS participates," which was negatively "impacting both price as well as volume." (¶¶59, 62).

Defendant Simkin also baselessly expressed confidence in PERSERIS when he stated at a May 23, 2024 presentation that peak revenue guidance for PERSERIS remained $200 to $300 million. (¶117). Simkin surely also knew about the reduced PERSERIS reimbursements under the IRA because Simkin worked with Preblick to finalize sales goals (¶68), and the reduced PERSERIS reimbursements that Preblick knew about as of March 2024 would have been relevant to determining those goals. Yet, on July 9, 2024—only weeks after Simkin's expression of

2

confidence in PERSERIS sales in the May 2024 Presentation—Indivior announced that it was ceasing all marketing and sales of PERSERIS.

Defendants made these misleading statements with scienter. *First*, as substantiated by confidential witnesses, the Individual Defendants had personal knowledge of undisclosed negative information that contradicted their positive public statements concerning SUBLOCADE and PERSERIS. For example, as noted, Crossley knew that forecasting the negative impact of Medicaid disenrollments on SUBLOCADE sales was "incredibly, incredibly difficult" because he monitored the Medicaid renewal process. He was also aware of negative prescriber feedback concerning PERSERIS from meeting with physicians in territories like North Carolina. Further, as noted, both Preblick and Simkin were aware that the IRA was adversely affecting PERSERIS pricing and volume.

*Second*, the May and June 2024 Presentations reaffirming guidance for SUBLOCADE and PERSERIS were very close in time to the July 2024 disclosures concerning the reduction in SUBLOCADE guidance and the complete collapse of PERSERIS sales. *Third*, Defendants concede that SUBLOCADE was a "core operation," and together with PERSERIS comprised virtually Indivior's entire business. *Fourth*, Defendants repeated their false and misleading statements on multiple conference calls and in multiple presentations with specificity, thus indicating that they had personal knowledge about the topics they discussed. *Fifth*, Defendants Crossley and Simkin made stock sales that were suspicious in timing and amount.

In sum, the AC presents a compelling narrative of how Defendants misled investors with scienter with respect to SUBLOCADE and PERSERIS during the Class Period. *See* Van Dec., Ex. A (chart of challenged statements). Defendants' arguments are unavailing, and their resorting

3

to hoping that the Court will view this case simplistically as "baseless shareholder litigation" (DB at 1) shows that their motion lacks substance.  The Court should deny the motion.

## II.   FACTUAL BACKGROUND

Indivior is a global pharmaceutical company that derived virtually all of its sales during the Class Period from two drugs: SUBLOCADE, a monthly injection used to treat moderate to severe OUD, and PERSERIS, an injection to treat schizophrenia in adults.  (¶¶2, 3).  In July 2024, Indivior ceased all marketing and sales of PERSERIS.  (¶10).

The Class Period begins on February 22, 2024, when Indivior announced its fourth quarter and FY 2023 results, and provided net revenue guidance for FY 2024 in a range of $820-$880 million for SUBLOCADE, and $55-$65 million for PERSERIS.  (¶9).  Throughout the Class Period, Defendants made materially false and misleading statements with scienter regarding SUBLOCADE and PERSERIS.  (¶¶5-7).  In particular, Defendants were aware of but concealed several critical developments that negatively impacted SUBLOCADE and PERSERIS sales.

*First*, even though the Medicaid renewal process was well underway by April 2024 (¶129), and Defendant Crossley monitored that process (¶61), Crossley did not disclose until July 2024 that it was "incredibly, incredibly difficult" to predict the impact of Medicaid disenrollment on SUBLOCADE sales.  (*Id.*).  Instead, in April 2024, Crossley promised that the "headwind" from Medicaid disenrollments on SUBLOCADE sales "***will*** go away in the back half [of 2024]."  (¶52).

*Second*, as of March 2024, Defendant Preblick was aware that increased scrutiny of drug pricing under the IRA was reducing PERSERIS reimbursements.  (¶77).  This development would have become known to (i) Defendant Crossley (from working with Preblick on PERSERIS sales guidance; ¶¶42, 44, 48, 50, 53-54, 56), and (ii) Defendant Simkin (from working with Preblick to finalize PERSERIS sales goals; ¶68).  Further, as of April 2024, from his meetings with physicians in territories like North Carolina (where CW-2 supervised a team of sales representatives (¶¶76-

4

77)), Crossley would have known that UZEDY was substantially outperforming PERSERIS because physician feedback concerning PERSERIS was overwhelmingly negative (as per CW-4, who sold PERSERIS in North Carolina between April and July 2024; ¶¶83-86). Yet, it was not until July 2024, that Defendants finally disclosed that the double whammy of competition and increased price scrutiny was so severe that it had rendered PERSERIS not financially viable. (¶¶59, 62). Instead, throughout the Class Period—until literally just over four weeks before Indivior ceased all marketing and sales of PERSERIS—Defendants made false and misleading statements concerning PERSERIS sales that they knew or recklessly disregarded were completely unattainable. (¶¶94, 104, 108, 115, 117, 119, 122).

The Class Period ends on July 9, 2024 when, before markets opened, Indivior announced a business update ("July 9 Update") reducing SUBLOCADE net revenue guidance for 2024 to $765-$805 million, and shocking investors by announcing that Indivior would immediately cease all sales and marketing of PERSERIS on the ground that "there is no longer a path forward for PERSERIS that is financially viable." (¶10). The July 9 Update was issued just over a month after a conference on June 5, 2024, at which Crossley reiterated a midpoint of (i) $850 million for SUBLOCADE net revenue in 2024, and (ii) $60 million for PERSERIS net revenue in 2024. (*Id.*)

Following the July 9 Update, and further commentary by Defendants on a conference call that same morning before markets opened, Indivior's stock price fell $5.15 per share, or 33.57%, to close at $10.19 per share on July 9, 2024. (¶11). As a result of Defendants' materially false and misleading statements during the Class Period, and the precipitous decline in the market value

of Indivior's securities upon the disclosure of the truth on July 9, 2024, Plaintiff and other Class members suffered significant losses and damages. (¶12).[2]

### III.    LEGAL STANDARD

On a 12(b)(6) motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). The Court may not draw inferences Defendants' favor. *See Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 189, 192, 195 (4th Cir. 2015) (reversing dismissal because inferences drawn in defendant's favor).

