# Exhibit B

# Indivior (INDV) / 20-F / 2023 FY Annual report (foreign)

Filed: 6 Mar 24, 3:05pm

⋮ Filing menu

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 20-F**

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2023.

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report _____

For the transition period from _____ to _____

Commission file number: 001-37835

**Indivior PLC**

(Exact name of Registrant as specified in its charter)

Not applicable

(Translation of Registrant's name into English)

England and Wales

(Jurisdiction of incorporation or organization)

10710 Midlothian Turnpike, Suite 125

North Chesterfield, Virginia 23235

(Address of principal executive offices)

**Jeff Burris, Chief Legal Officer**

**(**804) 379-1090 legal@indivior.com

10710 Midlothian Turnpike, Suite 125

North Chesterfield, Virginia 23235

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, $0.50 nominal value per share | INDV | London Stock Exchange<br>The Nasdaq Stock Market LLC |

Securities registered or to be registered pursuant to Section 12(g) of the Act: None

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

As of December 31, 2023, the number of outstanding ordinary shares was 136,526,357.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐ Yes     ☒ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. ☐ Yes     ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes     ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes     ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated Filer ☐        Non-accelerated filer ☒

Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards[†] provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

**C.    Research and Development Expenses, Patents and Licenses, etc.**

See "*Item 4. Information on the Company—B. Business Overview Background—8. Intellectual Property*," "*Item 4. Information on the Company—B. Business Overview Background—4. Research and Development*," and "*Item 5. Operating and Financial Review and Prospects.*"

**D.    Trend Information**

For a discussion of trend information, see "*Item 5.A.— Operating Results—Key factors affecting results of operations*."

**E.    Critical Accounting Estimates**

The consolidated financial statements are prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"). The preparation of the financial statements requires Management to make certain estimates and assumptions, either at the balance sheet date or during the year, which affect the reported amounts of revenues, expenses, assets, liabilities and contingent amounts. Our most significant accounting estimates, set out in Note 2 "Basis of Preparation" included in "Item 18. Financial Statements—Audited Consolidated Financial Statements," include a description of the estimates, assumptions and judgements applied in the preparation of the consolidated financial statements of the Group.

Given the uncertainties inherent in our business activities, we must make certain estimates and assumptions that require difficult, subjective and complex judgments. These estimates are based on the Group's knowledge of the amount, events, or actions considering history and expectations of future outcomes. Estimates and underlying assumptions are reviewed on an ongoing basis. Because of uncertainties inherent in such judgments, actual outcomes and results may differ from our assumptions and estimates, which could materially affect the Group's consolidated financial statements. Application of the following accounting policies requires certain assumptions and estimates that have the potential for the most significant impact on our consolidated financial statements. Management believes the estimation uncertainties included within each policy could be material to the results of operations or cash flows in a given period. Revisions to the following estimates are recognized prospectively.

- Accruals for returns, discounts, incentives and rebates

- Impairment of intangible assets

- Acquisitions

129

**ITEM 6: DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES**

**A.    Directors and Senior Management**

The following table sets forth the names and positions of the members of our Board as of the date of this annual report. Except as otherwise indicated, the business address of each of the directors is 234 Bath Road, Slough, Berkshire SL1 4EE, United Kingdom.

There are no familial relationships between any director, executive officer, or person nominated or chosen by the Group to become a director or executive officer.

