# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

*In re DXC Technology Company Securities Litigation*

Civil Action No. 1:24-cv-01351-AJT-WEF

THIS DOCUMENT RELATES TO: ALL ACTIONS

## MEMORANDUM OPINION AND ORDER

In this securities fraud action, Lead Plaintiff Sparinvest S.A. ("Plaintiff") alleges that Defendant DXC Technology Company ("DXC") and Executive Defendants Michael J. Salvino,[1] Kenneth P. Sharp,[2] and Robert F. Del Bene[3] (collectively the "Executive Defendants") made false or materially misleading statements or omissions that inflated DXC's stock price between May 26, 2021 and May 16, 2024 (the "Class Period") in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the Security and Exchange Commission ("SEC") Rule 10b-5. *See* [Doc. No. 65]. Plaintiff brings this action on behalf of themselves and all other people or entities who purchased or otherwise acquired DXC's common stock during the Class Period to recoup damages arising from the alleged false or materially misleading statements. *Id.* at 4. Before the Court is the Defendants' Motion to Dismiss for Failure to State a Claim, [Doc. No. 66] (the "Motion"), which the Court took under advisement following a hearing on March 7, 2025. Upon consideration of the Motion, the memoranda and exhibits

---

[1] Salvino was DXC's President & Chief Executive Officer from September 12, 2019 through December 18, 2023. [Doc. No. 65] ¶ 34.

[2] Sharp was DXC's Executive Vice President & Chief Financial Officer from November 30, 2020 through June 1, 2024. *Id.* ¶ 35.

[3] Del Bene was DXC's Executive Vice President and Chief Financial Officer from June 2023 until, at least, the filing of the Complaint. *Id.* ¶ 36.

1

submitted in support thereof and in opposition thereto, the argument of counsel at the hearing, and for the reasons stated below, the Motion, [Doc. No. 66], is **GRANTED**, and this action is **DISMISSED**.

## I. BACKGROUND

Plaintiff alleges the following in its Corrected Consolidated Amended Complaint ("AC"):[4]

DXC provides information technology ("IT") services to companies and employs approximately 130,000 employees from over 70 countries. [Doc. No. 65] ¶¶ 31, 56. It was created in the April 2017 merger of Computer Sciences Corporation ("CSC") and HP Enterprise Services ("HP").[5] *Id.* ¶¶ 1, 31, 56. At the time of the merger, DXC's then-Chief Executive Officer ("CEO"), John Michael Lawrie, stated that DXC was experiencing declining revenue, deceleration of its customer base, and on the lower end of growth and profitability. *Id.* ¶ 69. Due to the company's financial position, Lawrie announced that DXC sought to increase revenue through mergers and acquisitions ("M&A") in addition to emphasizing organic growth. *Id.* ¶¶ 73-74.

From 2017 through 2019, DXC acquired thirteen companies. *Id.* ¶¶ 3, 32, 81, 90. Although increasing revenue through M&A is a common way to increase company revenue, acquisitions create significant restructuring and "transition, separation, and integration" ("TSI") expenses[6] which can reduce profitability. *Id.* ¶¶ 77-78. However, investing in restructuring and TSI expenses

---

[4] The Defendants submitted multiple exhibits with the Motion, which the Court considered without converting the Motion to a motion for summary judgment since the exhibits were publicly available SEC filings or transcripts from investor calls that were incorporated into the Complaint. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014) (considering publicly available SEC filings); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (permitting district courts to review documents that are incorporated into the complaint at the motion to dismiss stage).

[5] The newly-formed DXC boasted approximately $26 billion of revenue and approximately 5,000 clients. [Doc. No. 65] ¶ 68.

[6] Restructuring and integration expenses "include costs related to workforce and real estate optimization and other similar charges, along with integration, planning, financing, and advisory fees and other costs associated with an acquisition." *Id.* ¶ 78. Where newly-merged companies use different IT, finance, or human resources systems, failure to properly integrate these systems can result in dis-synergies and increase operational costs and reduce free cash flow. *Id.* ¶¶ 78-79.

after an acquisition can be a prudent business investment because failure to do so may lead to dis-synergies, which arise either (1) where it is more expensive to run the merged company than it was to run the two companies separately or (2) where the revenue of the merged company is lower than it was for two separate companies. *Id.* ¶ 70.

On September 11, 2019, Lawrie resigned, and Salvino immediately replaced Lawrie as DXC's CEO. *Id.* ¶¶ 4, 92. During his first earnings call as CEO, Salvino stated that he planned to focus on integrating the newly-acquired businesses, simplifying DXC's operating model, and streamlining its offerings to customers to improve DXC's revenues. *Id.* ¶¶ 5, 94. Salvino announced that "[g]oing forward, DXC will run as one company." *Id.* ¶¶ 100-02. However, as DXC started these restructuring efforts and throughout the Class Period, it repeatedly issued SEC filings that warned that the restructuring "may not obtain . . . cost savings," [Doc. No. 67-16], may lead to "inefficiency," and may impact cash flow. [Doc. No. 67-20].

Against this backdrop, Plaintiff alleges that during the Class Period, the Executive Defendants made statements over thirteen investor calls and conference presentations that contained false or materially misleading statements regarding DXC's progress and success in integrating the myriad of newly-acquired business. More specifically, and by way of summary, Plaintiff alleges the following actionable statements:[7]

**Statement 1**: On a May 26, 2021 earnings call, Sharp and Salvino set forth five financial priorities for DXC, which included "winding down restructuring and TSI costs" from approximately $900 million annually to $550 million in fiscal year ("FY") 2022 and $100 million by FY2024 to "drive cash flow and improve earnings power." *Id.* ¶¶ 9, 113, 196. Salvino and Sharp opined that this reduction in TSI expenses would improve DXC's free cash flow ("FCF") from

---

[7] The relied upon statements are listed verbatim in Appendix A; however, for the sake of brevity, the Court reproduced the most salient portions of the statements herein while considering the entirety of the statement in its analysis *infra.*

negative $652 million in FY2021 to positive $500 million in FY2022 and 1.5 billion by FY2024. *Id.* ¶¶ 9, 196.

**Statement 2**: On June 17, 2021, Salvino and Sharp both spoke at DXC's Investor Day, at which Salvino expressed that DXC had an "unyielding focus on reducing restructuring and TSI expenses," *id.* ¶ 200, and planned to reduce its TSI expenses "from $900 million to $550 million and then ultimately to $100 million." *Id.* ¶ 201.

**Statement 3**: In the same speech, Salvino also noted that DXC was "making sure that any integration that we've done we're absolutely just going to make [sure] . . . it's done on the appropriate way." *Id.* ¶¶ 123, 201.

**Statement 4**: That same day, Sharp reiterated that DXC was "going through and evaluating and ending those [TSI] projects and shutting them down, getting them completed and getting them to the right results." *Id.* ¶ 201.

**Statement 5**: On an August 4, 2021 earnings call, Sharp reported that "[r]estructuring and TSI expenses were $76 million, down 58% from prior year," and DXC remained on track with reducing its TSI expenses to the anticipated levels and assured investors that with "[Salvino]'s leadership, we will continue to make decisions to better position the company for the longer-term, creating a sustainable business." *Id.* ¶¶ 205, 206; *see also id.* ¶ 125.

**Statement 6**: At a Citigroup Technology Conference presentation on September 14, 2021, Salvino reported that DXC had completed the "stabilization phase," and it was now "building the foundation for growth, meaning simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there." *Id.* ¶ 210.

**Statement 7**: A few months thereafter, on a November 3, 2021 earnings call, Sharp reported that "[a] key driver of improving cash flow is to continue to reduce our restructuring and

4

TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business addressing our outsized cost structure in certain countries and to reduce our facilities footprint" and reported that DXC remained on track to hit the TSI reduction targets announced in May 2021. *Id.* ¶¶ 129, 213.

**Statement 8**: On the November 3, 2021 call, Salvino reiterated these points by claiming that DXC's financial results showed "reduced debt, shrinking restructuring and TSI costs, increased margin and EPS and stronger free cash flow are all sustainable and a result of the operational work we are doing" and that these results "give[] us confidence that we [DXC] will achieve our FY '24 double-digit margin guidance." *Id.* ¶ 214. However, Salvino also informed investors that DXC was in the "early innings" of its restructuring. [Doc. No. 67-7] at 15.

