1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:                             }
INDIVIOR PLC SECURITIES            }    Civil Action No.
LITIGATION                         }    3:24 CV 554
                                   }

                                        April 22, 2025


            COMPLETE TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE HENRY E. HUDSON
              UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

Austin P. Van, Esquire
POMERANTZ LLP (NY-NA)
600 Third Avenue, 20th Floor
New York, New York  10016

Steven J. Toll, Esquire
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW, Suite 800
Washington, DC  20005
     Counsel on behalf of the Plaintiff


Robert J. Giuffra, Jr., Esquire
David M. Reid, Esquire
SULLIVAN & CROMWELL LLP (NY-NA)
125 Broad Street
New York, New York  10004

Frank Talbott V, Esquire
McGUIRE WOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219
     Counsel on behalf of the Defendants


                KRISTA M. LISCIO, RMR
               OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT

(The proceeding commenced at 9:49 a.m.)

THE COURT:  Good morning.

MR. GIUFFRA:  Good morning.

MR. VAN:  Good morning.

MR. TALBOTT:  Good morning.

THE COURT:  Call our first case for today, Ms. Pizzini.

THE CLERK:  Civil Action Number 3:24 CV 554.  *In Re: Indivior Securities Litigation.*

Lead plaintiff is represented by Mr. Austin Van and Mr. Steven Toll.

Defendants are represented by Mr. Robert Giuffra, Jr., Mr. David Rein and Mr. Frank Talbott V.

Are counsel ready to proceed?

MR. VAN:  Yes, Your Honor.

MR. GIUFFRA:  Yes, we are.

THE COURT:  All right.  The matter is before the Court this morning on the defendants' motion to dismiss. I have reviewed all of the pleadings, and I'm prepared to hear argument.

Mr. --

MR. GIUFFRA:  It's hard, Your Honor.  Giuffra.

THE COURT:  I'm sorry.  Nice to have you here this morning.

MR. GIUFFRA:  It's really nice to be here in

Richmond.  It's a beautiful city.

THE COURT:  I've reviewed the pleadings, I'm familiar with the case, and I'm anxious to hear what you've got to say in support of your motion to dismiss.

MR. GIUFFRA:  Thank you very much, Your Honor. It's Robert Giuffra with Sullivan & Cromwell for Indivior PLC; its CEO, Mark Crossley; its CFO, Ryan Preblick; and Chief Commericial Officer, Richard Simkin.

I think it's important at the outset to make it clear what the case is about and what it's not about.

THE COURT:  All right.  You may go right ahead. I'm anxious to hear it.  But I'll tell you, I've spent a great deal of time reviewing all the pleadings here, and I thought I had some understanding, but you may convince me that I don't.  Go right ahead.

MR. GIUFFRA:  Okay, Your Honor.  Well, it's not a case involving an alleged misstatement to alter the financial statements.  There's been no SEC investigation.

It's a case that's limited to, purportedly, false projections and forward-looking statements.  And it's important to keep in mind that when Congress enacted the Private Securities Litigation Reform Act, it gave Your Honor, and other district judges, the important responsibility of acting as a gatekeeper on these types of cases.

Congress raised the pleading standard for securities cases, and in fact put in place a specific statutorily safe harbor for exactly the kinds of statements that are alleged to be false here.  And in Exhibit 1 of Mr. Rein's declaration, there are 16 statements that the plaintiff says or claims are false.

Now, it's easy to allege that a projection was false in retrospect.  Oftentimes projections are not -- they don't come true.  But we want to encourage companies to make projections, and we also want to encourage companies to update projections, which is precisely what happened here.

THE COURT:  Now, there's a difference between an expectation and an aspiration.  I know that many, many leaders of corporations have a desire to achieve certain goals.  There's a difference between telling people what you hope to do and what you have done.

MR. GIUFFRA:  Correct.  The difference between making a historical statement of fact.  So, for example, we sold X hundred thousand widgets last year where we earned profits of, you know, a million dollars.  That's not what this case is about.  This case is about projecting into the future how the company will perform with respect to two specific products.

So, to sort of go right to it, Your Honor, in

February of 2024, last year, the company announced its earnings and then made projections about how it would do in the next year. And it made the projections about two products. One is called Sublocade. And that's an opioid use disorder drug. And the company projected a range.

It wasn't like they said, well, we guarantee we're going to get this much in revenue. They provided a range, which, by definition, reflects the fact that it's uncertain whether the number will be somewhere within the range. And oftentimes companies will update a range that's given at the beginning of the year, which is exactly what happened here in July.

And that original range for this product, Sublocade, is the biggest product in the company. It's 58 percent of the revenue in 2023. The original number was $820 million to $880 million, and then the company went and in July lowered that number down to $765 million to $805 million. And the actual number before 2024, and this is important, was $756 million.

So, it's almost right off the bottom of the range that was given in July. But if you just base it off the bottom of the range that was given in February at the beginning of the year, so you don't really know how things are going to turn out, the original number at the bottom of the range was $820 million, and the final number was

$756 million. So, they're off by about 7 percent. And investors recognize that when you make a projection, again, it's not perfection.

The other drug is a much smaller part of the company's product mix. It's only 4 percent of the revenue in 2023.

THE COURT: Was there an issue concerning the needle size with respect to that drug?

MR. GIUFFRA: Your Honor, what happened with respect to that drug was -- it's a drug called Perseris. It's used to treat schizophrenia. And in 2023, a company called Teva, which is a very, very big powerful pharmaceutical company, it was a new competitor that was disclosed to investors, put out its own product, which was called Uzedy, U-Z-E-D-Y. That's a mouth full. It was a new product.

And, obviously -- and that new product was started in the middle of the prior year. So, you didn't really know how successful it was going to be.

Teva put a lot of money into that product over the course of 2024, and essentially outcompeted Indivior. And that's why the company made the decision in part by July to stop selling that product because they weren't making money.

And in addition, one of the other overlays to

the facts in this case, and what was going on -- you have to remember it's 2023/2024, and we're just coming out of the pandemic. And there were a lot of -- there were new laws and new regulations that had been put in place in order to get better control of healthcare. One was the Inflation Reduction Act, which President Biden signed.

