IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| IN RE INDIVIOR PLC SECURITIES LITIGATION | Case No. 3:24-cv-554–HEH |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## MEMORANDUM OPINION
### (Granting Motion to Dismiss)

THIS MATTER is before the Court on Defendants Indivior PLC ("Indivior" or the "company"), Mark Crossley, Ryan Preblick, and Richard Simkin's (collectively, "Defendants") Motion to Dismiss (the "Motion," ECF No. 36), filed on January 10, 2025. Plaintiff David Hanshew ("Plaintiff") brings this class action individually, and on behalf of all others similarly situated, alleging securities fraud against Defendants pursuant to Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.*, and Securities and Exchange Commission Rule 10b-5.

The parties have filed memoranda in support of their positions, and the Court heard oral argument on April 22, 2025. At the hearing, the Court granted Defendants' Motion for the reasons articulated below.

## I. BACKGROUND

Indivior is a global pharmaceutical company that develops, manufactures, and markets pharmaceuticals to treat opioid use disorders and serious mental illnesses, including schizophrenia. (Am. Compl. ¶ 2, ECF No. 34.) The company is organized

under the laws of England and Wales and is headquartered in Chesterfield, Virginia. (*Id.* ¶ 18.) During the time in question, the company was led by Chief Executive Officer Mark Crossley ("CEO Crossley"), Chief Financial Officer Ryan Preblick ("CFO Preblick"), and Chief Commercial Officer Richard Simkin ("CCO Simkin"), among others. (*Id.* ¶¶ 19–22.)

Indivior's flagship pharmaceutical product is Sublocade, which is a monthly injection used to treat opioid use disorder. (*Id.* ¶ 18.) The company also sold Perseris, which is an injection used to treat adults with schizophrenia. (*Id.* ¶ 3.) In 2023, Sublocade sales generated net revenues of $630 million, or 58% of Indivior's net revenue for 2023, while Perseris sales generated net revenues of $42 million, or less than 4% of Indivior's net revenue for 2023. (*Id.* ¶¶ 3–4, 26, 29.) Plaintiff alleges that, beginning on February 22, 2024, and until July 9, 2024, Defendants made several intentional or reckless misrepresentations to shareholders and the public regarding the prospects of Sublocade and Perseris. (*Id.* ¶¶ 6–7.) After disclosing expected shortcomings in net revenue from these two (2) pharmaceuticals—and that Indivior would cease sales of Perseris—on July 9, 2024, Indivior's stock price fell $5.15 per share, or 33.57%, to close at $10.19 per share. (*Id.* ¶ 63.) Plaintiff was a shareholder during this time, and he brings this class action on behalf of a class consisting of all persons and entities that purchased or acquired Indivior stock between February 22, 2024, and July 8, 2024.

A. **Background of Sublocade**

In his Amended Complaint, Plaintiff alleges that Defendants knowingly or recklessly misled investors regarding the impact of Medicaid disenrollments on sales of Sublocade. (*Id.* ¶ 6.) Most individuals suffering from opioid use disorder are not employed or do not have employer-based health coverage and as a result, approximately 70% of the patients that use Sublocade are covered by Medicaid. (*Id.* ¶ 28.) At the beginning of the COVID-19 pandemic, Congress enacted the Families First Coronavirus Response Act ("FFCRA"), which required Medicaid programs to keep participants continuously enrolled through the end of the COVID-19 pandemic. (*Id.* ¶ 35.) In 2022, as part of the Consolidated Appropriations Act ("CAA"), Congress de-linked the continuous enrollment provision from the pandemic, ending the continuous enrollment on March 31, 2023, and allowing states to begin disenrolling individuals from Medicaid. (*Id.*) States progressively began disenrolling individuals from Medicaid beginning in April 2024. (*Id.*) During this disenrollment period, millions of individuals were scheduled to lose Medicaid, but many of these individuals would be eligible for re-enrollment. (*Id.*)

Also in 2022, Congress enacted the Inflation Reduction Act ("IRA") which required the Secretary of the Department of Health and Human Services ("HHS") to negotiate the price of certain high-spend Medicare pharmaceuticals starting in 2026. (*Id.* ¶ 36.) The Act also required manufacturers of certain pharmaceuticals covered by Medicare Part B or Part D to pay rebates to Medicare if the manufacturers increased their prices faster than inflation. (*Id.*) On August 29, 2023, the Centers for Medicare &

3

Medicaid Services, a division within HHS, published a list of the first ten (10)
pharmaceuticals that would be affected by the IRA. (*Id.* ¶ 38.) Although the IRA would
have a direct impact on the prices of these ten (10) pharmaceuticals, consultants opined
that the IRA would have an indirect effect on the pricing of other pharmaceuticals not
subject to the law. (*Id.* ¶ 39.)

### B. Background of Perseris

Plaintiff alleges that Defendants knowingly or recklessly misled investors into
believing that Perseris continued to receive positive prescriber feedback, when, in fact,
clinicians prescribing Perseris were providing negative feedback to Indivior sales
representatives and Perseris had never met its annual sales goals. (*Id.* ¶ 7.)

Perseris is an injectable drug that is administered monthly and requires an 18-
gauge needle. (*Id.* ¶ 31.) Before injecting a patient, a healthcare provider must mix a
prefilled liquid syringe and a prefilled powder syringe to create the injected concoction.
(*Id.* ¶ 32.) The direct competitor of Perseris is a drug called Uzedy, manufactured by
Teva Pharmaceuticals, Inc. (*Id.* ¶ 33.) Uzedy is administered every one (1) or two (2)
months and requires a 21-gauge needle. (*Id.*) Unlike Perseris, Uzedy is prepared as a
single-dose prefilled glass syringe and does not require any mixing prior to
administering. (*Id.*)

For medical needles, the larger the gauge, the thinner the needle. Accordingly, the
18-gauge needle used to inject Perseris is larger than its rival's 21-gauge needle. (*Id.*
¶ 34.) In general, medical studies have revealed that patients report less pain when they

receive injections from thinner (i.e., higher gauge) needles than alternative thicker (i.e., lower gauge) needles. (*Id.*)

### C. February 22, 2024 Press Release

On February 22, 2024, Indivior issued a press release announcing its Quarter Four ("Q4") results for fiscal year ("FY") 2023. (*Id.* ¶ 40.) The press release described net revenue guidance for the coming fiscal year, FY 2024, providing for Sublocade in a range of $820–880 million and for Perseris in a range of $55–65 million. (*Id.* ¶ 40.) That same day, Indivior held an earnings call where CEO Crossley and CFO Preblick spoke extensively. (*Id.* ¶ 41.) CEO Crossley stated that Indivior "expect[s] another year of strong net revenue growth led by Sublocade." (*Id.* ¶ 41.)

CFO Preblick also addressed the issue of Medicaid re-enrollment:

> Our SUBLOCADE guidance range contemplates a ***modest impact*** from the Medicaid re-enrollment similar to full-year 2023 and we will continue to monitor this dynamic during the year. Overall, we remain confident in meeting our net revenue target of $1 billion run rate exiting 2025 and our longer-term net revenue target of greater than $1.5 billion.

(*Id.* ¶ 43 (emphasis and italics added)[1].)

Concerning Perseris, CEO Crossley further stated,

> [Although] it's fair to say that we did face some significant challenges in the last couple of quarters of 2023 as a result of competitive pressures from a well-funded new market entrant. ***We nevertheless continue to believe in the potential of th[is] important medicine for schizophrenia based on its differentiated clinical profile and strong feedback we get from clinicians.*** Furthermore, since we expanded the field force nationally in 2022, we've seen increases in market coverage and penetration.

---

[1] The Court employs the bold and italics emphasis included by the parties. The original statements themselves included no emphasis.

("Statement 1") (*Id.* ¶¶ 42, 94 (emphasis and italics added).)  CFO Preblick

reiterated these claims:

> For PERSERIS, our full-year 2024 net revenue expectations are $55 million
> to $65 million, which represents 43% growth at the midpoint.  As [CEO
> Crossley] mentioned, we remain confident that PERSERIS' *differentiated*
> *profile* supports our peak net revenue expectations of $200 million to $300
> million.

("Statement 2") (*Id.* ¶¶ 44, 96 (emphasis and italics added).)