To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [*i.e.*, falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018). In addition, under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1)(B), and "state with particularity facts giving rise to a strong inference that defendants acted with" scienter. *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 656 (E.D. Va. 2021). In the Fourth Circuit, a complaint may allege a corporate defendant's scienter by alleging the scienter of an agent (*e.g.*, an employee) of that corporation. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

---

[2] Defendants' suggestion that an investor with small losses cannot lead a federal securities class action (DB at 5) is "at odds with both the text and the purpose of PSLRA, not to mention one of the main purposes of aggregate litigation itself." *Nayani v. LifeStance Health Grp., Inc.*, 641 F. Supp. 3d 57, 64-65 (S.D.N.Y. 2022) (citing 15 U.S.C. § 77z-1(a)(3)(B)(i) and *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)).

## IV.   DEFENDANTS REPEATEDLY MADE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

To plead falsity under the PSLRA, a plaintiff need not, "*prove* the falsity of the alleged misrepresentations at the pleading stage." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015). Instead, when a plaintiff alleges "'sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element.'" *Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015) (quoting *Hunter*, 477 F.3d at 174). "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken*, 155 F. Supp. 3d at 601. Here, Plaintiffs "allege facts and 'circumstances that, drawing reasonable inferences in their favor, would render their claims of [falsity] plausible.'" *Nieman v. Duke Energy Corp.*, 2013 WL 4004274, at *24 (W.D.N.C. July 26, 2013).

### A.    Plaintiff Adequately Pleads That Statements About SUBLOCADE Were False and Misleading

Defendants repeatedly misrepresented the impact of Medicaid disenrollments on Indivior's SUBLOCADE sales. Statements 3, 4, 5, 7, 10 were false and misleading because Defendants knew or recklessly disregarded that the negative impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast." In Statements #3 and 4, Defendants misleadingly assured investors that "we fully expect" the impact of disenrollment "to resolve as the year progresses," and that the "headwind" from Medicaid disenrollment "should begin to subside as we move through the second half of the year." (¶¶99-101). In Statement #5 and 7, Defendants misleadingly stated that they were looking "forward to subsiding impacts" from Medicaid disenrollment after June 2024 and that "we expect" the Medicaid disenrollment trend to "begin subsiding in the second half of 2024." (¶¶102-03, 107). Finally, in Statement #10, Crossley stated

7

*with certainty* that the "headwind" of Medicaid disenrollment "***will***" go away in the back half."

(¶113).  As discussed below, Defendants' various challenges to these statements each fails.

> **1.       Disclosure of the Risk of Negative Impact From Medicaid Disenrollments Was Contradicted by Crossley's Promise of When the Impact Would Resolve**

Defendants argue that Indivior disclosed the risk that SUBLOCADE sales may be adversely affected by Medicaid disenrollments.  (DB at 15).  True, but Defendants also misleadingly assured investors *with certainty* that the negative impact would disappear by the second half of 2024.  For example, Crossley pointedly promised on April 25, 2024, that the "headwind" from Medicaid disenrollments "***will***" go away in the back half [of 2024]."  (¶112).  *See Lambert v. Austin Ind.*, 544 F.3d 1192, 1196 (11th Cir. 2008) (the word "will" expresses certainty).  Crossley's statement in April 2024 that the "headwind" from Medicaid disenrollments "will" subside in the second half of 2024 was misleading because, as he finally conceded on July 9, 2024, the negative impact of Medicaid disenrollments on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast." (¶61).  Therefore, even if Defendants disclosed some risk that the Company might be adversely affected by Medicaid disenrollments, investors reasonably relied on Defendant Crossley's expression of certainty that such risk "*will*" go away in the back half of 2024.  *See Singer*, 883 F.3d at 442 ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *18–19 (D. Md. Sept. 1, 2023) (warning did not suffice where defendants touted positive information, but omitted negative information); *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 734 (N.D. Cal. Jan. 14, 2022) ("I cannot say that the 'mixture' of this information would 'discredit the [allegedly misleading

8

statement] so obviously that the risk of real deception *drops to nil*.'") (emphasis in original) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).

### 2.    Any Purported Opinion Statements Are Actionable

Defendants also argue that Statements 3, 4, 5, 7, 10 were "textbook examples of opinions, not facts," and argue that such opinions are inactionable.  (DB at 16).  But language that expresses a guarantee is not an opinion.  *See Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 387 (4th Cir. 2023) ("Unlike statements of fact, statements of opinion do not 'express[ ] certainty about a thing.'").  And most of those statements were not opinions, but statements of certainty.  For example, as noted, Statement #10 that the "headwind" from Medicaid disenrollments "***will*** go away in the back half [of 2024]" (¶112) is clearly a statement of certainty.  Moreover, these statements do not contain the usual prefatory language of opinion statements—opinion statements generally are "couch[ed] . . . with prefatory language like 'I believe' or 'in my estimation.'"  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020); *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 779 (E.D. Va. 2015) ("Defendants' statements do not contain the words 'believe' or 'think,' but instead suggest a greater sense of certainty.").

But even if any of Statements 3, 4, 5, 7, 10 were opinions, they were not earnestly held because Individual Defendants knew them to be false.  Defendants admit opinion statements are actionable if the "opinion expressed was not sincerely held" (DB at 16; *citing Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015)), but contend that Plaintiff makes no particularized allegation that any opinion was not "honestly held."  (DB at 16).  However, as detailed in Section V, *infra*, the Amended Complaint sets forth detailed allegations that Individual Defendants knew the statements to be false.  As substantiated by confidential witnesses, information known to each of the Individual Defendants contradicted their public

9

statements concerning SUBLOCADE and PERSERIS.  Additionally, Defendants concede that SUBLOCADE was a "core operation" and together with PERSERIS comprised virtually Indivior's entire business; Defendants repeated their false and misleading statements on multiple conference calls and in multiple presentations; and Defendants Crossley and Simkin made stock sales that were suspicious in timing and amount.