| Name | Position | Director Since | Term Expires[1] |
|---|---|---|---|
| Graham Hetherington | Chair | Nov. 2019 | Nov. 2026 |
| Mark Crossley | Chief Executive Officer and Executive Director | Feb. 2017 | (2) |
| Ryan Preblick | Chief Financial Officer and Executive Director | Nov. 2020 | (2) |
| Juliet Thompson | Senior Independent Director | Mar. 2021 | Mar. 2027 |
| Peter Bains | Independent Non-Executive Director | Aug. 2019 | Jul. 2025 |
| Dr. Keith Humphreys | Independent Non-Executive Director | Nov. 2023 | Nov. 2032 |
| Jerome Lande | Non-Executive Director | Mar. 2021 | Dec. 2024 |
| Joanna Le Couilliard | Independent Non-Executive Director; Designated Non-Executive Director for Workforce Engagement | Mar. 2021 | Mar. 2027 |
| Barbara Ryan | Independent Non-Executive Director | Jun. 2022 | Jun. 2025 |
| Mark Stejbach | Independent Non-Executive Director; Designated Non-Executive Director for Workforce Engagement | Mar. 2021 | Mar. 2027 |

_____

(1)   The dates listed represent the end of the respective Director's term of office on the Board.

(2)   Per their employment with the Group, Messrs. Crossley and Preblick serve at the request of the Board and may be removed at any time. Their business address is 10710 Midlothian Turnpike, Suite 125, North Chesterfield, VA, 23235, United States.

**Board Diversity Matrix**



Print

(5)  Mr. Stejbach was appointed as a member and Char of the Compliance, Ethics & Sustainability Committee on October 1, 2023.

(6)  Ms. Thompson was appointed as Senior Independent Director on October 1, 2023.

(7)  Dr. McLellan retired from the Board on February 29, 2024.

(8)  Ms. Parker and Mr. Phelan retired from the Board on September 30, 2023.

## Compensation of Executive Directors and Senior Managers

The table below sets forth the remuneration of the Executive Directors and Senior Managers for the financial year ended December 31, 2023.

| | Mark Crossley $'000 | Ryan Preblick $'000 | All Other Senior Managers Combined $'000 |
|---|---|---|---|
| **Fixed Pay** | | | |
| Base Salary | 834.2 | 516.7 | 3,823.0 |
| Taxable Benefits [1] | 64.2 | 66.8 | 836.2 |
| Retirement Benefits [2] | 28.0 | 28.0 | 237.7 |
| **Total Fixed Pay** | 926.4 | 611.5 | 4,896.9 |
| | | | |
| **Variable Pay** | | | |
| Annual Incentive Plan (AIP) [3] | 1,418.1 | 527.0 | 3,570.1 |
| Long Term Incentive Plan (LTIP) [4] | 5,230.1 | 3,724.9 | 19,434.1 [5] |
| **Total Variable Pay** | 6,648.2 | 4,251.9 | 23,004.2 |
| **Total Pay** | 7,574.6 | 4,863.4 | 27,901.1 |

(1)  Taxable benefits consist primarily of healthcare, car allowance, life and disability insurance, and professional support for the completion of U.S. and U.K. tax returns. Taxable benefits included a car allowance ($19,500 each for Mr. Crossley and Mr. Preblick) and premiums for medical coverage ($19,300 for Mr. Crossley and $29,800 for Mr. Preblick).

(2)  Executive Directors and Senior Managers may receive contributions into a defined contribution plan, a cash allowance, pension benefits in the form of company profit-sharing or matching contributions into the U.S. qualified 401(k) plan or a combination thereof. Mr. Crossley and Mr. Preblick received profit-sharing contributions of $13,200 (4% of base salary) and matching contributions of $14,900 (75% on elected deferrals up to 4.5% of base salary) to their 401(k) plan accounts.