**Statement 9**: At a February 2, 2022 earnings call, Sharp reiterated that DXC's "focus on driving structural changes has improved our ability to generate and hold on to more cash," and as a result, DXC experienced a total inflow of $696 million FCF from operations. [Doc. No. 65] ¶¶ 220-21. Despite the progress, Sharp reported that DXC was continuing reducing the TSI expenses and "expect[ed] to spend $500 million less on Restructuring and TSI expense than last year, while expanding margins by over 200 basis points." *Id.* ¶¶ 133, 222.

**Statement 10**: In May 2022, Salvino reported that DXC spent just $300 million on restructuring and TSI expenses (under the proposed budget), saw $743 million in FCF (which exceeded DXC's $500 million goal for FY2022), and confirmed that DXC would continue reducing its TSI expenses moving forward. *Id.* ¶ 134.

**Statement 11**: At an earnings call on May 25, 2022, Sharp reported that DXC "achieved a lot in the year, improving transparency into our performance, strengthening our balance sheet, significantly improving free cash flow, reducing restructuring and TSI expense, and executing on

5

our capital allocation program" and reported that DXC's "financial foundation" was in a stronger place. *Id.* ¶ 227.

**Statement 12**: Shortly thereafter at a presentation at the Cowen & Company Technology Conference on June 2, 2022, Sharp reported that when he first took over as CEO, "[a] lot of those [businesses] didn't get integrated in" and told investors "[t]hat's where we think we've got a lot of opportunity in the business, right, continuing driving the business together, drive kind of a unified face to the customer and make sure we're leveraging our accounts" and estimated that the future TSI expense reductions will lead to "$300 million or more cash improvement." *Id.* ¶¶ 231-32.

**Statement 13**: At an earnings call on November 3, 2022, Sharp reported that DXC would "continue to tightly manage our restructuring and TSI expenses" and reported that it spent approximately $57 million in that FY quarter and approximately $92 million in the first half of FY2022 on TSI expenses. *Id.* ¶ 236. Sharp informed investors that DXC "expect[ed] to see an uptick in restructuring expense in the second half of the year as we execute on our cost optimization efforts." *Id.*

**Statement 14**: On a February 1, 2023 earnings call, Sharp reported that DXC was "continu[ing] to tightly manage restructuring and TSI expenses" and reported that the "year-to-date, restructuring in TSI is $147 million, down $124 million from the prior year." *Id.* ¶ 240. Sharp also added that DXC saw nearly two years of positive FCF over $600 million, and the biggest driver of the cash flow was "the focus on driving down the restructuring [and] TSI." *Id.* ¶¶ 139, 241.

**Statement 15**: On May 18, 2023, Sharp resigned as CEO, effective on June 15, 2023. *Id.* ¶ 173. On an earnings call that same day, Sharp reported that DXC "continue[d] to tightly manage

6

restructuring and TSI expense[s]" and DXC's "restructuring and TSI expense was 232 million for the year, 68 million lower than our guide." *Id.* ¶ 246.

**Statement 16**: Sharp also expressed that DXC's "transformational journey . . . has delivered a better culture, stronger customer relationships, a better sales model, revenue stability, expanded margins, and free cash flow." *Id.* ¶ 142.

**Statement 17**: On August 2, 2023, DXC held a conference call for investors in which it was announced that DXC experienced a -9.9% decline of organic revenue over the first quarter of FY2024, negative FCF of $75 for the same quarter, and announced a reduction in its estimated FCF for FY2024 from $900 million to $800 million. *Id.* ¶¶ 18, 176. On the same call, Salvino reported that DXC "ha[s] made improvements in both leadership and our operating model to grow our company and to be even more competitive. We are managing areas that we can control very well, like free cash flow and restructuring in TSI, and the financial analytics that Rob and his team are focused on building will allow us to deliver more predictable and repeatable results." *Id.* ¶ 250.

**Statement 18**: On the same day, Del Bene reported that the "cost reduction plans that support the EBIT, the margin, the reduced margin, and . . . operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800" million FCF level and believed that the "operational improvements" being made would benefit DXC "over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level." *Id.* ¶¶ 251-52. Following this announcement—between August 2, 2023 to August 3, 2023—DXC's common stock declined 29.44% from $27.07 to $19.10. *Id.* ¶ 19.

**Statement 19**: On another earnings call on November 1, 2023, Del Bene reported that DXC increased its TSI expenditures to facilitate the restructuring of facility leases but maintained that

DXC was "tightly managing restructuring, and w[ould] continue to evaluate opportunities to streamline our operations" and was "starting to see the benefits of it." *Id.* ¶¶ 256, 258. In the same call, Del Bene reported that several factors were contributing to DXC's FCF but "[a]nother big contributor is a significant cost reduction activities" and asserted that DXC was "very successful in achieving the cost reduction goals this year" and is "on track with our cost reduction goals, and that will continue." *Id.* ¶¶ 185, 257.

**Statement 20**: On the same call, Salvino reported that DXC was continuing to oversee the operating model and reported "it takes most companies a year or 2 to get these operating models right[, but w]e now are starting to see the benefits of it because after last quarter . . . [and] I couldn't be more proud of the execution of our team this quarter." *Id.* ¶¶ 186, 258. Salvino also reported that "you're starting to see a team really starting to deliver now. . . . and having a consistency around hitting our financial performance." *Id.* ¶¶ 186, 258.

After hearing the above statements, various analysts issued statements that described DXC's progress towards increasing FCF as promising and at various points, increased their price targets per share. *Id.* ¶¶ 197, 202, 207, 216, 223, 228, 237, 247. However, on December 20, 2023, DXC announced that Salvino was immediately stepping down as CEO, and overnight, the price of DXC's common stock declined 12.15%, from $25.03 on December 19, 2023 to $21.99 on December 20, 2023. *Id.* ¶ 20. Raul Fernandez took over as DXC's Interim President and CEO. *Id.* ¶ 187.

Approximately six months after taking over DXC, Fernandez held an earnings call to discuss DXC's FY2024 results, in which Fernandez explained that DXC's revenues declined 5.3%, estimated that its FY2025 FCF would be lower than previously expected, *id.* ¶¶ 21, 189, and explained why there would be a lower FCF than expected, [Doc. No. 67-15] at 9. Fernandez also

reported that despite some negative results, in FY2024, DXC experienced its third straight year of FCF over $700 million. *Id.* at 5. Fernandez also announced a new reorganization, stating DXC had a "number of systems still in place that were acquired over time" but were "never integrated, never deduped" and as a result, it was "clear to [him] that the previous restructurings did not set a real, clean, solid, fully integrated baseline for profitable growth." [Doc. No. 65] ¶ 21. Fernandez announced that DXC would begin "undertaking a restructuring initiative aimed at simplifying and enhancing [DXC's] operations." *Id.* ¶ 22. Specifically, Fernandez reported that the reorganization would consolidate the enterprise business systems and optimize back-end office functions. [Doc. No. 67-15] at 7. Following Fernandez's announcement, DXC's common stock declined 16.9%, from $19.88 on May 16, 2024 to $16.52 on May 17, 2024. [Doc. No. 65] ¶ 24.