And those laws put enormous price pressure on what one could charge for -- in particular in the case of Perseris, how much could be charged for that product. So, the two combinations affected the company during the course of 2024. One was -- had a brand new competitor which was heavily well-funded, and you had the Inflation Reduction Act which reduced the amount of profit you could make from selling the drugs.

Now, on the point you raised, Your Honor, about the needle size became clear over the course -- and this was all known to the market that the Teva product was a product that was -- basically, the needle was such that it was less painful to use, and so that new product took off because people wanted to use a product that was less painful to use and doctors wanted to prescribe a product that was easier to use.

And so over the course of the beginning, the first half of 2024, the company warned investors and said, look, we're in a very competitive environment with respect

to Perseris.  We've got this new competitor.  And they actually specifically identified Teva as a competitor, and a competitive threat to the company.  So, the company made a projection, and then warned invertors that there's lots of reasons why that projection might not come true.

THE COURT:  So, it's your position that investors never received any guarantee of what kind of money they would receive based upon their investment, is that correct?

MR. GIUFFRA:  In fact, the opposite, Your Honor. Investors were constantly warned in page after page.  And this is Exhibit 2 to Mr. Rein's declaration, warnings about all the risks that the company faced, and the reasons why these actual results might differ from the actual experience results.

And that's actually what Congress wanted to encourage in this Private Securities Litigation Reform Act where it imposed a specific safe harbor for exactly the kinds of statements that are at issue in this case.

Let me talk about the two grounds for dismissal. And it's important to keep in mind that those are separate and independent grounds.  The other side needs to get past both hurdles.  We just have to win on either the -- whether the statements are actionable, or on whether the other side where plaintiffs have pled -- or plaintiff.

There's only one plaintiff in this case who alleges $756, I think, in losses.

And another thing the Private Securities Litigation Reform Act did was it wanted to encourage institutional investors, like pension funds, to come in. And one of things you see in these types of cases when you just have one plaintiff who is an individual, it says something about it because there's a market for these cases, to be candid, Your Honor.

THE COURT:  How much of a loss did the plaintiff suffer as a result of the downward trend of your product?

MR. GIUFFRA:  $596.

THE COURT:  Is that all?

MR. GIUFFRA:  That's all.

THE COURT:  Okay.

MR. GIUFFRA:  $596.  And I've been in cases, Your Honor, where plaintiffs have alleged, you know, tens of millions of dollars in losses.  This is a very small one.  I can't remember one, candidly, that was as low as $596.

So, let's talk about the first issue, which is where there's an actionable misstatement.  And there are many cases decided by the Fourth Circuit.  We sent up a case this week that was decided by one of your colleagues here in the Northern District of Virginia dealing with

exactly the type of statements --

THE COURT:  I read Judge Trenga's opinion.

MR. GIUFFRA:  Thank you, Your Honor.

But the Fourth Circuit in the *Raab* case, for example, made the point that a projection can always be found to be wrong in hindsight.  And that was a case where the company was off by about 30 percent off its projection.  And here, with respect to Sublocade, they were only off by 7 percent off the bottom of the range, and then it was adjusted during the year.

So, there are many cases which we cite in the Fourth Circuit, and around the United States, very similar to this case.

And what the plaintiff does is the plaintiff cherry-picks the disclosures and also ignores the warnings that the company made, and courts have said you can't do that.  Now, the other thing that's important is in that Private Securities Litigation Reform Act there's a provision.  Normally, on scienter, you have to show at least that there was deliberate recklessness in order to establish that the defendant acted with scienter.  But in a case involving a projection, a forward-looking statement, the plaintiff must plead particularized facts showing that the defendant had actual knowledge that the projection was false.  Actual knowledge, which is a very,

very high standard in a civil case.

Now, here let's just talk a little bit about Sublocade. Again, the largest product of the company. More than 50 percent of the revenues. And that original projection was $820 million to $880 million. Again, a range. And then it was lowered in July to $805 million to $765 million, with the actual number being $756 million. So, almost hit the number almost.

THE COURT: And the stockholders were advised of that, were they not?

MR. GIUFFRA: Yes, they were advised at the beginning. So, when the company made the projection in February, the stockholders were advised it was a projection. They were told that actual results might differ from the projection. They were given specific warnings about reasons why that projection might not come true. And one of the reasons, and probably the most important, was this is a drug that is an opioid disorder drug. It's used by poorer folks. And a lot of them are covered by Medicaid.

And right after the pandemic -- and this is super important to understand what's going on here. Basically, Congress passed a law that said you couldn't kick people off of Medicaid because, you know, the pandemic was going on. But obviously once the pandemic,

you know, ran down and we sort of got through that awful period, you had a situation where Congress and Health and Human Services, and the people that run Medicaid, were putting pressure on disenrolling folks.  And it was very hard in retrospect to predict what the disenrollment rates would be because you really didn't know, like, who would qualify, who wouldn't qualify.  That's another sort of overlay to the complexity of this case.

THE COURT:  How much of an impact did that have on your client's profits?

MR. GIUFFRA:  We believe it had a significant impact, and was probably the reason they missed that -- they had to readjust the guidance during the course of the year.  So, they had the benefit of seeing how the disenrollments were working in the first half of 2024, and then they did what a good company should do is they revised --

THE COURT:  How much of an impact did it have that -- that disenrollment, how much of an impact did that have on the overall profits of your client?

MR. GIUFFRA:  Well, Your Honor, in July when we announced the lower range, we announced four factors that cause -- this is in July of 2024.  We talked about the disenrollments, which were specifically warned about throughout the entire period from February to July.  We

said that's a big risk of this projection that we have given you-all.

They also talked about a cyber attack, which was a one-time event that affected a subsidiary of United Health Group. And that affected the amount of sales of this product.

They also talked about the fact that there was some one-off inventory adjustments by specialty pharmacies that are selling this drug.

And the last factor that was identified was a longer lead time. And there's a provision in I think the criminal justice system, probably the Department of Justice, to fund these types of drugs. And there were issues getting the funding.

All of those factors were a reason for the downward adjustment at midyear with respect to that projection, which is what you want a responsible company to do. That's Exhibit 10 to Mr. Rein's declaration.