### D. 2024 First Quarter Results

On April 25, 2024, Indivior announced its first quarter results for FY 2024.  (*Id.*

¶¶ 45, 98.)  This press release noted that the underlying demand for Sublocade remained

strong, but the drug's growth was being adversely affected by the CAA disenrollment of

Medicaid patients:

> SUBLOCADE's reported growth was, however, *adversely impacted by*
> *transitory items, including accelerating Medicaid patient disenrollments*,
> a cyberattack on the largest U.S. medical claims processor and abnormal
> trade destocking.  *We fully expect these items to resolve as the year*
> *progresses and, combined with the benefits of recent commercial*
> *investments behind SUBLOCADE, we anticipate an acceleration in our*
> *top-and bottom-line growth over the remainder of 2024, particularly in*
> *the second half. We therefore reconfirm our 2024 guidance, including*
> *SUBLOCADE net revenue of $820m to $880m.*

("Statement 3") (*Id.* (emphasis and italics added).)

That same day, Indivior held an earnings call to discuss these results.  During the

call, CEO Crossley stated,

> *Turning to SUBLOCADE, we delivered year-over-year net revenue*
> *growth of 36% in the first quarter, which is in line with our [FY] growth*
> *expectations.*  SUBLOCADE's sequential net revenue growth of 2% was
> lower than we planned.  We believe growth in dispenses were negatively

6

impacted by two external forces, including a higher-than-expected rate of Medicaid patient disenrollments and the cyberattack at Change Healthcare. *Let me provide more color on how each of these impacted SUBLOCADE's growth in the quarter and why we remain confident in our [FY] 2024 net revenue guidance.* First, the most recent data on Medicaid renewals indicates a higher-than-expected number of patient disenrollments of over 20 million. Recall at the peak during COVID, over 90 million patients were enrolled in Medicaid. This is particularly relevant in opioid use disorder treatment as the nature of the disease means that approximately 70% of our patients are covered by Medicaid. *The impact of this disenrollment process will annualize at the end of June and therefore this headwind should begin to subside as we move through the second half of the year. Although the impact on SUBLOCADE's growth in the quarter was larger than expected, Medicaid disenrollment was a known dynamic.*

("Statement 4") (*Id.* ¶¶ 46, 100 (emphasis and italics added).)

CEO Crossley added,

With . . . *Medicaid renewal annualizing at the end of June, we look forward to subsiding impacts from these transitory items, which we believe are masking the strong underlying demand for SUBLOCADE. In fact, early dispense trends in April are tracking back to the growth levels we had expected in [Q1].*

("Statement 5") (*Id.* ¶¶ 47, 102 (emphasis and italics added).)

CFO Preblick agreed:

Medicaid disenrollment dynamics had a disproportionate impact on our company as more than two-thirds of SUBLOCADE patients are covered by Medicaid. This impact accelerated in Q1, beyond the low single-digit headwind we had seen in prior quarters. *Looking ahead, we expect this trend to begin subsiding in the second half of 2024, as [Defendant Crossley] noted.*

("Statement 7") (*Id.* ¶¶ 47, 106 (emphasis and italics added).)

During the earnings call, an analyst asked CEO Crossley to elaborate on his statements concerning "growth headwinds from change in Medicaid." CEO Crossley

responded that "we have a continuing headwind of . . . the Medicaid renewal continuing, through to the half year where then we'll annualize that, *and that headwind will go away in the back half*." ("Statement 10") (*Id.* ¶¶ 52, 112 (emphasis and italics added).)

> CEO Crossley also discussed Perseris during the earnings call:
>
> Turning to PERSERIS, while competition has intensified in the risperidone LAI [long-acting injections] category, once-monthly risperidone products are gaining share rapidly, and the overall category is still growing. *Against this backdrop, we continue to highlight PERSERIS' unique product profile, which continues to result in positive anecdotal prescriber feedback on product performance.* Sequential dispense growth was 10%, *not only underscoring the good underlying momentum we're seeing, but also representing an acceleration from previous quarters.* We expect to augment our efforts with PERSERIS at the publication of real world evidence studies in the second half of 2024. *Taken together, we remain confident in our [fiscal year] net revenue guidance for PERSERIS and expect accelerating net revenue moving forward.*

("Statement 6") (*Id.* ¶¶ 47, 104 (emphasis and italics added).)

> CFO Preblick again reiterated CEO Crossley's statements:
>
> Moving to PERSERIS, reported net revenue of $11 million was up 38% versus the prior year and down 8% sequentially, due to low single-digit million destocking in the quarter. Encouragingly, dispenses are up 10% sequentially. *We remain confident in meeting our net revenue guidance of $55 million to $65 million.*

("Statement 8") (*Id.* ¶¶ 50, 108 (emphasis and italics added).)

> \* \* \*
>
> We have discussed a number of the external dynamics which impacted SUBLOCADE results in the quarter. *Based on our expectations for a resolution of these transitory headwinds* and continued strong business execution, we remain comfortable with our guidance elements for [FY] 2024, *including SUBLOCADE net revenue of $820 million to $880 million.*

("Statement 9") (*Id.* ¶¶ 50–51, 108 (emphasis and italics added).)

**E. The May and June 2024 Presentations**

On May 23, 2024, CEO Crossley, CFO Preblick, and CCO Simkin gave a presentation to analysts in New York City. (*Id.* ¶ 53.) During this presentation, CEO Crossley indicated that Perseris sales would "diversify" Indivior's revenue. (*Id.* ¶ 54.) CCO Simkin asserted that Perseris was capturing a disproportionate share of New-to-Brand Prescriptions ("Statement 11") and the projected peak net revenue in 2024 was $200 to $300 million ("Statement 12").[2] (*Id.* ¶¶ 55, 115, 117.) Ultimately, CFO Preblick affirmed the prior predictions for Sublocade of $820 million to $880 million and for Perseris of $55 million to $65 million. ("Statements 13 and 14") (*Id.* ¶¶ 56, 119.)

On June 5, 2024, CEO Crossley gave another presentation. (*Id.* ¶¶ 57, 122.) During this presentation, he reaffirmed the previous predictions for Sublocade and Perseris. ("Statements 15 and 16") (*Id.*)

**F. The July 9, 2024 Disclosure**

On July 9, 2024, Indivior issued a press release updating the company's guidance for FY 2024. (*Id.* ¶ 58.) The press release reduced FY 2024 net revenue guidance for Sublocade to $765–$805 million from the previous range of $820–$880 million and announced that Indivior would immediately cease all sales and marketing of Perseris. (*Id.*) The press release explained that the reduction of Sublocade was in a major part due to accelerated Medicaid disenrollments, which disproportionally impacted

---

[2] New-to-Brand Prescriptions refer to a patient's first prescription for a particular drug.

Sublocade. (*Id.* ¶ 59.) Additionally, Indivior was ceasing the marketing and sale of Perseris due "to the highly competitive market and impending changes that are expected to intensify payor management in the treatment category in which PERSERIS participates," which led Indivior to conclude that "there is no longer a path forward for PERSERIS that is financially viable." (*Id.*)

That same day, Indivior held a conference call to discuss the update. (*Id.* ¶ 60.) During the call, CEO Crossley was asked "what visibility" he had "on the timing" of Medicaid reenrollments. (*Id.*) CEO Crossley responded that Medicaid reenrollment was "incredibly, incredibly difficult to forecast." (*Id.* ¶ 61.) He noted,

> What we're seeing is states finalize their renewals, you see patients holding out to the last date, almost in anticipation of losing it. When people are f[alling] out of coverage, there's an estimate that 69% of those falling out of coverage are due to procedural reasons. ***And so the time and pace at which they're re-enrolling, it's just very complicated to forecast that.***

> And then we've seen the extension of the renewal process, which is pushed into Q3 for 8 of the 11 remaining states with Alaska and D.C. in 2025 and New York not scheduled. ***So a lot of lack of precision and inability to forecast what is really a one-off item that is kind of unprecedented with no analog. So very tough to forecast this.***

> When it comes to SUBLOCADE and the churn of patients, I think you're right. If I think about churn when it comes to disruption and re-enrollment, ***in this very unique patient base, that's a bit more chaotic than an average Medicaid patients [sic], the process of managing paperwork to reenroll is not as normal of a process as it would be for you or me.*** And so that process can be extended and take longer than we expect.

(*Id.* (emphasis and italics added).)

Another analyst asked about the impact of the Inflation Reduction Act on Perseris. CEO Crossley replied that the IRA is "resulting in increased management of the category,

which is impacting both price as well as volume as the category is managed with

PERSERIS's *lack of scale in the market*," and therefore, with respect to PERSERIS,

"what we see is not getting to profitability for a long period of time that we believe

makes the product not financially viable." (*Id.* ¶ 62 (emphasis and italics added).)