Moreover, even construed as opinions, Statements 3, 4, 5, 7, 10 are still actionable because these statements suggested to reasonable investors that Defendants had a basis to claim that the impact of disenrollments would disappear in the second half of 2024, when in fact Defendants had no such basis.  *See Omnicare*, 575 U.S. at 183; *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *7, *16 (D. Md. Aug. 5, 2021) ("An opinion statement could also be actionable based on a material omission if such a statement could be understood to 'convey facts about how the speaker has formed the opinion' or the 'speaker's basis for holding that view'").  Defendants failed to disclose that the impact of Medicaid disenrollments under the CAA on SUBLOCADE sales was "incredibly, incredibly difficult to forecast," "very complicated to forecast," and "very tough to forecast," and thus there was no basis for Defendants to state that they were looking "forward to subsiding impacts" from Medicaid disenrollment after June 2024.  (¶103).  That is, Defendants withheld "vital information that had concerned [Defendants], directly contradicted [their] claim, and undermined [SUBLOCADE's sales prospects]."  *2U*, 2021 WL 3418841, at *21.

### 3.    The Truth-on-the-Market Defense is Not Available

Defendants argue that Statements 3, 4, 5, 7, 10 could not have misled investors because the truth of these statements was already available to investors from other publicly available sources.  (DB at 16-17).  As detailed in Section IV(B) below, the truth-on-the-market defense is disfavored and inappropriate at the motion to dismiss stage.  *See Klein*, 525 F. Supp. 3d at 664; *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *6 (N.D. Cal. July 29, 2022).  In any event, the defense is

10

inapplicable here.  Statements from the Company about the impact of disenrollments on Indivior materially differed from any publicly available information because the Company was far better positioned to forecast the likely impact of disenrollments on Indivior's particular drugs and users than the public.   Accordingly, publicly available information about potential Medicaid disenrollments did not contradict the company's assurances or reveal any untruth in them. Moreover, the only source that Defendants cite in claiming that the "truth" of Defendants' statements had been revealed is an *August 19, 2022* publication of the U.S. Department of Health and Human Services which "mapped out" various scenarios.  (DB at 17).  That document was published *eighteen months* before the start of the Class Period *well before* the misstatements concerning Medicaid disenrollments were made.[3]

Furthermore, Defendants improperly rely for this argument on facts outside the complaint that are reasonably subject to dispute.   On a Rule 12(b)(6) motion, "courts are limited to considering the sufficiency of allegations set forth in the complaint and the documents attached or incorporated into the complaint," and extrinsic documents are not to be considered unless they are "integral to and explicitly relied on in the complaint."  *See Zak v. Chelsea Therapeutics Int'l*, Ltd., 780 F.3d 597, 605, 607-08 (4th Cir. 2015).  The only exception to this rule is "narrow." *Id.* at 607. A document cannot be used "as evidence contradicting the complaint."  *Id.*; *see Feinberg v. T. Rowe Price Group, Inc.*, 2018 WL 3970470, at *4 (D. Md. Aug. 20, 2018) (refusing to take judicial notice of document which "is not referenced in the Complaint and is offered only for the purpose of contradicting Plaintiffs' allegations").  Further, judicial notice must not "be used as an expedient for courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of

---

[3] Moreover, investors cannot be charged with knowledge of the HHS publication because it was not intensely transmitted to the public in a widespread manner sufficient to counter the misleading nature of Crossley's statements. *See* Section IV(B) below ("Third").

11

litigants to present evidence on disputed matters."  *Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015).

Defendants did not formally move for judicial notice, and instead summarily noted in a footnote that the Court may "take judicial notice of information contained on state and federal government websites."  (DB at 7 n.5; quoting *United States* v. *Garcia*¸ 855 F.3d 615, 621 (4th Cir. 2017)).  But the Court may only take judicial notice of the *fact of publication* of statements on a government website; the Court may *not* assume the truth of facts in those statements simply because they were published by the government—government information may be inaccurate.  *See United States ex rel. Sheldon v. Forest Lab'ys, LLC*, No. CV ELH-14-2535, 2024 WL 4544567, at *18 (D. Md. Oct. 22, 2024) (judicial notice of federal materials is limited to "their existence and contents," and therefore, "although [the court] may take judicial notice of the fact that certain statements were made in a document, [the court] may 'not take judicial notice of the truth' of those statements."); *In re Mun. Mortg. & Equity, LLC, Sec. and Derivative Litig.*, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012) (similar); *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 456 (D. Md. 2019) (similar).[4]

### 4. Defendants' Misstatements Are Not Protected by the Safe Harbor

Under the PSLRA's safe-harbor provision, statements are protected only if they are forward-looking and are accompanied by "meaningful cautionary statements" or made without

---

[4] Moreover, Defendants are not asking the Court to take judicial notice of *facts* from a government website, but to take judicial notice of various *forecasting scenarios*.  (DB at 17; Def's Ex. 9). Forecasting is subject to reasonable dispute.  *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (*citing Malone v. Microdyne Corp.*, 26 F.3d 471, 479–80 (4th Cir.1994)) ("a CEO's expression of 'comfort' with a financial analyst's prediction of his company's future earnings was held not to be factual in that, as a future projection, it was not capable of being proved false."); *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1219–20 (D.N.M. 2013) (*quoting* Fed. R. Evid. 201(b)) (declining to take judicial notice of analysts' reports because they contained forecasts of the company's future financial changes, and such information "is not 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'")

12

"actual knowledge" of their falsity. *See Genworth*, 103 F. Supp. 3d at 787. Defendants argue that Statements 3, 4, 5, 7, 10 were forward looking, and therefore are inactionable, but Defendants are wrong. (DB at 12-15). Read in their entirety, all of the statements contain both present and future statements and are not entitled to safe harbor protection. *In re Constellation Energy Grp., Inc. Sec. Litig.,* 738 F. Supp. 2d 614, 626 (D. Md. 2010) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). Statements 3, 4, 5, 7, and 10 are mixed present future statements, as they contain both present and future statements. Statement #3 points to Q1 results and states that the "underlying demand" for SUBLOCADE "*remains* strong" and "our strategy to expand prescribing in the justice system is delivering excellent results." (¶98). Statement #4 points to external forces that negatively impacted SUBLOCADE's net revenue growth, and "provide[d] more color on how each of these *impacted* SUBLOCADE's growth in the quarter and why we *remain* confident in our [FY] 2024 net revenue guidance. (¶100). Statement #5 states that "we *believe* [subsiding impacts from transitory items] are masking the strong underlying demand for SUBLOCADE." (¶102). Statement #7 stated "Medicaid disenrollment dynamics *had* a disproportionate impact on our company as more than two-thirds of SUBLOCADE patients are covered by Medicaid. This impact *accelerated* in Q1, beyond the low single-digit headwind we *had* seen in prior quarters." (¶106). Finally, Statement #10 stated that "we *have* a continuing headwind of . . . the Medicaid renewal continuing," and "*we've got* a few additional tailwinds." (¶112). Because each of these statements contain statements of present fact, they are not entitled to safe harbor protection.