(3)  The maximum Annual Incentive Plan ("AIP") opportunity for the Chief Executive Officer is 200% of his base salary. The maximum AIP opportunity for the Chief Financial Officer is 120% of his base salary. The maximum AIP opportunity for our Senior Managers ranges from 90% to 140% of their base salary. For our Executive Directors, the AIP is paid 75% in cash, with the remaining 25% deferred into conditional shares for two years under the Group's Deferred Bonus Plan. See "Deferred Bonus Plan 2018 ("DBP")," beginning on page 147. For Senior Managers, the AIP is paid in cash. For fiscal year 2023, the Remuneration Committee set stretching performance targets in the context of the business plan for 2023 and taking account of external forecasts. These targets were set by reference to the key strategic drivers for the business: global net revenue for SUBLOCADE and U.S. net revenue for PERSERIS, weighted 80%/20% respectively. For threshold performance 12.5% of the maximum bonus would be paid, for target performance 50% of the maximum bonus would be paid, and 100% of the maximum bonus would be paid for the delivery of performance significantly above both internal and external expectations. Achievement of the performance targets is calculated on a straight-line basis between threshold and target and between target and maximum. In addition, an ESG metric acted as a potential modifier to the overall AIP payout by which the overall AIP payout could be reduced by up to 10% if certain ESG targets were not met during the year; the Committee chose not to exercise its discretion to reduce the overall AIP payout. Overall performance resulted in a formulaic payout of 85% of maximum.

(4)  The LTIP awards granted to Mr. Crossley and Mr. Preblick on March 1, 2021 vested on March 1, 2024 and are subject to a two-year post-vesting holding period and will be released on March 1, 2026. The value of the awards was estimated based on the number of vested shares (300,000 and 213,665 for Mr. Crossley and Mr. Preblick respectively) at the three-month average share price of Indivior shares for the last quarter of the 2023 financial year (1405.2p) and converted to U.S. dollars using the average GBP/U.S.$ exchange rate over the same period (GB£1:U.S.$1.2407). The value generated through share price appreciation is $4,339k ($2,534k for Mr. Crossley and $1,805k for Mr. Preblick).

(5)  The value of the awards has been estimated based on the number of shares expected to vest (1,114,705) at the three-month average share price of Indivior shares for the last quarter of the 2023 financial year (1405.2p) and converted to U.S. dollars using the average GBP/U.S.$ exchange rate over the same period (GB£1:U.S.$1.2407).

137

## Annual Incentive Plan ("AIP")

In addition to base salary, an annual bonus opportunity exists for all employees, including the Executive Directors and Senior Managers. The maximum AIP opportunity for the Chief Executive Officer is 200% of his base salary. The maximum AIP opportunity for the Chief Financial Officer is 120% of his base salary. The maximum AIP opportunity for our Senior Managers ranges from 90% to 140% of their base salary. For our Executive Directors (the Chief Executive Officer and Chief Financial Officer), the AIP is paid 75% in cash, with the remaining 25% deferred into conditional shares for two years under the Group's Deferred Bonus Plan. See "The Deferred Bonus Plan 2018 ("DBP")," beginning on page 147. For Senior Managers, the AIP is paid in cash.

Performance measures under the AIP are designed to align to the key strategic drivers for the year ahead and are developed alongside the Group's annual financial plans. The Remuneration Committee has discretion to adjust the formulaic bonus outcomes both upward and downward (including to zero) to ensure alignment of pay with the underlying

performance of the Group, e.g., in the event performance is impacted by unforeseen circumstances outside Management control.

For the 2023 financial year, the Remuneration Committee set performance targets in the context of the business plan for 2023 and taking account of external forecasts. These targets were set by reference to the key strategic drivers for the business: global net revenues for SUBLOCADE and U.S. net revenues for PERSERIS, weighted 80%/20% respectively. For threshold performance 12.5% of the maximum bonus would be paid, for target performance 50% of the maximum bonus would be paid, and 100% of the maximum bonus would be paid for the delivery of exceptional performance significantly above both internal and external expectations. Achievement of the performance targets is calculated on a straight-line basis between threshold and target and between target and maximum. In addition, an ESG metric acted as a potential modifier to the overall AIP payout by which the overall AIP payout could be reduced by up to 10% if certain ESG targets were not met during the year; the Committee chose not to exercise its discretion to reduce the overall AIP payout as the relevant ESG targets were met. Overall performance resulted in a formulaic payout of 85% of maximum.