The core of Plaintiff's claim is that Fernandez's statements that DXC must undergo another restructuring initiative to integrate systems—only a few months after taking over as DXC's CEO—shows that the twenty statements made by the Executive Defendants during the Class Period about the success of reducing DXC's integration costs were false. *See id.* ¶¶ 13, 17, 144. In further support of the alleged falsity and scienter for each relied upon statement, Plaintiff points to statements by seventeen of DXC's former employees, *see id.* ¶¶ 39-55, 145-174, two of which stated that during the Class Period, DXC was not interested in meaningfully integrating the businesses as it was cheaper for DXC not to. *Id.* ¶¶ 145, 148. According to these employees, the failure to integrate caused employees within DXC to have different email systems, time sheets, computer systems, sales teams, delivery systems, human resources departments, client systems, and back-end systems, *id.* ¶¶ 145, 148, 151-52, 155, 161, 163-64; DXC never integrated Salesforce properly, which burdened employees with working in multiple tools at once and transferring data between tools, which was both clunky and increased the risk of errors, *id.* ¶ 159; *see also id.* ¶ 154;

DXC lacked a standardized sales team and client systems, and as a result, unintegrated DXC companies would submit competing contract proposals to the same clients, *id.* ¶ 148; some unintegrated company employees stopped attending DXC-led meetings altogether and would only meet with their internal teams, *id.* ¶¶ 156-57; and some of the acquired businesses did not want to integrate with DXC, which led to the refusal to participate in DXC-led deals without certain terms being met. *Id.* ¶¶ 163, 166. The employees have further stated that to make it appear that DXC's finances were better than they were, DXC engaged in repeat layoffs, which disproportionately impacted more senior employees with subject matter expertise and strained customer relationships. *Id.* ¶¶ 146-147, 149.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint, *see Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994), and should be granted "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The Private Securities Litigation Reform Act ("PSLRA") requires certain elements of a plaintiff's claim to be plead with greater particularity than the traditional Rule 8 standard. Specifically, a plaintiff who alleges "that the defendant (A) made an untrue statement of material fact; or (B) omitted to state a material fact . . . shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Similarly, where a securities action requires showing scienter, "the complaint shall, with respect to each act or omission alleged to violate [the securities laws], state with particularity giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2).

In cases like this one, Plaintiff must allege facts sufficient to support material factual misrepresentations or omissions made by defendants, *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342–43 (4th Cir. 2003), and "[c]ourts have employed a statement-by-statement analysis" in completing this analysis. *In re Genworth Fin. Inc. Secs. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015). A court must also analyze whether "plaintiffs plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false." *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 579 (E.D. Va. 2006). In that regard, the plaintiff must "allege facts sufficient to infer that . . . Defendants were *actually aware* of internal information inconsistent with their statements"—meaning, the statements must be both actually false or misleading, and Defendants must know that those statements are so. *In re Maximus, Inc. Secs. Litig.*, No. 1:17-cv-0884, 2018 WL 4076359, at *15 (E.D. Va. Aug. 27, 2018) (emphasis added).

## III. DISCUSSION

A. Count I: Violations of Section 10(b) of the Exchange Act & Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of" the rules propounded by the SEC. 15 U.S.C. § 78j(b). Rule 10b-5 similarly provides in relevant part that "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Plaintiff must therefore specifically allege "(1) a

11

material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017). The Plaintiff must also "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1)(B), in addition to pleading particularized facts that the defendant acted with the requisite scienter. The "required state of mind" under 10(b) is "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319, or severe recklessness that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 621 (4th Cir. 1999).

In its Motion, DXC challenges that Plaintiff has not alleged (1) an actionable material misrepresentation or omission, (2) scienter or (3) loss causation.[8] [Doc. No. 67] at 11-12.

**1. Plaintiff has not alleged an actionable false statement or omission.**

As reflected above, the basis of a Section 10(b) claim is that the defendant made "a public misrepresentation for which it may be found primarily liable." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 369 (4th Cir. 2004). The challenged statement must therefore either be false statement or an omission that renders the statement misleading that is demonstrably true or false. *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999); *see also Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091-96 (1991) (observing that even opinions may be demonstrably true or false and therefore are actionable). The statement or omission of fact also must be material,

---

[8] Because the Court determined that there was no actionable misstatement and insufficient allegations of scienter, the Court did not analyze whether Plaintiff sufficiently alleged particularized facts of loss causation.

meaning that "there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman*, 197 F.3d at 682-83 (citations omitted).

Certain statements are not actionable statements as a matter of law, including immaterial statements that no reasonable investor would rely on[9] and forward-looking statements about management's plans and objectives for future operations.[10] The PSLRA's safe-harbor for forward-looking statements applies to "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," as well as "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," 15 U.S.C. § 78u–5(i)(1), if (1) the statements were accompanied by meaningful cautionary language,[11] and (2) the speaker lacked actual knowledge of the statement's falsity at the time the statement was made. *See id.* § 78u–5(c)(1). Where a plaintiff alleges that forward-looking statements are actionable based on a defendant's actual knowledge of falsity, the plaintiff must allege particularized facts that show that the defendant had actual knowledge that the

---

[9] *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("'Soft,' 'puffing' statements . . . generally lack materiality because the market price of a share is not inflated by vague statements predicting growth[,]" including such statements as a business unit was "poised to carry the growth and success of 1991 well into the future[.]" (citing *Howard v. Haddad*, 962 F.2d 328 (4th Cir. 1992))); *see also In re Cable & Wireless, PLC, Secs. Litig.*, 332 F. Supp. 2d 896, 900 (E.D. Va. 2004) (defining an immaterial statement as "a certain kind of rosy affirmative commonly heard from corporate managers and familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.").

[10] *See Raab*, 4 F.3d at 290 ("[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws."); *see also In re DXC Tech. Co. Secs. Litig.*, No. 1:18cv01599, 2020 WL 3456129, at *5 (E.D. Va. June 2, 2020) (collecting cases). Even statements that include present tense may still fall within the safe harbor if it cannot "'meaningfully [be] distinguished from' Defendants' goals." *Emps. Ret. Sys. of the City of Baton Rouge & Parish of East Baton Rouge v. Macrogenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023).

[11] *See Paradise Wire & Cable Defined Pension Plan v. Weil*, 918 F.3d 312, 321 (4th Cir. 2019) ("Projections of future performance are generally not actionable under the federal securities laws as long as they are not worded as guarantees.").

forward-looking statements were false *when made* for the statement to fall outside of the safe harbor's protections. *See In re CIENA Corp. Secs. Litig.*, 99 F. Supp. 2d 650, 661–62 (D. Md. 2000); 15 U.S.C. § 78u–5(c)(1)(B)(i).

DXC argues that the alleged false statements are "mere puffery, forward-looking statements protected by the PSLRA's safe harbor, subjective opinions, or a combination of the three," and not demonstrably true or false. [Doc. No. 67] at 20-21. DXC also disputes that Plaintiff has not shown the falsity in any of the alleged misstatements. *Id.* at 16. Conversely, Plaintiff argues that the misstatements were "concrete claims about core aspects of DXC's business—often in response to pointed questions from analysts" rather than merely being puffery or subjective opinions. [Doc. No. 73] at 9. Further, Plaintiff argues that the PSLRA's safe harbor does not shield DXC from liability because the statements all consist of present or historical representations, rather than forward-looking statements. *Id.*

> *i. Statements of DXC's Plans to Reduce TSI Expenses Fall within the PSLRA's Safe Harbor (Statement Nos. 1, 2, 6, 9, and 10)*

**Statements 1, 2, 6, 9,** and **10**, reproduced in full in Appendix A, each involve statements by the Executive Defendants that concern forward-looking plans for DXC to reduce TSI expenses in the future. *See* [Doc. No. 65] ¶¶ 9, 113, 133-34, 196, 201, 222. **Statement 1,** repeated in substance in **Statement 2**, announced that DXC would be "winding down restructuring and TSI costs" from approximately $900 million annually to $550 million in FY2022 and $100 million by FY2024 to improve future FCF, *id.* ¶¶ 9, 113, 196, a message that was then reiterated in **Statements 2** and **9** shortly thereafter. *Id.* ¶¶ 133, 201, 220-22. **Statement 10** reiterates that DXC plans to continue reducing its TSI expenses to try and boost its FCF, *id.* ¶ 134, while **Statement 6** contains only vague statements that DXC is "building the foundation for growth" so that the company can meet its 2024 targets. *Id.* ¶ 210.

14

Each of these statements is a forward-looking statement about the company's plans for future operations and future financial goals that merely conveyed DXC's future planned reduction of TSI expenses. Plaintiff has not made any particularized allegation that would remove these statements from the otherwise applicable safe-harbor, such as the Executive Defendants knew these statements were false at the time they were made; to the contrary, the undisputed allegations in the AC and the documents incorporated therein demonstrate that DXC *did* significantly cut its TSI expenses, and because of this, DXC experienced substantial *improvements* in its FCF, debt reduction, and other positive financial reports during the Class Period, which allegedly resulted, at least in part, by reducing TSI expenses. *See e.g.*, [Doc. No. 67-7] at 5, 7-8. Accordingly, the Court finds that **Statements 1, 2, 6, 9,** and **10** are not actionable misstatements because Plaintiff has neither alleged that these statements are false nor alleged particularized facts demonstrating that the speakers knew these statements were false at the time they were made, and therefore, they fall within the PSLRA's safe harbor.