Now, it's important to look at the statements. And you asked this question. It is dead on point. The company, in making the initial guidance in February of 2024, expressly warned investors that its, quote, dependence on third-party payors, and specifically Medicaid, could impact the projection that they were giving.

And then they warned in their March 6th -- so that's, you know, probably another two weeks later the annual report for 2023 warned that sales, and the amount of sales they would have of Sublocade, the bigger product, would be affected by reimbursement by third-party payors, specifically Medicare.  And then in the -- and this was all during the class period, which runs from February to July.

In April, April 25, in the earnings call, the CEO warned about, quote, the impact of disenrollment because of mandatory disenrollment with respect to Medicaid post-pandemic.

The federal government wanted to get control over Medicaid, which it didn't have.

THE COURT:  And of course your client had no control over that.

MR. GIUFFRA:  Absolutely not.  And the world knew, and investors knew, this was going on.  So it was a known risk.  And you could look at the HHS website and you get some information on disenrollment.  So, this was not something that was happening in secret.  And it was a risk that the company, you know, advised investors of.

The statements that were made here by the company, these 16 statements, they were all statements that were characterized by opinion type statements:  We

15

believe.  I think.

This is the classic language of opinions.  And courts have made it clear that those sorts of opinion statements are not actionable unless not genuinely held by the defendant.

And again, as I mentioned, all of those statements were accompanied by very detailed warnings.  And they were not, as the plaintiff says, like, generic warnings.  They were specifically talking about the risk of Medicare.  So, if you look at the disclosures over the course of the period, we make a recommendation -- we make a projection of a range, we lower the range, we make the original projected range.  We say, look, Medicare disenrollments, which is a new phenomenon post-pandemic, is going to be a risk factor.  And it turns out to be true.

Plus, there were other one-off events, like that cyber attack which no one could have known in February that there was going to be a cyber attack in the next four months.

THE COURT:  How much of an impact did that have on your client?

MR. GIUFFRA:  I don't believe that the disclosure quantifies the particular impact.  I think it just talks about the elements that required the

readjustment of the guidance range.

THE COURT:  Okay.

MR. GIUFFRA:  And it's important to remember, it's called guidance for a reason.  It's not like when you issue an audited financial statement there's a knowable number that gets looked at by an accountant.  No one is claiming that there's anything in any of the audited financial statements that are wrong in this case.

Now, what the other side does, and it's all over their opposition brief, is they try to make a lot out of a statement that Mr. Crossly made where he talked about the issue of Medicare renewals, and the impact of Medicare renewals.  And they say, well, he used the word "will."  And that was on a conference call, so maybe you're a little bit less precise than you would be with a written statement, but we accept that.

But what they leave out, and this is pretty critical, this is Exhibit 4, is that he prefaced that statement by saying "I think."  I think we will have a continuing headwind of managing Medicaid renewals, I think.  Well, the words "I think" has been recognized by courts as reflecting an opinion.  And that means it's a forward-looking statement.

Let me talk a little bit about Perseris, which is, again, the much smaller product.  In 2023, Perseris

was $42 million in revenue. Sublocade, the much bigger product, was $630 million. And an important point to remember is that the actual reported earnings on Sublocade for 2024 were $756 million, which was about 10 percent higher than what it had even been the year before. So, this wasn't a product that was falling off some kind of a cliff. The growth, year over year, was not as high as the company had originally projected, but it was close to the final midyear projection.

Now, again, as I mentioned, and this is Exhibit 14 at 45, it's in the record, Perseris was the only product that existed, say, in 2023 until midyear when Teva announced this new product that could be injected into the fatty portion of the skin, and then that required complicated loading. It was considered, you know, a cutting-edge product.

THE COURT: At some point they ceased production of one of their products, did they not?

MR. GIUFFRA: Yes, they did. And that's exactly the one that I'm talking about, Perseris.

THE COURT: Okay. Go ahead.

MR. GIUFFRA: And that's the much smaller product. It was less than 5 percent of the company's revenue. And oftentimes people talk about a rule of thumb of 5 percent being material information to shareholders.

So, this was a very small product.

And what happened was, again, it was doing well, and it had done well in 2023.  Midyear, the big, you know, competitor, Teva, much bigger company than Indivior, starts a new product called Uzedy.  U-Z-E-D-Y.

Now, at the moment when the projection is made during the beginning of 2024, executives are not required to self-flagellate or say everything is going to be bad. You're allowed to be optimistic.  That's not securities fraud.  The securities frauds are not an insurance scheme for investors.

But what happened was Teva -- you know, they had a much big sales force than Indivior did.  And they basically marketed the heck out of that product.  And it was probably a better product, to be candid, because of the point you raised before about the needle being less painful than with the Indivior product.  But it was a warning throughout the period.

So, starting in February, up until July when the company made the business decision, which ultimately benefits the investors of the company, we're going to get out of this business because we're competing against a very strong competitor.  But they repeatedly warned investors that, you know, it was a very competitive environment and we might not be able to -- you know, we

might not be able to succeed.  And in fact, they were warned about the fact that the product might become obsolete.  They actually made a specific warning that we might become obsolete because of the competition that we were facing.

THE COURT:  When was that warning published to the stockholders?

MR. GIUFFRA:  During the middle of the class period.

THE COURT:  Okay.

MR. GIUFFRA:  So, the warnings, just to give you specific dates -- this is Exhibit 4 at Page 5.  This is in April.  In April 25, '24, the CEO, Mr. Crossley, warned, quote, competition has intensified.

And this is even earlier.  This is almost within three weeks after that initial projection for the year.  This is the March 6, 2024, annual report, Exhibit 3.  The company said that its product could be rendered obsolete or uneconomic by competition.  And that's exactly what happened.

So, in March they're saying, look, our product could be rendered obsolete or uneconomic by the competition.  And then by July, they made the business decision to get out of this product because it wasn't profitable enough.

20

Now, that product was also affected.  And this was another factor that was disclosed.  By the Inflation Reduction Act, we've put enormous price pressure on drugs that were being covered by Medicare and Medicaid.  And again, the people who are using this product are typically people with Medicaid.