Following Indivior's announcement on July 9, 2024, its stock price fell 33.57%.

(*Id.* ¶ 63.) Plaintiff alleges that Defendants made false and misleading statements

between February 22, 2024, and July 9, 2024, regarding the outlook of Sublocade and

Perseris. (*Id.* ¶ 64.) Plaintiff presents testimony from eight (8) confidential witnesses

("CW") which, Plaintiff alleges, shows Defendants knew of Perseris's struggling

performance well before July 9, 2024. (*Id.* ¶ 65.)

### G. Confidential Witness Testimony

Confidential Witness 1 worked for Indivior in California as an Area Sales Director

from August 2020 to July 2024. (*Id.* ¶ 66.) She managed a team of Institutional and

Clinical Specialists—or sales representatives—that sold Perseris. (*Id.*) CW-1 explains

that CFO Preblick and CCO Simkin set sales goals for Perseris. (*Id.* ¶ 68.) And three (3)

or four (4) times a year, CW-1 and others met with Perseris leadership to discuss sales

goals. (*Id.* ¶ 69.) These meetings were "typically attended by Tyson[, President of the

Behavioral Health Division], and occasionally by [CCO] Simkin." (*Id.* ¶ 70.) CW-1

never hit her individual sales quotas for Perseris, and, to her knowledge, Perseris sales

never hit its national sales goals during her time with Indivior. (*Id.*) She also noted that

Indivior used a web-based sales performance management platform called "Javelin." (*Id.*

¶ 72.) Although Javelin's data was accurate, it had a two (2) month delay, so Indivior

11

also tracked weekly and monthly Perseris sales through its own accounting system. (*Id.*) CW-1 alleges that Individual Defendants would have received weekly and monthly updates from these systems for Perseris sales. (*Id.* ¶ 73.)

According to CW-1, Perseris sales struggled to compete with its rival Uzedy because Uzedy's 21-gauge needle is thinner than Perseris's 18-gauge needle and the thinner needle caused less pain to patients. (*Id.* ¶ 74.) This sort of feedback, CW-1 explains, would be entered into a healthcare provider feedback system by sales representatives. (*Id.* ¶ 75.) The feedback would then be passed along to managers, senior leaders, and marketers. (*Id.*)

Confidential Witness 2 worked for Indivior as an Area Sales Director in North Carolina from January 2019 to July 2024. (*Id.* ¶ 76.) She states that chief financial officers from hospitals began complaining about reduced reimbursements for Perseris in January 2024. (*Id.* ¶ 77.) Under the Inflation Reduction Act, hospitals would receive Medicaid and Medicare reimbursements of the drug's maximum fair price plus 6% instead of the drug's average selling price plus 6%. (*Id.*) This change led several hospitals to tell CW-2 that they were considering switching to generic versions of Perseris. (*Id.*) This issue came up at least four (4) to five (5) times during weekly calls with leadership. (*Id.*) CW-2 states that Tyson, President of the Behavioral Health Division, was usually on these calls and CFO Preblick occasionally joined. (*Id.*) Sometimes, CW-2 notes, CEO Crossley accompanied sales representatives on their meetings with customers, and he would elicit feedback directly from the doctors in those

12

meetings.[3] (*Id.*) As with CW-1, CW-2 states that she understood that no team achieved its sales goal for Perseris and a common provider complaint about the drug was the needle size. (*Id.* ¶¶ 78–79.)

Confidential Witness 3 worked for Indivior as a Senior Medical Affairs Executive for several years. (*Id.* ¶ 80.) She alleges that the needle size required for administering Perseris was a common complaint and that she is "sure" the feedback would have been escalated to executives. (*Id.* ¶ 82.) CW-3 also notes that the medical team would have regular meetings to discuss provider feedback and these meetings would often be attended by CEO Crossley. (*Id.*) There were also company-wide meetings where provider feedback was discussed and CEO Crossley would sit in on those as well. (*Id.*)

Confidential Witness 4 worked for Indivior in North Carolina as a Senior Clinical Specialist from April 2024 to July 2024. (*Id.* ¶ 83.) She sold Perseris and noted that it was a challenge to compete with Uzedy because doctors preferred Uzedy's thinner needle. (*Id.* ¶ 84.)

Confidential Witness 5 worked for Indivior in Oklahoma and Kansas as an Executive Clinical Specialist from November 2021 to July 2024. (*Id.* ¶ 87.) CW-5 described Perseris as a "tough drug to sell" and the drug was not gaining a disproportionate share of the LAI market. (*Id.* ¶ 88.) Despite Perseris's lagging success,

---

[3] Although CW-2 states that CEO Crossley would elicit feedback and ask what was holding doctors back from using Perseris, CW-2 does not allege any specific feedback CEO Crossley received during these meetings. Thus, notably, CW-2 does not allege that the doctors often responded to CEO Crossley's inquires with complaints regarding the IRA reimbursements.

CW-5 was told by Tyson that the board of directors and executives of Indivior believed in and supported Perseris. (*Id.* ¶ 89.)

Confidential Witness 6 worked for Indivior across the Western United States as a Senior Area Sales Director from January 2022 to August 2024. (*Id.* ¶ 90.) CW-6 indicates that Uzedy had two (2) advantages over Perseris: (1) Uzedy was pre-mixed, and (2) Uzedy used a thinner needle. (*Id.* ¶ 91.)

Confidential Witness 7 worked for Indivior as an Executive Clinical Specialist from December 2021 to July 2024 selling Perseris. (*Id.* ¶ 92.) CW-7 states that Uzedy took market share from Perseris due to the use of thinner needles. (*Id.* ¶ 92.)

Finally, Confidential Witness 8 worked for Indivior in Missouri as an Executive Clinical Specialist from April 2023 to September 2024. (*Id.* ¶ 93.) She knew of territories that routinely missed sales goals for Perseris. (*Id.*) She notes that Tyson attended "Plan of Action" meetings where sales goals were discussed and CEO Crossley and CFO Preblick attended "Townhall" calls where they discussed Perseris's performance. (*Id.*)

According to Plaintiff, the testimony from these eight (8) confidential witnesses shows that Defendants' statements regarding the success of Perseris were false and misleading. First, Perseris was receiving overwhelmingly negative feedback—not the "strong feedback" that Defendants represented to the public. (*Id.* ¶ 95.) Second, Perseris's "differentiated clinical profile" that CEO Crossley boasted actually reflects Perseris's inferiority over competitors because it required larger, more painful needles. (*Id.*) Third, Plaintiff alleges that Defendants knew or recklessly disregarded feedback

from Indivior sales representatives that Perseris was difficult to sell due to its larger needle and other factors. (*Id.*) Ultimately, Plaintiff asserts that Defendants had no basis to continue predicting that Perseris would meet its anticipated annual sales.

For Sublocade, Plaintiff alleges that Defendants misled the public as to their expectations for Medicaid disenrollments and reenrollments. (*Id.* ¶ 99.) According to Plaintiff, Defendants knowingly or recklessly downplayed the impact of Medicaid disenrollments on the sales of Sublocade. (*Id.* ¶ 103.)

### H. Additional Scienter Allegations

To show that Defendants knew they were making false and misleading statements, Plaintiff highlights several sales of stock made by the individuals. (*Id.* ¶ 128.) In March 2024, Defendants made several stock transactions days after the stock vested: CEO Crossley sold 117,197 shares of Indivior stock (*id.* ¶ 130) and CCO Simkin sold 133,735 shares of Indivior stock (*id.* ¶ 136).

## II. LEGAL STANDARDS

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (alteration in original) (quoting *Tobey*, 706 F.3d at 387). But a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678).

A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In considering a motion to dismiss, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

For a Rule 12(b)(6) motion, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal citations omitted). A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citations omitted). The Court may also consider "documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely." *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 656–57 (4th Cir. 2004) (quoting *Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 629 (E.D. Va. 2003)). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the

16

exhibit prevails." *Id.* (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)) (alteration in original).

## III. ANALYSIS

Plaintiff alleges two (2) counts of securities fraud against Defendants: Count I—Violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; and Count II—Violations of Section 20(a) of the Exchange Act against the Individual Defendants. To state a claim for securities fraud under Section 10(b), Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta*, 552 U.S. 148, 157 (2008). The Private Securities Litigation Reform Act ("PSLRA") heightened the pleading standard for securities fraud, requiring a plaintiff to "specify each statement alleged to have been misleading" and the "reasons why." 15 U.S.C. § 78u-4(b). These misleading statements must also be made with sufficient scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). In addition to intentional conduct, scienter can also be satisfied by showing severe recklessness—an act "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999).