Furthermore, Defendants' statements expressing certainty that the impact of disenrollments would subside at a certain time are actionable because they were expressed as a guarantee. "Future performance projections . . . phrased as guarantees" are actionable. *See MacroGenics*, 61 F.4th at

13

389 (cited by Defendants).  For example, in Statement #10, Defendant Crossley promised that the "headwind" from Medicaid disenrollments "*will* go away in the back half [of 2024]."  (¶¶52, 112). *See Lambert*, 544 F.3d at 1196 (the word "will" expresses certainty).

Even if any of these statements were taken as forward-looking, they are not entitled to safe harbor protection because they were not accompanied by meaningful cautionary language.  As an initial matter, the Court should decline to determine this matter now because "the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss."  *See Ollila v. Babcock & Wilson Enters.*, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018)"); *Vaitkuviene v. Syneos Health, Inc.*, 2020 WL 5742714, at *16 (E.D.N.C. Aug. 7, 2020) (similar).  Moreover, cautionary language cannot be meaningful where, as here, "defendants know that the potential risks they have identified have in fact already occurred and that the positive statements they are making are false."  *See In re Genworth Fin. Inc. Sec.*3d at 790.

In any event, Defendants' cautionary language "referenced risks in broad terms as potential future dangers; none would have put investors on alert" of already known or materialized risks. *See 2U*, 2021 WL 3418841, at *14.  Defendants reference hollow, generic statements noting: "[a]ctual results may differ materially . . . because they relate to future events" and "we make forward-looking statements that are subject to risk and uncertainties and . . . actual results may differ materially." (DB at 13-14).  These statements are vague and boilerplate, and none of these statements cautioned that the effect of Medicaid disenrollment was incredibly difficult to predict. Thus, Defendants' language was not sufficiently tailored to the specific risks surrounding the affects of the Medicaid disenrollments or SUBLOCADE's prospects to serve as a meaningful caution.  *See In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019) ("Plaintiffs plausibly allege cautionary language relied on by SCANA fails to convey any

14

substantive warning to investors regarding the specific deficiencies facing the Project with any purportedly forward-looking statements."); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 121 (D. Md. 2021), *aff'd*, 31 F.4th 898 (4th Cir. 2022) ("[V]ague or boilerplate disclaimers will not suffice as meaningful cautionary language. Rather, the cautionary language must contain detailed language tailored to the specific risks the company faces.").

Finally, as set forth in Section V, *infra*, Defendants made these statements with actual knowledge of their falsity, and therefore are not entitled to safe harbor protection. Defendants attempt to mischaracterize their misstatements as being "wrong in hindsight," (DB at 13), but this is not a case in which a company made a projection of future performance that proved wrong through no fault of its own. Here, Defendants made statements with actual knowledge of their falsity without warning investors of the contradictory knowledge they possessed. Therefore, they cannot rely on safe harbor protection for their statements. *See Genworth,* 103 F. Supp. 3d at 790.

## B.   Plaintiff Adequately Pleads That Statements About PERSERIS Were False and Misleading

Throughout the Class Period, in Statements 1 and 6, Crossley repeatedly misrepresented PERSERIS's competitive advantages and clinician feedback about PERSERIS. For example, on conference calls, Crossley painted a false and misleading picture of PERSERIS's competitive mettle, advising that despite competition, he (i) "continue[d] to believe in the potential" of PERSERIS based in part on the "*strong feedback we get from clinicians*" (¶94) (Statement #1), and (ii) "remain[ed] confident" in net revenue guidance for PERSERIS—indeed, predicted "accelerating net revenue"—based on "*positive anecdotal prescriber feedback on product performance.*" (¶104) (Statement #6). Crossley, however, failed to disclose the overwhelmingly *negative* feedback from physicians regarding PERSERIS, and the resulting adverse impact on PERSERIS's ability to compete with UZEDY. (¶¶74, 79, 84, 91, 92). Crossley was well aware

15

of PERSERIS's overwhelmingly negative feedback from meeting with physicians in territories like North Carolina where negative feedback was rampant and UZEDY was outselling PERSERIS about nine to one.[5]  (¶¶76-77, 83-86).

Defendants argue that investors could not have been misled by such statements because Defendants disclosed that PERSERIS faced competition from UZEDY.  (DB at 17-18).  But through the misleading feedback-based statements above, Defendants hid from investors that the competition was eating their lunch—indeed, physicians preferred UZEDY over PERSERIS to such an extent that Indivior was compelled to cease all marketing and sales of PERSERIS only weeks after Defendants made highly positive statements concerning PERSERIS.  (¶¶59, 115-19, 121-22, 124).  As such, any warnings about competition were ineffectual.  *See Singer*, 883 F.3d at 442 (risk warning will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations; "[o]ne cannot, for example, disclose . . . the installation of a comprehensive sprinkler system to reduce fire danger, and omit that the system has been found to be inoperable, without misleading investors."); *accord Emergent*, 2023 WL 5671608, at *18–19 (warning did not suffice where defendants touted positive information, but omitted negative information).[6]

Defendants argue that they never represented that "all clinician feedback was positive." (DB at 19).  But once Crossley addressed the topic of physician feedback on conference calls, he was obligated to tell the whole truth (the good and the bad).  *See Cambridge Ret. Sys. v. Jeld-Wen*

---

[5] UZEDY was the only direct competitor to PERSERIS during the Class Period because UZEDY was the only other long-acting injectable ("LAI") for treating schizophrenia that used risperidone as its active ingredient.  (¶33).