In line with our Remuneration Policy, 25% of the 2023 bonus payable under the AIP to the Executive Directors was automatically deferred into conditional shares under the DBP. The deferred conditional share awards vest after two years subject to continued employment as well as malus provisions.

|  | Date of Grant | Number of shares under award | Closing share price at date of grant | Aggregate fair market value as of the date of grant (1) $'000 | Vesting Date |
|---|---|---|---|---|---|
| Mark Crossley | Mar. 16, 2023 | 18,169 | 1392.0p | 304.3 | Mar. 16, 2025 |
| Ryan Preblick | Mar. 16, 2023 | 6,752 | 1392.0p | 113.1 | Mar. 16, 2025 |

_____

(1)  The market value used to determine the number of shares subject to awards was 1,389p, being the average mid-market closing price of Indivior shares on the business day immediately preceding the date of grant and converted to U.S.$ using the closing exchange rate on the day immediately preceding the date of grant (GB£1:U.S.$1.2056)

138

**Indivior PLC Long-Term Incentive Plan ("LTIP")**

On March 3, 2023, the Chief Executive Officer and Chief Financial Officer were granted conditional awards over shares with a value equal to 400% of their base salary, being the maximum cap under the 2021 Remuneration Policy.

|  | Date of Grant | Number of shares under award at maximum(1) | Closing Share Price at date of grant | Aggregate fair market value as of the date of grant $'000 | Performance period | Vesting date | Release Date |  |
|---|---|---|---|---|---|---|---|---|
| Mark Crossley | Mar. 3, 2023 | 183,271 | 1512.0p | 3,336.8 | Jan. 2023 – Dec. 2025 | Mar. 3, 2026 | Mar. 3, 2028 | (2) |
| Ryan Preblick | Mar. 3, 2023 | 113,510 | 1512.0p | 2,066.7 | Jan. 2023 – Dec. 2025 | Mar. 3, 2026 | Mar. 3, 2028 | (2) |
| All Other Senior Managers Combined | Mar. 3, 2023 | 729,727 | 1512.0p | 13,302.0 | Jan. 2023 – Dec. 2025 | Mar. 3, 2026 | Mar. 3, 2026 |  |

_____

(1)  The market value used to determine the number of shares subject to awards was 1518.4p, being the average mid-market closing price of Indivior shares on the five business days immediately preceding the date of grant and converted to U.S.$ using the closing exchange rate on the day immediately preceding the date of grant (GB£1:U.S.$1.1991).
(2)  Awards granted to the Executive Directors under the LTIP are subject to a two-year post-vesting holding period and are then released to the Executive Director.
(3)  Conditional awards include the right to receive an amount equal in value to any dividends payable on the number of vested shares between the date of grant and the release date.

**Indivior Share Plans**

We have established the following plans, the key terms of which are summarized below.

*The Indivior Long-Term Incentive Plan (the "LTIP")*

The LTIP was adopted by the Board on November 5, 2014 and was amended by the Remuneration Committee on November 16, 2016, November 14, 2018 and February 14, 2023.

*Administration of the LTIP*

The LTIP is administered by the Remuneration Committee or, in the case of awards not being made to directors, such other committee as authorized by the Group (the "LTIP Committee").

*Eligibility*

The LTIP Committee may select any employee of the Group, including any Executive Director, to participate in the LTIP.

*Awards*

Awards may be granted over ordinary shares and will normally take one of three forms:

•    a conditional award, which is a right to receive ordinary shares on vesting;

•    an option to acquire ordinary shares at a price set by reference to their market value at the grant date; or

•    an option to acquire ordinary shares for no cost or a nominal amount.

Awards may be satisfied by the issue of new ordinary shares, the transfer of ordinary shares held in treasury or by paying an equivalent amount in cash.

Awards are personal to the participant and may not be transferred except on death. No payment is required for the grant of an award.