> *ii. Statements of DXC's Actual TSI Expense Reduction Fall within the PSLRA's Safe Harbor (Statement Nos. 5, 13, 14, 15, and 19)*

**Statements 5, 13, 14, 15,** and **19**, reproduced in full in Appendix A, are statements by the Executive Defendants that report DXC's actual reductions in TSI expenses. *See* [Doc. No. 65] ¶¶ 205-06, 210, 125, 139, 185, 236, 240-41, 246, 257. In **Statement 5,** Sharp reported that DXC's TSI expenses were down 58% from the previous year and reported it planned to continue positioning the business better moving forward. *Id.* ¶¶ 125, 205-06. Similarly, in **Statements 13**, **14** and **15**, Sharp reported how much DXC had already spent in TSI restructuring so far in that year and expressed that DXC would continue to closely manage the TSI expenses moving forward, *id.* ¶¶ 236, 240, 246; and in **Statements 14** and **19**, Del Bene and Sharp reported that DXC was on

track with its TSI cost reduction goals for the year, and this reduction improved DXC's FCF. *Id.* ¶¶ 139, 185, 214, 257.

**Statements 5, 13, 14, 15,** and **19** are present representations about the status of reducing TSI costs with vague references to future plans to continue TSI cost-cutting efforts. As set forth above, the AC and incorporated exhibits undisputedly show that DXC did significantly cut its TSI expenses during the Class Period and increase its FCF during the same period. *See id.* ¶ 134 (exceeding DXC's original guidance and reporting $743 million in FCF for FY2022); [Doc. No. 67-10] at 6 (announcing DXC experienced a swing of $1.4 billion in FCF over approximately two years); [Doc. No. 67-15] at 5 (sharing that DXC experienced three years in a row of FCF over $700 million as of FY2024). Plaintiff has neither plead particularized allegations that these statements were false or materially misleading nor plead any evidence that these statements were made with the intent to defraud investors or recklessness. Instead, the statements made by the Executive Defendants show that, at the time they made these statements, the Executive Defendants were reporting DXC's actual and true reductions of TSI expenses and the effects of the same. Some parts of the Statements also discuss future plans that DXC will continuing trimming TSI expenses which, as discussed above, fall within the PSLRA's safe harbor. Accordingly, the Court finds and concludes that **Statements 5, 13, 14, 15,** and **19** are not actionable.

> *iii. Statements that DXC was Wrapping up Integration Projects "Correctly" are too Vague to be Actionable (Statement Nos. 3 and 4)*

Both **Statements 3** and **4**, reproduced in full in Appendix A, conveyed that DXC was "making sure that any integration that we've done" is "done in the appropriate way [before] mov[ing] on from there," and Sharp reiterated this point by claiming DXC had "gone through and evaluat[e] and end those [integration] projects . . . shutting them down, getting them completed, and getting them to the right results." [Doc. No. 65] ¶¶ 123, 201.

16

Plaintiffs have not identified that any *single* integration effort that was referenced in these statements did not occur. DXC was integrating thirteen newly-acquired businesses into two other newly-merged companies, which required a plethora of integration efforts between the various companies and their systems, and there are no allegations that the integration efforts said to have taken at the time of these statements did not happen. Instead, Plaintiff's allegations that this is a false statement rests on the idea that every possible integration effort must have been started *and* completed before DXC could wind down its investment in TSI expenses. But the Executive Defendants never said that all the integration plans were completed and only represented that the unidentified integration efforts that were already in progress were being completed, and these statements were couched within vague statements of corporate optimism that these completed integration efforts would improve DXC's financial outlook.

Even if these statements could be used to support a claim, Plaintiff has not alleged sufficient evidence of intent to mislead investors or that these statements were made in reckless disregard of the truth. Plaintiff's AC identifies, in isolation, a few statements by the Executive Defendants which express the cost cutting efforts regarding TSI expenses; however, the full transcripts from the investor calls demonstrate that these measures saw significant improvement in reducing DXC's debts, increasing revenues, and increasing FCF. *See e.g.*, [Doc. No. 67-7] at 5, 7-8. The Executive Defendants made these statements but never represented that the thirteen merged companies were fully integrated; instead, they represented that these efforts at reducing TSI expenses were improving other aspects of the business. Accordingly, the Court finds that **Statements 3** and **4** are not actionable.

The Court's conclusion in this regard is consistent with the analysis and conclusions reached by other courts considering similar allegations. For example, in *City of Hollywood Police*

17

*Officers' Retirement System v. Henry Schein, Inc.*, the Eastern District of New York weighed whether certain statements "when taken together, appear[ed] to suggest that the company had successfully completed integration of the sales force" between two newly-merged companies, was actionable. 552 F. Supp. 3d 406, 416 (E.D.N.Y. Aug. 3, 2021). Because the plaintiffs in *Hollywood* identified *specific* integration efforts that were represented to be completed, even though no integration had taken place, the court found that the statements were actionable "concrete factual representations." *Id.* at 415-16. Conversely, in *In re Diebold Nixdorf, Inc. Securities Litigation*, the Southern District of New York, the Southern District of New York found that statements that integration efforts were "in process," that the newly-merged companies were "aligned" in sales force, goals, and quotas, or that they were confident in their ability to properly integration were "general and vague statements of corporate optimism" that amounted to nothing more than puffery. No. 19-CV-6180, 2021 WL 1226627, at *2, 11 (S.D.N.Y. Mar. 30, 2021). Statements 3 and 4 are more akin to *Diebold* rather than *Hollywood*. [12]

---

[12] The other cited cases relied upon by Plaintiff typically involved concrete representations of specific facts, rather than, as in this case, statements that are either (1) true, (2) vague corporate puffery, or (3) covered by the PSLRA's safe harbor. For example, *SS Richmond LLC v. Harrison* involved representations by the Defendants that construction project could begin "immediately" because he already secured financing, even though the Defendants had neither. 640 F. Supp. 3d 453, 470 (E.D. Va. 2022). *Ollila v. Babcock & Wilson Enters., Inc.* involved a defendant's statement that an additional piping redesign was unforeseeable even though there was evidence that four other sites had similar issues previously. No. 3:17-cv-109, 2018 WL 792069, at *2 (W.D.N.C. Feb. 8, 2018). Similarly, in *E. Ohman J:or Fonder AB v. NVIDIA Corporation*, the defendant, in an attempt to deflate their revenues, represented that the reported revenues for one product was the "majority" of its revenues, without mentioning that another product generated over double the amount of that revenue. 81 F.4th 918, 936 (9th Cir. 2023). *Union Asset Management Holding AG v. SanDisk LLC* did involve statements somewhat comparable (*e.g.*, that integration efforts were going "quite well" and given the latest acquisition that it was integrating, the integrated company "gives us number one market share position."), No. 15-cv-01455-VC, 2017 WL 3097184, at *1-2 (N.D. Cal. June 22, 2017), but the Northern District of California found that these statements were actionable only because they failed to disclose other aspects of the company's performance that would have been important to investors, such as that it missed its Q4 goals by a wide margin and was struggling to fully integrate due to sales model problems. *Id.* at *2. Here, however, there are no allegations that the Executive Defendants did not meaningfully disclose the company's current financial status in each of the relied upon investor calls.

*iv. Statements of DXC's Plans to Continue the Reductions are within the PSLRA's Safe Harbor, and Statements of the Benefits DXC saw from the TSI Reductions are not False or Materially Misleading (Statement Nos. 7, 8, 11, 12, 16, 17, 18, and 20).*

**Statements 7, 8, 11, 12, 16, 17, 18,** and **20**, reproduced in full in Appendix A, are similar to some of the above statements, but in addition to reporting that DXC had cut its TSI expenses, the Executive Defendants also reported that DXC was experiencing positive effects, at least in part, due to the TSI expense reduction. A vast majority of these statements are loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that, if not within the PSLRA's safe harbor, no reasonable investor could find them important to the total mix of information available." *See In re Cable*, 321 F. Supp. 2d at 766–67. Moreover, many of them are also true.