And so the combination of the enhanced competition from a very powerful competitor, which was warned about, and the lower pricing, made this an uneconomic product for the company to ultimately sell. They made the decision in July, for the benefit of the shareholders, to get out of it.

THE COURT:  You may have touched on this, but did your client notify the stockholders of the impact this could have on the value of their stock?

MR. GIUFFRA:  What the company did was it said that competition could render the product obsolete or uneconomic.  And it did so within three weeks of making that initial projection in February of 2024.

No one quantified, like, what the -- because companies don't normally make a quantification of the impact of something on the stock price.  Typically what companies do is they talk about the impact on earnings.

And again, by definition, the numbers we're talking about here were denominated as projections and

they were a range of numbers as opposed to something specific. And they were also numbers that were -- you know, we remain confident. Well, the fact that you say we remain confident in your product isn't securities fraud. You know, you're not supposed to -- you know, doom and gloom is not the way business works in America.

And another important point is that the difference in the features that made the Teva product better than the Indivior product were made known to shareholders. They knew this needle, for example, in the product for Teva was a thinner needle and a better needle. And so that information was put out there.

Now, what the other side will talk about and say, well, you know, you cite positive feedback that you were getting from doctors. And they were getting positive feedback. And what the plaintiff does, and I'll talk about this in a second, is they have some former sales people who were laid off when the company stopped selling this product who then said, well, in North Carolina -- and this is Confidential Witness 2 saying sales weren't going so great. Okay, well, that's just one data point.

A good example of this, Your Honor, is they make a big deal in their complaint about -- you probably saw this pie chart in the complaint. And this is talking -- this is an analyst presentation -- or a presentation that

was done in May of 2024.  And there's data that is provided with respect to the extent to which Perseris is getting new patients, right?  You have schizophrenia, you get the needle once, and you start.  And there's no allegation here that any of the numbers that are being provided to investors are false.  Not a single allegation.

It's all about, well, you made this projection or you didn't predict in February that you'd have to shut down the sale of this product by July.  But, again, executives are not obligated to be clairvoyant.

Let me turn to – and this will be the end of my presentation – the second ground for dismissal.  And again, it's important to remember that in these securities cases, the plaintiff again has to prevail on both -- the statements have to be actionable.  They have got to get past all the warnings.  But then at the same time, they've also got to establish scienter or fraudulent intent.  And without being able to do that, in and of itself, that's an independent ground for dismissal.

Now, at the end of their brief, and I think this is telling, the plaintiff focuses on what they claim are insider trading allegations, but they leave it to the end of the brief.  And the problem that they face is that there's many cases that talk about how in order to have, you know, insider trading allegations that are

particularized and sufficient to get past the motion to dismiss, those allegations can't be -- you have got to plead particularized facts that the trading is unusual or suspicious.

Now, many corporate executives receive compensation in stock. And it's fairly standard to have a vesting period with respect to the stock grant that you get when you are an executive, and that's because you want to tie the executives --

THE COURT: And that's the case here?

MR. GIUFFRA: Yes. And that's exactly what happened here.

THE COURT: As I understand it, as part of their compensation each year they received stock, which they had to hold for a certain period of time. And if they wanted to liquidate, they could do it at that point.

MR. GIUFFRA: That's exactly right, Your Honor. And in fact with respect to Mr. Crossly, the CEO, there's two sets of stock grants that are at issue. One were 2019 grants, which he then sold in 2024. Those were five-year restricted grants. So, he had to hold those stocks for five years. His economics were tied directly to the company's economics. And then some of his grants were two-year grants.

And then Mr. Simkin had a three-year vesting

period on his stock. And it turned out that in both cases the vesting period for Mr. Crossly ended on -- and this is Exhibit 17. And we provided the trading information which we're entitled to do under the Private Securities Litigation Reform Act because they make an accusation of insider trading. And the company is allowed to put forward publicly available information, which is what we do, showing the trading pattern.

And what we learn is the vesting period for Mr. Crossley, the five- or the two-year vesting period, depending on which shares we're talking about, ended on March 5, 2024. That's Exhibit 17. And then also on March 15, 2024. That's Exhibit 18.

And so you've got the vesting period ending March 5 and then March 15, and then the stock sales are, like, immediately thereafter on March 14, March 15, and March 18. And that's Exhibit 18.

That's not suspicious. That's exactly what one would expect an executive, who's been holding the stock for five years, to do. And the reason they do it is for the same reason we all are, to try to own diversified portfolios of stock. It doesn't make sense to have your -- all your stock and all your economics in one company. You want to try to get a diversified portfolio.

With respect to Mr. Simkin, his three-year

options -- it was a grant.  His three-year grant, excuse me, the vesting period for that grant ended on March 1, 2024.  That's Exhibit 16.  And then he sold, starting on March 4, March 5, March 6, and March 14, right after the vesting period.  And that's all laid out in the briefs.  And we have the documents.

Courts have made clear that even if someone sells 75 percent of their stock, if it's not done in a suspicious way, that doesn't -- that's not enough to plead the kind of insider trading that's necessary to establish scienter.

Now, let me just refer -- and it's important to also keep in mind that with respect to the CFO, Mr. Preblick, there are no allegations of trading at all.

Now, it's important to keep in mind that the Supreme Court has said that in interpreting the Private Securities Litigation Reform Act there's an exacting burden that the plaintiff has to meet.  There's no other area in federal law that Congress has actually prescribed a pleading standard like this one.  That's why we have, for example, the discovery stay.  There's been no discovery in this case because Your Honor is the gatekeeper, trying to weed out the cases that should go forward and which ones shouldn't.

And in order -- if you have no motive

allegations, you've got to establish severe recklessness, which is a very high standard.  That has been recognized by the Fourth Circuit in the *Matrix* case as, quote, an extreme departure from ordinary care.

And, you know, one of the allegations that's made by the plaintiff is that, well, the CEO and the Chief Commercial Officer must have known that there was a problem with the original projections.  And the Fourth Circuit in the *Yates* case at 744 F.3d. at 890, that's a 2014 case, says you can't just point to the --

THE COURT:  What circuit was that?

MR. GIUFFRA:  The Fourth Circuit.

THE COURT:  The Fourth Circuit?