17

Plaintiff must establish that Defendants made a "false statement or omission of material fact." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999). Generally, expressions of opinion, puffery, or corporate optimism will often not be actionable unless "it is both factual and material." *Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 386 (4th Cir. 2023). The PSLRA also contains a Safe-Harbor provision that prevents liability for certain forward-looking statements when such statements are "accompanied by meaningful cautionary language" or the plaintiff fails to prove the speaker made the statements with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(i)(1); *id.* § 78u-5(c)(1).

Here, Defendants argue that their statements constitute future performance projections which were not guarantees, were stated in the form of opinions, and ultimately fall within the Safe-Harbor provision. (Mem. in Supp. at 12–13, ECF No. 37.) They also contend that Plaintiff has failed to show the requisite scienter necessary for securities fraud. (*Id.* at 22–27.)

Plaintiff counters that many of the statements contain declarations of false, present facts using phrases such as "remains strong," "we remain confident," "we believe," "had a disproportionate impact," and "have a continuing headwind." (Resp. in Opp'n at 13, ECF No. 38 (quoting Am. Compl. ¶¶ 98, 100, 102, 106, 112).) Additionally, he claims that statements regarding positive prescriber feedback were factual claims, which were demonstrably false. (*Id.* at 16.) Furthermore, Plaintiff contends that CEO Crossley stated the "headwind" from Medicaid disenrollments "*will* go away in the back half [of 2024]"

18

and this is not a forward-looking statement, but instead a guarantee, which is actionable. (*Id.* at 13–14 (emphasis and italics in original).) Moreover, the cautionary language, Plaintiff argues, was not meaningful. Vague, boilerplate disclosures, Plaintiff contends, are insufficient. (*Id.* at 14–15.) And here, Defendants knew their statements were false, the warnings were generic, and they would not have alerted any investors to the actual difficulties Indivior faced. (*Id.* at 14.)

### A. Statements 3, 4, 5, 7, 9, 10, 13, and 15 concerning Sublocade

In general, Statements 3, 4, 5, 7, 9,[4]10, 13, and 15 reflect Defendants' remarks on the impact of Medicaid disenrollment on Sublocade and their revenue projections for that drug. For these statements, Defendants assert several defenses: (1) the statements are opinion statements and inactionable, (Mem. in Supp. at 16); (2) the statements were forward-looking and accompanied by "meaningful cautionary language," (*id.* at 12–14); and (3) the statements were forward-looking, and Plaintiff has not shown they were made with "actual knowledge" of their falsity, (*id.* at 14). In response, Plaintiff argues that (1) Defendants' disclosure of Medicaid disenrollments is overshadowed by the certainty to which Defendants relayed the subsiding headwinds leading into 2024, (Resp. in Opp'n at 8); (2) Defendants' statements were phrased as guarantees, not opinions, (*id.* at 9–10); (3) even if the statements were opinion, Defendants did not earnestly hold those opinions or they had no basis to hold them, (*id.*); (4) the statements were not forward-looking because they were conveying present facts, (*id.* at 12–14); and (5) finally, the statements were

---

[4] Plaintiff does not appear to dispute Statement 9 is insufficient. (*See* Reply at 7 n.6.)

accompanied by vague and boilerplate language, not sufficiently cautionary to entitle

Defendants to the Safe-Harbor protection, (*id.* at 14–15).[5]  The Court addresses each

argument in turn.

### i. Statements of Opinion

Plaintiff asserts that Defendants phrased their remarks as guarantees—not

opinions.  And although Plaintiff acknowledges that Defendants recognized that

Medicaid disenrollments were having a negative impact on Indivior's growth and

revenue, Plaintiff asserts these disclosures were hollow in light of Defendants' certainty

that the negative impact would disappear.  (Resp. in Opp'n at 8.)  But this ignores the

context and content of Defendants' statements.  In response to a question from an analyst

about Medicaid disenrollment, CEO Crossley stated,

> *I think* that's what I would call one factor to the growth.  *I think* we have a
> continuing headwind of the manage – of the Medicaid renewal, continuing
> through to the half year, where then we'll annualize that, and that headwind
> will go away in the back half.  But I think the other elements with regards to
> the cyberattack and things like that, you're thinking of it correctly.  The
> patients should return to treatment either by re-adjudicating with the
> insurance they're in, or if it's Medicaid reentry, they'll go somewhere else to
> get the insurance coverage.  So, that will be a tailwind.

(ECF No. 37-5 at 12 (emphasis added); *see* Statement 10.)  Plaintiff ignores the repeated

prefaces of "I think" and focuses solely on the statement that "headwind *will* go away."

(Resp. in Opp'n at 8.)  But that is an unreasonable read of the statement.  Reading the full

statement in its context, CEO Crossley plainly appears to be expressing his opinion—far

---

[5] The parties also discuss the Truth-on-the-Market defense and other defenses.  (Resp. in Opp'n
at 10–12; Reply at 13.)  However, the Court only addresses those arguments necessary to rule on
the Motion.

from promising or guaranteeing anything. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) ("Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."); *Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) ("The prefatory 'I believe' or 'I think,' for example, conveys that a speaker is sharing a personal belief, not warranting facts. The 'reasonable investor is expected to understand' such a statement 'in its full context.'" (quoting *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019)).

Plaintiff's reliance on Defendants' other statements similarly misses the mark, and the Court finds those statements are also opinions—not guarantees. (*See, e.g.*, Statement 3 (noting that Sublocade growth was "adversely impacted by transitory items, including accelerating Medicaid patient disenrollments," and Defendants "fully expect these items to resolve as the year progresses" and "anticipate an acceleration in [] growth . . . ."); Statement 4 ("The impact of this disenrollment process will annualize at the end of June and therefore this headwind should begin to subside as we move through the second half of the year."); Statement 5 ("With . . . Medicaid renewal annualizing at the end of June, we look forward to subsiding impacts from these transitory items, which we believe are masking the strong underlying demand for Sublocade . . . . "); Statement 7 ("Looking ahead, we expect this trend to begin subsiding in the second half of 2024 . . . .").

In response, Plaintiff contends that these opinions cannot have been earnestly held because Defendants knew them to be false. (Resp. in Opp'n at 9.) But Plaintiff has no evidence of this. Plaintiff points to the confidential witnesses, yet they only discuss

Perseris—not Sublocade. (*Id.* at 9–10.) And as the Court will address, Plaintiff's

argument that CEO Crossley and CCO Simkin made "suspicious" stock sales is

unavailing. *See infra* Section III.E.i. Thus, Plaintiff resorts to arguing that Defendants

simply had no basis to claim that the impact of disenrollments would disappear in the

second half of 2024 because CEO Crossley later disclosed that the impact of

disenrollments was "incredibly, incredibly difficult to forecast," "very complicated to

forecast," and "very tough to forecast." (Resp. in Opp'n at 10; Am. Compl. ¶ 61.) Yet

this argument "amounts to little more than pleading fraud by hindsight." *KBC Asset

Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 613 (4th Cir. 2021) (quoting *In re Triangle

Cap. Corp. Sec. Litig.*, 988 F.3d 743, 753 (4th Cir. 2021)).

At oral argument, Plaintiff highlighted that by April 2024, Defendants had

"received two-thirds of the states' completion data for . . . the Medicaid disenrollments."

(Tr. at 41:5–6, ECF No. 44.) Similarly, in his Complaint, Plaintiff alleges that according

to the Center for Medicare and Medicaid Services' ("CMS") Scheduled State Timelines

for Completing Unwinding-Related Renewals Preliminary Analysis, thirty-two (32)

states had completed their unwinding process—five (5) states by February 2024, twelve

(12) additional states by March 2024, and fifteen (15) additional states by April 2024.

(Am. Compl. ¶ 129.) However, this is directly contradicted by the citation Plaintiff relies

on. In its analysis, CMS states that by March 2024, only five (5) states had completed

their unwinding process and by April 2024, an additional twelve (12) states completed

theirs. (*Id.* ¶ 129 n.13 (citing Center for Medicare and Medicaid Services, *Scheduled

State Timelines for Completing Unwinding-Related Renewals*, 5 (May 31, 2024),

https://www.medicaid.gov/resources-for-states/downloads/sst-cmpltng-unwndng-rnwls-prlmnry-anlys-05312024.pdf).) Thus, by April 25, 2024, at best, CEO Crossley only had information for seventeen (17) states. Also, the CMS analysis recognizes that the "completion" data does not include "certain populations whose renewals were extended due to state implementation of [] waivers, mitigation plans, concurrence requests, or other authorities." (*Id.*) And it notes that "state timelines for completing *all* unwinding-related renewals may be later than dates included in" the data. (*Id.* (underline and italics in original).) But most notably, the CMS analysis was released on May 31, 2024, well over a month after the allegedly misleading statements. Therefore, Plaintiff offers no grounds beyond hindsight allegations for the Court to find that CEO Crossley lacked a basis to hold the impact of Medicaid disenrollments would subside.