[6] Defendants also mischaracterize the PERSERIS-related Statements 1, 6, 8, 12, 14, and 16 as forward-looking, DB at 12 n.8, but these arguments fail for the same reasons they fail with respect to Statements 3, 4, 5, 7, 9, and 10.  *See supra* Section IV(A)(4).

*Holding, Inc*., 496 F. Supp. 3d 952, 965 (E.D. Va. 2020) ("once a party speaks on a topic, they have an obligation to tell the whole truth."). Instead, Crossley only disclosed *positive* information about PERSERIS, and withheld information about *negative* physician feedback that was adversely affecting PERSERIS sales. This rendered the PERSERIS Statements misleading "half-truths." *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 518-20 (D. Md. 2022) (citing three Fourth Circuit decisions for the principle that, even absent a false statement, when an executive makes positive statements about a company's prospects, the nondisclosure of related negative information that the executive is aware of constitutes an actionable omission); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) ("half-truths" mislead "by saying one thing and holding back another.").

Defendants challenge the PERSERIS Statements on other grounds, but none are availing. *First*, Defendants claim that the statement highlighting "positive anecdotal prescriber feedback" (Statement #6) was "too vague." (DB at 18). But whether particular physician feedback is "positive" or "negative" is objectively verifiable (*e.g.*, a complaint that PERSERIS is inconvenient to administer (¶91) is obviously "negative" feedback). *See Virginia*, 501 U.S. at 1094 (whether a sale price is "high" or "fair" can be verified by objective facts). Moreover, the basis for liability here is that statements like "*positive* anecdotal prescriber feedback" were unaccompanied by disclosure of persistent *negative* physician feedback concerning PERSERIS. (¶105). As noted, in the Fourth Circuit, a fraud claim may rest on nondisclosure of adverse information. *See Novavax*, 645 F. Supp. 3d at 518.[7]

---

[7] For this reason, Defendants' authorities are inapt. (DB at 18-19). In neither *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 51 (2d Cir. 2019), nor *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749 (E.D. Va. 2004), did the plaintiffs allege that defendants disclosed only positive information and withheld

*Second*, Defendants challenge certain PERSERIS Statements as "inactionable opinions." (DB at 19).  But the statements concerning "feedback" (#1 and #6) did not convey Crossley's opinion.  Rather, Crossley was conveying physicians' opinions about PERSERIS, and thus coming from Crossley, these were factual statements.  That is, Crossley did not say "I believe that physician feedback has been positive," but instead stated definitively that "PERSERIS's unique product profile *continues to result in positive anecdotal prescriber feedback on product performance*." (¶104) (Statement #6).  *See Omnicare*, 575 U.S. at 183 (distinguishing statements of fact that express certainty from opinions that express beliefs).

Moreover, under *Omnicare*, an opinion is actionable when there are omitted facts about which the speaker knows or should know that substantially undermine the opinion.  *See Abramson*, 965 F.3d at 175-77.  Consequently, statements like #6, #8, and #12 expressing "confidence" in PERSERIS's net revenue guidance (¶¶104, 108, 117), or charts like #14 and #16 depicting PERSERIS's net revenue guidance (¶¶121, 124), are actionable because—as Defendants were aware (¶77)—there was persistent *negative* physician feedback concerning PERSERIS, and negative impact from the IRA on PERSERIS reimbursements, that rendered any "confidence" in PERSERIS's net revenue guidance completely unjustified. (¶¶105, 109, 118, 121, 124).  Indeed, just over four weeks after Crossley confirmed PERSERIS guidance in the June 5, 2024 Presentation (¶122), Indivior ceased all marketing and sales of PERSERIS.  (¶¶57-58).

Critically, the negative physician feedback, and negative impact of the IRA, were not some minor facts "cutting the other way" (like the *Omnicare* hypothetical of a junior attorney who disagrees with six senior colleagues; 575 U.S. at 190).  Instead, it was information that completely

---

negative information concerning a particular topic, as occurred here.  Parenthetically, the *Oklahoma Firefighters Pension* case was decided by the Southern District of New York, not the Eastern District of Virginia (as Defendants indicate at page 19 of their brief).

undermined the basis for having any confidence or belief whatsoever in PERSERIS's net revenue guidance.

*Third*, citing sources alleged in the Complaint, Defendants assert that PERSERIS's and UZEDY's product features were "well-known to investors through publicly available information." (DB at 9 & n.6, 19). But those sources only state that thicker needles tend to be more painful, and only disclose PERSERIS's and UZEDY's dosing options and the instructions for administering each injection. (¶¶32-34). There was no publicly available source, however, disclosing that physician feedback concerning PERSERIS was persistently *negative*, and that PERSERIS's inferior product attributes were causing doctors to overwhelmingly prefer UZEDY over PERSERIS. (¶¶74, 79, 81, 84, 91, 92). Only Indivior employees were privy to that information. *See In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 305 (4th Cir. 2019) (fact that shareholders knew CEO would make more money after the merger did not mean they knew about secret compensation discussions); *Tchatchou v. India Globalization Cap. Inc.*, 2021 WL 307415, at *8 (D. Md. Jan. 29, 2021) (argument that information was public failed because only defendant knew key omitted fact that there was no manufacturer); *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1373 (S.D. Fla. 2001) (what defendants failed to disclose was not the legislation itself, but the adverse impact of the legislation on operations).

Moreover, the "truth on the market" defense that Defendants raise "is intensely fact-specific," and thus "rarely an appropriate basis" to dismiss a complaint "for failure to plead materiality." *Klein*, 525 F. Supp. 3d at 664; *see Pardi*, 2022 WL 3018144, at *6 ("truth-on-the-market" defense typically unavailable at the pleading stage since the defense disputes materiality, which is a mixed question of law and fact that the Supreme Court has held is best reserved for trial).