139

*Timing*

Awards may only be granted within 42 days following: the announcement of the Group's results for any period; the removal of any restrictions imposed on the Group which have previously prevented an award from being granted; any date on which changes to legislation or regulations affecting share plans are announced or made; or at any other time if the LTIP Committee considers that exceptional circumstances exist. No awards may be granted under the LTIP after November 5, 2024.

*Individual limit*

Under the 2021 Remuneration Policy, the maximum annual award that may be made to any individual in respect of any financial year will be the lower of 300,000 ordinary shares or 400% of base salary.

*Plan limits*

The LTIP is subject to the limit that on any date, the aggregate nominal amount of ordinary shares that may be allocated under the LTIP may not, when added to the nominal amount of ordinary shares allocated in the previous 10 years under all employee share plans of the Group, exceed 10% of the then equity share capital of the Group.

For these purposes, ordinary shares are treated as allocated when they are issued or transferred in satisfaction (directly or indirectly) of a person's right under an award. No account will be taken of (i) ordinary shares acquired for a price equal to their market value at or about the date of acquisition and whose cost is borne by the employee; or (ii) an award to the extent to which the LTIP Committee considers that it will be satisfied by the transfer of existing ordinary shares other than treasury shares.

*Performance conditions*

Each award may, or in the case of Executive Directors of the Group must, be subject to one or more performance conditions, at least one of which must be linked to the performance of the Group, which will determine whether and to what extent the participant will receive ordinary shares. Performance conditions are normally measured over a period of three years. For Executive Directors the performance conditions are measured on one occasion only; there is no re-testing.

The LTIP Committee may waive or change performance conditions if events happen as a result of which the LTIP Committee reasonably considers it appropriate to make the change, provided that any changed performance conditions will not be materially easier or more difficult to satisfy.

*Vesting of awards*

Awards will normally only vest in accordance with the performance conditions at the end of the performance period or, if later, three years after the date of grant. Awards granted to the Executive Directors under the LTIP are subject to a two-year post-vesting holding period and are then released to the Executive Director.

Each award may, to the extent that it vests, be adjusted by the LTIP Committee to include the dividends payable on the vested shares during the period starting with the date the award is granted and ending with the date on which the award vests or the option is exercised. The adjustment will be made, as the LTIP Committee may decide, either by paying an amount equal to the dividends in cash or by paying that amount in ordinary shares. Dividend equivalents will be paid to any relevant participant as soon as practicable after entitlement to the ordinary shares under the award or, in the case of an option, after exercise.

In the case of conditional awards, the ordinary shares are issued or transferred to the participant as soon as reasonably practicable upon vesting while in the case of options, the award becomes exercisable on vesting and may be exercised during the exercise period specified at the time of grant.

140

Alternatively, the LTIP Committee may decide to satisfy awards on vesting by a cash payment.

The LTIP includes a clawback provision under which the LTIP Committee may reduce and/or recover awards. Awards may be adjusted subsequent to their exercise if, before the later of (i) the second anniversary of the date a conditional award vests or an option becomes exercisable, as applicable, and (ii) the fifth anniversary of the award date the LTIP Committee determines in its absolute discretion that there was a material misstatement of the Group's results for any of the financial years during a performance period, there was serious misconduct by the participant, or at any time from the award date (or the start of the performance period, if earlier) there was serious reputational damage to any member of the Group.

*Termination of employment*

If a participant ceases to be employed within the Group for any reason other than misconduct, he is entitled to retain any awards which have vested.

If a participant ceases to be employed within the Group, his unvested awards lapse unless he leaves for a permitted reason. A permitted reason is death, injury, ill-health, disability, redundancy, retirement with his employer's agreement, the sale of the company or business in which the participant works and such other reason as the LTIP Committee may decide.