In **Statement 7**, Sharp reported that "[a] key driver of improving cash flow is to continue to reduce our restructuring and TSI spend," which he believed was "a prudent investment in the business," and reported that DXC remained on track to hit the TSI reduction targets that were previously announced. [Doc. No. 65] ¶¶ 129, 213. As to the third portion of this statement, as set forth above, there is no evidence that DXC did not cut its TSI expenses, and the Court cannot conclude that there are any particularized allegations of falsity. As to the former two portions of the statement, they are forward-looking statements that fall within the PSLRA's safe harbor, and as set forth above, Plaintiff has not plead any particularized facts that Sharp knew that DXC was not planning to reduce TSI expenses even though he stated they had. To the contrary, statements made in the same investor's call showed that DXC had seen benefits of this TSI reduction, namely in (1) improving revenue growth, [Doc. No. 67-7] at 5; (2) seeing its "third straight quarter of both improving organic revenue growth and sequential margin expansion, *id.*; (3) showing progress from the double-digit declines in organic revenue, *id.* at 7; and (4) increasing "free cash flow from

19

the quarter was $404 million, up 33% compared to the previous year." *Id.* at 8. When viewing **Statement 7** within the context of the other, quantitative improvements to DXC that were announced at the same time as Statement 7, the Court cannot find sufficient facts that any part of the statement was either false or made with the requisite scienter to form an actionable basis for the 10(b) claim.

**Statement 8** conveyed that DXC saw "reduced debt, shrinking restructuring and TSI costs, increased margin and EPS and stronger free cash flow are all sustainable and a result of the operational work we are doing" and opined that these results "give[] us confidence that we will achieve our FY '24 double-digit margin guidance." [Doc. No. 65] ¶ 214. Plaintiff does not dispute that DXC saw these debt reductions and other financial benefits, but instead, disputes that DXC believed that these changes were "sustainable" as a result of the reorganization efforts; but, this forward-looking statement amounts to nothing more than vague corporate optimism that cannot serve as an actionable basis for a 10(b) claim. *See Raab*, 4 F.3d at 289.

Sharp later made **Statement 11** when reporting that DXC "achieved a lot in the year, improving transparency into our performance, strengthening our balance sheet, significantly improving free cash flow, reducing restructuring and TSI expense, and executing on our capital allocation program" and reported that DXC's "financial foundation" was in a stronger place.[13] [Doc. No. 65] ¶ 227. Yet, again, in the same investor call, Salvino reported that DXC had narrowed its decline in organic revenue and built up $743 million in FCF, [Doc. No. 67-9] at 5, both of which support Salvino's representations to investors, undercutting the allegation of falsity and scienter.

---

[13] This statement, and the others like it, are also non-actionable opinions of the Executive Defendants. "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Omnicare, Inc. v. Laborers Dist. Coll. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015).

20

**Statement 12** concerns Sharp's observation that when he first took over as CEO, "[a] lot of those [businesses] didn't get integrated in. That's where we think we've got a lot of opportunity in the business, right, continuing driving the business together, drive kind of a unified face to the customer and make sure we're leveraging our accounts" and estimated that the future TSI expense reductions will lead to "$300 million or more cash improvement." [Doc. No. 65] ¶¶ 231-32. The latter portion of this statement is a forward-looking statement of expected earnings and Plaintiffs have not plead any particularized facts to show that Sharp had actual knowledge that this statement was false at the time it was made. Further, given that this statement was made only a week after DXC announced that it saw FCF totaling $743 million for FY2022, which exceeded DXC's original guidance, *id.* ¶ 134, the Court cannot find that Plaintiff has sufficiently alleged that this statement was false or made with the requisite scienter.

In **Statement 16**, Sharp also shared that DXC's "transformational journey . . . has delivered a better culture, stronger customer relationships, a better sales model, revenue stability, expanded margins, and free cash flow" ("Statement 16"). *Id.* ¶ 142. Again, it appears that DXC, in fact, saw expanded margins, FCF, and revenue stability, and the only other representations made by Sharp are vague puffery that no reasonable investor would rely on. *See Raab*, 4 F.3d at 289.

In **Statement 17**, Salvino reported that DXC "ha[s] made improvements in both leadership and our operating model to grow our company and to be even more competitive. We are managing areas that we can control very well, like free cash flow and restructuring in TSI, and the financial analytics that Rob and his team are focused on building will allow us to deliver more predictable and repeatable results." *Id.* ¶ 250. Again, any references to the FCF are undisputedly true, and the references to the operating model improvements are vague, corporate puffery that cannot provide the basis for a 10(b) claim. *See Diebold*, 2021 WL 1226627, at *2, 11.

21

**Statement 18** includes Del Bene's report that the he believed the ongoing cost reduction plans would allow DXC to reach $800 million FCF and that the "operational improvements" would continue benefitting DXC "over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level." *Id.* ¶¶ 251-52. Again, this forward-looking statement of expected earnings falls within the PSLRA's safe harbor, and at the same time that these statements were made, DXC also announced that its FCF was "better than expected . . . due to continued focus on working capital management include strong collections performance," [Doc. No. 67-12] at 6, 8, and reported that it experienced four quarters of stable revenue. *Id.* at 11. In light of the positive quantitative results that DXC saw, Plaintiffs have not alleged sufficient evidence that Del Bene knew this statement was false or made the statement with the requisite scienter.

Finally, in **Statement 20**, Del Bene reported that DXC was "tightly managing restructuring, and w[ould] continue to evaluate opportunities to streamline our operations" and "starting to see the benefits of it," *Id.* ¶¶ 256, 258; and Salvino also reported that "it takes most companies a year or 2 to get these operating models right[, but w]e now are starting to see the benefits of it because after last quarter," *id.* ¶¶ 186, 258, and reported that "you're starting to see a team really starting to deliver now. . . . and having a consistency around hitting our financial performance." *Id.* ¶¶ 186, 258. Again, however, in the same investor call that these statements were made, the quantitative financial performance of the company did support that DXC was seeing financial success in the aftermath of making these changes. *See* [Doc. No. 67-13] at 8 (reporting $91 million FCF in the latest quarter that was an increase in FCF from Q1 and better than the previous year's performance); *see also id.* at 12 (showing an analyst indicated that DXC saw "impressive accomplishments" in boosting FCF). And the Executive Defendants' references

to DXC's getting its operational model "right" and starting to see the "benefits" are vague, corporate puffery that cannot provide the basis for a 10(b) claim. *See Raab*, 4 F.3d at 289.

Plaintiff cites to various statements from former employees, the bulk of which merely state that DXC did not integrate a multitude of systems, [Doc. No. 65] *id.* ¶¶ 145, 148, 151-52, 155, 159, 161, 163-64, an observation essentially undisputed, but nonetheless insufficient to show that any particular relied upon statement was false.

Only two other statements get to the heart of Plaintiff's claims. One employee[14] indicated that DXC had no interest in "meaningfully integrating the businesses it acquired." *Id.* ¶ 39, 145. Another employee[15] shared that DXC "did not want to integrate because it was less expensive not to." *Id.* ¶ 148. However, "[t]hese generalized subjective assessments from employees who disagree with managers' courses of conduct do not demonstrate that those managers knew that their conduct would be unsuccessful or that their statements would be misleading to investors." *See In re DXC*, 2020 WL 3456129, at *11.

### 2. *Plaintiff has not alleged particularized facts showing a strong inference of scienter.*

As set forth above, Plaintiff has not alleged particularized facts that any of the Executive Defendants knew that any of the relied upon statements were false or misleading, and the Defendants contend that Plaintiff also fails to sufficiently allege the necessary element of scienter, particularly since (1) Plaintiff does not suggest a compelling reason for DXC to commit fraud as evidenced by DXC being in the midst of a $ billion stock repurchase during the Class Period [Doc. No. 67] at 32-33; (2) the former employee witnesses do not allege specific knowledge that would allow them to conclude that the Executive Defendants knew their statements were false, *id.* at 34-

---

[14] This employee was a manager in DXC's security division during the Class Period. *Id.* ¶ 39.
[15] This employee was a member of DXC's Cloud and ITO Division for part of the Class Period. *Id.* ¶ 40.