MR. GIUFFRA:  Yes, sir.

THE COURT:  Okay.

MR. GIUFFRA:  And held that you can't just cite the position of someone in the company and say they must have known.  You need particularized facts being pled that the CEO or the CFO or the Chief Commercial Officer actually knew that the projections were not accurate.

Now, the best the plaintiffs can do, and this is important, they have these eight confidential witnesses. All of them are sales people who sold Perseris.  None of them had anything to do with Sublocade, which is the bigger product.  So, they only have the product that's

$45 million in 2023 sales that gets stopped in the middle of the year.

They don't make any particularized claims that any of the individual defendants knew at the time they made the projections that the projections were false. They had no acts. They don't cite any documents that those executives would have seen. And none of these sales people were in the executive suite, you know, setting the projections. They weren't part of it. They were out in the field trying to sell the smaller of the two products that are at issue in this case.

THE COURT: Was there any activity on the market that would have put one of your clients on notice that there may be a major reduction in the value of the stock?

MR. GIUFFRA: No, Your Honor. And in fact, you know, the other side says the best they can do is they can cite their confidential witnesses who say that the Perseris product, the smaller product that's 1/16th the size of the other product in terms of revenues, was not doing well, at least in the jurisdictions where they were selling the products. So, Confidential Witness 2 was selling in North Carolina. That's one of our 50 states. And so that doesn't really tell you what the whole overall country was doing.

They claim, for example, that, well, the senior

executives would have had access to the sales data of the company, but then they don't cite any specific sales data that the executives saw that would have caused them to update the guidance sooner than they did.  And remember again, the case starts with guidance in February, and then there's the updated guidance in July.

And with respect to Perseris, the decision is made to just stop selling it because of the combination of the enhanced competition and the Inflation Reduction Act.

It's also important to remember that these confidential witnesses are not people who were working closely with the executives.  These are people the best they can say is, well, you know, Mr. Simkin might have been on a conference call, or the CEO may have gone and met with doctors in North Carolina.  That's very anecdotal evidence that one can cherry-pick, but it's not the kind of evidence that would establish that the CEO or the CFO or the Chief Commercial Officer knew that the projections were false.

And again, because they're projections, they've got to show actual knowledge.  It's not even recklessness.  It's actual knowledge that these projections were false.  And the fact that they updated the projection, you know, by July suggests that they were trying to do the right thing.

The last point -- two other points that plaintiff made, and then I will sit down.  Thank you for being so generous with the time.  There are allegations about the Chief Commercial Officer, Mr. Simkin, that he would have known about the projection with the issues with Perseris, and they did have to shut the product down.  What "would have known" is not particularized allegations.  It's a speculative allegation by definition.  And courts have repeatedly rejected "would have known" allegations.

Plaintiffs also talk about, well, you were still positive about Perseris in May and June, and then you make a decision, you know, five or six weeks later to stop selling the product.  Well, that happens all the time in business.  You're trying to figure out whether you can make money with respect to a product, you're trying to figure out how the competitor is dealing with it.

And cases have made it quite clear, including the Fourth Circuit, that looking at a time gap, which is what plaintiffs are doing here, is nothing more than trying to plead fraud by hindsight.  And that's not acceptable under the securities laws.

The last thing the plaintiffs do is they say, well, you know, Perseris was a core operation of the company.  Well, it wasn't.  It was less than 5 percent of the revenue in 2023.  But this so-called core operations

doctrine is one that courts rarely apply.

And again, with Sublocade, which is the bigger product, when the company -- if you just look at the bottom of the initial range, they were only off by 7 percent, and then they almost hit it on the number for the year with the revised guidance that was given in July of 2024.

So, to sum up, Your Honor, there are two good grounds to dismiss this complaint. One, the statements are not legally actionable. And the second is plaintiffs have not made the kinds of particularized allegations of scienter that are sufficient to withstand the motion to dismiss. And since they can't satisfy both -- either, in fact, they have to satisfy both to get past the motion to dismiss, we urge the Court to dismiss, and to do so with prejudice.

They haven't proposed an amendment here, and so there's no need for us to go through this again. You know, my experience has been that when plaintiffs think that they have some new facts that they want to plead, they'll seek to amend the complaint. They haven't done that here. They're prepared to stand on the allegations that they have.

So, we would urge the Court to dismiss the case with prejudice. Thank you very much.

THE COURT:  Thank you, sir.  Appreciate your presentation.

Good morning, sir.

MR. VAN:  Good morning, Your Honor.

So, just --

THE COURT:  I want to make sure for the record, you are Mr. Patrick Van, is that correct?

MR. VAN:  My first name is Austin, but my middle name is Patrick.

THE COURT:  Austin.  I'm sorry.  Nice to have you here this morning.

MR. VAN:  Thank you.

THE COURT:  You go right ahead.

MR. VAN:  So, there are three sets of misstatements at issue here, and most of the presentation you just heard is directed to only one of those.  And so let's just be clear about what the misstatements are that are at issue.

The first set are misrepresentations that they made about how predictable the disenrollment process was for Medicaid for their drug, Sublocade.  How predictable was it?  They said it's very predictable.

The impact will go away in the back half.  We expect the impact to go away in the second half.  We believe it will go away.  They were suggesting that this

was a predictable process when in fact by February, March, April, by April they already had two-thirds of the states having finished the disenrollment process.  They knew by that point that this disenrollment process was incredibly chaotic, the reason being that Sublocade is given to opioid use disorder patients.  People who tragically are akin to something like heroin addiction.  They're not good at filling out paperwork.

So, they weren't re-enrolling, and it was very difficult to predict when they would be able next to re-enroll.  It was a chaotic process.  And they had all that information.  They knew about that chaos by April at the latest.  By then they had had two-thirds.  By February they already had five states.  They should have known by February that this was going to be a chaotic process.

THE COURT:  How would they determine with any degree of exactness exactly what the impact would be?

MR. VAN:  Well, so it's not necessary that they would be able to determine it.  In fact, that they could not determine it proves our point that they shouldn't have been saying with certainty that this will be a resolved process by June.  That was misleading to investors.