### ii. The Safe-Harbor Provision

Defendants assert that Statements 3, 4, 5, 7, 9, 10, 13, and 15 are also not actionable because they fall within the PSLRA's Safe-Harbor provision as forward-looking statements which are accompanied by "meaningful cautionary" language or not made with actual knowledge of their falsity. (Mem. in Supp. at 12–14.) Conversely, Plaintiff argues that "[r]ead in their entirety, all of the statements contain both present and future statements and are not entitled to safe harbor protection." (Resp. in Opp'n at 13.) The Court again disagrees with Plaintiff's characterization of the statements. As the Court of Appeals for the Fourth Circuit has held, the use of present tense does not automatically "prohibit the Safe-Harbor Protection from applying" if that language "cannot 'meaningfully [be] distinguished from' Defendants' goals." *MacroGenics*, 61

F.4th at 389 (alternation in original).  And thus, "the statement[s]—read in [their] entirety—[are] forward-looking."  To escape this conclusion, Plaintiff takes a piecemeal approach and clings to any present tense word or phrase in the statements.

Plaintiff points to Statement 3 where CEO Crossley notes that "[t]he underlying demand for [Sublocade] remains strong and our strategy to expand prescribing in the justice system is delivering excellent results."  (Resp. in Opp'n at 13 (quoting Am. Compl. ¶ 98).)  This statement certainly offers a fact—that Sublocade demand remains strong and the strategy to expand is successful.  But Plaintiff never avers that Indivior's "strategy to expand prescribing in the justice system" did not deliver "excellent results."  Instead, Plaintiff contends that CEO Crossley misrepresented the impact of Medicaid patient disenrollments and, therefore, had "no basis to reconfirm guidance of Sublocade net revenue of $820 million to $880 million in 2024."  (Am. Compl. ¶ 99.)

"[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."  *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 626 (D. Md. 2010) (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).  Yet here, the "part of the statement that refers to the present"—the delivery of excellent results—is not in dispute.  The part that is in dispute—the impact of Medicaid disenrollments and the reconfirmation of net revenue—is prefaced with forward-looking language including "expect" and "anticipate."  *See MacroGenics*, 61 F.4th at 389 ("Although Defendant's statement uses "anticipate" in the present tense, the verb itself has a forward-looking definition.").  Each allegedly misleading statement fares similarly.

24

In each statement, Plaintiff points to present tense language that is either not in dispute or a is classic expression of opinion.   In Statement 4, he quotes and emphasizes the part where CEO Crossley "points to external forces that negatively impacted Sublocade's net revenue growth, and 'provide[d] more color on how each of these *impacted* Sublocade's growth in the quarter and why we *remain* confident in our [FY] 2024 net revenue guidance.'" (Resp. in Opp'n at 13 (quoting Am. Compl. ¶ 100 (emphasis added)).)  But Plaintiff does not assert that CEO Crossley misrepresented the historical impact of Medicaid disenrollment—such as seeing "higher-than-expected number of patient disenrollments over 20 million," (Am. Compl. ¶ 100) which CEO Crossley goes on to discuss—but that he misrepresented the future impact of Medicaid disenrollment.  In Statement 5, Plaintiff points to an opinion.  (Resp. in Opp'n at 13 (citing Am. Compl. ¶ 102 ("[W]e believe [subsiding impacts from transitory items] are masking the strong underlying demand for Sublocade.")).)  In Statement 7, Plaintiff points to the disclosure that "Medicaid disenrollment dynamics *had* a disproportionate impact on our company as more than two-thirds of Sublocade patients are covered by Medicaid.  This impact *accelerated* in Q1, beyond the low single-digit headwind we *had* seen in prior quarters." (Resp. in Opp'n at 13 (quoting Am. Compl. ¶ 106 (emphasis added)).)  But again, this is not alleged to be false.  (*See* Am. Compl. ¶ 107 (identifying only the "statement that 'we expect' the trend of Medicaid disenrollments to 'begin subsiding in the second half of 2024' [to be] materially false and misleading").)

In Statement 10, Plaintiff emphasizes that CEO Crossley said, "we have a continuing headwind" and "we've got a few additional tailwinds." (Am. Compl. ¶ 112.)

However, once again, Plaintiff does not argue Indivior did not face headwinds—i.e., challenges—when it came to Medicaid disenrollment.[6] Nor does Plaintiff assert the absence of tailwinds. Instead, he contends that the prediction that the "headwind will go away in the back half" was false and misleading. (*See id.* ¶ 113.) But this prediction is clearly forward-looking.

Finally, Plaintiff asserts that even if the statements are forward-looking, they are not accompanied by meaningful cautionary language. (Resp. in Opp'n at 14.) He argues that the warnings Defendants provided amount to no more than "hollow, generic statements," that the statements were "vague and boilerplate," and ultimately, that they were "not sufficiently tailored to the specific risks surrounding the effects of the Medicaid disenrollments or Sublocade's prospects to serve as a meaningful caution." (*Id.*) Although some of Defendants' language was certainly vague and boilerplate—as one would expect—the Court finds that Defendants' statements were accompanied by sufficiently meaningful cautionary language that was "tailored to the specific risks the company face[d]." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 121 (D. Md. 2021), *aff'd*, 31 F.4th 898 (4th Cir. 2022); (*see e.g.*, ECF No. 37-3 (detailing Defendants' cautionary disclosures).[7]

---

[6] The Court fails to see how he could since the theory of the case rests on Indivior experiencing challenges from Medicaid disenrollment.

[7] Plaintiff suggests that whether there was meaningful cautionary language is a question of fact. (Resp. in Opp'n at 14 (citing *Ollila v. Babcock & Wilson Enters., Inc.*, No. 3:17-CV-109, 2018 WL 792069, at *5 (W.D.N.C. Feb. 8, 2018)).) Although there may be instances where the adequacy of cautionary language is close and best suited for a trier of fact, "Congress apparently intended the applicability of the safe harbor to be addressed even on a motion to dismiss." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (citing 15 U.S.C. § 78u-5(e)

Defendants repeatedly cautioned investors that their statements included forward-looking remarks which were subject to numerous variables and that actual results may differ. (*See* ECF No. 37-3.) These variables included "healthcare laws and regulations, requirements imposed by regulatory agencies and payments and reporting obligations under government pricing programs," Indivior's "dependence on third-party payors for the reimbursement of [its] products and the increasing focus on pricing and competition in [the] industry," and "the significant amount of laws and regulations that [Indivior is] subject to," among many others. (ECF No. 37-7 at 8.) Defendants further explained that Medicaid disenrollment, in particular, may adversely affect the company. (ECF No. 37-4 at 28 (noting Indivior "may also be adversely affected by disenrollments from . . . Medicaid.").) Because of its impact on the company, Defendants specifically explained the impact of the Inflation Reduction Act, the Families First Coronavirus Response Act, and the Consolidated Appropriations Act on Medicaid disenrollments and what these recent laws meant for the company.[8] (*See id.*) This included the notable aspect that "millions of people are expected to lose Medicaid which could reverse recent gains in coverage." (*Id*; *accord* ECF No. 10 (detailing HHS "administrative churning" scenarios).)

---

(instructing *courts* to consider "any cautionary statement accompanying the forward-looking statement" upon a motion to dismiss based on the Safe-Harbor provision)), *abrogated in part by Tellabs*, 551 U.S. 308; *see In re Marriott Int'l*, 543 F. Supp. 3d at 126 ("[The Court] may properly consider the cautionary statements on a motion to dismiss in appropriate circumstances.")

[8] Defendants apparently explained the legislation and its impact so well that Plaintiff found it sufficient to include the disclosures—nearly word-for-word—as background in his Complaint. (*Compare* Am. Compl. ¶¶ 35–38, *with* ECF No. 37-4 at 27, 100.)