19

To the extent the "truth-on-the-market" defense is available at the pleading stage, Defendants bear the heavy burden of proving "that the information that was withheld or misrepresented was transmitted to the public *with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by their previous statements*." *Klein*, 525 F. Supp. 3d at 664. Here, while Plaintiff's sources were accessible on the Internet, they were not intensely transmitted to the public in a widespread manner sufficient to counter the misleading nature of Crossley's PERSERIS Statements. *See Alpha Cap. Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *9 & n. 16 (S.D.N.Y. Nov. 18, 2014) (argument that company has no duty to disclose information accessible on the Internet but not widely reported is an "oversimplification of the law" and a "sweeping proposition" unsupported by caselaw); *United States v. Royer*, 549 F.3d 886, 897 (2d Cir. 2008) (fact that information may be found publicly if one knows where to look does not make the information "public" for securities trading purposes).

### C. Defendants Misrepresented that PERSERIS Was Capturing a Disproportionate Share of the New-to-Brand Prescriptions Market

Defendants also misled investors to believe that PERSERIS was capturing a disproportionate share of the New-to-Brand Prescriptions (*i.e.*, a patient's first prescription for a particular drug) market for LAI drugs to treat schizophrenia in a slide presented by Defendant Simkin in the May 2024 Presentation. (¶115) (Statement #11). The statement that PERSERIS was capturing a disproportionate share of new LAI prescriptions was materially false and misleading because, as CW-5 stated, "PERSERIS was not gaining a disproportionate share of the LAI market." (¶88). In fact, PERSERIS was a "tough drug to sell" because of competition from UZEDY. (¶¶84, 88).

20

Defendants claim in a footnote, (DB 18 n. 11), that Statement 11 "also is too vague to be actionable, especially where Plaintiff does not allege the accompanying data is false." Yet Plaintiffs do claim that the data in Statement 11 were false—the AC alleges based on statements by CW-5 that PERSERIS was not in fact capturing a disproportionate share of the New-to-Brand Prescriptions market. The AC need not specify the exact amounts by which the data in the slides are off—the AC adequately alleges the falsity of this statement by specifying the statement and the "reason or reasons why the statement is misleading," which is all that is required to plead falsity under the PSLRA at this stage. *See Singer*, 883 F.3d at 439; *Kiken*, 155 F. Supp. 3d at 601 (a plaintiff need not, "*prove* the falsity of the alleged misrepresentations at the pleading stage.").

## V.   PLAINTIFF ADEQUATELY ALLEGES SCIENTER

A plaintiff adequately pleads scienter under the PSLRA by alleging a "strong inference" that defendants acted with either an intentional or reckless state of mind. *See Zak*, 780 F.3d at 606. Allegations of recklessness can "survive a motion to dismiss" where the danger of misleading investors "was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*

Plaintiffs need *not* show that the inference of scienter is irrefutable (*i.e.*, "of the 'smoking-gun' genre"), or even "the most plausible of competing inferences." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007); *accord Klein*, 525 F. Supp. 3d at 665. Instead, plaintiffs need only show that "the malicious inference is at least as compelling as any opposing innocent inference." *Zak*, 780 F.3d at 606.

When comparing competing inferences, courts should "consider the scienter allegations holistically and accord those allegations the inferential weight warranted by context and common sense." *Id.*; *see also Tellabs*, 551 U.S. at 326 ("court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."); *accord In re James River Grp. Holdings,*

21

*Ltd. Sec. Litig.,* 2023 WL 5538218, at \*18, 26 (E.D. Va. Aug. 28, 2023); *Novavax*, 645 F. Supp. 3d at 529.

### A.    As Substantiated by Confidential Witnesses, Information Known to Defendants Contradicted Their Public Statements

A complaint pleads a strong inference of scienter when it alleges that defendants made public statements about certain subjects that contradicted their personal knowledge of undisclosed adverse information concerning those same subjects.  *See Zak*, 780 F.3d at 609 ("defendants either knowingly or recklessly misled investors by failing to disclose critical information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete."); *Novavax*, 645 F. Supp. 3d at 515-23, 524-26 (defendants acted with scienter where they made positive statements, but failed to disclose key obstacles to securing a vaccine's approval).

### 1.    Defendant Crossley

*Five* CWs who worked for Indivior as sales directors or representatives stated that physicians regularly shared negative feedback with them concerning PERSERIS's competitive disadvantages, including a larger needle size, fewer dosing options, and mixing requirements. (¶¶74, 79, 84, 91, and 92).  Crossley would have been aware of this negative feedback and its impact on PERSERIS sales *not* merely because of his position or access (as Defendants mistakenly contend; DB at 23), but because of direct communications.  Specifically, as CW-2 confirmed, Crossley sometimes accompanied sales representatives to meetings with physicians during which Crossley would ask the physicians what was holding them back from using PERSERIS and what was stopping them from selling more.  (¶77).  Notably, CW-2 supervised sales representatives in North Carolina (¶76), and a sales representative who covered eastern North Carolina from April to July 2024—CW-4—stated that many doctors in her territory preferred UZEDY because patients

22

had complained about PERSERIS's needle size, and UZEDY was outselling PERSERIS about nine to one. (¶¶83-86). Thus, the inference that Crossley heard negative feedback from doctors concerning PERSERIS is extremely strong. Plaintiff need not allege more. *See Novavax*, 645 F. Supp. 3d at 526 ("While the CWs do not allege that they personally provided specific problematic information to Erck, *allegations of scienter need not provide 'smoking-gun' evidence."*); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 311, 319 (S.D.N.Y. 2024) (scienter adequately pleaded where CEO "occasionally attended" meetings where defects discussed).

Despite his direct exposure to negative feedback concerning PERSERIS, Crossley did not disclose this critical information to investors. Instead, Crossley painted an entirely different picture on conference calls, advising that despite competition, he (i) "continue[d] to believe in the potential" of PERSERIS based in part on the "*strong feedback we get from clinicians*" (¶94), and (ii) "remain[ed] confident" in PERSERIS net revenue guidance—indeed, predicted "accelerating net revenue"—based in part on "*positive anecdotal prescriber feedback on product performance.*" (¶104). In short, Crossley's public statements concerning *positive* feedback about PERSERIS contradicted his knowledge of *negative* feedback about PERSERIS, and thus Crossley intentionally or recklessly mislead Indivior investors concerning product attributes that were adversely affecting PERSERIS's ability to compete against UZEDY.