Where a participant leaves for a permitted reason and the award is subject to a performance condition, the award will vest after the end of the performance period and be released on the normal release date. Alternatively, the LTIP Committee may decide that the extent to which the award will vest will be measured in accordance with a determination of the performance conditions and other conditions at the end of the financial year in which the cessation of employment occurs. The award will also be reduced pro rata to reflect the period from the date of cessation of employment until the date of the end of the performance period as a proportion of the performance period, unless the LTIP Committee decides otherwise.

In the case of death, the performance conditions will not apply and the award will vest and be released on the date of death, but the award will be reduced on a time pro-rated basis. If the award is not subject to performance conditions, the award will vest on the normal vesting date unless the LTIP Committee decides otherwise. Options that have already vested, or which vest following termination of employment, may be exercised within the 12 months following their release.

### Change of control

Special rules apply in the event of a change of control, including a change of control resulting from a scheme of arrangement or a takeover.

Unless the LTIP Committee decides otherwise, awards will vest (if at all) on the date of the change of control, but only to the extent that any performance conditions have been satisfied at that date as determined by the LTIP Committee and the extent to which the award vests shall be reduced pro rata to reflect the period from the date of the event until the date of the end of the performance period as a proportion of the performance period.

In the event of a change of control, participants may or the LTIP Committee may require that participants surrender their awards in return for substitute awards over shares in the acquiring company or another company. The LTIP Committee may allow awards to vest on a similar basis in the event of a demerger or other corporate events.

### Listing

So long as the ordinary shares are listed on the Official List and traded on the London Stock Exchange, the Group will apply for any new ordinary shares issued under the LTIP to be admitted to the Official List and for permission to trade in those ordinary shares. Ordinary shares issued under the LTIP

141

will rank equally in all respects with existing ordinary shares except for any rights attaching to the ordinary shares by reference to a record date prior to the date of allotment.

### Variation of Capital

On any variation of the Group's share capital, or in the event of a demerger, special dividend or other circumstances which the LTIP Committee considers appropriate, the LTIP Committee may adjust the number or class of ordinary shares or securities comprised in an option or conditional award and, in the case of an option, the option price.

### Benefits non-pensionable

Benefits under the LTIP will not form part of a participant's remuneration for pension purposes.

### Amendments

The LTIP Committee may, without the approval of the Group, amend the LTIP through any minor changes to benefit the administration of the LTIP, to comply with or take account of the provisions of any proposed or existing legislation or changes to any applicable legislation, or to obtain or maintain favorable tax, exchange control or regulatory treatment for participants or for any company in the Group.

Except as described above, no amendment which is to the advantage of existing or future participants may be made, without the prior approval of the Group in general meeting, to those provisions dealing with eligibility, limitations on the number of ordinary shares which may be issued under the plan, or the rights of a participant in the event of a capitalization issue, rights issue or open offer, sub-division or consolidation of shares or reduction of capital or any other variation of capital of the Group.

### HM Revenue and Customs in the United Kingdom ("HMRC") registered options

The LTIP allows options to be granted in satisfaction of the conditions of Schedule 4 of the Income Tax (Earnings and Pensions Act) 2003, as amended (the "ITEPA").

### U.S. Participants

The LTIP contains a part to ensure that options granted to and held by U.S. participants have an exercise price that is at least fair market value, and that conditional awards granted to and held by such U.S. participants either meet the requirements of the short-term deferral exemption to Section 409A of the United States Internal Revenue Code 1986, as amended, or are compliant therewith.

### Canadian Participants

The LTIP contains a part to ensure that an award made to a participant who is subject to taxation under the laws of Canada is not taxed as a "Salary Deferral Arrangement." All awards subject thereto are administered and interpreted in a manner which complies with such intent.

### The Indivior Savings-Related Share Option Plan (the "Sharesave Plan")

The Sharesave Plan was adopted by the Board on November 5, 2014 and amended by the Remuneration Committee on May 16, 2017 and February 14, 2023.

### Administration

The Sharesave Plan is administered, in accordance with its rules, by the Board or a duly authorized committee thereof.

142