35; and (3) no sufficient inference of scienter can be inferred from the new CEO quickly finding other restructuring efforts that *he* believed were prudent.

Plaintiff argues that scienter with respect to their own integration statements can be found, at least under a reckless standard, based on Fernandez's ability to quickly recognize the need for another restructuring; the Executive Defendants' repeated statements about the progress towards integration in light of limiting integration efforts; and the Executive Defendants' resignations. [Doc. No. 73] at 30 -34.

In a securities fraud action, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976). A plaintiff can show scienter by pleading intentional misconduct or recklessness.[16] *Ottmann*, 353 F.3d at 344. In determining whether scienter has been adequately alleged, courts consider all the circumstances, including motive and opportunity, to determine whether the plaintiff has alleged a "strong inference" of scienter. *Id.* at 345. To qualify as "strong," an inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Whereas Federal Rule of Civil Procedure 9(b) allowed a person's state of mind to "be averred generally," the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

---

[16] However, as this Court has noted with respect to the recklessness standard, "this 'slightly lesser species of intentional misconduct,' must be 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Maximus*, 2018 WL 4076359 at *24–25 (internal citations omitted).

24

15 U.S.C. § 78u–4(b)(2). The PSLRA also requires the Court to "compare the malicious and innocent inferences cognizable from the facts pled" and "only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 608 (4th Cir. 2021).

Plaintiff's theory of scienter cannot pass muster for multiple reasons. First, as the Fourth Circuit stated in *Boykin v. K12, Inc.*:

> The first strike against plaintiffs' scienter claims is their inability, recounted above, to point to a statement of clear falsity. Although falsity and scienter are distinct elements of a Rule 10b-5 claim, they are, as noted, interrelated. Just as "certain statements are such that, to show them false is normally to show scienter as well," the inverse is also true.

54 F.4th 175, 186 (4th Cir. 2022) (citation omitted). As reflected above, Plaintiff has failed to allege that that any of the relied upon statements was a statement of clear falsity.

Second, Plaintiff has not alleged facts that reflect the Defendants had a motive to commit fraud. In that regard, Plaintiff has not alleged allegations of insider stock sales or any other malicious motive for committing the alleged fraud. *Compare* [Doc. No. 67] at 11, *with* [Doc. No. 73]. In fact, during the Class Period, DXC was in the midst of repurchasing $1 billion of its outstanding shares, [Doc. No. 67-13] at 8, and it cannot be reasonably inferred that Defendants intended to artificially inflate its own stock price during a large stock buyback period. *See Bldg. Trades Pension Fund of W. Penn. v. Insperity, Inc.*, No. 20 Civ. 5635, 2022 WL 748017, at *15 (S.D.N.Y. Mar. 15, 2022) ("Moreover, the fact that Insperity repurchased over $200 million of stock during 2019, including almost $50 million of stock in the fourth quarter of 2019 . . . undercuts any inference of scienter."). Without allegations of self-dealing or other personal gain by the Executive Defendants, Plaintiff faces a steep battle to allege scienter. *See Boykin*, 54 F.4th at 186.

Third, while Plaintiff can show scienter through recklessness, "the plaintiff faces a more stringent standard for establishing fraudulent intent and must state with particularity facts giving rise to a *strong inference* of fraud based on conscious behavior or severe recklessness." *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 744 (D. Md. 2001) (emphasis added). Plaintiff's theory is that the statements of former employees, ongoing statements about integration progress, and comments about DXC's success for integration should be sufficient to show at least recklessness by the Executive Defendants. In reviewing the former employee's statements, there is no doubt that DXC was not fully integrated, but the Executive Defendants never told investors that DXC was fully integrated, and DXC still planned to invest approximately $100 million per year in TSI expenses even after the reductions were effectuated. It is also undisputed that during the Class Period DXC saw improvements to its FCF and revenue, and within the context of the company's overall performance, the former employee statements, statements of integration progress, or comments about the success of integration do not sufficiently establish a "strong inference" of scienter.[17] At bottom, it appears that Fernandez, a new CEO, saw other TSI efforts that he believed were necessary to further DXC's growth; however, this difference in vision for DXC falls short of the "strong showing" of scienter required to successfully plead a case under the PSLRA.

B. Count II: Violations of Section 20(a) of the Exchange Act

Count II of the AC asserts a cause of action under Section 20(a) of the Exchange Act. *See* [Doc. No. 65] at 111-12. Section 20(a) creates joint and several liability for "control persons," *i.e.*,

---

[17] Plaintiff also argues that during the Class Period DXC entered a Consent Order and paid a penalty for misclassifying expenses as TSI costs, which should have made the Executive Defendants more careful in their own integration-related disclosures. [Doc. No. 65] ¶ 280; [Doc. No. 73] at 33. However, even considering this fact and those set forth above, the Court does not find that sufficient factual support for the contention that Defendants made false statements with the intent to defraud investors or in reckless disregard of the truth.

26

the Executive Defendants, who "directly or indirectly, control[] any person liable under any provision of" the Exchange Act. 15 U.S.C. § 78t(a). Such derivative liability claims are based on the theory that the individuals named in Count II had the authority to control the persons or entities that committed the Section 10(b) violations. *See Yates*, 744 F.3d at 894 n.8. However, because the Court finds that the AC fails to allege any violations under Section 10(b), Count II must be dismissed. *See id.*; *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018).

## IV. CONCLUSION

For the reasons stated above, Plaintiff has not met the high pleading standard required under the PSLRA as it relates to an actionable misstatement and scienter, and for those reasons, it is hereby

**ORDERED** that the Motion, [Doc. No. 66], be, and the same hereby is, **GRANTED** and this action be, and the same hereby is, **DISMISSED.**

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record and enter judgment in favor of the Defendants pursuant to Fed. R. Civ. P. 58.

March 27, 2025
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge

27

## *Appendix A*

**Statement 1:** *May 26, 2021 FY4Q21 Conference Call*

- <u>Sharp</u>: "Fourth, we will reduce restructuring and TSI expense to approximately $550mm in FY'22 to under $100 million in FY'24, ultimately, improving cash flow. . . . *One of our key initiatives we are employing to drive cash flow and improve earnings power is to wind down restructuring and TSI costs.* Since DXC was formed 4 years ago, we had significant cash outflows with approximately $900 million in expense per year on average. In FY 22, this will be reduced to approximately $550 million, with a larger portion being allocated to facilities restructuring efforts to improve the work experience for our people as we reshape our portfolio for our virtual model." [Doc. No. 65] ¶ 196 (emphasis in original).

**Statement 2, 3, and 4:** *June 27, 2021 – Investor Day*

- <u>Sharp</u>: discussed "how [DXC] intend[ed] to drive cash. . . ." stating "we have an unyielding focus on reducing restructuring and TSI expenditures." *Id.* ¶ 200.

- Moffett Nathanson analyst, Lisa Ellis, asked Defendants Salvino and Sharp to provide additional details regarding DXC's plan to reduce its restructuring and TSI expenses in the following exchange:

  > ELLIS: . . . . I had a couple of questions on the free cash flow outlook. Thanks for the additional detail and focus there. It's like the lynchpin of the FY 2024 outlook. Two things. Ken, these are for you, I'll just ask them both upfront. First, you highlighted reducing TSI and restructuring as the primary lever of free cash flow improvement over the next couple of years. Can you just give a bit more color on what you're doing to reduce that line item like specifically what's different or maybe what you are stopping doing that you were doing before? . . .

  > SALVINO: Lisa, thanks for the question. And I'm going to take the first one on restructuring and TSI. Ever since I've sat in the seat as CEO, this has been a – something of a thorn on our side. Right? So when you look at what we did last year, around $900 million of restructuring and TSI, we're basically pretty much cut [that] in half. *And the focus there is around making sure that any integration that we've done we're absolutely just going to make through that, look, it's done [i]n the appropriate way and move on from there.* The restructuring, we're very focused on the real estate stuff. So, the plans underneath these numbers now are very detailed as it relates to how we're going to go from $900 million to $550 million and then ultimately to $100 million and look like our peer group again as it relates to restructuring and TSI. So, those were the comments I would make on that.