The second set of misstatements concerns Perseris.  And I think what's really key here is that they were telling Perseris that we're getting positive

feedback, overwhelmingly positive feedback from prescribers, when in fact we have not just one confidential witness, as my friend mentioned, we have five confidential witnesses coming forward and saying that that was not the case. And these weren't from one state. They were from all over. And they were saying that overwhelmingly the feedback from prescribers for Perseris was negative.

And so for defendants to come forward and say that they're receiving positive feedback, and that that was a reason for them to be confident in their revenue projections for this drug Perseris, that was blatantly misleading.

And the third set are these revenue projections that was the focus of this presentation. And those were also misleading because they didn't have a firm basis to make those projections. And those projections, incidentally, were off by 7 percent. And that might sound like a little, but it's actually a lot.

THE COURT: A projection is a projection. It's not -- it doesn't have exactness to it. It's based upon the information at hand at that time, and how reasonable people could construe it.

MR. VAN: Sure. But they gave a range. And this was outside even the narrowest part of that range.

And they were giving those projections even up until just four weeks before they said we're not going to meet those projections. And they were off by 7 percent, which is material to investors. The threshold of materiality is usually 5 percent under SEC rules. And it was so material to investors that they devalued the company by one-third upon hearing that news.

So, those are the three categories of misstatements. And I guess I'd like to just go through and address the issues that defendants have raised with respect to each of them.

THE COURT: Yes, sir. Take as much time as you want.

MR. VAN: Thank you, Your Honor.

Okay. So, with respect to the first set, which is these misrepresentations about the predictability of Medicaid disenrollments for Sublocade, defendants say that they disclosed the risk in March of 2024. But by that time, the risk that this process would be chaotic had already materialized. Seventeen states had finished the disenrollment process by March.

And so it was actually a misleading statement for them to come forward and say there may be problems associated with Medicaid disenrollments when those problems were actual. They had already started to happen.

It is actually a well-established principle of law that to state is merely hypothetical an event that is already materialized is misleading.

So, it's -- they're barking up the wrong tree if they're trying to say that this was disclosed. If they are giving risk disclosures of those sorts, those were themselves misleading statements.

So, then they say that these statements are opinions. So, certainly one of the statements is not an opinion. That is Statement 10. And there he's saying -- Crossley, the CEO of the company, is stating that this impact will go away in the back half.

And they try to say, well, this broad paragraph really that is his statement begins at the -- starts with the term, "I think." Well, if you look, as Your Honor will I'm sure, at that complete statement, it's a separate clause in which Crossley is stating that the headwind will go away in the back half. And it's being stated with certainty.

Regardless, these other statements which, you know, admittedly do begin with statements, like, "I think" are also actionable. And that is primarily under the Supreme Court's opinion in *Omnicare*. So, the Supreme Court said opinions can be actionable. Nothing wrong with opinions. They can be actionable as omissions if the

speaker omits a material fact that conflicts with what a reasonable person would take from the statement.

And here, reasonable investors would take from these statements we expect the impact of the Medicaid disenrollments to be resolved by June, they would certainly take from that statement that defendants did not have some basis clearly contradicting that.  Here, they did.

By April, two-thirds of states had already completed their Medicaid disenrollments.  So, they already knew.  They knew fully well that this was a chaotic process.  So, they had strong reason not to make those statements, and they omitted that contrary information, that material information, from their statements.  So, they're misleading even if they're opinion statements and actionable.

So, defendants try to say -- so, they look to the PSRA safe harbor provision.  My friend went through that.  And this is a provision of the PSRA.  But importantly, -- and this applies to four of these statements.

Importantly, it does not apply, one, to guarantees.  So, Statement 10, this does not apply to that if Your Honor agrees, as you should, that this was a guarantee.  It was a separate clause.  The impact will be

resolved by June. That statement was not forward-looking. It's not projected by the safe harbor.

And then these opinion statements, to the extent that, you know, these other statements --

THE COURT: It's hard for me to conclude that it's a guarantee based upon the fact that they explain that there were a lot of variables out there, the market was changing, and that they projected that they would be able to achieve these goals. But the real issue here is was it a commitment on their part or was it simply an expectation?

MR. VAN: Well, certainly in that statement there was a statement of a guarantee. They were saying this will happen.

THE COURT: Okay.

MR. VAN: So, Statement 10 was a guarantee. And these other statements were actionable because of what they omitted primarily. They omitted that they already had information that this was a chaotic process. And they had no reason to expect that this would be resolved by June. They had a reason to expect it would not resolve by June.

But the point I was making with respect to the safe harbor provision is that omissions are not forward-looking. Material omissions are not forward-looking, and

so those also aren't protected.

And let me just read quickly into the record a case, 2023, U.S. Dist. Lexis 139294, *23.  That's *In re IronNet.*  It's a case I found from the Eastern District of Virginia from this district.

THE COURT:  Okay.

MR. VAN:  Which addresses a set of authority. This case may not -- this Court may not see as many security cases as some other districts, but, for example, the Southern of District of New York has a well-developed body of law –

THE COURT:  I have no doubt.

MR. VAN:  – in this area.  And that case, from this district, points to that body of law for this proposition that omissions are not forward-looking and are not protected under the safe harbor provision.  So, that is the Sublocade set of misleading statements.

The second set of misleading statements that I don't think really was addressed adequately by my friend are the statements about Perseris and the prescriber feedback.  So, this really was misleading.  They said we're receiving -- let me just read it.  "We remain confident in net revenue guidance based on positive antidotal prescriber feedback on product performance."

There is a well-established principle that you

cannot speak in half truths. You can't say something that is just partly true.

And when you speak on a topic -- you don't have to talk on any topic. They weren't required to bring up prescriber feedback. But once they mentioned prescriber feedback, the law says that they had to tell the whole truth. And the whole truth is certainly -- this was overwhelmingly negative feedback. And we know that, and we adequately pleaded it based on five confidential witnesses who said basically just that.

And this was known. It was known to Crossley because we have CW-2, I believe, or -- excuse me, CW-1 -- yeah, CW-2, stating that Crossley accompanied sales representatives to meetings with physicians. The CEO himself.