Defendants also never hid the fact that 70% of Indivior's patients are covered by Medicaid and the company's growth was "negatively impacted by . . . a higher-than-expected rate of Medicaid patient disenrollments." (Am. Compl. ¶ 100.)  And because Indivior relies so heavily on Medicaid patients, the Medicaid disenrollment process would inevitably have a "disproportionate impact" on the company.  (*Id.* ¶ 106.)  As CFO Preblick noted in February 2024, Medicaid disenrollment and reenrollment was a "dynamic" the company would "continue to monitor . . . during the year."  (*Id.* ¶ 43.)

Despite all of these "'extensive, specific and tailored' [warnings] to the 'very complaints' Plaintiff[] raise[s]," he continues to insist they were not enough.  *See MacroGenics*, 61 F.4th at 390 (quoting *Paradise Wire*, 918 F.3d at 319).  Under Plaintiff's theory, the only way for Defendants to satisfy their duty to investors was to disclose that Medicaid disenrollment was incredibly difficult to predict.  But this is more than the Safe-Harbor provision requires.

The Safe-Harbor provision applies so long as the forward-looking statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. 78u-5(c)(1)(A)(i).  And on this record, the Court finds Defendants' "language adequate under 15 U.S.C. § 78u–5(c)(1)(A)(i) because it provided meaningful, extensive, and specific caution directly related to the statements concerning" Medicaid disenrollment. *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010) (cited approvingly in *MacroGenics*, 61 F.4th at 389).

**B. Statements 1 and 6 concerning Perseris**

But before addressing Statements 2, 8, 12, 14, and 16 concerning Perseris, the Court must address Statements 1 and 6 because Plaintiff's principal contention centers around the content of those two (2) statements—namely, the positive feedback from prescribers about Perseris.

Defendants argue that Statements 1 and 6 are vague expressions of opinion that are not actionable. (Mem. in Supp. at 18–19.) Although CEO Crossley represented that Indivior was receiving positive feedback, Defendants contend that he did not represent that *all* feedback was positive. (*Id.* at 19.) And the public, Defendants emphasize, understood other pharmaceuticals, like Uzedy, had competitive advantages over Perseris. (*Id.*)

Plaintiff asserts that—as attested to by the confidential witnesses—feedback from Perseris was overwhelmingly negative, and CEO Crossley was aware of this. (Resp. in Opp'n at 15–16.) So when CEO Crossley told investors that prescriber feedback was positive, he was uttering misleading "half-truths." (*Id.* at 17.) And when "an executive makes positive statements about a company's prospects, the nondisclosure of related negative information that the executive is aware of constitutes an actionable omission." (*Id.* (citing *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 518–20 (D. Md. 2022)).) Additionally, Plaintiff contends that the statements are not vague because whether Defendants received positive or negative feedback is objectively verifiable. (*Id.*) For that same reason, Plaintiff argues that the statements cannot be opinions. (*Id.*) Finally, Plaintiff highlights that although Uzedy's needle size and competitive features were

29

known to the public, there was no publicly available source disclosing that prescriber feedback was persistently negative. (*Id.* at 19.)

During an earnings call on February 22, 2024, CEO Crossley stated that Indivior continues "to believe in the potential of [Perseris] . . . based on its differentiated clinical profile and strong feedback we get from clinicians." (Statement 1.)  At the following earnings call on April 25, 2024, he similarly stated that Indivior continues "to highlight Perseris' unique product profile, which continues to result in positive anecdotal prescriber feedback on product performance." (Statement 6.)

"An enterprise in the process of raising capital will naturally seek to present itself in a positive light.  But the law recognizes that not all self-promotion is actionable, nor does Rule 10b-5 exist to 'purge the market of all optimism.'" *Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) (quoting *Xia Bi v. McAuliffe*, 927 F.3d 177, 183 (4th Cir. 2019)).  Accordingly, the Fourth Circuit routinely recognizes that "'immaterial boasting and exaggerations' will generally not constitute fraud." *Id.* (quoting *Xia Bi*, 927 F.3d at 183).  The relevant standard is whether "a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision." *In Re Marriot Int'l*, 31 F.4th 898, 902 (4th Cir. 2022) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999)).  Applying this standard, it is clear that no reasonable investor would make an investment decision based on CEO Crossley's vague and optimistic passing statements of "strong feedback" and "positive anecdotal prescriber feedback."

First, the statements offer "no meaningful, objective data that an investor would rely upon." *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (quoting *Billhofer v. Flamel Techs., S.A.*, No. 07 CIV. 9920, 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)); *see also Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036–37 (N.D. Cal. 2012) (finding "getting really great feedback" was merely a "feel good" and puffery statement "which investors do not rely [on] when valuing corporations").[9] CEO Crossley's use of the phrase "strong feedback" does not communicate to a reasonable investor whether the feedback was positive, negative, or constructive. And the phrase ultimately lacks the sentiment, substance, or specifics necessary for an investor to reasonably rely on it. "Positive anecdotal prescriber feedback" fares no better. Although the phrase communicates that some feedback was positive, it still lacks "quantitative metrics, qualitative comparisons, or other specifics." *See Boykin*, 54 F.4th at 183. In the final analysis, "it is not actionable for a company to give positive descriptions of what it reasonably believes to be its strengths." *Id.*

Yet Plaintiff contends Defendants had no reasonable basis to believe feedback was positive since Perseris feedback was overwhelmingly negative, not positive. And by opening the discussion of prescriber feedback, Defendants were obligated to disclose the full truth. However, although omissions and half-truths may be actionable, "[a]n opinion

---

[9] Although not binding, the Court finds the rationale in these particular decisions persuasive.

'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *MacroGenics*, 61 F.4th at 388 (quoting *Omnicare, Inc.*, 575 U.S. at 189–90).

Based on Plaintiff's confidential witnesses, Perseris struggled to sell, and sales representatives struggled to meet their sales goals largely due to Uzedy's needle and administration advantages. However, Plaintiff does not demonstrate how these details undercut the view that Perseris's "differentiated clinical profile" and "unique product profile" did in fact give rise to "strong feedback" and "positive anecdotal prescriber feedback *on product performance*." (Statement 1; Statement 6 (emphasis added).) Although Plaintiff asserts that Defendants misled investors that Perseris was capturing a disproportionate share of the New-to-Brand Prescription market, he fails to present any factual allegations indicating that this claim was inaccurate. *See infra* Section III.D. Plaintiff also does not dispute that Perseris had a differentiated and unique profile which was supported by market research. (*See* ECF No. 37-16 at 47 (noting Perseris's differentiated profile).) In sum, Plaintiff fails to adequately allege that Defendants were withholding facts which so overwhelmingly undercut their statements that they were obligated to disclose them. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("Moreover, it bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" (quoting 17 C.F.R. § 240.10b-5(b)).).

32

Additionally, Plaintiff ignores the cautionary remarks that *did* accompany the feedback statements. In Statement 1, CEO Crossley began by highlighting that "it is fair to say that we did face some significant challenges in the last couple of quarters of 2023 as a result of competitive pressures from a well-funded new market entrant"—namely, Uzedy. (Am. Compl. ¶ 94.) Similarly, in Statement 6, CEO Crossley commented that "competition has intensified in the risperidone LAI category" and it was against this backdrop that Indivior continued to highlight Perseris's "unique product profile." (*Id.* ¶ 104.) Ultimately, Defendants were candid that Perseris faced struggles and tough competition. And "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," *Omnicare*, 575 U.S. at 190, the Court does not find that Defendant's "expressions of enthusiasm and use of superlatives" would materially mislead a reasonable investor, *see Xia Bi*, 927 F.3d at 183.

### C. Statements 2, 8, 12, 14, and 16 concerning Perseris

Plaintiff does little to distinguish Statements 2, 8, 12, 14, and 16—which reaffirmed revenue guidance for Perseris—from the forward-looking statements concerning Sublocade. (*See* Resp. in Opp'n at 16 n.6.) The core addition to Plaintiff's argument is that "statements like #6, #8, and #12 expressing 'confidence' in PERSERIS's net revenue guidance ([Am. Compl.] ¶¶ 104, 108, 117), or charts like #14 and #16 depicting PERSERIS's net revenue guidance ([*Id.*] ¶¶ 121, 124), are actionable because—as Defendants were aware ([*Id.*] ¶ 77)—there was persistent *negative* physician feedback concerning PERSERIS, and negative impact from the IRA on PERSERIS reimbursements, that rendered any 'confidence' in PERSERIS's net revenue guidance

completely unjustified." (Resp. in Opp'n at 18.) But as the Court found with the

Sublocade statements, the Court finds that Statements 2, 8, 12, 14, and 16 are forward-

looking statements which were accompanied by meaningful cautionary language. *See* 15

U.S.C. § 78u-5(c)(1).