Moreover—unless he was completely making things up as he spoke—Crossley's references to prescriber feedback on the conference calls on February 22, 2024, and April 25, 2024 (¶¶42, 48) confirm that he had personal knowledge concerning provider feedback; otherwise, he could not have spoken publicly about that subject with such confidence. And if Crossley knew about positive feedback concerning PERSERIS, there is a strong inference that he also knew about

23

the negative feedback that five CWs have confirmed. *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9-10 (1st Cir. 2021) (fact that CEO and CFO plugged new product on conference calls and at conferences raised a strong inference that they either inquired about the product before promoting it or were reckless in failing to do so, and thus could be charged with knowledge that the product never worked); *Dentsply*, 732 F. Supp. 3d at 319 (specificity of defendants' statements concerning specific topics is strong circumstantial evidence that they were receiving information about those topics, or were reckless in suggesting they did).

Likewise, with respect to SUBLOCADE, on the April 25, 2024 call, Crossley promised that the adverse impact of Medicaid disenrollments on SUBLOCADE sales "***will go away in the back half [of 2024]***" (¶112) (Statement #10). *See Lambert*, 544 F.3d at 1196 ("will" expresses certainty). This statement was contradicted by Crossley's knowledge—later conceded on July 9, 2024—that the adverse impact of Medicaid disenrollments was "incredibly, incredibly difficult to forecast," "just very complicated to forecast," and "very tough to forecast." (¶61). Crossley, however, knew about such forecasting complexities well before July 2024 because the renewal process was well underway during the Class Period (¶129), and Crossley conceded that he monitored the renewal process. (¶61) ("*we've seen the extension of the renewal process*, which is pushed into Q3 for eight of the 11 remaining states with Alaska and D.C. in 2025 in New York not scheduled. *So a lot of lack of precision and inability to forecast what is really a one-off item that is kind of unprecedented with no analog. **So very tough to forecast this***.").

For all of the above reasons, Plaintiff adequately pleads a strong inference of scienter with respect to Crossley's PERSERIS and SUBLOCADE Statements.

### 2.    Defendant Preblick

The IRA legislation provides for greater scrutiny of drug pricing. (¶¶36-39). On July 9, 2024, Defendants revealed that due "to the highly competitive market and *impending changes that*

24

*are expected to intensify payor management in the treatment category in which PERSERIS participates*," PERSERIS was no longer "financially viable," and Indivior was ceasing all marketing and sales of the drug. (¶59). As Crossley later explained on a conference call, the IRA was "resulting in increased management of the category, which is impacting both price as well as volume," and rendering PERSERIS not financially viable. (¶62).

But according to CW-2, warning signs concerning the adverse impact of the IRA on PERSERIS had already begun emerging in January 2024, when hospital CFO's in her territory began complaining about reduced Medicaid and Medicare reimbursements for PERSERIS under the IRA. (¶77). In February 2024, CW-2 spoke with her manager concerning the risk of customers' abandoning PERSERIS because of reduced reimbursements. (*Id.*). Starting in March 2024, according to CW-2, the issue of reduced PERSERIS reimbursements became a regular topic of discussion on weekly phone calls between Area Sales Directors like CW-2 and the Behavioral Health Division leadership ("BHD Leadership Calls"). (*Id.*). According to CW-2, Preblick occasionally joined these calls (*id.*), and thus, starting in March 2024, Preblick would have become aware of reduced PERSERIS reimbursements under the IRA.

Despite his personal knowledge of this emerging headwind, Preblick never adjusted PERSERIS guidance during the Class Period. To the contrary, Preblick stated on the April 25, 2024 call, that "[w]e remain confident in meeting our [FY] net revenue guidance of $55 million to $65 million" for PERSERIS. (¶108) (Statement #8). Preblick repeated this guidance during the May 2024 Presentation. (¶¶119, 121) (Statement #14). These statements conflicted with the knowledge of reduced PERSERIS reimbursements that Preblick would have acquired beginning in March 2024 from participating in the BHD Leadership Calls during which this topic was

regularly discussed. (¶77). Thus, Plaintiff adequately pleads a strong inference of scienter with respect to Preblick's PERSERIS Statements.

### 3. Defendant Simkin

Information chains within companies that keep executives informed about new developments contribute to an inference of scienter. *Novavax*, 645 F. Supp. 3d at 526. Here, Simkin would have known about reduced PERSERIS reimbursements because, according to CW-1, Simkin and Preblick finalized the sales goals for PERSERIS (¶68), and the reduced PERSERIS reimbursements that Preblick knew about from the BHD Leadership Calls (¶77) would have been relevant to determining those goals. Thus, there is a strong inference that Simkin also knew about reduced PERSERIS reimbursements. *See Novavax*, 645 F. Supp. 3d at 526. Yet, Simkin stated at the May 2024 Presentation that peak revenue guidance for PERSERIS remained $200 to $300 million. (¶117) (Statement #12). This statement conflicted with the knowledge of reduced PERSERIS reimbursements that Simkin would have acquired from working with Preblick to determine PERSERIS sales goals. Thus, Plaintiff adequately pleads a strong inference of scienter with respect to Simkin's PERSERIS Statements.

### B. The Close Proximity Between the May and June 2024 Presentations and the Corrective Disclosure on July 9, 2024, Bolsters the Inference of Scienter

On July 9, 2024, Indivior reduced SUBLOCADE net revenue guidance for SUBLOCADE by 6-8%. (¶58). Indivior also shockingly announced that it was ceasing all marketing and sales of PERSERIS. (*Id.*). This reduction in SUBLOCADE guidance—and complete collapse in PERSERIS sales—occurred (i) just over four weeks after Crossley, at the June 2024 Presentation, provided net revenue guidance for 2024 for SUBLOCADE of $850 million, and for PERSERIS of $60 million (¶122), and (ii) just over six weeks after (1) Simkin, at the May 2024 presentation, projected PERSERIS peak revenue of $200-$300 million, and (2) Preblick, at the May 2024

26

Presentation, provided net revenue guidance for 2024 for SUBLOCADE of $820-$850 million (up 35%), and for PERSERIS of $55-$65 million (up 43%). (¶¶117, 119). The significant reduction in SUBLOCADE sales projections—and the complete collapse of PERSERIS sales—in such a short time further strengthens the inference of scienter. *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021) (finding inference of scienter from restatements issued seven months after rosy representations of revenues).

*KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601 (4th Cir. 2021) is not to the contrary because it declined "to draw a strong inference of scienter **based solely** on there being a short amount of time between positive announcements and statements announcing negative financial information." *Id.* at 612. Here, proximity is just one piece of Plaintiff's holistic analysis establishing a strong inference of scienter. *See Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *36 (E.D. Va. Mar. 24, 2021) (considering "*four month*" proximity where it was "*not the only fact* that Plaintiffs advance to plead scienter"); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 483 (E.D. Va. 2002) (where complaint "does not seek to ground the scienter element in temporal proximity *alone*," fact that company "was in a state of *severe financial distress . . . only two months* after [audit opinion]" supported inference of scienter).

### C.    SUBLOCADE Was the Core of Indivior's Business

"[A]llegations that individual defendants were senior executives and that the relevant operations represented a core business of their company are relevant to a court's holistic scienter analysis, provided, of course, that they are accompanied by particularized allegations that a defendant was aware of problems in those operations." *Emergent*, 2023 WL 5671608, at *26; *see also Kiken*, 155 F. Supp. 3d at 606 (inference of scienter bolstered when challenged statements concern core operations). Among the factors considered in determining whether a segment is "core," is whether defendants made repeated public statements concerning the segment. *Id.*

27

Defendants do not dispute that SUBLOCADE, as Indivior's largest drug, was a core operation of the Company.  (DB at 24).

        **D.**        **Defendants Made Virtually All of Their False and Misleading Statements on Conference Calls, or in Presentations to Analysts and Investors**

Since the aim of earnings calls is to inform investors, making false and misleading statements on earnings calls further supports an inference of scienter.  *See Cambridge*, 496 F. Supp. 3d at 967 n.17.  Here, Defendants made virtually all of their false and misleading statements on conference calls, or in presentations to analysts and investors.  (¶¶40-57).

        **E.**        **Crossley's and Simkin's Stock Sales Were Suspicious in Timing and Amount**

Where, as here, defendants fail to disclose negative information while releasing positive information that they know is incomplete, the inference of scienter is sufficiently strong that a court need not inquire into defendants' financial motivations.  *See Zak*, 780 F.3d at 610 & n.7.  Nevertheless, stock trades bolster an inference of scienter "if the timing and amount of a defendant's trading were unusual or suspicious."  *See Novavax*, 645 F. Supp. 3d at 528.  Here, Crossley and Simkin reported stock sales that were suspicious in amount and timing.

In terms of amount, in March 2024, Crossley sold 57% of his Indivior shares (¶132), and Simkin sold 53% of his Indivior shares.  (¶136).  These are significant percentages constituting more than half of Crossley's and Simkin's holdings.  *See James River*, 2023 WL 5538218, at *24 (25% and 21%); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E.D. Va. 2000) (10.3%, 85.6%, 35.6%, 50%, and 51.8%); *In re Orbital Scis. Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 686 (E.D. Va. 1999) (15% and 72%); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (30%); *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 82, 85 (2d Cir. 1999) (40%).  Further, the sales generated $2.4 million in cash for Crossley (¶132), which exceeded his cash compensation of $1.99 million in 2023 (*i.e.*, $926.4K, plus the 75% of his $1.42M in "AIP" comp

28

paid in cash since Crossley was an Executive Director). (Van Dec., Ex. B at 130, 137). *See Suprema*, 438 F.3d at 278 (inference of scienter strengthened where profits from trades were substantial in comparison to overall compensation).[8]

The *timing* of Crossley's and Simkin's trades in March 2024 is also suspicious because as noted above, according to CW-2, the issue of reduced PERSERIS reimbursements became a regular topic of discussion on the BHD Leadership Calls starting in March 2024, and Preblick occasionally joined those calls. (¶77). In turn, Preblick worked with Simkin to finalize sales goals for PERSERIS (¶68), and worked with Crossley and Simkin to prepare PERSERIS net revenue guidance for conference calls and presentations. (¶¶48, 50, 53-57). Falling PERSERIS reimbursements would have been relevant to determining PERSERIS sales goals and guidance. Thus, at a time when they became aware through Preblick that reduced PERSERIS reimbursements were emerging as a headwind (and Crossley was aware of negative prescriber feedback), both Crossley and Simkin were reducing their ownership of Indivior stock by over 50%. *Orbital*, 58 F. Supp. 2d at 686 (fortuitous timing of sales was suspicious).

Defendants make much of the fact that the shares sold had just vested. (DB at 21). But both Crossley and Simkin could have held their shares; instead, they chose to sell. Defendants also flag that Preblick did not make any suspicious trades during the Class Period (DB at 22), but "the absence of a motive allegation is not fatal." *Klein*, 525 F. Supp. 3d at 666.

---

[8] In 2023, Crossley also earned $5.23 million in long-term compensation, but this was not paid in cash. Instead, the shares awarded are subject to a two-year post-vesting holding period that will end on March 1, 2026. (Van Dec., Ex. B at 137). Thus, the receipt of $2.4 million in immediate cash from stock sales was significant to Crossley.

29

## VI.    PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Since Plaintiff has pleaded primary violations of Section 10(b), as detailed above, Defendants' argument for dismissal of Plaintiff's Section 20(a) claims fails.  (DB at 28).

## VII.    CONCLUSION

Defendants' Motion should be denied.[9]

---

[9] If for any reason any part of the Motion is granted, Plaintiff respectfully requests permission to amend the Amended Complaint or the opportunity to seek leave to amend.  Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").  Leave to amend "should be denied *only* when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Franks v. Ross*, 313 F.3d 184, 193 (4th Cir. 2002).

Dated:  February 10, 2025

Respectfully submitted,

**COHEN MILSTEIN SELLERS
& TOLL PLLC**

*/s/ Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice*)
Austin P. Van
(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
(*pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*

31