  > SHARP: Wonderful, Mike. Thank you. So, Lisa, I'd just maybe touch on the TSI and restructuring. And Michael Corcoran is on the call as well and you will likely know this, but Michael runs our M&A process. *And he's been working through each and every open WBS code on TSI. And literally, we've been going through*

28

*and evaluating and ending those projects and shutting them down, getting them completed and getting them to the right results.* So, you'll see that – you'll see TSI expense continue to decline as we kind of move on through the current fiscal year. So, I think that's a great result. Mike is incredibly focused. I think it was my – probably my priorities that you gave me. I think it was number three coming in. *So, certainly, we've been drilling into them. I do think we'll have a good outcome with it.* And you said Lisa, I just want to make sure I get words right. But I think you were talking about our main lever. I would say we've got a lot of levers on cash flow. My list I put in there I would say is somewhat indicative. And we're going to work all of these together.

Id. ¶ 201 (emphasis in original).

## Statement 5: *August 4, 2021 – FY1Q22 Conference Call*

- Sharp: reported that DXC incurred "[r]estructuring and TSI expenses [of] $76 million [for FY1Q22], down 58% from prior year." With respect to DXC's cash flow performance, Defendant Sharp stated: "As you likely realize, with Mike's leadership, *we will continue to make decisions to better position the company for the longer term, creating a sustainable business.* Certain of these decisions impacted cash flow this quarter. As our guidance anticipated, we plan to take certain actions that impacted the Q1 cash flow. We remain on track to deliver our full year free cash flow guidance of $500 million." *Id.* ¶ 205 (emphasis in original).

- Sharp: "One of our key initiatives to drive cash flow and improve earnings power is to wind down restructuring [and] TSI costs. We expect to reduce this from an average of $900 million per year over the last four years to $550 million in FY '22 and about $100 million in FY '24." *Id.* ¶ 206.

## Statement 6: *September 14, 2021 – Citi Global Technology Conference*

- At the Citi Global Technology Conference, Citigroup analyst, Ashwin Shirvaikar, asked Salvino how DXC's current restructuring differed from prior restructuring efforts at DXC:

    SHIRVAIKAR: Yes. So I thought maybe a good first question would be to investors who are just now coming back to the name after maybe a hiatus of a year or 2. It may look to them like DXC is still restructuring the same thing that they saw maybe a couple of years ago. But then, of course, the current management team has achieved a lot in a couple of years. And that's perhaps different partly because I think you're seeking to balance multiple priorities. You're not just focused on cost, for example. So can you maybe speak to the broad approach in terms of clients, employees, the portfolio offering and so on?

    SALVINO: Ashwin, thanks. So look, the approach is this. *We're running a very structured playbook.* And when I say playbook, it's got 3 phases. *First phase is over, that's the stabilization phase. That was done in FY '21, and we say*

29

*stabilization*. This is where we sought to implement what I call the 5 steps of the transformation journey. Those steps stay the same through each phase. The goals just change in each step. *So now we're in building the foundation for growth, meaning simply put, everything we do this year will help us grow as it relates to us hitting our 2024 targets that we put out there*.

*Id.* ¶ 210 (emphasis in original).

**Statement 7 and 8:** *November 3, 2021 – FY2Q22 Conference Call*

- Sharp: "A key driver of improving cash flow is to continue to reduce our restructuring and TSI spend. Our restructuring and TSI efforts are highly focused, and we believe are a prudent investment in the business, addressing our outsized cost structure in certain countries and to reduce our facilities footprint to align to our virtual model. We remain on track to reduce restructuring [and] TSI from an average of $900 million per year over the last four years to $550 million in FY 2022 and about $100 million in FY 2024." *Id.* ¶ 213.

- Sharp: DXC "continue[d] to deliver on reducing restructuring and TSI expense." *Id.* ¶ 214.

- Salvino: "The good news is the financial results that Ken just took us through reduced debt, shrinking restructuring and TSI costs, increased margin and EPS and stronger free cash flow are all sustainable and a result of the operational work we are doing. This gives us confidence that we will achieve our FY 2024 double-digit margin guidance." *Id.* ¶ 214.

- Analyst Ashwin Shirvaikar asked for details regarding DXC's plan to reduce restructuring and TSI expenditures:

  SHIRVAIKAR: . . . . And then restructuring [and] TSI, as I sort of look at what you've done year-to-date and the full year projection, it would seem like the current level probably be maintained for the next couple of quarters. I just want to make sure that's accurate and what leads to sort of the quarter-to-quarter step up, step down. Any particular call outs on what you're specifically doing there? Sorry, if I missed that.

  SHARP: Yeah. We've guided the $550 million for the full year. We're running probably a little bit light of that at this point. What I would say, Ash, *when we've taken a very disciplined focus effort on every dollar of spend. So we make sure there's business cases, it's being deployed thoughtfully.* So you could see it tick up in the second half of the year to get to the $550 million, but I would just say, we're working diligently to manage it. So I would say that $550 million is a good number. *But if we don't need the money, we certainly won't spend it.*"

*Id.* ¶ 215 (emphasis in original).

**Statement 9:** *February 2, 2022 – FY3Q22 Conference Call*

- <u>Sharp</u>: "Clearly, our focus has been on improving our cash flow. Specific to new business, we have been focused on structuring our transactions to have lower capital intensity, potentially trading off revenue in favor of cash flow. As you can see from my prior comments, our focus on driving structural changes has improved our ability to generate and hold on to more cash. Cash flow from operations totaled an inflow of $696 million. Free cash flow for the quarter was $550 million, an increase of $956 million as compared to prior year, and moves our year-to-date free cash flow to $650 million or $150 million above our full year guidance." *Id.* ¶ 215.

- <u>Sharp</u>: "This quarter, we made particularly strong progress with cash generation and continued reduction of Restructuring and TSI expense. . . . We also continue to make progress on reducing Restructuring and TSI expense. This reduction contributed $195 million to cash flow during the quarter as compared to the prior year. Further, this also achieves one of our goals of narrowing the difference between GAAP and non-GAAP earnings." *Id.* ¶ 221.

- <u>Sharp</u>: To put this all in context, we expect to spend $500 million less on Restructuring and TSI expense than last year, while expanding margins by over 200 basis points. Our focus is to embed these types of expenses over time into the normal performance of the business, and believe we have taken significant strides in doing so." *Id.* ¶ 222.

**Statement 10 and 11:** *May 25, 2022 – FY4Q22 Conference Call*

- <u>Sharp</u>: "As Mike mentioned earlier, *our financial foundation is in a much better place. We achieved a lot in the year,* improving transparency into our performance, strengthening our balance sheet, *significantly improving free cash flow, reducing restructuring and TSI expense*, and executing on our capital allocation program." *Id.* ¶ 227 (emphasis added).

**Statement 12:** *June 2, 2022 – Cowen & Company Technology, Media & Telecom Conference*

- During the Cowen & Company Technology, Media & Telecom Conference, Cowen analyst Bryan C. Bergin asked about DXC's free cash flow and how it planned to bridge the gap between its FY 2022 free cash flows and its $1.5 billion guidance for FY 2024:

  > BERGIN: . . . . Free cash flow, let's move to that. So you touched on 4Q and '22 earlier in your commentary, but let's talk about the bridge forward. So you ended fiscal '22 at $743 million. That did include some notable proactive measures that we had discussed. You're projecting $800 million in fiscal '23, and you affirmed that $1.5 billion, []24 target. As you think about that $743 million to $1.5 billion, what are the biggest swing factors there?

  > SHARP: . . . . So when you think about a bridge, I think there are a handful of items that jump out that are pretty big swingers for us. So certainly, the margin expansion, that's a piece. And then when you think about restructuring and [T]SI, I think we

were -- when John [Sweeney] and I first showed up, we had a [b]oard of our big opportunities. Restructuring and TSI with one of $1 billion opportunity.

SWEENEY: $900 million.

SHARP: It's probably over $100 million right -- so we were trying to sort our way through that and certainly shutting it down. And it seems like, Brian, it would be so easy just to stop it, right? It's not as easy as you think unfortunately, because it gets to be the culture. And when you said $900 million, John, it was $900 million on average for every year, DXC is created. So literally tackling that. I think we've got about $300 million or more cash improvement that will come out of that, which I think is a positive. So the margin expansion, restructuring, [T]SI, the other area for me that's a real hard one is the CapEx side. So we'll say CapEx and lease originations because we still debate over what the free cash flow definition is, is a classic we turned the analysis.