I commend him for wanting to be so grassroots and in the weeds. He actually went to talk to prescribers. And unless he had an unusually unrepresentative sample in what he went and discussed with these prescribers, he knew that that statement was misleading. That these prescribers were giving bad feedback. And of course they were giving bad feedback. It was a giant needle. It was really painful, but there was another option.

So, that second set of misstatements is also

misleading.  And they mention that they disclosed the Perseris competition.  That disclosure does nothing to tell investors that prescribers were overwhelmingly giving negative feedback on their drug.  Merely to say that there was another competitor doesn't dispel the market from what they took from defendants' misleading statement.

They state that they had no duty to disclose all customer feedback.  Well, the principle I just explained applies.  They require once they spoke on a topic to tell the whole truth, and they failed to do that.  The whole truth was that even if, you know, there was one prescriber somewhere who thought a giant needle wasn't particularly bad and wanted to make his patient suffer, you know, overwhelmingly doctors didn't like this drug.  It was inferior.

They mention that the product features were well-known to investors.  That's really neither here nor there.  The point is that they were misleading the public by stating that prescribers were having positive feedback for whatever reason.  You know, for whatever reason they were giving positive feedback when in fact they weren't.

Okay, so just to summarize scienter, which is the second component here, there are these sets of misleading statements that we have and then there is this other element of the cause of action for 10(b) that we

41

have to show.  The defendants have challenged scienter. I've already mentioned some of the bases, but I can go over them quickly.

For Crossley -- for Sublocade, again, they received two-thirds of the states' completion data for Sublocade for the Medicaid disenrollments by April.  By the time they made the statement in April 25th that they were expecting the impact of Medicaid disenrollments to be resolved, assuring investors that the Medicaid disenrollment process was not chaotic, they already knew fully well from their experience with two-thirds of the states that this was a chaotic process.

THE COURT:  But they said we expect some reduction in revenue caused by unexpected events.  Didn't they make it clear that was not a totally stable market?

MR. VAN:  Well, I think investors tend to know that's a generic warning.  I mean, I think that that is something that they put in boilerplate so that they -- so that their lawyers, in moments like this, can go and dig it up and point to it.  Investors don't rely on statements like that.  What they do rely on are specific statements by people like Crossley, you know, in his remarks to investors at -- on conference calls, speaking directly with them, saying, look, we expect that this is going to be gone.  This will not be a problem by June.  And they

knew that it would be a problem after June.  That was a knowing misrepresentation on the part of Crawly -- Crossley.  Excuse me.

For Perseris, I already mentioned that Crossley himself went to visit with physicians.  And unless he, for some bizarre reason, spoke to the only five physicians in the country who really loved this giant needle, he would have received negative feedback.

For Preblick, these relate to the Perseris revenue guidance statements.  Preblick, the CFO of the company, we know from CW-2 that he actually joined the leadership calls.  So, he was on calls.  And we know from CW-2 that starting in March 2024 on those calls, those weekly calls, a frequent topic of discussion were the reduced Perseris impacts -- excuse me, the Perseris reimbursements from IRA.

So, they already knew at the end of March that Perseris was in trouble for two reasons.  One was the prescriber feedback, and the other was that the Inflation Reduction Act was reducing reimbursements.  And that element was directly conveyed to Preblick on these phone calls.

So, he would have been well aware of a concern -- or that something had changed that would have adjusted their revenue expectations for Perseris by March

of 2024 at the latest.

And Simkin should have known the same because Simkin and Preblick finalized the sales goals for Perseris together.  So, surely, Preblick, having joined these calls, would have conveyed this information to Simkin in discussing the sales goals for Perseris.

And for the stock sales, I think that this is certainly a motive.  It may well be that these vested at the right time, but they certainly could have held on to them.  Instead, they sold more than half of their shares.  It was a dump of everything -- well, of more than half of their shares, and this was --

THE COURT:  That was a major part of their compensation, and they sold their shares -- the corporation understood that was a portion of their salary, and that they would sell those shares as their compensation, is that not correct?  Maybe I misunderstood.

MR. VAN:  Yes, Your Honor.  Absolutely.  But had they believed that those shares were going to increase in value, it would have been irrational for them to sell them.

THE COURT:  That depends upon if they needed the money.

MR. VAN:  Well, so -- maybe so.  But it was, nevertheless, a motive for them to make misrepresentations

to inflate the value of those shares until the point of which they vested. It remains a motive, even given the fact that they were going to vest in March. They made misrepresentations in February and March. They had a motive to make those misrepresentations so there wasn't a tank before they had a chance to sell. So, that remains a strong motive.

THE COURT: Okay.

MR. VAN: So, I think those are my key points.

Do you have any questions for me, Your Honor?

THE COURT: No, sir. Thank you very much. I appreciate your presentation.

MR. VAN: Thank you.

THE COURT: Okay. Any rejoinder, sir?

MR. GIUFFRA: Yes, Your Honor. I'll be fast.

THE COURT: Take your time.

MR. GIUFFRA: I'll try to speak slowly though.

THE COURT: Otherwise, you'll be in serious trouble with my court reporter.

MR. GIUFFRA: I know that.

THE COURT: And you don't want to tangle with her. I'll tell you that right now.

MR. GIUFFRA: I don't want to. Fortunately, I do cases all over the country, but I'm from New York, so sometimes I start talking too quickly, and that's not

good.

Let me start with where plaintiff's counsel started, which was to basically say, well, in July the company's executives said, well, it turned out to be difficult to predict the impact of the Medicare disenrollment. That's a classic example of executives being honest and straightforward with investors, explaining what happened. And now it's suddenly being said, well, you should have said that back in February. Well, it was months and months of data and events that caused them to then reassess what had happened, so that's not -- that's not securities fraud.

But more importantly, the company at Exhibit 3, and we have -- if you take a look at Exhibit 3, which is the company's annual report, which was issued in March, there's literally pages of warnings about the difficulty of figuring out how Medicare disenrollments would occur after the pandemic. And there's literally -- I won't read it, Your Honor, but on Pages 26 and 27, there's literally paragraphs about how difficult this process is going to be. How there's been changes in government programs.