Statements 2, 8, 12, 14, and 16 include comments by Defendants that they "remain

confident" in revenue projections and other remarks during presentations wherein

Defendants reaffirm revenue projections. They fit the classic definition of forward-

looking statements under the PSLRA. *See id.* § 78u-5(i)(1) (defining a forward-looking

statement as "a statement containing a projection of revenues" and "a statement of future

economic performance"). Additionally, the statements were accompanied by "extensive,

specific, and tailored" warnings. *See Paradise Wire*, 918 F.3d at 319.

First, as the Court has discussed, Defendants prefaced Statements 1 and 6 with

comments that Perseris faced "some significant challenges" from Uzedy and that

competition in general "has intensified." *See supra* Section III.B. Contrary to Plaintiff's

contention that Defendants "hid from investors that the competition was eating their

lunch," Defendants openly admitted it. (*See* Resp. in Opp'n at 16.)

Second, as with Sublocade, Defendants also cautioned investors with general

warnings. For example, Defendants stated that revenue projections were subject to

numerous variables including healthcare laws, "requirements imposed by regulatory

agencies and payments and reporting obligations under government pricing programs,"

"market acceptance of [Indivior's] products as well as [Indivior's] ability to

commercialize [its] products and compete with other market participants," and Indivior's

"dependence on third-party payors for the reimbursement of [its] products and the increasing focus on pricing and competition in [the] industry," among many others. (ECF No. 37-7 at 8.) Defendants also disclosed that Indivior "depend[s] on [its] ability to commercialize our products and acceptance of [its] products by physicians, patients, and healthcare payers," and the company "operate[s] in a highly competitive industry." (ECF No. 37-4 at 9.)

Furthermore, Defendants warned investors that the products may be rendered obsolete in the future:

> The pharmaceutical and biotechnology industries are also characterized by continuous product development and technological change. ***Our products could, therefore, be rendered obsolete or uneconomic through the development of new products with unique advantages*** (including, e.g., new chemical entities that may be safer, more effective or more convenient than our products) or by technological advances in manufacturing or production by our competitors. In particular, ***several of our branded products face competition from generic products in key markets as well as competition from alternative products or treatments.*** Among other things, ***competition could continue to require us to increase further the level of rebates and other offsets to gross revenues, particularly in our U.S. operations, and could impact potential volume growth of any particular product, which could reduce our net revenues and therefore our results of operations in future periods.***

(*Id.* at 24 (emphasis and italics added).)

And as the Court previously discussed, Defendants explained the Inflation Reduction Act and its potential impact on the company. *See supra* Section III.A; (ECF No. 37-4 at 28, 45, 108.) Finally, Defendants expressly warned investors that "Perseris ***faces competition from other long-acting injectables, including existing products from***

*competitors such as* Johnson and Johnson, Otsuka, *Teva* and Alkermes, as well as

potential future entrants, in addition to a heavily genericized oral market."

(*Id.* at 84 (emphasis and italics added).)

In light of all of these warnings, the Court finds that Defendants provided

"meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the forward-looking statement." 15 U.S.C.

§ 78u-5(c)(1)(A)(i). The accounts from Plaintiff's confidential witnesses support this

conclusion.

CW-2 states that CFOs from hospitals began complaining about the impact of the

Inflation Reduction Act on Medicaid and Medicare reimbursements in January 2024.

(Am. Compl. ¶ 77.) And because of the IRA's impact, CW-2 began hearing threats from

customers that they would stop using Perseris and switch to generic versions. (*Id.*) The

disclosures addressed these issues. They specifically warned that the IRA, the Patient

Protection and Affordable Care Act, and section 340B of the Public Health Services Act

have had, or will have, an impact on rebates, reimbursements, and overall prices of

pharmaceuticals. (*See* ECF No. 37-4 at 108.) And although "Perseris enjoy patent

protection, [it] faces competition from other long-acting injectables, including . . . Teva, .

. . [and] a heavily genericized oral market." (*Id.* at 84.) Additionally, while Defendants

did not warn investors that Uzedy was a better product due to its thinner needle and easier

administrability, they noted strong competition from Uzedy which CEO Crossley

described as "a well-funded new market entrant." (Statement 1.)

For these reasons, the Court finds that Statements 2, 8, 12, 14, and 16 are protected under the Safe-Harbor provision.

### D. Statement 11 concerning Perseris New-to-Brand Prescriptions

At an analyst presentation on May 23, 2024, CCO Simkin presented a slide which stated that Perseris was capturing a disproportionate share of NBRx or New-to-Brand Prescriptions for LAI pharmaceuticals to treat schizophrenia. (Statement 11.) Plaintiff asserts that this was materially false and misleading because CW-5 indicated that Perseris was not gaining a disproportionate share of the LAI market and Perseris was "a tough drug to sell" drug. (Am. Compl. ¶¶ 87–89, 116.) Defendants contend that CCO Simkin's statement is "too vague to be actionable, especially where Plaintiff does not allege the accompanying data is false." (Mem. in Supp. at 18 n.11.) In response, Plaintiff argues in his brief that "Plaintiff[] do[es] claim that the data in Statement 11 [was] false—the AC alleges based on statements by CW-5 that PERSERIS was not in fact capturing a disproportionate share of the New-to-Brand Prescriptions market." (Resp. in Opp'n at 21.) But the Court cannot find where the record supports this allegation.

According to the Amended Complaint, CW-5 indicated that Perseris was not gaining a disproportionate share of the LAI market. (Am. Compl. ¶ 88.) The slide presented to analysts claims that Perseris is capturing a disproportionate share of New-to-Brand Prescriptions—of the LAI market. (*Id.* ¶ 115.) It also claims that the growth of the LAI market is driven by a large percentage of New-to-Brand Prescriptions. (*Id.*) Neither of those claims posit that Perseris is gaining a disproportionate share of the broader LAI market. Instead, the claims posit that of the broader LAI market, Perseris is

37

capturing a disproportionate share of a subset market—namely, the New-to-Brand

Prescription market. In other words, CW-5's claims and Defendants' claims are not

inconsistent; they are speaking about different markets. Plaintiff cannot overcome this by

mischaracterizing the Amended Complaint in his brief in opposition. *See Com. of Pa. ex*

*rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that

the complaint may not be amended by the briefs in opposition to a motion to dismiss."

(alternations in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

1107 (7th Cir.1984), *cert. denied,* 470 U.S. 1054 (1984))). Because Plaintiff does not

allege facts showing that Statement 11 contains anything false or misleading, he fails to

state a claim.

### E. Allegations of Scienter

To survive a motion to dismiss, Plaintiff must "state with particularity facts giving

rise to a strong inference," 15 U.S.C. § 78u-4(b)(2), of "'intentional misconduct' or such

'severe recklessness' that the danger of misleading investors was 'either known to the

defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli v.*

*Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (quoting *Ottmann v. Hanger*

*Orthopedic Grp., Inc.*, 353 F.3d 338, 343–44 (4th Cir. 2003) (internal quotations

omitted)). The Fourth Circuit has emphasized that "raising a 'strong inference' of

scienter is no small burden," and "an inference of scienter can only be strong—and

compelling, and powerful—when it is weighed against the opposing inferences that may

be drawn from the facts in their entirety." *Id.* (citing *Tellabs*, 551 U.S. at 323).

Accordingly, the test the Supreme Court has prescribed is that "[a] complaint will survive

. . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

Plaintiff asserts that he has satisfied this stringent test. First, Plaintiff contends that he has alleged facts that implicate each Individual Defendant. He highlights that several confidential witnesses remarked "that physicians regularly shared negative feedback with them concerning Perseris's competitive disadvantages, including a larger needle size, fewer dosing options, and mixing requirements." (Resp. in Opp'n at 22.) And CEO Crossley was aware of this feedback by virtue of his position, access, and direct communications with physicians. (*Id.*) Thus, when CEO Crossley remarked that Perseris was receiving positive feedback, this statement contradicted his personal knowledge that Perseris was receiving negative feedback. Additionally, Plaintiff asserts that because CEO Crossley admitted in July 2024 that Medicaid disenrollments were difficult to forecast and he was monitoring the renewal process, this reveals that he never had a basis to forecast in the first place. (*Id.* at 24.)