*Id.* ¶ 231.

- Sharp: "The business historically didn't report organic revenue. They were doing a series of acquisitions. A lot of those didn't get integrated in. That's where we think we've got a lot of opportunity in the business, right, continuing driving the business together, drive kind of a unified face to the customer and make sure we're leveraging our accounts." *Id.* ¶ 232.

**Statement 13: *November 3, 2022 – FY2Q23 Conference Call***

- Sharp: "*We continue to tightly manage our restructuring and TSI expenses*. These expenses totaled $57 million in the quarter or $92 million for the first half of the year. We expect to see an uptick in restructuring expense in the second half of the year as we execute on our cost optimization efforts." *Id.* ¶ 236.

**Statement 14: *February 1, 2023 – FY3Q23 Conference Call***

- Sharp: "We continue to tightly manage restructuring and TSI expenses. These expenses totaled $55 million in the quarter. And year-to-date, restructuring in TSI is $147 million, down $124 million from prior year." *Id.* ¶ 240.

- On February 1, 2023, DXC held a conference call for analysts and investors, Cowen analyst Bryan Bergin inquired into the factors impacting DXC's improved cash flow performance:

BERGIN: Wanted to start on free cash flow. So Ken, just hoping to dig on the moving pieces here to make sure we understand this for '23 and '24. So can you first talk about some of the factors that drove the strong 3Q performance? Should we expect the continued lumpiness in free cash flow generation going forward? Or does that start to kind of smooth out?. . .

32

SHARP: All right. Great, Bryan. And look, if I need to clarify, feel free to jump back in. Look, it's great work from the team, right? We've been at this for a couple of years, right? If you wind the clock back, the business had negative free cash flow. We've done a lot of work. Probably the biggest, you look at it now 2 years in a row of positive cash flow over $600 million. So it's really not lost on us, right? A lot of good work from a lot of people across the entire business. The biggest driver, right, if you had to just kind of look holistically at the business has been the focus on driving down the restructuring [and] TSI. So I think that's been somewhere around $600 million swing, so year-to-year. So I think that's a pretty big piece. And then just this quarter, we had built up some AR. It's a little bit hard to tell on the balance sheet but -- because of FX movements and so forth. But we had built up some AR in the last couple of quarters and brought that back down this quarter to kind of a more normalized level. So really, the team has done a nice job just driving across the business.

*Id.* ¶ 241.

**Statement 15 and 16:** *May 18, 2023 – FY4Q23 Conference Call*

- Sharp: "We continue to tightly manage restructuring and TSI expense. Our restructuring and TSI expense was $232 million for the year, $68 million lower than our guide. We have been focused on improving the quality of earnings and limiting this kind of non-GAAP adjustment." *Id.* ¶ 246.
- Sharp: "Our clear execution of our transformational journey by our talented team in FY'23 has delivered a better culture, stronger customer relationships, a better sales model, revenue stability, expanded margins and free cash flow[.] I'm happy that our focus in FY'24 will not be on fixing challenges but delivering higher quality revenue, margin and EPS, expanding fee cash flow and returning another $1 billion to shareholders while maintaining our investment-grade profile." DXC has "built a solid financial foundation and fixed many of the challenges at DXC." *Id.* ¶ 142.

**Statement 17 and 18:** *August 2, 2023 – FY1Q24 Conference Call*

- Salvino: "We are actioning the cloud ITO and Modern Workplace offerings of G[I]S, which have been impacted by the slowing IT market and are keeping us from making the progress we desire. We are still confident that we will stabilize the performance of these two offerings. We have made improvements in both leadership and our operating model to grow our company and to be even more competitive. We are managing areas that we can control very well, like free cash flow and restructuring [and] TSI, and the financial analytics that Rob and his team are focused on building will allow us to deliver more predictable and repeatable results." *Id.* ¶ 250.

- During the August 2, 2023 Conference Call, Cowen analyst, Zack Ajzenman, questioned why free cash flow guidance was not reduced further in light of the guidance reduction to organic revenue and margins:

33

AJZENMAN: . . . . And just to follow up on free cash flow and related on margins, I guess given the cut on the revenue and earnings, I guess we're surprised the free cash flow view is not reduced even further. So maybe you can speak to the levels that are partly inflating free cash flow here and maybe what you're doing to support expenses without cutting into the bone.

DEL BENE: Yeah, Zack, this is Rob Del Bene. Thanks for the question. Look, when we take a look at the EBIT margin that we expect to perform at that level for the remainder of the year, take a look at the working capital levers we have taken all together, we are confident that we could achieve this adjusted level of $800 million. So we have cost reduction plans that support the EBIT, the margin, the reduced margin, and we have operational actions and line of sight to deliver working capital and capital expenditure reductions to get to the $800.

Id. ¶ 251.

- Another analyst, Keith Bachman of BMO Capital Markets, piggy-backed on this question asking Defendants:

    BACHMAN: . . . . On the free cash flow to EBIT, I heard the answer to a previous question on why the free cash flow performance is better, some working capital tweaks. And I want to ask it in the context of, are those working capital tweaks, are you sort of borrowing from next year's potential free cash flow generation by some of the things that you're doing to support the 800 target versus a more significant degradation associated with the EBIT line?

    DEL BENE: . . . . *The answer to that is no*. I mean, we think there are operational improvements that will benefit us over the long term, which will help us drive capital savings over time and get the receivables to what we think is the right sustainable future level. *So we are not trying to accelerate anything temporarily. We're more focused on just operational discipline and getting to the right levels, as I said, on a sustained basis*.

Id. ¶ 252 (emphasis in original).

**Statement 19 and 20:** *November 1, 2023 – FY2Q24 Conference Call*

- <u>Del Bene</u>: "Restructuring and TSI expense increased to $38 million, with the increase entirely due to the restructuring of facility leases part of our effort to rightsize our facility footprint. *We are tightly managing restructuring, and we'll continue to evaluate opportunities to streamline our operations*." Id. ¶ 256 (emphasis in original).

- Analyst James Friedman of Susquehanna International Group sought additional detail:

    FRIEDMAN: So you've had some impressive accomplishments in especially the free cash flow and the free cash flow per share. I was wondering if you could kind

34

of unpack how you're achieving that, Rob, because it really stands out on both the numerator and denominator.

DEL BENE: . . . . One of the -- there are several -- as you would imagine, there are several factors that contribute to the free cash flow performance. It starts with the value delivered by the teams and the offerings that we have, the profitability of those offerings. *Another big contributor is a significant cost reduction activities [sic] that the teams have embarked on. And last year, they were very successful in achieving the cost reduction goals this year. We're on track with our cost reduction goals, and that will continue.*

Id. ¶ 257 (emphasis in original).

- Rod Bourgeois from DeepDives followed up further on the $800 million target for FY23, which he described as "the key metric":

  BOURGEOIS: . . . . So thanks to Rob for outlining the free cash flow drivers to get you to the $800 million target. That's clearly the key metric here. I want to ask another question about free cash flow kind of from a different angle. Clearly, the industry is experiencing the cyclical challenges, and that's impacting your project-based revenues this year. If you weren't seeing cyclical challenges in your project-based revenues this year, would you then be in a position for free cash flow north of $800 million? In other words, I'm trying to get a take on to what extent the cyclical demand challenges are impairing your free cash flow power this year?

  SALVINO: So Rod, the other thing I would add to Rob's comments is we keep overlooking the operating model. So it takes most companies a year or 2 to get these operating models right. *We now are starting to see the benefits of it* because after last quarter, right, every transformation hit some bumps. But I couldn't be more proud of the execution of our team this quarter. What that means, is we're getting to a lower level of detail than DXC has ever seen with our customers. And that detail not only produces new project work. It also makes us have the ability to manage our margins a lot better to generate more free cash flow. So when I talk about the right model, right leader approach, to me, *that's the catalyst that we're giving to the market* at this point in time. *You're starting to see a team really starting to deliver now.* Versus being able to -- and having a consistency around hitting our financial performance. So we don't have much more on the free cash flow. We're happy with where it is and where it's going to be, and we'll go forward from there.

Id. ¶ 258 (emphasis in original).

35