Talked about how at the beginning of the pandemic that Congress enacted something called the Families First Coronavirus Response Act, which included a requirement that the Medicare programs keep people

continuously enrolled through the end of the Covid health emergency in exchange for federal funding, and then how that changed.  And so this company was trying to deal with a really difficult situation where no one had ever made predictions about what disenrollments would be like because we've only had two pandemics in the last 100 years.

On the question of Perseris, and these confidential witnesses, well, this product had sold $40 million in revenue in the prior year.  There were people who were using the product.  They just cherry-pick a few confidential witnesses, and those were all people who were terminated when the company made the decision relatively quickly from February to stop selling the product because the competitive pressures they faced were too great.

And then on the projections, and I think this is a devastating point, they make a big deal about this statement that Mr. Crossley made at the April 25, 2024, analyst conference call where he talked about, you know, we're having difficulty figuring out our Medicare renewal rates, but we expect it to be easier in the second half of the year.  And he says, "I think."  And that's clearly a projection.

But when you look at what the company did, it

announced revised guidance.  It went from $820 million to -- $880 million to $765 million to $805 million.  And the actual for the year turned out to be $756 million.  So, they were off by $9 million.  That exactly confirms that the projection that Mr. Crossley made in April about how things would become easier to understand in the second half of the year, and your projections could be stronger, turned out to be exactly right.  So, that actually helps us.

With respect to Perseris again, they don't say with respect to these confidential informants -- or confidential witnesses, excuse me, they don't say when they heard from doctors.  They don't say whether it was in March, April, May, June.  Well, clearly there was adverse feedback certainly toward the end of the class period because the company made the decision in July to get out of selling the product.  And so they don't identify when those -- when those statements were made with respect to doctors.  And in any event, there were positive doctors because, you know, doctors were prescribing this product to the tune of $42 million in the prior year.

And the company of course disclosed the competition from Teva, as I had mentioned before.  And they also discussed the impact of the Inflation Reduction Act, all specifically disclosed risks that turned out to

be true.

Let me just say a word about the stock sales. As you correctly pointed out, investors knew that the stock grants were an important part of these executives' compensation.  Investors were told when the vesting periods would end, and the executives did what anyone who wanted to be economically rationale would do, which is sell the stocks so you could diversify your portfolio.

And the statement was made that somehow the stock, you know, was devalued by a third in July when they announced the bad business results.  The fact that the projections were going to have to be readjusted and that Perseris -- they weren't going to sell it anymore.  Well, there were other things that were announced at that point in time by the company, including a major litigation settlement.  And all of that were business reversals that caused the stock price to go down.

And again, where I started, Congress made it clear in the Private Securities Litigation Reform Act that the securities law are not a form of insurance.  Just because the company's stock price goes down doesn't mean that securities fraud has occurred.  In fact, what Congress did was in order to prevent these kinds of cases, raised the pleading standards more than for any other area of federal law.

So, we would urge the Court, Your Honor, to dismiss the case with prejudice. There has been no request to replead. And the Court should dismiss the complaint, number one, because the challenge statements, there are 16 of them, are not actionable. They're forward-looking statements.

And second, and for an independent reason, plaintiffs have not pled particularized facts that these defendants had actual knowledge that any of the projections that they made were false. If anything, what the record here shows are company executives who are trying to work through a very difficult period post-pandemic trying to guestimate what the projections will be. And they warned investors that there were risks associated with making those projections in, you know, detailed disclosures, paragraphs and paragraphs in the company's disclosures.

So, we would urge the Court to dismiss the case with prejudice. Thank you so much.

THE COURT: All right. Thank you very much.

Gentlemen, I appreciate --

Yes, sir.

MR. VAN: I have just one quick request.

THE COURT: Sure.

MR. VAN: We think that there are three clear

sets of misstatements here.  But if Your Honor --

THE COURT:  Speak more slowly.  We can't understand you.

MR. VAN:  Sure thing.

THE COURT:  Why don't you come on up to the podium.

MR. VAN:  It was a quick comment, and I didn't mean to --

THE COURT:  That's okay.

MR. VAN:  We do believe that there are three, you know, pretty clear sets of misstatements here that are actionable.  But if for any reason Your Honor does choose to dismiss the entirety of this case, we certainly want leave to amend.  We think that there's plenty we could add.

THE COURT:  Okay.  I understand that.

MR. VAN:  Thank you, Your Honor.

THE COURT:  Well-taken.

All right, the issues at hand here in the case this morning are forward-looking statements and market predictions, which are insufficient as currently pled to show fraudulent intent, particularly those prefaced by the comment, "We expect some reduction in revenue caused by unexpected events."

The corporate representations currently at issue

are not a guarantee, but they are a periodically adjusted expectation. As currently alleged, the plaintiff's claims do not meet the heightened pleading standard for security fraud claims. And we'll discuss this in more detail in a written opinion.

The complaint will be dismissed, but I will dismiss it without prejudice and give you a chance to file an amended complaint within 30 days.

A memorandum opinion will be issued by my chambers as quickly as we can put it together, gentlemen.

MR. VAN:  Thank you, Your Honor.

THE COURT:  Anything further today?

MR. GIUFFRA:  Thank you very much, Your Honor.

MR. VAN:  Nothing further here. Thank you so much, Your Honor.

THE COURT:  All right. Very well.

MR. GIUFFRA:  One point. That's 30 days from today?

THE COURT:  Yes, sir.

MR. TOLL:  Your Honor, the one question is 30 days from the opinion so we'll know the grounds exactly that you focus on?

THE COURT:  Yes, that makes a lot of sense. Thirty days from the day that I issue the opinion. That's a fair request.

MR. GIUFFRA:  That's fine, Your Honor.

THE COURT:  Thank you, gentlemen.

We'll stand in recess.

(The proceeding concluded at 11:05 a.m.)

REPORTER'S CERTIFICATE

I, Krista M. Liscio, OCR, RMR, Notary
Public in and for the Commonwealth of Virginia at
large, and whose commission expires March 31, 2028,
Notary Registration Number 149462, do hereby certify
that the pages contained herein accurately reflect
the notes taken by me, to the best of my ability, in
the above-styled action.

Given under my hand this 6th day of May, 2025.
                              /s/
                              Krista M. Liscio, RMR
                              Official Court Reporter