Plaintiff makes similar arguments for CFO Preblick and CCO Simkin. He argues that the confidential witnesses noted issues with drug pricing under the IRA and this information was passed along to executives, including CFO Preblick, during sales calls and other meetings. (*Id.* at 24–26.) And CCO Simkin worked with Preblick to determine Perseris sales goals. So, according to Plaintiff, CCO Simkin acquired "the knowledge of reduced Perseris reimbursements . . . from working with Preblick to determine Perseris sales goals." (*Id.* at 26.)

39

Plaintiff also contends that the close proximity in time between Defendants reaffirming revenue guidance in May 2024 and June 2024 and Defendants revising revenue guidance on July 8, 2024, support scienter. (*Id.* at 26–27.) Although Plaintiff recognizes that close proximity alone may be insufficient to find scienter, he highlights that "proximity is just one piece of Plaintiff's holistic analysis." (*Id.* at 27.) Moreover, Plaintiff argues that since Sublocade was the core of Indivior's business, the Court can impute knowledge of Sublocade's difficulties onto the Individual Defendants. (*Id.*) Plaintiff further argues that where Defendants made their statements—namely, investor conference calls and presentations—adds to an inference of scienter. Finally, Plaintiff asserts that CEO Crossley's and CCO Simkin's stock sales were suspicious. In March 2024, CEO Crossley sold 57% of his Indivior shares and CCO Simkin sold 53% of his Indivior shares. (*Id.* at 28 (citing Am. Compl. ¶¶ 132, 136).) The timing is suspicious because, according to CW-2, the issue of reduced Perseris reimbursements became a regular topic of discussion at meetings beginning in March 2024 and CFO Preblick occasionally attended those meetings. (*Id.* at 29.) And according to Plaintiff, the fact that the shares CEO Crossley and CCO Simkin sold had just vested is irrelevant because they "could have held their shares." (*Id.*)

Despite Plaintiff's many arguments, the Court finds none of them availing. Looking at the facts holistically, the Court finds they do not raise a "strong inference" of scienter. To begin, Plaintiff fails to identify a plausible motive for Defendants. And although Plaintiff is not required to "put forward any plausible motive for why Defendants sought to defraud investors," "it 'weighs heavily' against [him] in the scienter

analysis." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 242 (4th Cir. 2023) (quoting *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021)).

### i. CEO Crossley's and CCO Simkin's Stock Transactions

The only motive Plaintiff offers—the "suspicious" stock sales—is implausible. Both CEO Crossley and CCO Simkin received stock that was subject to a multi-year vesting period. (*See* ECF Nos. 17–22.) In March 2024, these vesting periods ended and CEO Crossley and CCO Simkin could sell their stock. Within days, they did. "Although the profits realized by [Defendants] were significant relative to their base salaries, these proceeds were the result of accumulated stock options and were an intended part of their overall compensation package." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999). Plaintiff counters that CEO Crossley and CCO Simkin *could* have held their stock. And because they did not, the sales are suspicious. Indeed, according to Plaintiff, CEO Crossley and CCO Simkin would be "irrational" to sell their stock if they anticipated it to rise in price. (Tr. at 43:20.) But executives sell stock for many reasons, including so they can pay taxes, reinvest proceeds, diversify their investment portfolio, or simply spend the money. Here, the brief time period between the stocks vesting and their sale indicates that one of the several innocent explanations is most compelling.[10] Contrary facts could prove otherwise, but Plaintiff offers none. Therefore, without

---

[10] For example, CEO Crossley received 91,204 shares on March 5, 2024. (ECF No. 18.) On March 14, 2024, he sold exactly 91,204 shares. (ECF No. 19.) Similarly, CEO Crossley received 15,444 shares on March 15, 2025, and that same day, he sold 15,444 shares. (*Id.*)

anything "unusual or suspicious" about the stock sales, Plaintiff fails to show any motive behind the alleged fraud, and this weighs heavily against him. *See San Antonio Fire & Police*, 75 F.4th at 242; *see also In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (finding *di minimis* stock sales insufficient to establish scienter).

### ii. Allegations of Scienter Concerning Sublocade

Plaintiff offers little to support the finding of scienter with respect to Sublocade. First, Plaintiff relies on CEO Crossley's statements that the Medicaid disenrollment process was "very tough to forecast." But as the Court has explained, this is little more than pleading in hindsight. *See supra* Section III.A.i. Next, Plaintiff offers the temporal proximity between the misleading statements throughout February and June and the negative disclosure in July. But the Court cannot "draw a strong inference of scienter based *solely* on there being a short amount of time between positive announcements and statements announcing negative financial information." *KBC Asset Mgmt. NV*, 19 F.4th at 612. To avoid relying solely on temporal proximity, Plaintiff points out that Sublocade was the core of Indivior's business. Although true, it is just as insubstantial as his first argument. "To be sure, such allegations are relevant to the court's holistic analysis of scienter. But without additional detailed allegations . . . the [C]omplaint falls short of the PSLRA's particularity requirements." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014) (emphasis added). Plaintiff attempts to build his case regarding Sublocade with broad, generalized facts that could apply in nearly any circumstance. But the PSLRA requires more. It requires Plaintiff to "state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2) (emphasis added); *see Tellabs*, 551 U.S. at 314.  Plaintiff falls far

short of doing so.[11]

### iii. Allegations of Scienter Concerning Perseris

Turning to Perseris, the Court again finds that Plaintiff fails to present "strong

inferences" of scienter.  Plaintiff relies heavily on eight (8) confidential witnesses, but

their testimony remains insufficient to prove his case.  Several witnesses state that they

never met their sales goals for Perseris, and as far as they know, sales for Perseris never

hit the annual quota.  But Plaintiff never alleges Defendants misled investors into

believing Perseris was meeting its sales goals.  In addition, the confidential witnesses are

conspicuously silent on what the sales goals were.  The Court can only speculate whether

the annual quota matched or exceeded Indivior's revenue projections.  Without more

details, the Court cannot draw any inferences with respect to scienter based on the

knowledge that Indivior did not meet unspecified sales goals.

The confidential witnesses also highlight that they received complaints regarding

Perseris's larger needle and more frequent dosage.  But again, Plaintiff never alleges that

Defendants misled investors about this issue.  On the contrary, Defendants warned

investors that Uzedy was a strong competitor of Perseris.  (*See* Statement 1.)  The same

applies to IRA reimbursements, about which Plaintiff never alleges Defendants misled

investors.

---

[11] Although Plaintiff presents several confidential witnesses, none of them discuss Sublocade.

At best, Plaintiff establishes that Defendants knew Perseris was struggling to sell and that sales representatives were receiving negative prescriber feedback compared to Uzedy. But the Court must assess whether Plaintiff pled facts that show Defendants' intent or recklessness "to deceive, manipulate, or defraud." *See Tellabs*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12 (1976)). The Court finds that simply knowing Perseris was struggling to compete against Uzedy does not give rise to "strong—and compelling, and powerful"—inference of scienter. *Cozzarelli*, 549 F.3d at 624 (citing *Tellabs*, 551 U.S. at 323). Accordingly, the Court holds that Plaintiff has failed to adequately plead that Defendants acted with the requisite scienter.

### F. Count II—"Control-Person" Claim

"[S]ection 20(a) is the vehicle for imposing liability on control persons. The liability of a control person under section 20(a) is derivative of—and dependent upon— liability of a controlled person under section 10(b). Thus, if the complaint 'is legally insufficient with respect to the [section] 10(b) claim, the [derivative section] 20(a) claim must also fail.'" *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018) (citation omitted) (quoting *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014)). Because the Court finds that Plaintiff fails to adequately allege a claim under Section 10(b), Count II also fails.

### IV. CONCLUSION

In the final analysis, the Court finds that the challenged statements are not actionable or subject to the PSLRA's Safe-Harbor provision. In addition, the Court finds that Plaintiff has not met the heightened pleading standard for securities fraud.

Accordingly, for the reasons stated herein, Defendants' Motion to Dismiss will be granted. The Court maintains serious doubts as to whether Plaintiff can sufficiently amend his Complaint, however, the Court will grant Plaintiff's request for leave to amend. Plaintiff shall have thirty (30) days from the entry of this Memorandum Opinion and accompanying Order to once again amend his Complaint. Failure to amend will result in dismissal with prejudice. *See Britt v. DeJoy*, 45 F.4th 790, 796–97 (4th Cir. 2022); *Ballard v. Carlson*, 882 F.2d 93, 95 (4th Cir. 1989).

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: August 6, 2025
Richmond, Virginia